DBJABAR1ps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          (S1) 13 CR 365 (KPF)

5   RUDOLPH BARTEE,

6              Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           November 19, 2013
9                                          9:05 a.m.

10  Before:

11                 HON. KATHERINE POLK FAILLA

12                                         District Judge

13                        APPEARANCES

14  PREET BHARARA
         United States Attorney for the
15       Southern District of New York
    BY:  BRENDAN F. QUIGLEY, ESQ.
16       JEFFREY A. BROWN, ESQ.
         Assistant United States Attorneys
17

18  FEDERAL DEFENDERS OF NEW YORK INC.
         Attorneys for Defendant
19  BY:  JULIA L. GATTO, ESQ.
         JONATHAN A. MARVINNY, ESQ.
20

21  Also Present:  Richard Busick
                   Special Agent
22                 Federal Bureau of Investigation

23                 Lia McInerney
                   Paralegal, U.S. Attorney's Office
24
                   Alexandra Katz
25                 Paralegal, Federal Defenders of New York Inc.

1          (Trial resumed; jury not present)

2          THE COURT:  Just two housekeeping matters, please,

3     while Jose is getting the jury.

4          Ms. Gatto, based on your comments yesterday, we

5     thought about Mr. Vulcano and what we could do for him.  And so

6     we've given him the number to chambers to give to his wife so

7     that if anything were to happen and she were to go into labor,

8     she can call immediately and we would have someone let us know

9     immediately that something is happening.  So he is much calmer

10     and happier as a result of having told his wife about that.  I

11     think, as a result -- I knew he was going to pay attention, but

12     now I really know he is going to pay attention because that

13     particular issue has been resolved.

14          Secondly, I asked both parties for this:  I will need

15     the occasional nudge if you would like me to read a limiting

16     instruction.  I've got two here.  I have a sense when they

17     should be read, but I don't mind if the parties say, your

18     Honor, if you would read the limiting instruction right now.  I

19     will do so.  So that's what we've got.

20          And then who is our first witness this morning?

21          MR. QUIGLEY:  Your Honor, the first witness will be

22     Agent Corey Walsh from the FBI.

23          THE COURT:  Thank you.  Is there anything to discuss

24     with me before the witness testimony begins?

25          MR. QUIGLEY:  Just one thing briefly, your Honor.

DBJABAR1ps

1          THE COURT:  Yes.  Go ahead.

2          MR. QUIGLEY:  Last night we entered into a stipulation

3   with the defense on the admissibility of photographs.

4   Basically, all photographs that were taken on taken of 715

5   Hollywood Avenue on May 7th, we would -- what we intend to do

6   is, early on in Agent Walsh's testimony, offer that stipulation

7   and publish it, and then we would just publish the photos as

8   they come up in the direct examination.  I just wanted to make

9   sure the Court was OK with that.

10         THE COURT:  No, I was.  I saw the stipulation.  So I

11  assume after you'll be reading the stipulation then I would be

12  admitting into evidence both the, I guess it's 901, whatever

13  the stipulation number is, and -- 905?

14         MR. QUIGLEY:  Correct.

15         THE COURT:  -- and then the exhibits that are

16  referenced within the stipulation.

17         MR. QUIGLEY:  Right.  And then after that, we would

18  just, I would come back here and we would publish Government

19  66.  Whatever photos are in that range as they come up in

20  testimony, they will be published on the screen.

21         THE COURT:  That's fine by me.  The other thing is, I

22  don't know how every other judge does it, but if you tell me

23  once that you're going to be approaching the witness, you'll

24  have an "understanding" that you can approach the witness

25  without asking each time.

1          MR. QUIGLEY:  OK.  Thank you, your Honor.

2          THE COURT:  Thank you.

3          Mr. Lopez, are you ready?

4          MS. GATTO:  Yes, your Honor.  I'm sorry, your Honor --

5          THE COURT:  Oh, Ms. Gatto.

6          MS. GATTO:  If I could just go to the bathroom one

7     moment, if there is a moment.

8          THE COURT:  That's fine.  Go ahead.

9          MS. GATTO:  Thank you.

10          (Pause)

11          THE COURT:  May I just ask the parties whether they

12     have tested the nifty screens that are for use here to make

13     sure they work.

14          MR. QUIGLEY:  We have not, your Honor.

15          MR. MARVINNY:  We have not.

16          THE COURT:  Oh, no.  I'm sure they're on.  I guess the

17     question is, has anyone tried to display anything to see if it

18     works?  That's what's in my mind.

19          MR. MARVINNY:  They are not, it is not showing.

20          THE CLERK:  I think I might be able to turn them on

21     here.

22          MR. MARVINNY:  Yes, now they're on.

23          THE COURT:  Now they're on?

24          THE CLERK:  Are they on?

25          THE COURT:  Wow.  I can see it now.  They are on now.

DBJABAR1ps

1  And can I just trouble you to check the larger screen in the

2  gallery?

3          MR. MARVINNY:  That's on as well, your Honor.  The

4  only thing that I would say is a couple of the screens in the

5  front jury row is undulating such that the text is illegible,

6  whereas these screens in the back are not.

7          THE COURT:  My hope is that they stop and sort of warm

8  up.  But otherwise if you have to, you can pass around the

9  exhibit if need be, the low-tech way.  Thank you.

10          THE CLERK:  May I bring in the jury, your Honor?

11          THE COURT:  Yes.  Thank you.

12          (Jury present)

13          THE COURT:  All right.  Good morning.  Thank you.  We

14  just have two more jurors coming in.  You can sit down as long

15  as it's not going to impede the progress of anyone else.

16  Everyone else, please be seated.

17          Excellent.  Good morning and welcome to the first day

18  of the presentation of evidence in this case.  I'm just remind

19  you, and I think you know this already, that if I could ask

20  you, please, to get here as close to 8:45 as possible, only

21  because you'll want to leave at 2:30.  You won't want to leave

22  at 3.  And the sooner we start, the sooner we'll end for the

23  day.  So I know you know that already and I also know that mass

24  transit and ways of getting in can sometimes be a little

25  unpredictable.  But just keep in mind what it took for you to

DBJABAR1ps

1     get in today and try and get in as close to 8:45 tomorrow.

2              Now we will begin with the government presenting its

3     case.  Mr. Quigley.

4              MR. QUIGLEY:  Your Honor, the government calls Agent

5     Corey Walsh.

6              THE CLERK:  Please come forward and remain standing in

7     the witness box.  And please watch your step.

8      COREY WALSH,

9         called as a witness by the government,

10        having been duly sworn, testified as follows:

11             MR. QUIGLEY:  May proceed, your Honor?

12             THE COURT:  You may.

13             Good morning.

14             THE WITNESS:  Good morning, your Honor.

15    DIRECT EXAMINATION

16    BY MR. QUIGLEY:

17    Q.  Where do you work, Mr. Walsh?

18    A.  The Federal Bureau of Investigation.

19    Q.  Are you currently assigned to a squad?

20    A.  Yes.  Division CT4.

21    Q.  What squad were you assigned to on May 7th?

22             MS. GATTO:  Your Honor --

23             THE COURT:  Yes.  Is that necessary?  He was assigned

24    to a squad.  Yes?

25             MR. QUIGLEY:  Right.  Yes, he was, your Honor.

1          THE COURT:  Let's move on.

2          MR. QUIGLEY:  All right.

3   Q.  How long have you been an FBI agent?

4   A.  Approximately a year and a half, sir.

5   Q.  What did you do before you joined the FBI?

6   A.  I was in the United States Army, sir.

7   Q.  How long did you serve in the military?

8   A.  Four years, sir.

9   Q.  Where did you serve in the military?

10  A.  I was an infantry officer assigned to Fort Polk, Louisiana,

11  one tour in Iraq, sir.

12  Q.  Directing your attention to May 7th of this year, were you

13  working with the FBI on that day?

14  A.  Yes, sir.

15  Q.  Did you and other FBI agents and NYPD detectives go to 715

16  Hollywood Avenue in the Bronx?

17  A.  Yes, sir.

18  Q.  What kind of building is 715 Hollywood Avenue?

19  A.  It's a two- or three-family residence with a parking lot

20  with lots of cars in the front and a backyard, sir.

21  Q.  Did there come a time when you and other law enforcement

22  officers went inside that address?

23  A.  Yes, sir.

24  Q.  What time was that, approximately?

25  A.  Approximately 9 a.m., sir.

1  Q.  Would you describe the layout of the building when you went

2  inside.

3  A.  When you walk in, there's one main door on the ground

4  level.  When you walk inside that main door, there is a door

5  immediately to your left and a long hallway, with two opposing

6  doors on the ends.

7  Q.  And did there come a time when you were in the first-floor

8  hallway?

9  A.  Yes, sir.

10  Q.  Can you tell the jury what happened while you were in the

11  first-floor hallway.

12  A.  After we entered that main door, agents and detectives went

13  into the first door on the left-hand side, which led to an

14  upstairs apartment.  They spoke to the residents of that

15  apartment.  Then they came back down and they said that wasn't

16  the apartment that we needed to go into.  And we proceeded down

17  the hallway to the opposing doors at the end of the hall.

18         Once we were there, Detective Lamendola, who was with

19  the NYPD, began banging on both doors on the opposing sides of

20  the hallway, announcing Police, law enforcement.

21  Q.  And did there come a point where someone answered one of

22  the doors?

23  A.  Yes, sir.  The door on the left-hand side was answered.

24  Q.  How long had Detective Lamendola had been knocking on the

25  door before it was answered?

1   A.   Maybe five minutes, sir.

2   Q.   And how many times did he say, he said Police or announce,

3   before that door was entered?

4   A.   A couple dozen, sir.

5   Q.   Did there come a time when you saw someone come through

6   that door on the left side of the hallway, and out into the

7   hallway?

8   A.   Yes, sir.

9   Q.   Do you know who that person was?

10  A.   Yes, sir.  That person was Mr. Bartee.

11  Q.   And could you see Mr. Bartee when he came into the hallway?

12  A.   Yes, sir, I did.

13  Q.   What was he wearing?

14  A.   He was wearing jeans, boxers, and no shirt, sir.

15  Q.   Do you see Mr. Bartee in the courtroom today?

16  A.   I do, sir.

17  Q.   Could you identify him by referencing an item of clothing

18  that he's wearing?

19  A.   Mr. Bartee is the gentleman in the back of the courtroom

20  next to defense counsel, wearing a suit, sir.

21          THE COURT:  Do you want to identify a tie.

22          THE WITNESS:  Yes, sir.  He's wearing a gray-and-black

23  tie.

24          MR. QUIGLEY:  Your Honor, I would ask that the record

25  reflect that the witness has identified the defendant.

1          THE COURT:  So reflected.

2    Q.  Did there come a time that you went into that door on the

3    left side of the hallway?

4    A.  Yes, sir, I did.

5    Q.  And where did that door lead to?

6    A.  The door on the left side of the hallway leads down a steep

7    staircase that goes to a landing where the entrance to the

8    apartment and another door is.

9          MR. QUIGLEY:  Your Honor, at this time I offer

10   Government's Exhibit 905 with a stipulation.

11         THE COURT:  You may read that into the record.

12         MR. QUIGLEY:  Ms. McInerney, if we can publish 905.

13         THE COURT:  Let's hold with that.  I think the jury

14   can follow along.  Thank you.

15         MR. QUIGLEY:  It is hereby stipulated and agreed by

16   and between the United States of America, by Preet Bharara,

17   United States Attorney, Brendan F. Quigley and Jeffrey A.

18   Brown, Assistant United States Attorneys, and Rudolph Bartee,

19   the defendant, by and with the consent of his counsel, Julia

20   Gatto, Esq., and Jonathan Marvinny, Esq., that Government's

21   Exhibits 1 through 111 and 114 through 151 are photographs that

22   fairly and accurately depict 715 Hollywood Avenue, including

23   the basement apartment, on May 7th, 2013.

24         "It is further stipulated and agreed that Government

25   Exhibits 1 through 111 and 114 through 151 and this stipulation

1    may be received in evidence as government exhibits at trial."

2              THE COURT:  All right.  Hearing no objection from the

3    defense, Government Exhibits 1 through 111, 114 through 151,

4    and 905 are received in evidence.

5              (Government's Exhibits 1 through 111, 114 through 151,

6    and 905 received in evidence)

7              MR. QUIGLEY:  Ms. McInerney, can we publish Government

8    Exhibit 3.

9    Q.  You see it up on the screen, Agent Walsh?

10   A.  Yes, sir, I do.

11   Q.  What is that a picture of?

12   A.  This is the picture of the hallway on the ground floor,

13   with the two opposing doorways, and the doorway on the left

14   that's open is the one that leads down to the basement

15   apartment, sir.

16   Q.  That's the doorway Mr. Bartee came out of?

17   A.  Yes, sir, it is.

18   Q.  That's the door where you later searched?

19   A.  Yes, sir.

20             MR. QUIGLEY:  Ms. McInerney, can you publish

21   Government Exhibit 151.

22   Q.  Agent Walsh, what is that a picture of?

23   A.  There is a picture of the staircase that leads down to a

24   landing and the entrance to the apartment is actually back to

25   the left.  You can't really see.  It's kind of an angled door.

1   And the door directly, at the bottom of the staircase, leads to

2   a storage area, utility room.

3   Q.  So the top of the staircase is near the open door that we

4   saw in the last photo?

5   A.  Correct, sir.

6   Q.  And you mentioned the utility at the bottom of the

7   staircase.  Did there come a point on May 7, 2013 when you

8   searched that utility room?

9   A.  Yes, sir.

10  Q.  Did you search it with anyone?

11  A.  Yes, sir.  Agent Coughlin at one point and then Agent Floyd

12  at another, sir.

13  Q.  Is that utility room inside or outside the basement

14  apartment?

15  A.  It's outside the basement apartment, sir.

16          MR. QUIGLEY:  Ms. McInerney, if we could publish

17  Government's Exhibit 11.

18  Q.  What is that a picture of, Agent Walsh?

19  A.  It's a picture of that utility storage room, sir.

20  Q.  What if anything did you find in that utility room when you

21  searched it on May 7, 2013?

22  A.  There is an air-handling unit in the back and a water

23  heater, sir, that's -- among other things, that's it, sir.

24  Q.  No weapons or contrabands?

25  A.  No, sir.

1    Q.   Did there come a time on May 7th, 2013 when you and other

2    FBI agents searched the basement apartment itself?

3    A.   Yes, sir.

4    Q.   Other than the agents, who else, if anyone, was present

5    during the search?

6    A.   Ms. Davis, sir.

7    Q.   What was your understanding who Ms. Davis was?

8    A.   It was my understanding that Ms. Davis was the common-law

9    wife of Mr. Bartee.

10   Q.   Where did you first start searching?

11   A.   In the bedroom, sir.

12   Q.   How many bedrooms were there in the apartment?

13   A.   Just one, sir.

14   Q.   Who else, if anyone, was with you when you were searching

15   the bedroom?

16   A.   Agent Floyd, sir.

17   Q.   Were you and Agent Walsh searching any particular part of

18   the bedroom?

19   A.   Yes, sir.  I started the search in the long closet on the

20   right-hand side of the room, had sliding doors, sir.

21   Q.   And what in that closet?

22   A.   Clothes, sir, shoes, bags, small double bags.

23   Q.   What kind of clothes?

24   A.   Men's clothes, sir.

25   Q.   What, if you know, was Agent Floyd doing while you were

1  searching that closet?

2  A.   While I was searching that closet, he was searching the

3  closet in the opposing corner, sir.

4  Q.   Without saying anything that Agent Floyd said to you, did

5  there come a point when you and Agent Floyd found something?

6  A.   Yes, sir.  He had a magazine with ammunition in it for a

7  weapon.

8  Q.   Just backing up one second, going back to when you were in

9  the hallway, how would you describe Detective Lamendola's voice

10  when he was knocking on the door announcing Police?

11  A.   He was yelling loudly, knocking very loudly on both doors,

12  sir.

13  Q.   So returning to the search of the bedroom, what did you see

14  with respect to -- what did you see when Agent Floyd found

15  something?

16  A.   He had in his hand a magazine for a weapon that had

17  ammunition in it, sir.

18  Q.   How much time went by from when you first began searching

19  that bedroom to when Agent Floyd found that magazine?

20  A.   Just a couple of minutes, maybe five minutes.

21  Q.   Do you know where he found the magazine?

22  A.   Yes, sir.

23  Q.   Where was it?

24  A.   In the closet that he was searching in the corner of the

25  room.

1   Q.   What did you search after that?

2   A.   After that, we lifted the mattress off the bed, and

3   underneath the mattress there was a piece of plywood on top of

4   the box frame.  And we saw, I saw almost like hinges on the top

5   of the box-spring, and we lifted that up and there was a

6   storage compartment inside the box-spring.

7   Q.   What if anything did you find inside that storage

8   compartment?

9   A.   There was lots of small plastic baggies that were packaged

10  together, sir.

11          MR. QUIGLEY:  Your Honor, may I approach?

12          THE COURT:  You may.

13  Q.   Agent Walsh, I'm handing you what's been marked for

14  identification as Government's Exhibit 205-A.  Do you recognize

15  that?

16  A.   Yes, sir, I do.

17  Q.   How do you recognize that?

18  A.   This is the box that I placed those baggies, in sir.

19  Q.   And where did you place those baggies from when you placed

20  them in that box?

21  A.   From another box that came from our evidence vault, sir.

22  Q.   How do you know that to be the box that you placed them in?

23  A.   I placed them in the box and signed my name over the tape,

24  that's sealing it.

25  Q.   Would you open the box.

1   A.  (Witness complies)

2          THE COURT:  Don't take anything out just yet.

3   Q.  And what do you see in the box?

4   A.  These are the baggies that were underneath the -- inside

5   the storage compartment.

6   Q.  Are they in the same or substantially the same condition as

7   when you found them on May 7th of this year?

8   A.  Yes, sir.

9          MR. QUIGLEY:  Your Honor, I would offer Government's

10  Exhibit 205A.

11         MS. GATTO:  No objection.

12         THE COURT:  Government's Exhibit 205A is admitted.

13         (Government's Exhibit 205A received in evidence)

14         MR. QUIGLEY:  Your Honor, may we publish 205A, some of

15  the baggies?

16         THE COURT:  You may.

17         Counsel, at this time, might it make sense for me to

18  read the two instructions to the jury?

19         MS. GATTO:  That's fine.

20         THE COURT:  Mr. Quigley, do you agree?

21         MR. QUIGLEY:  Yes, your Honor.

22         THE COURT:  Thank you.

23         Ladies and gentlemen, as these bags are being passed

24  around, there are two things I would like to instruct you on

25  and I would like you to listen very carefully as I say these.

DBJABAR1ps                    Walsh - direct

1          First of all, you've heard testimony about a search

2     taking place at 715 Hollywood Avenue.  I am instructing you

3     that the agents' presence at 715 Hollywood Avenue on May 7th,

4     2013 was lawful, and you are not to speculate as to their

5     reasons forgoing there.

6          I further instruct you that the agents' search of the

7     apartment was conducted pursuant to consent from Marion Davis

8     and was also lawful.

9          Now, with respect to these bags, you have heard

10    evidence that plastic bags were found in the apartment.

11         MS. GATTO:  Your Honor --

12         THE COURT:  Yes.

13         MS. GATTO:  I think that the instruction made

14    reference to testimony that has not yet been made.

15         THE COURT:  Which part?

16         MS. GATTO:  I'm sorry, your Honor.  I'm mistaken.  I

17    apologize.

18         THE COURT:  That's OK.  Thank you.

19         I'll repeat myself.

20         You've heard evidence that plastic bags were found in

21    the apartment.  You're seeing some of them now.  I instruct you

22    that you may consider this evidence, if at all, only for the

23    limited purpose of determining whether the evidence makes it

24    more or less likely that Mr. Bartee knowingly possessed the gun

25    and ammunition.  You are not to consider it for any other

1    purpose.  You are not to consider it as evidence of

2    Mr. Bartee's character.  Mr. Bartee is charged only with

3    possessing a gun and ammunition and nothing else.  Thank you.

4            You may continue.

5    Q.  Agent Walsh, before May 7th, 2013, had you seen baggies

6    like this before?

7    A.  Yes, sir.

8    Q.  In what context had you seen them?

9    A.  For packaging narcotics, sir.

10   Q.  Have you ever in your personal professional life seen them

11   used for anything else?

12   A.  In that size and shape, no, sir.

13   Q.  Did there come a time when you learned that another agent

14   had found a firearm in the apartment?

15   A.  Yes, sir.

16   Q.  Without saying what anybody said, can you tell us you

17   learned about that.

18   A.  Agent Coughlin came into that bedroom holding the bag

19   containing the firearm, sir.

20   Q.  What happened after that?

21   A.  What happened after that, Agent Foto came into the back

22   bedroom and took the magazine and left the back bedroom to go

23   back into the living room where he was talking to Ms. Davis

24   with another agent.

25   Q.  Did the search stop at some point?

1   A.  Yes, sir, it did.

2   Q.  Why did stop?

3   A.  So that Ms. Davis could get dressed because Agent Foto had

4   asked her to accompany the agents to the precinct.

5   Q.  Where did you go when the search stopped?

6   A.  I left the apartment, sir, and went back out to the car to

7   get more supplies for searching the apartment.

8   Q.  And did the search continue at some point?

9   A.  It did, sir.

10  Q.  What if anything did Agent Floyd do before you continued

11  the search?

12  A.  As we reentered the apartment, sir, he was taking

13  photographs of the apartment, and the things in the apartment,

14  sir.

15  Q.  Once the search resumed, did he search other areas of the

16  apartment, other than the apartment bedroom?

17  A.  Yes, sir.  There's a room just outside of the bedroom that

18  I searched.

19  Q.  What was in there?

20  A.  Two bunk beds with clothes on it, a small table, vacuum

21  cleaner, cleaning pots, normal things that you would have in a

22  house, sir.

23  Q.  What kind of clothes were in the bunk beds?

24  A.  They appeared to be like dirty clothes, sir, men's clothes.

25  Q.  Did it look like anyone had been sleeping in those beds

1   recently?

2   A.  No, sir.  There was no sheets or pillows on either of those

3   beds.

4   Q.  And where was the bunk bed in relation to the apartment

5   bedroom?

6   A.  Just outside the door on the left-hand side when you exited

7   the bedroom.

8   Q.  Did you take custody of certain evidence that was taken

9   from the apartment that day?

10  A.  I did, sir.

11  Q.  What did you do?

12  A.  I took custody of the plastic baggies that were located,

13  the magazines, the ammunition, and the firearm, sir.

14         MR. QUIGLEY:  Ms. McInerney, if we could publish

15  Government Exhibit 74.

16  Q.  Agent Walsh, do you recognize that?

17  A.  Yes, sir.  This is the closet that I began searching when

18  we started the search.

19  Q.  That's where the apartment bedroom would be entered?

20  A.  Yes, sir.

21         MR. QUIGLEY:  Ms. McInerney, could you publish

22  Government's Exhibit 121.

23  Q.  What is that a picture of?

24  A.  This is the floor of that same closet, sir.

25  Q.  And this is, again, the closet that you were searching --

1  the bedroom that you searched with Agent Floyd.

2  A.  Yes, sir.  Yes.

3       MR. QUIGLEY:  Ms. McInerney, would you publish

4  Government's Exhibit 58.

5  Q.  What is that a picture of?

6  A.  This is the picture of the bedroom, sir, taken from near

7  the bedroom door.

8  Q.  And can you see on this photograph the closet where Agent

9  Floyd found the ammunition?

10  A.  Yes, sir.  It's the closet in the back left corner that

11  appears to be framed out from the walls of the room.

12  Q.  So it's to the left of that two-by-four leaning there?

13  A.  Yes, sir, behind the dresser.

14  Q.  And then what do you see to the right of that two-by-four?

15  A.  That's the bed, sir, and that's the storage -- the lid to

16  the storage compartment is lifted up and you can see the

17  baggies inside the, you know, what would be then -- inside the

18  box.

19       MR. QUIGLEY:  Ms. McInerney, you could publish

20  Government's Exhibit 67.

21  Q.  And what's that a picture of?

22  A.  That's are the plastic baggies that were inside that

23  storage compartment, sir.

24       MR. QUIGLEY:  Ms. McInerney, could you publish

25  Government's Exhibit 123.

DBJABAR1ps                    Walsh - direct

1   Q.  Agent Walsh, what's that a picture of?

2   A.  This is a picture of the two bunk beds that are outside of

3   that bedroom door, sir.

4   Q.  And what kind of clothes do you see?

5   A.  Shirts, jeans, what looks like men's and women's clothes,

6   sir.

7        MR. QUIGLEY:  Ms. McInerney, would you publish

8   Government's Exhibit 55.

9   Q.  Agent Walsh, what's that a picture of?

10  A.  This is a picture of the bedroom door, and on the

11  right-hand side is the edge of the bunk beds that are just

12  outside the door.

13  Q.  So that's the bunk beds that are on the right side of

14  Government's Exhibit 55 that we saw in the previous exhibit?

15  A.  Yes, sir.

16        MR. QUIGLEY:  No further questions, your Honor.

17        THE COURT:  Any cross?

18        MS. GATTO:  Yes, your Honor.

19        May I, your Honor?

20        THE COURT:  You may.  Thank you.

21  CROSS EXAMINATION

22  BY MS. GATTO:

23  Q.  Good morning, Agent Walsh.

24  A.  Good morning, ma'am.

25  Q.  On May 7th, you were part of a search team, correct, going

1   into the apartment?

2   A.  Yes, ma'am.

3   Q.  You were not alone, right?

4   A.  No, ma'am.

5   Q.  There were at least size people searching the apartment?

6   A.  Approximately, yes, ma'am.

7   Q.  When I say you were not by yourself, correct, there's Agent

8   Floyd, yes?

9   A.  Yes.

10  Q.  Coughlin?

11  A.  Yes, ma'am.

12  Q.  Walsh.  Oh, that's you.  Foto?

13  A.  Yes, ma'am.

14  Q.  Agent Lamendola?

15  A.  Yes, ma'am.

16  Q.  Anyone else?

17  A.  Agent Wheeler was also there, ma'am, but she wasn't

18  searching.  She was with Ms. Davis at the time.

19  Q.  So the six I mentioned, you were part of the search.

20  A.  Yes.

21  Q.  You're an experienced search team, that is correct?

22  A.  Yes, ma'am.

23  Q.  You had a year, a year and a half of experience?

24  A.  Yes, ma'am.

25  Q.  Agent Floyd, you know, has done hundreds of searches; am

1    right?

2    A.   Yes, ma'am, I believe, yes.

3    Q.   As an FBI agent, you've had training on how to conduct

4    searches, correct?

5    A.   Yes, ma'am.

6    Q.   You know where to look?

7    A.   Fair to say, yes, ma'am.

8    Q.   You searched high and low?

9    A.   Yes, ma'am.

10   Q.   You left no stone unturned, correct?

11   A.   Correct, ma'am.

12   Q.   Before you do the search, I'd like to talk about when

13   you're up in the hall.

14        MS. GATTO:   And Ms. McInerney, if I could bother you

15   to show Government's Exhibit 3.

16        You know what, I think Ms. Katz can do it.

17   Q.   This is the exhibit you were just testifying about with

18   Mr. Quigley.

19   A.   Yes, ma'am.

20   Q.   So this is the hallway where you and other agents are

21   waiting as, I think it was Detective Lamendola knocked on the

22   door, correct?

23   A.   That's correct, ma'am.

24   Q.   It's a narrow hallway, correct?

25   A.   Yes, ma'am.

1   Q.  And how far from Detective Lamendola were you when he was

2   knocking?

3   A.  Maybe three or four people from the door.

4   Q.  Are you basically standing by as you're waiting while

5   Lamendola is knocking on the door?

6   A.  If I remember correctly, ma'am, Agent Lamendola was

7   standing in the middle and knocking on both doors and Detective

8   Shelly was standing on the right-hand side.  And then the rest

9   of us are standing on the left-hand side of the door.

10  Unless --

11  Q.  So the --

12  A.  I'm sorry.  Sorry.  The left-hand side of the hallway.

13  Q.  And Detective Lamendola is the only agent knocking,

14  correct?

15  A.  Yes, ma'am.

16  Q.  And he's knocking on both doors, correct?

17  A.  Yes, ma'am.

18  Q.  And you've since learned that the door to the right went to

19  another apartment; am I right?

20  A.  Yes, ma'am.  I never entered that, but my understanding is

21  there's another apartment there.

22  Q.  And another individual?

23  A.  No, ma'am.  I don't know.

24  Q.  That individual never answered the door, correct?

25  A.  No, ma'am.

1  Q.  And this was at 9 in the morning.  Is that right?

2  A.  Yes, ma'am.

3  Q.  You can hear the knocking, right?

4  A.  Of course, yes, ma'am.

5  Q.  But I'm right you can't hear what's going on in the

6  apartment below, right?

7  A.  No, ma'am.

8  Q.  In fact, there's a door and you can see it in Government's

9  Exhibit 3, between all the agents and the staircase that went

10  into the apartment, correct?

11  A.  There is an apartment door and then this door on the

12  left-hand side, yes, ma'am.

13  Q.  So right.  And maybe my question was unclear.  The door

14  depicted in Government Exhibit 3 is actually the door that you

15  then go through to get to the apartment.

16  A.  Yes, ma'am.  The door is open in the picture.

17  Q.  And between that door and in the actual apartment living

18  space, the basement apartment, is a flight of stairs, correct?

19  A.  Yes, ma'am.

20  Q.  You describe it as a steep flight of stairs, correct?

21  A.  Yes, ma'am.

22  Q.  And then beyond those stairs is another door, correct?

23  A.  Yes, ma'am.

24  Q.  Another entrance door, correct?

25  A.  Yes, ma'am.

1         MS. GATTO:  And if Ms. Katz wouldn't mind, please put

2    up Government Exhibit 34.

3    Q.  After you walked through that door at the bottom of the

4    stairs to get into the living room in the basement apartment --

5    correct?

6    A.  Yes, ma'am.

7    Q.  And then you get to the bedroom through a long hallway,

8    correct?

9    A.  Yes, ma'am.

10   Q.  Am I right that that's depicted in Government Exhibit 34?

11   A.  Yes, ma'am.

12   Q.  And so at the very end and to the left, that's where the

13   bedroom is.

14   A.  That's correct, ma'am.

15   Q.  And there's a door beyond that door too, correct?

16   A.  I believe so, yes, ma'am.

17        MS. GATTO:  Thank you.

18   Q.  After Detective Lamendola knocked on the door, Ms. Davis

19   came to the door, correct?

20   A.  I never saw Ms. Davis in the door, ma'am, I just saw

21   Mr. Bartee step out.

22   Q.  And when you saw Mr. Bartee, he didn't have I shirt on; is

23   that right?

24   A.  Yes, ma'am.

25   Q.  He was calm, correct?

1    A.  Yes, ma'am.

2    Q.  Cooperative?

3    A.  Yes, ma'am.

4    Q.  Polite?

5    A.  Yes, ma'am.

6    Q.  And at some point you encountered Ms. Davis.

7    A.  Not directly.  I never had the conversation with her, but I

8    saw her passing when I was in the apartment, sir.

9    Q.  When you saw her she was still in her sleeping clothes,

10   right?

11   A.  Yes, ma'am.

12   Q.  In fact at some point later in the morning you gave her

13   some privacy to get dressed.

14   A.  Yes, ma'am.

15   Q.  To change from her pajamas to the clothes she would wear if

16   she was leaving the house, right?

17   A.  Yes, ma'am.

18   Q.  She'd have to put a bra on.

19   A.  Yes, ma'am.

20   Q.  And she had to change out of those pajamas?

21   A.  Yes, ma'am.

22   Q.  And when you saw Ms. Davis, she too was calm, correct?

23   A.  Yes, ma'am.

24   Q.  And polite?

25   A.  Yes, ma'am.

DBJABAR1ps                    Walsh - cross

1   Q.  She allowed you to search the apartment.

2   A.  Yes, ma'am.  Yes.  I never had direct contact with

3   Ms. Davis, but yes.

4   Q.  She gave permission for you to search.  And every room was

5   searched.

6   A.  Yes, ma'am.

7   Q.  You, yourself, you observed the utility room, correct?

8   A.  Yes, ma'am.

9   Q.  The room with the bunk bed?

10  A.  Yes, ma'am.

11  Q.  I want to show you what's been marked as Defendant's

12  Exhibit A.

13          May I approach, your Honor?

14          THE COURT:  Yes.  Is there a copy for me?

15          MS. GATTO:  There sure is, but I'll get you another

16  copy.

17          THE COURT:  I'll share with him.  He won't mind.

18          THE WITNESS:  No, ma'am.

19          THE COURT:  All right.  Is there an application or do

20  you want him to look at it first?

21          MS. GATTO:  I would like you to look at it.

22          THE COURT:  Go ahead.

23  Q.  Based on your search and your timing in the apartment, you

24  would say you're familiar with the apartment's layout, correct?

25  A.  Yes, ma'am.

1   Q.  And is that a fair and accurate representation of the

2   layout of the basement apartment?

3   A.  Yes, ma'am.  Just one comment, that the room that's labeled

4   "sump-pump room" was longer and not as wide as depicted in this

5   drawing.

6   Q.  OK.

7        MS. GATTO:  Your Honor, we offer Defendant's Exhibit

8   A.

9        MR. QUIGLEY:  No objection, your Honor.

10        THE COURT:  I'm sorry.  I didn't hear you.

11        MR. QUIGLEY:  No objection.

12        THE COURT:  Thank you.  All right.  Defendant's

13   Exhibit A is admitted into evidence.  Thank you.

14        (Defendant's Exhibit A received in evidence)

15        MS. GATTO:  Ms. Katz, if you could publish that.

16   Q.  So if you could help the jury walk through the apartment,

17   I'll ask you some questions about it.  That orange landing

18   there, that is the top of the staircase, correct?

19        JUROR NO. 8: Excuse me.  This screen is like not good.

20        THE COURT:  Unfortunately, what can we do?  Can we

21   pass them out?  There are a few screens that wobble a little

22   bit.  We can't do anything about it.  I thought they would warm

23   up and they would wobble less, but all right.  We'll pass

24   around paper copies as well for those exhibits that you ought

25   to be looking at.

1    Q.  So just to familiarize yourself with the apartment, that

2    landing up there is the top of the first level of the house,

3    correct?

4    A.  Yes, ma'am.

5    Q.  And the stairs, the steep staircase that you go down to get

6    to the actual basement apartment?

7    A.  Yes, ma'am.

8    Q.  There's only one apartment down there, correct?

9    A.  That's correct, ma'am.

10   Q.  And it's in the basement of the house?

11   A.  Yes, ma'am.

12   Q.  And as you walk in through the door, that precedes the

13   living room.  You see that?

14   A.  Yes, ma'am.

15   Q.  And you went, you and Agent Floyd, you searched here in the

16   bedroom.  That's right?

17   A.  That's correct, ma'am.

18   Q.  And your testimony is that you searched the clothes closet.

19   And that's the longer of the closets that is depicted, correct?

20   A.  That's correct, ma'am.

21   Q.  And Agent Floyd, he searched the linen closet?  Is that the

22   right description of that closet?

23   A.  Ma'am, I don't really remember what was in that closet, but

24   it was a smaller closet than the one that's --

25   Q.  The smaller closet that's depicted in the bedroom is the

1    closet that Agent Floyd search?

2              MS. GATTO:  Ms. Katz, if you would put up Government's

3    Exhibits 68 and 69.

4    Q.  That's the closet that Agent Floyd found the magazine in,

5    correct?

6    A.  That's correct, ma'am.

7    Q.  It's shallow; is that a fair description of it?

8    A.  Yes, ma'am.

9    Q.  It doesn't have a light inside of it?

10   A.  I don't recall, ma'am.

11   Q.  If has three shelves; is that correct?

12   A.  Yes, ma'am.

13   Q.  And when you searched it, the middle shelf had some

14   personal items on it?

15   A.  I didn't search that closet, ma'am.

16   Q.  Well, you were in the bedroom, right?

17   A.  Yes, ma'am.

18   Q.  And you saw the closet?

19   A.  Yes, ma'am.

20   Q.  So when you were in the bedroom and you saw the closet, you

21   saw what is depicted here, right?

22   A.  Yes, ma'am.

23   Q.  The linens, those are on the top shelf.

24   A.  Yes, ma'am.

25   Q.  And you know that the magazine was found above the door

1  frame on the inside of the closet, correct?

2  A.  Yes, ma'am, on the top of the two-by-four the frame of the

3  closet.

4  Q.  And so that would be depicted in Government's Exhibit 69,

5  the top molding.  Do you see that?

6  A.  Yes.

7  Q.  Behind that.  If you reached your hand behind that, that's

8  where it was found.

9  A.  Yes, ma'am.

10  Q.  That's of 7 feet up from the ground, right?

11  A.  I don't know, ma'am.  Maybe.

12  Q.  Well, you were there when you saw it.  Does that seem like

13  a fair estimation of the height of that?

14  A.  Sure.  Fairly.

15  Q.  And is it also fair to say it's about 15 inches up from the

16  top shelf?

17  A.  Maybe.  It looks like it could be 15 inches.

18  Q.  Will you agree with me that, just standing in front of the

19  closet, you can't see the ledge?

20  A.  On the inside?

21  Q.  Yes, just standing in front of the closet, you can't see

22  the ledge that's on the inside.

23  A.  That's correct.

24  Q.  And you agree with me that just standing in front of the

25  closet, you can't see anything sitting on that ledge, correct?

1   A.  That's correct, ma'am.

2   Q.  Now, the gun --

3           MS. GATTO:  Ms. Katz.

4   Q.  The gun, the gun was found in this room here called the

5   sump-pump room, correct?

6   A.  Yes, ma'am.

7   Q.  All the way across the apartment in that room on the other

8   side.

9   A.  Through the bathroom, yes, ma'am.

10  Q.  And that's through a closed door?  That's how you get to

11  the sump-pump room?

12  A.  Yes, ma'am.

13  Q.  I want to show you a couple of pictures, and you can tell

14  me if this depicts the sump-pump room?

15          MS. GATTO:  Government Exhibit 81, Ms. Katz.

16  Q.  Is that what it looks like inside that room?

17  A.  Yes, ma'am.

18          MS. GATTO:  Government Exhibit 82.

19  Q.  Another picture?

20  A.  Yes, ma'am.

21  Q.  Accurate?

22  A.  Yes, ma'am.

23  Q.  And Government Exhibit 86.  Another shot, different angle?

24  Right?

25  A.  Yes, ma'am.

1    Q.   Do you agree with me that this sump-pump room is not part

2    of the living space in the apartment?

3    A.   Yes, ma'am, I agree with you.

4    Q.   It's unfinished?

5    A.   Yes, ma'am.

6    Q.   It doesn't have a real floor.

7    A.   No.  I believe it's concrete, ma'am.

8    Q.   It's fair to describe it as disgusting, right?

9    A.   Yes, ma'am.

10   Q.   The floor is actually covered with toilet paper and feces,

11   yes?

12   A.   From what I recall, yes, ma'am.

13   Q.   There is a sump pump in there?

14   A.   Yes, ma'am, I believe it's a sump pump.

15   Q.   Do you know what a sump pump is, by the way?

16   A.   I do, ma'am.

17   Q.   If you could describe it for us.

18   A.   It pumps excess water out of your basement or a crawlspace

19   that's flooded.

20   Q.   I want to go back to the bedroom and to the bed.  You said

21   that you and Agent Floyd had lifted up the mattress to find

22   some of the bags that were passed around.

23   A.   Yes, ma'am.

24   Q.   And it's a storage bed, that bed we're looking at.

25   A.   Yes.  Well, there's a storage area in the box-spring.

1   Q.  It wasn't altered in any way, correct?

2   A.  No, ma'am.  I didn't, like, examine it to see if it was

3   altered.

4   Q.  But you were able to lift it up and there was a storage

5   area.

6   A.  Yes, ma'am.

7   Q.  And you testified that the bags that you found in there,

8   you've, in your experience with narcotics -- I'm sorry.  I

9   withdraw that.

10              (Mr. Quigley rose)

11              THE COURT:  Yes.

12              MS. GATTO:  I'll withdraw that.

13   Q.  You said that, in your experience with law enforcement,

14   it's used for packaging drugs; is that correct?

15   A.  That's correct, ma'am.

16   Q.  And you answered that question based on your experience as

17   an FBI agent, correct?

18   A.  That's correct, ma'am.

19   Q.  So I'm going to ask you a different question.  You know

20   that these bags have other uses, not where you have a law

21   enforcement officer, just an everyday person, those bags can

22   have other uses, correct?

23   A.  Sure.  You could put various things in those bags, ma'am.

24   Q.  Seeds, right?

25   A.  Sure.

1    Q.  Jewelry?

2    A.  Sure.

3    Q.  And it's not illegal to have those plastic bags, correct?

4    A.  No, ma'am.

5    Q.  In fact, you can buy those plastic bags over Amazon, right?

6    A.  I don't know, ma'am.  I never looked for plastic bags over

7    Amazon.

8    Q.  Now, in this case, you didn't find any narcotics in the

9    apartment, correct?

10   A.  No, ma'am.

11   Q.  The bags themselves, they had no residue on them?

12   A.  Not to my knowledge, no, ma'am.

13   Q.  They were just bags inside of bags, correct?

14   A.  That's correct, ma'am.

15   Q.  Otherwise the bags were empty?

16   A.  Yes, ma'am.

17   Q.  And you didn't find any scales that you would weigh

18   narcotics with, correct?

19   A.  No, ma'am.

20   Q.  You didn't find a ledger book somehow memorializing drug

21   sales, correct?

22   A.  No, ma'am.

23   Q.  You didn't find rubberbands?

24   A.  Not that I recall, no.

25   Q.  Cutting agents?

DBJABAR1ps          Walsh - cross

1    A.  H'm, there were things in the apartment that could be used

2    as a cutting agent.

3    Q.  You didn't find any, any -- you didn't find any drugs in

4    the apartment.

5    A.  No, ma'am.

6    Q.  And to be clear, the gun, that wasn't recovered from that

7    storage bed, correct?

8    A.  No, ma'am.  They were in the closet.

9    Q.  Different parts of the apartment?

10   A.  In the same bedroom, yes, ma'am.

11   Q.  Outside of the plain view.

12   A.  That's correct, ma'am.

13   Q.  One was found on the interior ledge; it's 7 feet high?

14   A.  Approximately, yes, ma'am.

15   Q.  And the gun was found in the wall of the sump-pump room,

16   correct?

17   A.  I don't think it was in the long thing, but, you know, in

18   the ceiling.

19   Q.  In a dropped ceiling.

20   A.  Yes, ma'am.

21          MS. GATTO:  I have nothing further.  Thank you.

22          THE COURT:  Thank you.

23          Is there any redirect?

24          MR. QUIGLEY:  No, your Honor, there is not.

25          THE COURT:  All right.  Thank you.

1              Thank you, Agent Walsh.

2              (Witness excused)

3              MR. QUIGLEY:  Your Honor, before we call the next

4    witness, we would like to offer two additional stipulations.

5              THE COURT:  OK.  Which ones, please?

6              MR. QUIGLEY:  It would be Government's Exhibit 904 --

7              I just need to collect the bags.

8              THE COURT:  Please do.

9              MS. GATTO:  And the exhibits?

10             THE COURT:  Yes, please.

11             MR. QUIGLEY:  Your Honor, we first call for Government

12   Exhibit 904.

13             THE COURT:  Would you like to read it.  Thank you.

14             MR. QUIGLEY:  Sure.

15             "It is hereby stipulated and agreed by and between the

16   United States of America, by Preet Bharara, United States

17   Attorney, and Brendan F. Quigley and Jeffrey A. Brown,

18   Assistant United States Attorneys, and Rudolph Bartee, the

19   defendant, by and with respect to his counsel, Julia Gatto,

20   Esq. and Jonathan Marvinny, Esq. that Rudolph Bartee, the

21   defendant, lived in the basement apartment at 715 Hollywood

22   Avenue with his common-law wife, Marion Davis, from in or about

23   November 2012 through May 7, 2013.

24             "It is further stipulated and agreed that this

25   stipulation may be received in evidence as a government exhibit

1    at trial."

2            THE COURT:  Government Exhibit 904 is received in

3    evidence.

4            (Government's Exhibit 904 received in evidence)

5            MR. QUIGLEY:  Your Honor, if I now could ask,

6    Government's Exhibit 902, permission to read.

7            THE COURT:  Yes, please.

8            MR. QUIGLEY:  "It is hereby stipulated and agreed by

9    and between the United States of America, by Preet Bharara,

10   United States Attorney, Brendan S. Quigley, and Jeffrey A.

11   Brown, Assistant United States Attorneys, that Rudolph Bartee,

12   the defendant, by and with the consent of his counsel, Julia

13   Gatto, Esq. and Jonathan Marvinny, Esq., that:

14           "Government Exhibit 201 is a .380 caliber magazine

15   that was found at 715 Hollywood Avenue on May 7, 2013 and that

16   was examined by New York City Police Department criminalist

17   Brandy Mora between May 9th and 11th, 2013.

18           "Government Exhibit 202 is a .380 caliber ACP Wolf

19   ammunition that was found in 715 Hollywood Avenue, Bronx, New

20   York, on May 7, 2013 and that was examined by NYPD criminalist

21   Brandy Mora between May 9th and 11th, 2013.  One round in

22   Government Exhibit 202 was test-fired during analysis by the

23   NYPD Firearms Analysis Section.

24           "Government Exhibit 203 is a .380 calendar Taurus P.T.

25   58 S handgun, serial number KMF 00299, that was found at 715

DBJABAR1ps                    Walsh - cross

1    Hollywood Avenue, Bronx, New York, on May 7, 2013 and that was

2    examined by New York City Police Department criminalist Brandy

3    Mora between May 9th and 11th, 2013.

4         "Government Exhibit 204 is the black plastic bag which

5    contained the .380 caliber Taurus P.T. 58 S handgun, serial

6    number KMF 00299, that was found at 715 Hollywood Avenue,

7    Bronx, New York, on May 7, 2013.  Government Exhibit 204 was

8    examined by New York City Police Department criminalist Brandy

9    Mora between May 9th and 11th, 2013.

10        "Government's Exhibits 201 through 204 have been in

11   the continuous custody of the NYPD, the FBI, the Office of the

12   New York City Medical Examiner, and/or the United States

13   Attorney's Office since May 7, 2013.

14        "Testing by the NYPD Firearms Analysis Section showed

15   that Government Exhibit 201, the .380 caliber magazine, was

16   compatible with Government Exhibit 203, the .380 caliber Taurus

17   P.T. 58 S handgun serial number KMF 00299.

18        "Government Exhibit 203, the .380 caliber Taurus P.T.

19   58 S handgun, serial number KMF 00299, was inoperable when it

20   was received at the Firearms Analysis Section due to a broken

21   firing pin block lever.  The weapon was made operable for

22   test-fire purposes.

23        "It is further stipulated and agreed that Government's

24   Exhibits 201, 202, 203, 204, and this stipulation may be

25   received as evidence in this trial."

1          THE COURT:  All right.  Government Exhibits 201, 202,

2     203, 204, and 902 are received in evidence.

3          (Government's Exhibits 201, 202, 203, 204, and 902

4     received in evidence)

5          MR. QUIGLEY:  Thank you, your Honor.

6          The government calls Agent Jason.

7          THE CLERK:  Please come forward and remain standing in

8     the witness box.  This way, sir.  Please watch your step.

9      JASON FLOYD,

10         called as a witness by the government,

11         having been duly sworn, testified as follows:

12         THE COURT:  You may proceed, Mr. Quigley.

13         MR. QUIGLEY:  Thank you, your Honor.

14    DIRECT EXAMINATION

15    BY MR. QUIGLEY:

16    Q.  Mr. Floyd, where do you work?

17    A.  The FBI, sir.

18    Q.  And you're an agent with the FBI?

19    A.  Yes, I am.

20    Q.  Were you with the FBI on May 7th of this year?

21    A.  Yes, I was.

22    Q.  Were you assigned to a particular squad that day?

23    A.  Yes.  Squad C19.

24    Q.  How long were you assigned to squad C19 that day?

25    A.  Just a week or so.

1    Q.  What were you doing before that?

2    A.  I was an FBI agent in Pendelton, Oregon.

3    Q.  Before becoming an FBI agent, what did you do?

4    A.  I was a police officer.

5    Q.  As a police officer and FBI agent, approximately how many

6    searches have you participated in?

7    A.  Hundreds, sir.

8             THE COURT:  I'm sorry, did you say "one hundred" or

9    "hundreds"?

10            THE WITNESS:  Hundreds, ma'am.

11            THE COURT:  Thank you.  I'm sorry.  You would think

12   I'd know, I'm close enough to hear you.  But thank you.

13   Q.  Directing your attention to May 7th of this year, did you

14   and other FBI agents and NYPD detectives go to 715 Hollywood

15   Avenue in the Bronx?

16   A.  Yes.

17   Q.  Did there come a time when you and other agents began a

18   search of the basement apartment?

19   A.  Yes.

20   Q.  What time was that approximately?

21   A.  Approximately 9:30.

22   Q.  When you started the search, where did you go?

23   A.  I went to the only bedroom in the apartment.

24   Q.  Did anyone else go to the bedroom with you?

25   A.  Special Agent Corey Walsh.

1    Q.   Were there other agents present?

2    A.   There were.

3    Q.   What were they doing?

4    A.   They were assisting with the search.

5    Q.   When you and Agent Walsh got to the bedroom, what did you

6    do?

7    A.   I started searching the left side of the room.  He started

8    searching the right side.

9    Q.   Did there come a time when Agent Walsh said something to

10   you about the closet he was searching?

11   A.   Yes.  He said that he -- while searching the closet,

12   located a ledge on the inside wall of the closet.

13   Q.   And what did you do as a result of that?

14   A.   I was searching another closet in the room.  It prompted me

15   to see if there was a ledge in that closet, which there was.

16   Q.   What if anything did you find on that ledge?

17   A.   I found a magazine to a gun.

18   Q.   What was inside the magazine?

19   A.   There were bullets inside the magazine.

20   Q.   Can you describe how the magazine was positioned in the

21   closet?

22   A.   The magazine was laying on top of the two-by-four framing,

23   horizontally, near the middle of the opening to the closet.

24   Q.   How would you describe the magazine appearance when you

25   found it?

DBJABAR1ps                    Floyd - direct

1   A.   The magazine was not dirty.  It was not dusty.

2   Q.   When you reached up to that ledge, how long was it before

3   you found the magazine?

4   A.   Almost immediately.

5   Q.   And how long had you been searching the apartment bedroom

6   before you found the magazine?

7   A.   Probably less than five minutes.

8   Q.   Agent Floyd, how tall are you?

9   A.   Approximately 6 foot.

10  Q.   And did you need to stand on a ladder or step to reach that

11  ledge?

12  A.   No, I did not.

13  Q.   What did you do when you found the magazine?

14  A.   I made a verbal announcement to everybody else in the

15  apartment that I had found the magazine.

16  Q.   Why did you do that?

17  A.   Mostly for safety purposes so everybody would know that

18  there's likely a weapon in the house, also to let everybody

19  know that there is likely a weapon in the house and to be

20  looking for it.

21  Q.   What makes you say there is likely to be a weapon in the

22  house?

23            MR. MARVINNY:  Objection.

24            THE COURT:  Can you rephrase your question.  I'm

25  sorry.  May I just hear the question again, please, from --

1    Q.  What made you say there was likely a weapon in the house?

2              MR. MARVINNY:  Objection.

3              THE COURT:  All right.  I'll allow it.

4    A.  In my experience, oftentimes when you find a magazine,

5    there is also an associated gun.

6              MR. QUIGLEY:  Your Honor, may I approach?

7              THE COURT:  You may.

8    Q.  Agent Floyd, I'm handing you what's in evidence as

9    Government's Exhibit 201 and 202.  What are those?

10   A.  This is the magazine and bullets I found inside the closet.

11   Q.  How do you know that?

12   A.  I recognize them from the search and from the photographs.

13   Q.  And was that evidence packaged by you before today?

14   A.  Yes, I did.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   BY MR. QUIGLEY:

2   Q.  Where did you search after you found the magazine?

3   A.  We continued to search the rest of the bedroom to include

4   the bed.

5   Q.  What, if anything, did you do with respect to the bed?

6   A.  I always when I search I always search underneath the bed

7   and underneath the mattress.  I just picked the time, we lift

8   the mattress off and look under the storage compartment.

9   Q.  What, if anything, did you find in this storage

10  compartment?

11  A.  When we lifted up the storage compartment there were

12  thousands of small plastic baggies.

13  Q.  Had you seen baggies like this before?

14  A.  Yes, I had.

15  Q.  In what context had you seen them?

16  A.  Drug context.

17  Q.  What do you mean by that?

18  A.  I have never seen baggies like that not associated with

19  drug use and drug dealing.

20  Q.  How were they being used or associated with drugs when you

21  saw them previously?

22  A.  Typically they are what holds the drugs, drugs found inside

23  those baggies.

24  Q.  You are saying they're used to package drugs?

25  A.  Yes.

1    Q.  Had you been seen them in your personal or professional

2    life in any other context?

3    A.  No, I did not.

4    Q.  Where did you search after you searched the bed?

5    A.  After the bedroom was completed we went outside the bedroom

6    to the foyer area where there was a couple of bunk beds.

7    Q.  Do you know if anybody had been sleeping in those?

8    A.  No, it did not.

9    Q.  What did you find on them?

10   A.  The beds were covered with clothing and other items.

11   Q.  What kind of clothing?

12   A.  Male and female normal clothing.

13   Q.  And other than the bunk beds and the bed in the bedroom,

14   were there any other beds in the apartment?

15   A.  No, sir.

16   Q.  Did there come a time when you took photographs of the

17   apartment?

18   A.  Yes.

19            MR. QUIGLEY:  Can we public Government Exhibit 69.

20            (Pause)

21   Q.  Do you recognize that, Agent Floyd?

22   A.  Yes, I do.

23   Q.  What is that a picture of?

24   A.  That is the closet that I searched where I found the

25   magazine.

1   Q.  And can you describe where in that closet you found the

2   magazine.

3   A.  When looking at the closet on the outside you can see white

4   trim running along the top.  On the opposite side of the

5   drywall there's a two-by-four that helps to creates the

6   structure of the closet.  Just on top of that two-by-four

7   behind the drywall is where I found it.

8           MR. QUIGLEY:  Can you publish Government Exhibit 117?

9   I am sorry Government Exhibit 70.

10          (Pause)

11  Q.  Agent Floyd, what's that a picture of?

12  A.  The dresser in the bedroom.

13  Q.  Where is that in relation to the closet where you found the

14  magazine and ammunition?

15  A.  If you are standing in front of the closet that's directly

16  to the left.

17          MR. QUIGLEY:  Can you publish Government Exhibit 117.

18          (Pause)

19  Q.  What's that a picture of, Agent Floyd?

20  A.  That's a picture further back almost as you entered the

21  bedroom you'll see the dresser on the left and the bed on the

22  right towards the back you see a water bottle on the ground and

23  a one-by-six leaning against the wall just across where the

24  closet is at.

25  Q.  Where do you see on the left side of the bed?

1   A.  I see clothes.

2   Q.  What type of clothing is that?

3   A.  Jeans, shirts.

4          MR. QUIGLEY:  If could you publish Government Exhibit

5   110.

6          (Pause)

7   Q.  What is that a picture of?

8   A.  That is the magazine that I located in the closet.

9   Q.  Is this how it was when you found it?

10  A.  Yes.

11  Q.  Where is that picture taken?

12  A.  That was taken in the bedroom on the dresser, by the side

13  of the bed.

14         MR. QUIGLEY:  Can you publish Government Exhibit 173.

15         (Pause)

16  Q.  What is that a picture of?

17  A.  That's a picture of the kitchen inside the apartment.

18  Q.  Directing your attention to that white bottle, what is that

19  picture?

20  A.  It appears to be a bottle of bleach.

21         MR. QUIGLEY:  No further questions, your Honor.

22         THE COURT:  Thank you.

23         Mr. Marvinny.

24         MR. MARVINNY:  Thank you, your Honor.

25  CROSS-EXAMINATION

1    BY MR. MARVINNY:

2    Q.  How are you, Agent Floyd?

3    A.  I am fine, sir.  How are you?

4    Q.  I am good.  Thank you.

5         On May 7th of this year you were part of the team that

6    searched the basement apartment?

7    A.  Yes, sir.

8    Q.  There were in terms of people actually doing the search,

9    there were about six of you, is that right?

10   A.  Approximately, five or six, yes.

11   Q.  Could you just tell us quickly who they were?

12   A.  Yes.  There was me, Special Agent Corey Walsh, Special

13   Agent Kevin Coughlin and my boss Supervisor Special Agent

14   Barbara Davis.

15   Q.  So you had your boss watching you that day?

16   A.  Yes.

17   Q.  Fair to say that you all comprised a pretty experienced

18   search team?

19   A.  One of the agents was a younger agent but yes.

20   Q.  Let's talk about, you testified that you've done hundreds

21   of searches, right?

22   A.  Yes.

23   Q.  That was in your experience as both a police officer?

24   A.  And an FBI agent.

25   Q.  And as an FBI agent?

 1   A.   Yes.

 2   Q.   And other members of the team had done searches as well?

 3   A.   Yes.

 4   Q.   This wasn't your first time searching on apartment?

 5   A.   No, sir.

 6   Q.   Part of why you training as an FBI agent and as a police

 7   officer is in how to conduct searches?

 8   A.   Correct.

 9   Q.   You learn where to look for things?

10   A.   Yes.

11   Q.   Where typically things might be hidden?

12   A.   Correct.

13   Q.   You get a lot of training on that kind of thing, right?

14   A.   Yes, sir.

15   Q.   Now, correct me if I am wrong.  It sounds like when you

16   first came into the apartment you sort of headed back to the

17   bedroom right away?

18   A.   That is correct.

19   Q.   That's correct and there's only one bedroom in the

20   apartment, yes?

21   A.   Yes.

22   Q.   And your testimony was that you were with Agent Walsh?

23   A.   Most of the time, yes, sir.

24   Q.   So the two of you were kind of searching the bedroom

25   together?

DBJAABAR2          Floyd - Cross

1    A.  Yes.

2    Q.  Agent Walsh was looking at one closet?

3    A.  He searched one closet yes, amongst other things.

4    Q.  I'm sorry?

5    A.  Amongst other parts of the bedroom.

6    Q.  OK.  And you were looking at what I call the linen closet,

7    is that right?

8    A.  Correct.

9    Q.  And as Agent Walsh was searching the other closet in the

10   bedroom he said there's a ledge in closet, correct?

11   A.  Yes.

12   Q.  And that kind of triggered you to look for a ledge in the

13   closet you were searching, right?

14   A.  Correct.

15            MR. MARVINNY:  Can we put back up 69, Government

16   Exhibit 69.

17            (Pause)

18   Q.  So, Agent Floyd, you tubing talked about this photo on your

19   direct-examination, correct?

20   A.  Yes.

21   Q.  This is a picture of the linen closet that you were

22   searching?

23   A.  Yes.

24   Q.  And you testified that the ledge at the top of the closet

25   ran along the interior of the closet, is that right?

DBJAABAR2          Floyd - Cross

1    A.  That is correct.

2    Q.  So, it's on the opposite side of that molding, that white

3    molding that we see on the outside of the closet in Exhibit 69?

4    A.  Yes.

5    Q.  Now, again, when Agent Walsh said he had found a ledge you

6    decided to look for a ledge, right?

7    A.  Yes.

8    Q.  And at that point you kind of reached your hand into the

9    closet and ran your hands along the ledge in the linen closet,

10   yes?

11   A.  Yes.

12   Q.  And you discovered in that manner that there was also a

13   ledge in the linen closet, yes?

14   A.  Yes.

15   Q.  You actually discovered the magazine that you found on the

16   linen closet kind of by touching it, yes?

17   A.  That's correct.

18   Q.  So you didn't -- you couldn't see it, right?

19   A.  No, I couldn't.

20   Q.  Fair to say that I think you testified to this on direct as

21   one stands in front of that linen closet looking up there's no

22   way to see what would be on top of that ledge, right?

23   A.  Not from the outside, no.

24   Q.  Not from the outside?  And so again the way you found the

25   magazine was sort of running your hand along.

1   A.  That is correct.

2   Q.  You testified that you are about six feet, is that right?

3   A.  Yes, sir.

4   Q.  So it's fair to say, is it not, that the ledge where you

5   found the magazine is approximately seven feet high?

6   A.  It appears to be a normal sized closet, yes.

7   Q.  Is seven feet normal?

8   A.  I am not sure, sir.  I don't know how tall it was exactly.

9   I just know it appeared to be what is a normal size.

10  Q.  Okay.  But so you reached up about a foot higher to run

11  your hand along that ledge, is that fair to say?

12  A.  Yes, sir.

13  Q.  I want to talk briefly about the plastic bags that you

14  found in the bed.

15          THE COURT:  May I just ask one question?

16          MR. MARVINNY:  Yes.

17          THE COURT:  You talked about this ledge.  How deep is

18  this ledge?  I understand where you found it.  Is it a foot?

19  Is it a couple inches?  Is it one inch?  Do you know?

20          THE WITNESS:  From my recollection, ma'am, its, the

21  closet's constructed out of two-by-fours.  Two-by-fours in

22  width is an inch and a half and the two-by-four was -- OK.  So

23  the four inch portion of the two-by-four or the three and a

24  half inch portion where you see the white trim.

25          THE COURT:  OK.

1      THE WITNESS:  And then so that's like that with the

2  short part on top, this is where I found the magazine on the

3  one and a half inch portion of the two-by-four.

4      THE COURT:  All right.  Thank you.

5      MR. MARVINNY:  I am a little confused but not from --

6      THE COURT:  You can say it is my questioning, OK.

7  BY MR. MARVINNY:

8  Q.  Just so the jury is clear, Agent Floyd, the ledge is about

9  four inches wide?

10  A.  About an inch and a half.  The two-by-four was laid on

11  edge.  From my recollection the two-by-four is laid on edge.

12  The two-by-four is confusing.  It's not actually a two-by-four.

13  It is one and a half by three and a half.

14  Q.  Agent Floyd, do you think you might be mistaken?  It isn't

15  a fact that the two by four lays such that the four inch part

16  is the flat portion?

17  A.  That is not my recollection but it could be true.

18      MR. MARVINNY:  One moment please, your Honor?

19      THE COURT:  Of course.

20      (Pause)

21      MR. MARVINNY:  Your Honor, may I approach?

22      THE COURT:  Yes.

23      (Pause)

24  BY MR. MARVINNY:

25  Q.  Agent Floyd, I've just handed you a picture that's been

DBJAABAR2          Floyd - Cross

1    premarked as Defendant's Exhibit D for identification.  Are you

2    looking at that picture?

3    A.  I am, sir, yes.

4    Q.  Now, do you recognize that ledge that's depicted in that

5    picture?

6    A.  Sir, I don't recognize where this picture is at.  There

7    is -- background to it.

8    Q.  You don't recognize that?

9    A.  No, sir.

10   Q.  OK.  Does looking at this picture refresh your recollection

11   about perhaps how the ledge looked on the day you searched the

12   apartment?

13        MR. QUIGLEY:  Objection, your Honor.  I think he's

14   already answered that he didn't see the ledge, so.

15        THE COURT:  All right.  Well, is there anything about

16   that picture cause you to question the testimony previously

17   given?

18        THE WITNESS:  The two-by-four, it was my recollection

19   that was on the narrow side very well could have been on the

20   longer three and a half inch side.

21        MR. MARVINNY:  That's fine.  I'll take that back.

22        (Pause)

23   Q.  In any event, Agent Floyd, at the risk of beating a dead

24   horse you discovered the ledge by you rubbing your hand on the

25   ledge, right?

DBJAABAR2            Floyd - Cross

1    A.  That's correct.

2    Q.  You didn't see it with your naked eye?

3    A.  That is correct.

4    Q.  So, let's just talk briefly about these plastic bags that

5    you found.

6    A.  OK, sir.

7    Q.  You testified that in your experience you've seen these

8    bags used to package narcotics?

9    A.  Yes.

10   Q.  In fact, I think your testimony was that usually the drugs

11   go inside that bag, right?

12   A.  Correct.

13   Q.  The bags hold drugs?

14   A.  Yes.

15   Q.  Now, in this case you didn't find any narcotics in that

16   apartment, correct?

17   A.  That is correct.

18   Q.  And you didn't find any residue of narcotics in any of

19   those bags, correct?

20   A.  No, we did not.

21   Q.  Those bags were completely empty?

22   A.  They were.

23   Q.  Let's talk about some other things you didn't find in that

24   apartment.  You didn't find a scale that might be used to

25   measure drugs?

1    A.  Correct.

2    Q.  You didn't find any book or any notation of what looked to

3    represent drug deals?

4    A.  No, sir.

5    Q.  You didn't find rubber bands that might be used in the drug

6    trade?

7    A.  No, we did not.

8    Q.  Just a couple more questions.  You were the photographer

9    that day, on May 7th, right?

10   A.  That is correct.

11   Q.  So we have you to thank for these pictures, correct?

12   A.  Correct.

13   Q.  I just want to show you one photograph.  Now, it seems like

14   you didn't really, you didn't participate in searching what we

15   call the sump pump room, did you?

16   A.  That is correct.  I photographed it but I did not search

17   it.

18   Q.  You photographed it but you didn't search it?

19   A.  Correct.

20   Q.  That's the room where the gun was ultimately found,

21   correct?

22   A.  That is correct.

23   Q.  Now did you have the opportunity to photograph the entrance

24   to that sump pump room before it was searched, isn't that

25   right?

DBJAABAR2          Floyd - Cross

1    A.  No, I did not.

2    Q.  You did not?

3    A.  No.

4            MR. MARVINNY:  Can we put up Government Exhibit 78,

5    please.

6            (Pause)

7    Q.  Agent Floyd, do you recognize what's depicted in Government

8    Exhibit 78?

9    A.  That's the door to the sump pump room.

10   Q.  That's the door to the sump pump room.  Now did you take

11   this photograph?

12   A.  Yes, I did.

13   Q.  Did you take this photograph before or after the sump pump

14   room was searched?

15   A.  After.

16   Q.  After.  Are you certain about that?

17   A.  Yes, sir.

18           MR. MARVINNY:  Are we able to put the photos side by

19   side?  Can we put 78 and 129 side by side please.

20           (Pause)

21   Q.  Can you see those photographs in front of you, Agent Floyd?

22   A.  Yes.

23   Q.  OK.  So we look at 79 which is the photograph -- I'm sorry.

24   78, which is the photograph on the left you testified that that

25   is a photograph of the entrance to the sump pump room, correct?

1    A.   Yes.

2    Q.   And that fairly and accurately depicts how the entrance to

3    the sump pump room looked that day of the search, May 7?

4    A.   Yes.

5    Q.   OK.  What do we see on photograph on the right, Government

6    Exhibit 129?

7    A.   Same area different angle.

8    Q.   Same area, different angle?

9    A.   Later.  There was time between those two photographs.

10   Q.   OK.  Do you know how much time passed?

11   A.   I don't know how much time passed.

12   Q.   Is it possible, Agent Floyd, that Government Exhibit 79 was

13   taken before the search of the sump pump room?  I am sorry.  78

14   was taken before the search of the sump pump room?

15            THE COURT:  If you know.  No one's asking you to

16   speculate.

17   A.   Number 78 was taken after the gun was located.

18   Q.   Let me ask you this, Agent Floyd.  Does Government Exhibit

19   78 -- despite when was taken, does it more or less represent

20   how the entrance to the sump pump room looked before the sump

21   pump room was searched?

22            MR. QUIGLEY:  Objection; foundation.

23            THE COURT:  Let me hear the question again.  Restate

24   the question.

25   Q.   Despite when it was taken, does Government Exhibit 78, the

1    photograph on the left fairly and accurately depict the way the

2    door to the sump pump room looked before it was searched?

3                THE COURT:  That is if you know, sir.  Again, I am not

4    asking you to speculate.

5    A.  I don't know.  I am sure the door was in the exact same

6    location but what else was in the room or moved around in that

7    very small bathroom, I don't know.

8    Q.  Well, you see in Government Exhibit 78 and in 129 there's a

9    space heater in front of the door, yes?

10   A.  Yes.

11   Q.  And there's a little bit of -- there's a piece of

12   insulation.  If you look at Government Exhibit 78 there's a

13   piece of insulation running along the bottom of the door?

14   A.  Yes.

15   Q.  And the door is closed, correct?

16   A.  That's correct.

17   Q.  And then off to the right on Government Exhibit 78 you see

18   a bottle of some liquid?

19   A.  Yes.

20   Q.  And you also see a small white disk next to the bottle of

21   liquid, correct?

22   A.  Yes.

23   Q.  Then if we look at Government Exhibit 129 which is the

24   photo on the right you see again that space heater, yes?

25   A.  Yes.

DBJAABAR2                    Floyd - Cross

1    Q.  Then you see the bottle of liquid?

2    A.  Yes.

3    Q.  But the, that small white disk isn't in that photo,

4    correct?

5    A.  That's correct.

6    Q.  Is it fair to say that people moved things around to set up

7    this photo?

8    A.  To set up this photograph that would not be the way I would

9    say that.

10   Q.  Well, someone moved the white disk, correct?

11   A.  Number 78 was taken after the gun was found and the search

12   was continuing.  Number 129 would be an exit photograph after

13   everybody was done searching, photographing the status of the

14   rooms before we left.

15   Q.  OK.  So these two photographs then more or less accurately

16   depict the entrance to the sump pump room on May 7, 2013, yes?

17   A.  Yes.

18            MR. MARVINNY:  Thank you.  You can put those down.

19            (Pause)

20            MR. MARVINNY:  I have nothing further, your Honor.

21            THE COURT:  Thank you.  Is there any redirect?

22            MR. QUIGLEY:  Very briefly, your Honor.

23            THE COURT:  Very well.

24   REDIRECT EXAMINATION

25   BY MR. QUIGLEY:

1  Q.  Agent Floyd, you were asked about various narcotics related

2  items that you did or did not find in the apartment.  Did you

3  search and find the gun?

4  A.  I'm sorry.  Repeat the question.

5  Q.  You were asked about various narcotics related items that

6  your search team did or did not find in the apartment.  Did

7  your search team find a gun in the apartment?

8  A.  Yes, they did.

9          MR. MARVINNY:  Objection.

10          THE COURT:  Hold on.  I'll let it in.

11          MR. QUIGLEY:  Nothing further, your Honor.

12          THE COURT:  All right.  Ladies and gentlemen, let us

13  take our morning break.  We'll make it brief, so about five

14  minutes or so.  Just go back to the jury room.  Get yourself

15  freshened up and we'll be ready for the next witness cause we

16  are done with this one.  Thank you, sir.

17          (Jury not present)

18          THE COURT:  We'll be back in five minute.

19          Anything anybody wants to discuss with me at this

20  time?

21          MS. GATTO:  No, your Honor, not from us.

22          THE COURT:  Can I know who the next witness is?

23          MR. QUIGLEY:  Agent Coughlin.

24          THE COURT:  See you in five.

25          (Recess)

1      (Jury present)

2           THE COURT:  The government may call its next witness.

3           MR. QUIGLEY:  Your Honor, the government calls Agent

4     Kevin Coughlin.

5           THE COURT:  Thank you.

6      KEVIN COUGHLIN,

7         called as a witness by the Government,

8         having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MR. QUIGLEY:

11    Q.  Where do you work, Mr. Coughlin?

12    A.  I work for the FBI as a special agent.

13    Q.  How long have you been an FBI agent?

14    A.  Over five years.

15    Q.  What did you do before you joined the FBI?

16    A.  I was in the Marine Corp for a long period of time.  I went

17    to law school when I was in the Marine Corp became a jag

18    officer where I was a prosecutor.  Then after that I worked for

19    United States House of Representatives in D.C. as an attorney.

20    I was a counsel and professional staff member of the House

21    Armed Services Committee.  I did that for a number of years

22    before joining the FBI.

23    Q.  And during your military service did you serve overseas?

24    A.  Yes, two tours in Iraq.

25    Q.  Directing your attention to May 7th of this year, did you

1    and other FBI agents and NYPD detectives go to 715 Hollywood

2    Avenue in the Bronx?

3    A.  Yes, we did.

4    Q.  Did there come a time when you began a search of that

5    apartment?

6    A.  Yes, I did.

7    Q.  Where did you go -- sorry.  Search a basement apartment?

8    A.  Yes.

9    Q.  Where did you when you were outside the basement apartment?

10   A.  When we first got into the apartment I was standing in the

11   living room area between the living room and the kitchen while

12   other agents that were with us were speaking to the female that

13   was present there regarding getting consent to search the

14   apartment.

15   Q.  Did you later learn the identity of, that woman's name?

16   A.  I don't recall her name.  I know that she was a female who

17   lived there at the residence with Mr. Bartee.  I don't recall

18   her name.

19   Q.  And could you see into the living room from where you were

20   standing?

21   A.  Yeah.  Essentially, I was in the living room between the

22   living room and the kitchen area.

23        MR. QUIGLEY:  Could you publish Government Exhibit 26.

24        (Pause)

25   Q.  Do you recognize that picture?

1   A.  Yes, I do.  That's like the coffee table that was in the

2   middle of the living room area, to the left of that coffee

3   table where was a TV was.

4   Q.  What do you remember about that table when you first got in

5   the apartment?

6   A.  I remember there being a large amount of cash on the table,

7   quite a number of 20 dollar bills.

8   Q.  How much would you say approximately?

9   A.  I couldn't say for certain but it was definitely more than

10  a hundred dollars.

11  Q.  What did you and the other agents do with that money?

12  A.  We asked the female that lived at the residence to collect

13  the money up because we didn't want there to be any questions

14  regarding how much was there or down the road if she questioned

15  how much money was there we asked her to collect all the money

16  up and keep it on her person.

17  Q.  Did there come a time when you actually began to search the

18  apartment?

19  A.  Yes, there did.

20  Q.  Where did you search first?

21  A.  Myself, I searched the kitchen first.

22  Q.  While you were searching the kitchen what were the other

23  agents doing?

24  A.  The other agents went to the rear of the residence and

25  based on my recollection I believe they started out in the

1    master bedroom.

2              MR. QUIGLEY:  Could we publish Government Exhibit 173.

3              (Pause)

4    Q.  Do you recognize that?

5    A.  Yes, I do.

6    Q.  What is that?

7    A.  That's a photo of the kitchen and, essentially, at an

8    around the time that I conducted the search.

9    Q.  Directing your attention to the right side of the screen,

10   do you see the, looks like a money on the counter?

11   A.  Yes.

12   Q.  Do you recall that being present when you began the search?

13   A.  Yes.  This photo essentially represents what the kitchen

14   looked like prior to the search.

15   Q.  Did there come a time when you learned that agents had made

16   a discovery in the bedroom?

17   A.  Yes.

18   Q.  Without saying what anyone told you, can you describe what

19   you learned and how you learned it?

20   A.  Yes.  After learning that there was some items that were

21   discovered in the bedroom I went into the back master bedroom.

22   I asked at the time there was a magazine found to a gun and I

23   had asked Special Agent Floyd where that was discovered, at

24   which point he demonstrated to me in the back left hand closet

25   of the master bedroom -- so as you walk into the master bedroom

DBJAABAR2                    Coughlin - Direct

1   there was a closet on the left, a closet on the right.  The

2   closet that Special Agent Floyd had found it in was in the back

3   left.  He demonstrated that he had to go into the closet and

4   then reach up behind the overhang of the closet and that's we

5   pulled down a magazine to a firearm.  In addition, there was a

6   compartment that was inside the bed, essentially, where you

7   would expect to have the box spring of the bed.

8           MS. GATTO:  Objection.

9           THE COURT:  I'm sorry?

10          MS. GATTO:  Objection to his characterization of the

11  storage area.

12          MR. QUIGLEY:  Describe it where he found it, your

13  Honor.

14          THE COURT:  All right.  I'll let him continue.

15  A.  So, essentially, where you would expect to have the box

16  bring and the bed it lifted up on hinges and then there was a

17  compartment inside that area.

18  Q.  What was in that compartment?

19  A.  Essentially, it was small baggies that I refer to it as

20  "dime bags".

21  Q.  What impact, if any, did the discovery in the bedroom have

22  on your search?

23  A.  Based on the locations of where these items were discovered

24  it had kind of heightened my search, what I was looking for.  I

25  was looking for other places that more creative hiding place

1    that somebody could have something.  So, essentially, I mean to

2    the point where I was knocking on wood panel walls to see if

3    there was a false back or something like that.  So it

4    definitely heightened up where I started looking into different

5    places.

6    Q.  And what, if any, impact did the discovery of the magazine

7    and ammunition have on your search?

8    A.  Based on discovering the magazine you would assume that

9    there would be a gun to where that magazine would go.  So,

10   essentially, I was looking in the areas where somebody would

11   hide a gun.  And because my presumption was if there's a

12   magazine the magazine would go to a gun and we hadn't found a

13   gun yet.

14   Q.  Did there come a time when you went into the apartment

15   bathroom?

16   A.  Yes, there did.

17           MR. QUIGLEY:  Can you publish Government Exhibit 34.

18           (Pause)

19   Q.  What do you see in this exhibit?

20   A.  Essentially, this is the hallway of the apartment.  So

21   where this photo was taken behind that person that took the

22   photo is the living room and the entryway into the apartment.

23   And directly to the right, that first area where that light

24   switch is is, essentially, the open doorway into the kitchen

25   area.

1  Q.  Referring to a kind of greenish teal?

2  A.  Exactly.  So that was the first area I searches and you can

3  see like the beginning of a little cabinet there, that would be

4  part of the cabinets of the kitchen.  So essentially as you

5  walked down this hallway, that first doorway on the right-hand

6  side is the bathroom.  As you continue to walk back, that back

7  room which I would refer to almost like a second bedroom is

8  where there was two double, two bunk beds or, essentially, one

9  bunk bed with two beds in it on the left-hand side and around

10 the corner there was the doorway that went into the master

11 bedroom.  So, essentially, on the -- you see the wall on the

12 left-hand side, the other side of wall is where the master

13 bedroom would be.

14 Q.  OK.  Just taking it back a couple steps, so the bathroom is

15 the white door frame on the right side past the teal colored

16 panel there?

17 A.  Yes.

18 Q.  And you said there was a bunk bed in the back.  Did you

19 observe those bunk bed?

20 A.  Yes.

21 Q.  What did they have on them?

22 A.  They had a lot of clothing, piles of clothing.  There was

23 some bags of clothes, if I recall, on the floor as well.

24 Q.  Did there look like anybody had been sleeping in those?

25 A.  No.  There was no sheets on the beds or anything like that.

1    There was just a mattress.  It appeared to me that they were

2    using the beds for, to put their clothes on or to hang their

3    clothes up and stuff like that.

4    Q.  And the entry for the apartment is where in relation to

5    this photo?

6    A.  It's essentially behind the person that would have taken

7    this photo because the entryway is behind the living room.  So

8    you have to come into the entryway into the living room.  The

9    kitchen's on the right-hand side then you walk down this

10   hallway.  Bathroom is on the right-hand side, continue to walk

11   down, make a left into that second bedroom, then make another

12   like sharp U-turn into the master bedroom.

13   Q.  So someone coming from the master bedroom to the entrance

14   of the apartment would have to walk towards the camera?

15   A.  Yes.  So, essentially, if you left the master bedroom on

16   your way tot he entrance you would come down this hall past the

17   bathroom, past the kitchen through the living room to go to the

18   front door.

19          MR. QUIGLEY:  Can we publish Government Exhibit 78?

20          (Pause)

21   Q.  What is this a picture of?

22   A.  This is a photo of when you walked into the bathroom the

23   shower was on the left-hand side, sink on the right-hand side

24   of the toilet and medicine cabinet and then this door was there

25   with this heater pushed in front of it and, essentially, that,

1    what I thought was a closet to the bathroom which I later

2    discovered was not a closet.

3    Q.  So does this depict how that door and the item in front of

4    it appeared when you walked into the bathroom?

5    A.  Yes.

6    Q.  Do you know when this picture was taken?

7    A.  This was taken after, essentially, soon after the search.

8    Q.  So did you place the --

9    A.  Yes.  So I placed the heater back into the position it was

10   in when I walked into the bedroom.  So this is after I had

11   already conducted a search and, essentially, I -- for the photo

12   I pushed it back to the same location that it was when I first

13   walked into the bathroom.

14   Q.  And did you eventually, did there come a point during the

15   search when you opened the door?

16   A.  Yes, there was.

17   Q.  What was behind that door?

18   A.  When I -- so, I rolled the heater out of the way.  I opened

19   the door then I discovered what I would describe as either like

20   a sump pump room or rather it's a more of as a sewage room.

21          MR. QUIGLEY:  Could we publish Government Exhibit 82.

22          (Pause)

23   Q.  Do you recognize that, Agent Coughlin?

24   A.  I do.

25   Q.  Do what's it a picture of?

1   A.  Photo, roughly taken from the doorway of that closet I was

2   just talking to that was the entryway into a sump pump sewage

3   area.

4   Q.  When you opened the door on May 7, what, if anything, stood

5   out to you?

6   A.  The fact that the light was on in there was suspicious to

7   me, you know as far as why the light would be on in that room.

8   Q.  Could you see where the switch for that light was?

9   A.  Yes.  It was a pull switch.  You could see the middle of

10  the room where that string or chain was hanging down there and

11  essentially that was the light that was on when I opened the

12  room.

13  Q.  How did the room smell?

14  A.  I mean, it smelled bad.  It smelled like, you know, sewage

15  or -- yes.

16  Q.  How would you -- were there any bugs in the room?

17  A.  Yeah.  There was a number of fly tapes, you know, like

18  those long, you know, tapes that you would pull out to catch

19  flies and both type tapes were completely covered in flies.

20  Q.  How would you generally describe --

21  A.  It was dirty.  It was a very dirty room, filthy all over

22  the place.

23  Q.  Where did you go once you opened the door?

24  A.  I went, essentially, I bypassed, essentially, there was a

25  big hole in the ground where there was dirty water sewage water

1    whatever it was.  Then I stepped over there and started my

2    search in the back of the room to try to look for areas where I

3    might want to, where I might hide something.

4    Q.  Did there come a time when you searched the sump pump

5    itself?

6    A.  Yes.

7    Q.  How did you do that?

8    A.  So the sump pump was a big circular area in the floor.  And

9    the -- it was as I said the water was disgusting.  You couldn't

10   see into the water at all because it was, essentially, so

11   dirty.  And so, obviously, I was -- my thought was if somebody

12   threw something in there that there could be something on the

13   bottom but, obviously, I was hoping there wasn't, cause I

14   really didn't want to stick my hand into that water.

15            So what I did was I found a rod or a stick or

16   something that was in that back room and I stuck it down to the

17   bottom.  And it was fairly deep.  And then I started,

18   essentially, dragging the stick that I had along the bottom

19   slowly and then coming back and forth making small,

20   essentially, curves to see if that stick would catch on

21   something which would have indicated that there was something

22   on the bottom that would have been as I stated for me to reach

23   down into the water and see what it was.  But after making my

24   passes along the bottom of that, you know, sewage pump or

25   whatever you want to call it, I didn't find anything on the

1    bottom.

2    Q.  OK.

3    A.  Anything that I would have considered that would have

4    necessitated me putting my hand down there.

5         MR. QUIGLEY:  Could you briefly publish Government

6    Exhibit 84.

7         (Pause)

8    Q.  What is that?

9    A.  That's the sewage area or the sump pump area there.  I can

10   only assume that that lid there on the, to the right is,

11   essentially, would have been the cover for that.  But,

12   obviously, this was the, what it looked like when I came in.

13   So it was, the area was completely opened.

14   Q.  What did you do after you searched that area?

15   A.  I continued to search the area for other places where I

16   thought there could be something hidden there.

17   Q.  When you walked back toward the bathroom door?

18   A.  There was.  Essentially in that room in the ceiling what I

19   would describe as like an air duct, like a metal duct work

20   system that would be commonly used in like let's say an HVAC or

21   heating or cooling system and, essentially, was in the ceiling.

22   In the back of that room that was flush with the wall.  So,

23   essentially, the metal of the ducts were was, essentially, flat

24   with the wall.  So you wouldn't be able to get your hand up

25   there to search but as that duct work started walking towards

1   the closet door, the door that I entered through there started

2   becoming some space between the duct work and the wall.

3          MR. QUIGLEY:  If you could publish Government Exhibit

4   88.

5          (Pause)

6   Q.  Looking at this, Agent Coughlin, do you see the duct work

7   you are talking about, you were speaking about?

8   A.  Yes, you do.  So, to the right there you see the light with

9   the hanging switch there.  And to the left you see where those

10  are kind of coat hooks, wood coat hooks.  So, to the left there

11  you see where the duct or metal duct work is flush with the

12  wall.  But right where that little two-by-four touches the wall

13  you could see there start to becoming an opening.  If you look

14  on he right-hand side you can see the duct work starts to make

15  a right-hand turn from what I understood based on looking at it

16  or essentially supporting that duct work.  So that you could

17  start seeing the opening of the -- in the duct work where those

18  two-by-fours are.  And, essentially -- so, I stuck my hand up

19  to try to feel along the side of the metal duct work to see if

20  there was anything up there or any location that you could hide

21  something.

22  Q.  Just look back at Government Exhibit 88, that open door at

23  the bottom of the picture, that's the door to the bathroom?

24  A.  Yes.  The door to the bathroom where initially when the

25  photo from a few minutes ago where that heater was in front of

 1    that is the door that I opened to enter into this room which

 2    was the only way in or out of that room.

 3    Q.   OK.  And as you ran your hand along the duct work back

 4    towards the bathroom, did there come a point when you found

 5    something?

 6    A.   Yes.  So, essentially, I was running my hand along the duct

 7    work.  Then I felt there was an opening or an empty space on

 8    the other side of that two-by-four that drop down.  And there

 9    was like a little, I would say almost like a platform where

10    there was like an empty space where you could reach your hand

11    up and reach your hand down.

12    Q.   What did you find?

13    A.   Essentially when I reached up there and I felt the opening

14    and I reached in and over that two-by-four, I felt a plastic

15    bag.  And, essentially, at that time I felt a plastic bag and I

16    felt what I believed to be a gun side inside that bag which is

17    what I had pulled out.

18                MR. QUIGLEY:  Would you publish Government Exhibit 89.

19                (Pause)

20    Q.   What is that?

21    A.   Essentially, that is picture of me demonstrating exactly

22    where I put my hand up into -- essentially, that's me right

23    there, the back of my head and my jacket.  And so I reached up

24    inside exactly where I was talking about that empty space and

25    that's how I reached up and over and down which is how I exact

1   position that my hand was when I pulled the gun out.

2   Q.  This picture was taken after you found the gun?

3   A.  Yes.  Essentially, I was demonstrating for the person that

4   is taking the photos exactly where and how I found it to make

5   it easier to understand down the road the exact location that I

6   pulled the gun from.

7   Q.  Just to the left of your head there is the -- you can see

8   the entrance to the bathroom?

9   A.  Yes.

10          MR. QUIGLEY:  Can you publish Government Exhibit 90.

11          (Pause)

12  Q.  What's that?

13  A.  Essentially, it's a closer up photo of me demonstrating

14  exactly where I pulled that gun out of and where I had to put

15  my hand in order to pull that gun out.  So, essentially, better

16  demonstrate exactly the location where the gun was found.

17          MR. QUIGLEY:  Can you publish Government Exhibit 92.

18          (Pause)

19  Q.  What's that?

20  A.  Essentially, that's the gun that is inside the bag that I

21  found in that location.  Essentially, that's exactly what I

22  pulled out of that, essentially, place.

23  Q.  And then what is the bluish purplish thing underneath the

24  gun?  What is that?

25  A.  That's my hand.  I was wearing gloves at the time.  The

1    gloves I was wearing were, essentially, blue purplish.  You can

2    see the top center there that my other hand with the same

3    coated glove.

4    Q.  Were other agents wearing gloves during the search?

5    A.  Yes.

6    Q.  Can you describe the appearance of the plastic bag when you

7    found it?

8    A.  The plastic bag appeared to be a regular plastic bag.  It

9    was clean.  There wasn't any dirt on it or cobwebs or anything

10   like that.

11   Q.  Any bugs flying around?

12   A.  Nope.  It appeared to be a regular clean bag.

13   Q.  Any dust?

14   A.  Nope, no dust.

15   Q.  Did you take the gun out of the plastic bag?

16   A.  I did.

17   Q.  Can you describe the appearance of the gun when you found

18   it?

19   A.  The gun is in the same condition as it is pretty much

20   today.  It was clean.  It wasn't dirty at all.  Essentially, it

21   was, it appeared to be in a functional good order.

22   Q.  Visible defects?

23   A.  No visible detects.

24   Q.  Any major problems?

25   A.  No.  No dirt, no rust, nothing.  It was as I said, it's the

DBJAABAR2                    Coughlin - Direct

1   same condition as it is today.

2   Q.  Any insects crawling on it?

3   A.  Nope.

4           MR. QUIGLEY:  Your Honor, may approach?

5           THE COURT:  Yes.

6   Q.  Agent Coughlin, I am handing you what's been marked for

7   identification as Government Exhibit 203.

8           THE COURT:  Was this already received in evidence?

9   Q.  What's in evidence as Government Exhibit 203, do you

10  recognize that?

11  A.  Yes, I do.

12  Q.  What is that?

13  A.  This is, essentially, this is the gun that I found in that,

14  essentially, the hiding place, the closet where I pulled the

15  gun out of in that duct work system.

16  Q.  How do you know that's the gun?

17  A.  Because it matches the description of the photos we tooken

18  the day of and the serial number KMF00299.  Essentially, that

19  matches the serial number from the photos that we took

20  immediately after I'd found it.

21          MR. QUIGLEY:  Can you publish Government Exhibit 99.

22          (Pause)

23  Q.  What is that a picture of?

24  A.  Essentially, that is the -- after I'd taken the gun out of

25  the plastic bag we laid some newspaper down and I believe it

1    was the living room to take a photo of it.  I laid the gun down

2    for the individual who was taking the photos.  And you said see

3    at the end of the gun there on the left-hand side the KMF0299

4    is the serial number that matches the serial number of the gun

5    that you just handed to he me.  Obviously, the description of

6    both -- the description of both the photo and the gun match.

7    Q.  Just, Agent Coughlin, has the gun been rendered safe for

8    today's courtroom purposes?

9    A.  Yes.  It's -- there's a plastic, essentially, a zip tie has

10   been looped through the barrel to ensure that the gun can't be

11   fired with this in.  So it's, obviously, it's unloaded but it's

12   already been rendered safe by this zip tie in there.

13              MR. QUIGLEY:  Nothing further, your Honor.

14              THE COURT:  All right.  Thank you.

15              Cross-examination?

16              MS. GATTO:  Yes.  Thank you, your Honor.

17   CROSS-EXAMINATION

18   BY MS. GATTO:

19   Q.  Good morning, agent.

20   A.  Good morning.

21   Q.  Agent Coughlin, so you're the agent who recovered the gun,

22   right?

23   A.  Yes.

24   Q.  I think you described a spot that you found it in as a

25   creative hiding spot, correct?

1    A.  Yes.

2    Q.  You actually had a bit of a complicated way put your hand

3    up a wall across a two-by-four and down?

4    A.  Yes.

5            MS. GATTO:  If you wouldn't mind showing us Government

6    Exhibit 92.

7            (Pause)

8    Q.  So that's a picture of how the gun in the plastic bag

9    looked after you recovered it?

10   A.  Yes.

11   Q.  And you already told the jury that you're wearing latex

12   gloves?

13   A.  Yes.

14   Q.  When you conduct a search you bring latex gloves with you?

15   A.  Yes.

16   Q.  Your team does?

17   A.  Yes.

18   Q.  Because you want to be careful?

19   A.  Yes.

20   Q.  You need to be careful to preserve the evidence, is that

21   correct?

22   A.  Yes.

23   Q.  And by preserving the evidence, not only the actual items

24   you recover but any forensic evidence that's on there, correct?

25   A.  Yes.

1  Q.  Because you know that this sort of thing is going to be

2  sent to a lab some day?

3  A.  Yes.

4  Q.  And lab a scientist is going to exam it under a microscope

5  or more complicated machinery to determine the forensic

6  evidence on there?

7  A.  Yes.

8  Q.  So you wear gloves so that you, one, keep the forensic

9  evidence that's already on there on there, right?

10  A.  That's correct.

11  Q.  And, two, not transfer any of your DNA or fingerprints on

12  to it?

13  A.  Yes.

14  Q.  So you are very careful.  That is the standard procedure,

15  correct?

16  A.  Yes, it is.

17  Q.  So I am going to talk a little bit more about when you

18  recovered the gun but I want to take a step back.  I think you

19  testified that the first place you searched was the kitchen, is

20  that right?

21  A.  Yes.

22  Q.  And you did a thorough search, correct?

23  A.  Why.

24  Q.  You opened up the cupboards and the closets, right?

25  A.  Yes.

DBJAABAR2                    Coughlin - Cross

1    Q.  The drawers?

2    A.  I did.

3    Q.  You didn't find any contraband in the kitchen?

4    A.  I did not.

5    Q.  You saw plates, right?

6    A.  I probably did.  I don't remember, specifically, all the

7    items that I found in the cabinets but --

8    Q.  The typical things you would find in the kitchen, right?

9    A.  Yes.

10   Q.  For somebody who lived there and eats there?

11   A.  Exactly.

12   Q.  And I think you also testified that you searched the

13   bathroom before you went into the sump pump room, is that

14   right.

15   A.  Yes.  When I first walked into the bathroom.

16   Q.  Again conducted a thorough search, that is your job, right?

17   A.  Yes.

18   Q.  Looked in the medicine cabinet?

19   A.  Yes.

20   Q.  Didn't find any contraband in there?

21   A.  Did not.

22   Q.  Shaving cream and toothpaste and things you typically see?

23   A.  Normal items you would find in bathroom, yes.

24   Q.  Then from the bathroom after other agents had found the

25   magazine you then went to the sump pump room?  Did I get that

1   right?

2   A.  No.  I believe that the other items were found in the

3   master bedroom before I went to the bathroom?

4   Q.  Yes.  That's what I meant to say.

5   A.  Yes.  I didn't go into the bathroom because I either was

6   still searching the kitchen or I may have -- I think I was

7   finishing up the kitchen if I remember correctly.  I also

8   searched that second bedroom where all the clothes were.  I did

9   some searching in there but I don't remember the order when I

10  did that.

11  Q.  OK.  But regardless ultimately you go into the sump pump

12  room?

13  A.  Yes.

14          MS. GATTO:  If you wouldn't mind Government Exhibit

15  78.

16          (Pause)

17  Q.  This you testified is how the door appeared before you

18  entered the sump pump room?

19  A.  Yes.

20  Q.  And this picture was taken after you actually searched?

21  A.  That is correct.

22  Q.  But you were careful to put the items back?

23  A.  In the same location they were when I first walked in

24  before I actually went into that room.

25  Q.  Right.  You were careful to preserve the scene?

1    A.  Yes.

2    Q.  That's your job?

3    A.  Yes.

4    Q.  So just so we know the items that are here, I write that

5    this is some sort space heater in the front?

6    A.  Yes.  And it was plugged in.

7              THE COURT:  May I just ask you let her finish her

8    question so the court report can take both question and answer

9    accurately.

10   Q.  You predicted my next question.  There's a wire that goes

11   from that electrical heater is actually plugged into an outlet,

12   correct?

13   A.  That is correct.

14   Q.  And you see this kind of black foam on the bottom of that

15   door?

16   A.  Yes.

17   Q.  Do you see that?

18   A.  Yes.

19   Q.  Okay.  So I'm right that that's some sort of like draft

20   protector; is that what you call it?

21   A.  Yes.  It's, essentially, it's attached to the bottom so

22   when you open the door it slides with the door.  So it doesn't

23   come off but, essentially, it's attached to the bottom and you

24   open it up, stays on the bottom.  Then when you close it it

25   closes back with it.

1   Q.  Some sort of insulation?

2   A.  Yes.

3   Q.  Then there's a jug of purple -- is that cleaning fluid?

4   A.  It would appear to be cleaning fluid, yes.

5   Q.  Then there's a white disk?

6   A.  Yes.

7   Q.  All those items were in front of the door before you

8   entered the sump pump room?

9   A.  Yes.

10  Q.  You had to physically move them to get --

11  A.  Well, not the -- only the heater.  The other items were in

12  the locations so I could see where the door would have swung.

13  You wouldn't have had to move those items.  It's almost like

14  those items would be placed if you had opened up the door and,

15  essentially, they were, essentially, pushed but I didn't move

16  those items.  That's, essentially, the location those items

17  were before I went into the closet.

18  Q.  You would agree with me you moved the heater?

19  A.  Yes.

20  Q.  You are telling us that you didn't move the solvent?

21  A.  Based on my recollection the heater was the only thing I

22  moved to get into closet.  Everything else was in the, roughly,

23  in the same place that it was when I came into the bathroom.

24  Q.  You believe you that you didn't move that disk?

25  A.  I don't believe I moved that disk, no.

1    MS. GATTO:  If I could bother you for Government

2  Exhibit 87.

3         (Pause)

4  Q.  I think this is a picture, comparable picture that you

5  looked at on your direct.  Am I right that on the left is where

6  you recovered the firearm from?

7  A.  Yes.  Essentially, my hand would have gone up between or

8  behind where the hooks are, like the coat hooks, the wooden

9  pegs they're essentially between the two-by-fours is where.

10  Q.  So, if you are walking into the room you, essentially,

11  found the gun immediately to the right, to your right, correct?

12  A.  Yes.

13  Q.  And the door between the bathroom and the sump pump room it

14  opens into the bathroom, correct?

15  A.  Yes.

16  Q.  Not into the sump pump room?

17  A.  That's correct.

18  Q.  And if the bathroom light is on it casts light on the area

19  where you found the gun, correct?

20  A.  Could you repeat the question?

21  Q.  Sure.  So let me just take a step back.  You see how the

22  door in this picture with the -- let's do it this way.  The

23  door in this picture is the door between the bathroom and the

24  sump pump room, right?

25  A.  Yes.

1   Q.  And if this door is opened it opens into the bathroom?

2   A.  Yes.

3   Q.  And if that bathroom light is on, correct, it casts light

4   on the area where you found the gun?

5   A.  Well, I would say, yes, but also too if you look there's

6   another, essentially, there's another area next to that.  So,

7   essentially, you have --

8   Q.  Well, my question is really, yes or no, does the light in

9   the bathroom cast light on the area where you found the gun?

10  A.  I don't know because I was never in a position where the

11  light in that room was off and the only light was in the

12  bathroom.  So I have no idea if that light in the sump pump

13  room were off whether or not the light from the bathroom would

14  have cast light on that area, I don't know.

15  Q.  Fair enough.  Let's talk about the other lights that's in

16  there that's deeper into the sump pump room.

17  A.  Yes.

18  Q.  I am right that that's several feet deep into the such pump

19  room?

20  A.  If you look at where the two-by-four is for where the wood

21  pegs are the light is, obviously, attached to where that

22  two-by-four is.  So I mean if I had to estimate it I would say

23  a few feet into the room would be the light switch.

24  Q.  I'd, certainly, have to walk into the room to turn it on,

25  correct?

1    A.  I would say not walk in.  I would say step in.

2    Essentially, you could reach that light from where I pulled

3    that gun from.  So -- and that is just maybe a step or two into

4    the room.  So, I said if you step into the doorway you're,

5    essentially, it's based on my recollection.  I believe that's

6    kind of reaching distance but you would have to be in the room

7    if that's your question, yes.

8    Q.  That my question.

9            THE COURT:  One question, one answer.  Thank you.

10   Q.  Just so the record is clear, your feet have to be in the

11   sump pump room for you to turn that light on, yes?

12   A.  I would think so but I didn't try to turn that light on

13   from the bathroom.  So, I mean I don't know if you would be

14   able to reach.  I didn't try that.  If you asked me my opinion

15   I would think I would step into the room.

16   Q.  You testified that that light was on when you first entered

17   the sump pump room?

18   A.  Yes.

19   Q.  You have no way of knowing when that light was turned on,

20   correct?

21   A.  No, I didn't.

22   Q.  You didn't unscrew the bulb and conduct some sort of kind

23   of examination giving the timing of when it was on?

24   A.  No, I didn't.

25   Q.  You don't know who turned it on?

1    A.   No, I don't.

2    Q.   You didn't dust it for fingerprints, right?

3    A.   No.

4    Q.   Or send the clip, the clip of the string that turned it on

5    and send it off to the labs?

6    A.   No.

7    Q.   The items that are recovered from that room, the gun and

8    the plastic bag and the ammo, they're all treated as evidence,

9    right, after you recover them?

10   A.   Yes.

11   Q.   We talked a little bit at the start of your

12   cross-examination but evidence is safeguarded after it's found,

13   right?

14   A.   Yes.

15   Q.   Those items are photographed.  That's one thing you do with

16   evidence, right?

17   A.   Yes.

18   Q.   They're vouched?

19   A.   Yes.

20   Q.   By "vouchered" I mean a record is maintained by law

21   enforcement of where the item was found, right?

22   A.   Yes.

23   Q.   You took custody of it?

24   A.   Yes.

25   Q.   Where it's going next, for example, if it was going to the

1   lab, right?

2   A.  Yes.

3   Q.  This may be a stupid question but you are not leaving those

4   items behind the apartment?  You are taking them with you when

5   you finish your search?

6   A.  Yes.

7   Q.  For the records?

8   A.  Yes.

9   Q.  This is standard practice for when you recover things?

10  A.  Yes.

11  Q.  Things of evidentiary value?

12  A.  Yes.

13  Q.  You testified on direct that when you first get into the

14  apartment when you are in the living room you saw some cash on

15  the table, right?

16  A.  Yes.

17  Q.  That money was never vouchered, correct?

18  A.  It was not.

19  Q.  In fact, you don't really know how much it was?

20  A.  I don't.

21  Q.  The money was never photographed, right?

22  A.  Not to my knowledge.

23  Q.  You never seized it, right?

24  A.  We did not.

25  Q.  And so you left and the money stayed in the apartment,

1    correct?

2    A.  I don't know if it stayed in the apartment because the

3    female that lived at that residence had it in her possession.

4    So I can only assume when she left the apartment she took it

5    with her.  So I don't think it was there when we left the

6    apartment cause I think she left at some point as well.

7    Q.  You gave her the money?

8    A.  Yes.  Well, we didn't give it to her.  She took it off the

9    table.  So we didn't handle the money.

10   Q.  You asked her to take it off the table?

11   A.  Yes.

12   Q.  And she kept it?

13   A.  Yes.

14   Q.  So I am right that related to the firearms investigation

15   your team seized the gun, the magazine and the plastic bag that

16   the gun was hidden in?

17   A.  Yes.

18   Q.  None of those items were out in the open, correct, Agent

19   Coughlin?

20   A.  No.

21   Q.  You only found -- your team only found them because you

22   conducted a thorough search, right?

23   A.  Yes.

24           MS. GATTO:  No further questions.

25           THE COURT:  Any redirect?

1        MR. QUIGLEY:  Very briefly, your Honor.

2        THE COURT:  Very brief.

3   REDIRECT EXAMINATION

4   BY MR. QUIGLEY:

5   Q.  Agent Coughlin, you testified on cross examination you

6   conducted a thorough search; do you recall that?

7   A.  Yes.

8   Q.  During your search do you recall you or any of the other

9   members of your team finding any jewelry making equipment or

10  beads?

11  A.  I don't recall.

12  Q.  You don't recall any of that stuff being found?

13  A.  I don't recall any of that stuff being found.

14       MR. QUIGLEY:  Can you publish Government Exhibit 78

15  again.

16       (Pause)

17  Q.  Agent Coughlin, you said this photo was taken after you

18  found the gun?

19  A.  Yes.

20  Q.  And you and the other agents had been in that sump pump

21  room when this photo was taken?

22  A.  Yes.  We had already been in that room when that photo was

23  taken.

24  Q.  And did you have to mop up the floor or anything before

25  taking this photo?

DBJAABAR2                    Coughlin - Redirect

1   A.   No.

2   Q.   How did the floor appear to you looking at Government

3   Exhibit 78?  Do you see any dirt on it?

4   A.   There appears to be some dirt on it.

5   Q.   Generally, it appears clean?

6   A.   Yeah, in general.

7           MR. QUIGLEY:  Government Exhibit 34.

8           (Pause)

9   Q.   Do you recall when this photo was taken?

10  A.   Essentially, we were taking the photos.  It would have been

11  based on my recollection, I think it was after we had found the

12  items, so it was at some point soon after we had found the

13  items.  So they were like a step-by-step of through the

14  apartment to kind of demonstrate the sequence of events so we'd

15  be able to walk through it at a later date.

16  Q.   So you and other agents had been in the sump pump room when

17  this photo was taken?

18  A.   Yes.

19  Q.   And does the floor generally look clean?

20  A.   Generally, yes.

21  Q.   Did you have to mop it or anything before you took this

22  photo?

23  A.   No.

24          MR. QUIGLEY:  No further questions.

25          THE COURT:  No recross?

1        MS. GATTO:  No.

2        (Witness excused)

3        THE COURT:  Mr. Quigley.

4        MR. QUIGLEY:  The government calls Brandy Mora a.

5    BRANDY MORA,

6        called as a witness by the Government,

7        having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. QUIGLEY:

10   Q.  Ms. Mora, where do you work?

11   A.  New York City Police Department Police Laboratory.

12   Q.  Where is that lab located?

13   A.  In Jamaica, Queens.

14   Q.  And how long have you worked there?

15   A.  Approximately, four years.

16   Q.  Do you work in any particular department?

17   A.  Yes.  I work in the latent print development unit of the

18   laboratory.

19   Q.  What do you do there?

20   A.  I examine evidence for possible presence of latent prints.

21   Q.  You also swab evidence for DNA?

22   A.  Yes, I do.  I collect DNA and trace evidence when present.

23   Q.  Can you briefly describe how evidence gets to the lab?

24   A.  The evidence is submitted by NYPD officers, as well as

25   other submitting agencies such as the FDNY, DEA, ATF.

1  Q.  With respect to the latent fingerprint examination can you

2  just briefly describe what you do with latent fingerprint

3  evidence?

4  A.  We analyze it for physical and chemical methods to develop

5  latent prints off of them.

6  Q.  If there any latent prints developed what do you with them

7  after that?

8  A.  Whenever I develop latent prints I digitally photograph

9  them and they are sent to the latent print section of the NYPD

10  for further evaluation to compare and identification purposes.

11  Q.  You also mentioned you swab evidence for DNA.  What do you

12  do with the DNA swab?

13  A.  The swabs that I collect from the evidence are forwarded to

14  the medical examiner's office for further evaluation.

15  Q.  So in your lab do you actually prepare fingerprints and DNA

16  that you find on other people?

17  A.  No, I don't do any comparisons or latent prints or DNA

18  collection.  I only do the development of prints from the

19  evidence.

20  Q.  Can you describe the training you've received?

21  A.  Yes.  I have bachelor's degree in forensic science from

22  John Jay College of Criminal Justice.  I did a six month

23  internship at the medical examiner's office in New Jersey and I

24  received six months in-house training at the laboratory in the

25  field of latent print development and this training consists of

1    classroom instruction, written oral and practical examines

2    hands-on exercises, approximately, two weeks of mock casework.

3    I've also received training in digital photography, as well as

4    DNA collection and preservation.  And I've received a training

5    from an external source, Bronx Smith & Associates.  That class

6    was introduction to friction ridge examination.

7         MS. GATTO:  Is it possible to move that screen?  We

8    are having trouble hearing the witness.  I think that's part of

9    the problem.

10   Q.  Ms. Mora, what is a fingerprint?

11   A.  A fingerprint is an impression left by the friction ridge

12   of the skin of your finger.

13   Q.  Are there different kinds of fingerprints?

14   A.  Yes.  There's three types.  There are prints that can be

15   seen with.the naked eye and this a print such as ones left in

16   blood or ink.

17        There's the second type is latent print.  This print

18   is  not seen by the naked eye such as prints left in

19   perspiration.  You can use powders and dusting to develop it.

20        The third type is three dimensional print and this

21   print is left in like a soft a -- substrate such as gum or

22   clay.

23   Q.  When someone touches an object, they automatically leave a

24   fingerprint?

25   A.  No, not necessarily.

1    Q.  What does that depend on?

2    A.  It depends on many factors.  The first factor is a person's

3    friction ridges of skin.  If somebody's ridges are too thin

4    they may not produce well.  Perspiration is another factor

5    where somebody who doesn't sweat enough their ridges will not

6    be produced on the substrate.  Somebody who has lot of

7    perspiration ridges become distorted.  Another factor of the

8    substrate itself, which the characteristics of substrate such

9    as the softer dirty texture -- the friction ridge being

10   reproduced.

11          In regards to firearms, the main types of

12   manufacturers treat firearms with a finished and the finish is

13   called gun gluing.  The reason for the gun gluing is it will

14   inhibit the corrosion and rusting of the firearm and also dulls

15   the firearm to remove the glare.  This finish though also

16   inhibits fingerprints being reproduced onto the firearm.

17          There is another factor is the air temperature and

18   humidity that can cause perspiration to evaporate, to

19   condensate thereby -- latent print that may have been left

20   behind.  The package and handling of evidence if it's

21   improperly handled or packaged print can get destroyed that

22   way.

23          MS. GATTO:  Your Honor, we have no objection but I

24   think she has to be qualified as an expert.

25          THE COURT:  I was wondering when that was going to

1    happen.  Were you planning on offering her as an expert?

2              MR. QUIGLEY:  We were, your Honor.

3              THE COURT:  All right.  Because she is kind of

4    testifying about a lot of things that I think should have been

5    asked after qualification.  So, are there additional

6    qualifications questions you'd like to ask her and then will

7    the defense, give the defense and opportunity --

8              MR. QUIGLEY:  No additional qualification questions.

9              THE COURT:  All right.  Then let me ask are there

10   additional questions?

11             MS. GATTO:  No, your Honor.  And we have no objection.

12             THE COURT:  All right.  Then, we'll know this for the

13   next time.  She is qualified as an expert.

14             Have you finished your answer?

15   A.  The last factor would be the where substrate is stored such

16   as shoved in a pocket or under a mattress.  If it gets wet that

17   will also eliminate or destroy prints that were left.

18   Q.  You mentioned substrate.  Just explain in layperson terms

19   what that means?

20   A.  Substrate is just the item that we are analyzing, just the

21   items submitted for evidence.

22   Q.  So in a case of a gun, would be the gun?

23   A.  Yes.  The substrate would be the gun, a knife, a bag, the

24   paper.

25   Q.  If someone were wearing gloves would that --

1    A.  Yes, it would.

2    Q.  Is it possible for someone to remove fingerprints from an

3    object?

4    A.  Yes.  Anything can be removed if it were cleaned or wiped

5    down or washed off.

6    Q.  You mentioned firearms.  Have you examined firearms for the

7    presence of latent prints?

8    A.  Yes, I have.

9    Q.  By firearms I mean have you examined ammunition for latent

10   prints?

11   A.  Yes, I have.

12   Q.  About how many cases, what percent of the time would you

13   say you obtained latent prints off of firearms and ammunition?

14   A.  In latent prints I've done, approximately, 30, 32 cases of

15   firearm or firearm evidence.  It's an estimate I would say

16   probably about 20 or 30 percent of the time I recovered prints

17   off the firearms.

18   Q.  20 percent of the time you recovered?

19   A.  Yes.

20   Q.  And the other 70 or 80, you don't?

21   A.  Correct.

22   Q.  When you get a piece of physical evidence at the lab what

23   steps do you take in examining for fingerprints?

24   A.  When evidence is submitted to the latent print units

25   there's two types of evidence that we received, porous or non

1  porous evidence.  Porous evidence is anything that readily

2  absorbs liquid and moisture poise.  That would be like paper

3  objects.

4          Nonporous items are items I do not readily absorb

5  moisture.  These are both treated differently.  The porous are

6  treated with a visual exam and ultralight source examine and

7  then chemical reagents.  The nonporous are treated similarly

8  with visual examine and ultralight source examine.  Then it's

9  cyanoacrylate fuming process.  This is known as superglue

10  fuming.  And then it's treated with -- which is just a reagent

11  that's put on substrate to enhance the color of the prints that

12  were left behind.

13  Q.  A are firearms and ammunition porous or nonporous?

14  A.  Nonporous.

15  Q.  Plastic bags?

16  A.  Nonporous.

17  Q.  You said you have to do visual inspection?

18  A.  Correct.

19  Q.  What do you do?

20  A.  A visual inspection is just visually looking at the

21  evidence with your naked eye.

22  Q.  The last three steps are what?

23  A.  The last three, the latent prints if there's any presence.

24  Q.  What do you do if you find a latent print?

25  A.  When I find a latent print I digitally photograph it and

1    then a copy of that photo is enhanced and both the photo as

2    well as the enhancement is sent to the latent print section for

3    comparison identification.

4    Q.  Do you record every latent print that you find?

5    A.  No.  We only record the latent prints that are potentially

6    of value.

7    Q.  What do you mean by that?

8    A.  A latent print deemed potentially of value is one that is

9    sufficiently qualitative detail and an examine with similar

10   training and experience would agree is conducive to have

11   further examination and comparison.

12   Q.  Directing your attention to May of this year.  Have you

13   received certain evidence of the case involving a Rudolph

14   Bartee?

15   A.  Yes, I did.

16   Q.  Did you prepare a report in connection with that case?

17   A.  Yes, I did.

18   Q.  Did you participate in the analysis in that report?

19   A.  Yes.

20   Q.  Was the report prepared and maintained in the regular

21   course of business at the lab where you worked?

22   A.  Yes, it was.

23   Q.  Was it prepared at or close to the time when the test was

24   completed?

25   A.  Yes.

1          MR. QUIGLEY:  Your Honor, can I approach and show

2     what's been marked for identification as Government Exhibit

3     304?

4          THE COURT:  You may approach.

5     Q.  Do you recognize that, Ms. Mora?

6     A.  Yes.

7     Q.  What is that?

8     A.  It is the lab report that I concluded for the analysis.

9     Q.  This is the lab report you prepared in connection with the

10    case involving Mr. Bartee?

11    A.  Correct.

12         MR. QUIGLEY:  Your Honor, the government offers

13    Government Exhibit 304 into evidence.

14         MS. GATTO:  No objection, your Honor.

15         THE COURT:  Government Exhibit 304 is submitted in

16    evidence.

17         MR. QUIGLEY:  Can we publish Government Exhibit 304.

18         (Pause)

19    Q.  In connection with this case, Ms. Mora, what evidence did

20    you receive?

21    A.  For this case I received a .380 caliber and gun, a .380

22    caliber magazine and eight .380 caliber cartilages as well as

23    one plastic bag on a separate voucher.

24    Q.  With respect tot he gun, the ammunition and the magazine,

25    what did you conclude with respect to the fingerprints?

1   A.  After my analysis I was not able to develop any latent

2   prints on that evidence so there is nothing submitted to the

3   latent print section for that voucher.

4   Q.  So was there any further analysis with respect to the

5   fingerprints on those items?

6   A.  In regards to those three items that is no further latent

7   print analysis, no.  There was DNA collected from that

8   evidence, however.

9   Q.  With respect to the plastic bag you received what did you

10  conclude with respect to the fingerprints on that object?

11  A.  From the plastic bag I developed non latent prints,

12  potentially, of value.

13  Q.  What did you do with respect to those latent prints?

14  A.  Those latent prints were each photographed individually,

15  then uploaded to our Adams database.  From there a copy of that

16  photo is enhanced.  By enhancing, we just change the color for,

17  remove the color to black an white and we increase the contrast

18  between the background and the ridges.  And those photos are

19  then, the original photos as well as copies are sent to the

20  latent print section for them to do the comparison

21  identification analysis.

22  Q.  How did you label thos photos?

23  A.  Each latent print is labeled with my initials and unique

24  identifier and file number.

25  Q.  And directing your attention to where it says item number

1   seven on Government Exhibit 304 do you see where it says BAM 1

2   through four; are those your initials?

3   A.   "BAM" is my initials and then the numbers are the number of

4   prints that I developed.

5   Q.   Where it says next to BAM one through four, do you see

6   where it says on each side of the bag?

7   A.   Yes.

8   Q.   What does that mean?

9   A.   BAM one through four were found on the inside of the bag.

10  The BAM five was on the, found on the outside side of the bag.

11  And the remaining ones were found on the outside of the bag.

12  Q.   Did you also swab the gun, the ammunition and magazine for

13  DNA?

14  A.   Yes.

15  Q.   Can you describe what steps if any you took to prepare

16  these items for swabbing?

17  A.   Yes.  Prior to opening the evidence I would decontaminate

18  and prepare my work space for evidence analysis.  And the steps

19  of this is to put on new personal protective equipment which

20  includes sterile lab coat, gloves, face mask and hairnet.  I

21  then proceed with decontaminating the work place which is

22  washing the space as well as my tools and equipment going to be

23  used with a ten percent bleach solution.  I then follow that

24  with 70 percent ethanol solution wash.  After the tools and the

25  work space is decontaminated I then lay down bench paper before

1   I open my evidence and proceed with the analysis.

2   Q.  And you mentioned bleach and ethanol I believe?

3   A.  Yes.

4   Q.  What, in fact, does that have on any DNA present in your

5   work pace?

6   A.  The bleach solution kills off any remaining DNA that may

7   have been previously been there.  And the ethanol solution

8   removes any other contaminants as well as stops the -- of DNA

9   from the bleach is there by the ethanol, causes it to not

10  remove any DNA from the case you are about to open.

11  Q.  You mentioned swabbing.  You swabbed these items.  Can you

12  just in layman's terms describe to the jury what swabbing

13  means?

14  A.  Yes.  The swabbing procedure we use a sterile cotton swab.

15  We add two to three drops of sterile water to it and use the

16  tip of the swab to, in contact with the area that we're going

17  to swab the firearm evidence.

18  Q.  What does a swab look like?

19  A.  Like a Q-tip.

20  Q.  What parts of the gun did you swab?

21  A.  For this evidence I swabbed the trigger guard and the sides

22  of the trigger.  I swabbed, the second swab is from the

23  textured area handgrips.  The third was the textured area of

24  the slide, the safety and the magazine release.  And the last

25  swab on the firearm was from the inside of the edges of the

1   barrel.

2   Q.  And what parts of the magazine did you swab?

3   A.  The magazine was swabbed on the top and bottom edges.

4   Q.  What about the bullets?

5   A.  For the eight cartridges I took one swab from the head

6   stamp for all eight cartridges.

7            THE COURT:  What is a head stamp?

8   A.  The bottom part of the bullet, the flat end.

9   Q.  And with respect to that evidence, the gun, the magazine,

10  and the bullets, how did you determine to swab those areas?

11  A.  The areas that I swab are the areas most likely contained

12  to have handled and touched by individuals more least likely to

13  contain any prints that we would be able to develop.

14  Q.  Is there a standard proceed in your lab to swab those areas

15  of the firearms and ammunition?

16  A.  Yes, it is.

17  Q.  Did you also swab the bag for DNA?

18  A.  Yes.  I swabbed the edges of the handles of the bag.

19  Q.  With respect to the swabs from the gun, the ammunition and

20  the magazine and the bag what did you do with those?

21  A.  These swabs are then packaged individually into biological

22  evidence bag and then sealed and signed and sent forward to the

23  medical examiner's office for their analysis.

24  Q.  What voucher numbers are associated with the swabs that you

25  took in this case?

DBJAABAR2                    Mora - Direct

1   A.  They were vouchered on Z008090 and Z008091.

2           MR. QUIGLEY:  One second, your Honor?

3           (Pause)

4           MR. QUIGLEY:  Nothing further, your Honor.

5           THE COURT:  All right.  Could we ask defense counsel

6   about how long do you think the cross-examination will be?

7           MS. GATTO:  Maybe 15 minutes.

8           THE COURT:  All right.  Let's start it already because

9   we started a little late this morning.

10  CROSS-EXAMINATION

11  BY MS. GATTO:

12  Q.  Good morning.

13  A.  Morning.

14  Q.  So, Ms. Mora, I've got this right, you don't actually

15  conduct the comparison of the evidence?

16  A.  Correct.  I do not.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1  Q.  You just recover the forensic evidence, correct?

2  A.  Correct.

3  Q.  And then you send it off to another lab where they actually

4  compare what you recovered.

5  A.  Yes.  We send it to another unit of the NYPD.

6  Q.  That's another lab is there?

7  A.  Yes.

8  Q.  So am I fair to describe your job as collecting as much

9  data as you can, to be used by a series of scientists?

10  A.  Correct.

11  Q.  And in connection with DNA, you're looking for DNA that's

12  suitable for comparison; is that right?

13  A.  Correct.

14  Q.  And by "suitable for comparison," you mean a sample of DNA

15  that then can be compared to a suspect's DNA, correct?

16  A.  Correct.

17  Q.  So the purpose is determining whether or not that suspect's

18  DNA matches the DNA that you were able to recover, right?

19  A.  Can you rephrase the question.

20  Q.  Yes.  The purpose of this all is so that as things step,

21  someone can determine or not whether or not a suspect touched

22  the item.

23          MR. QUIGLEY:  Objection.

24          THE COURT:  I'll allow it.

25  Q.  And for the purpose, the fingerprints are the same thing,

1   right?

2   A.   Yes.

3   Q.   You're developing the fingerprints so they can be compared?

4   A.   Any prints that are potentially evaluated, yes.

5   Q.   To determine whether or not a suspect touched an item,

6   correct?

7          MR. QUIGLEY:  Objection.

8          THE COURT:  You'll have redirect.

9   Q.   Correct?

10  A.   Yes.

11  Q.   And I think you testified to this already.  So when you --

12  and I'll stick with DNA at first.  When you swab the items for

13  DNA, you look for the areas that are most likely touched,

14  right?

15  A.   Most likely to contain the DNA but least likely to destroy

16  any prints.

17  Q.   I see.  So, here -- and we're talking about touch DNA,

18  right?

19  A.   Correct.

20  Q.   And touch DNA, that's when skin cells leave some remnants

21  that can then be compared, right?

22  A.   To my understanding, yes.

23  Q.   You don't swab every last inch of the gun.

24  A.   Yes.

25  Q.   You choose which section to be swabbed.

1    A.   Correct.

2    Q.   And if you could help us with some of the terminology --

3             MR. QUIGLEY:  Ms. McInerney, if you wouldn't mind

4    putting up Exhibit 99, which is of a firearm.

5    Q.   You recognize the firearm in connection with the

6    experiments you did with the swabbing?

7    A.   Yes.

8    Q.   You testified on direct that you swabbed the slide,

9    correct?

10   A.   The textured area of the slide.

11   Q.   So I think if you could look at Government Exhibit 304 if

12   you have that in front of you.

13   A.   Mm-hmm.

14   Q.   Item no. 4.3, toward the bottom, said that you got one swab

15   of material from the textured area of the slide, the slide and

16   magazine release, and safety.  Do you see that?

17   A.   Correct.

18            MS. GATTO:  If you could, Ms. McInerney, thank you,

19   but if you could go back to Government Exhibit 99.

20   Q.   And so the slide is the area that's sort of the long strip

21   at the top of the gun; is that right?

22   A.   Yes, the top -- yes.

23   Q.   And then the safety, the safety is -- where is the safety?

24   A.   It's this back lever underneath the slide, between the

25   slide and the handgrip.

1   Q.  So the record is clear, it's this lever that you see above

2   the Brown handle.

3   A.  Correct.

4   Q.  And the magazine, I'm right that the magazine release is

5   this little button that's right near the trigger?

6   A.  I believe so, yes.

7   Q.  And the magazine, if the magazine were in this gun, it

8   would be inserted at the base of that, correct?

9   A.  Right.

10  Q.  And so if somebody wanted to release that magazine, they

11  would press that button.

12  A.  Correct.

13  Q.  And by pressing that button, then somebody can have the

14  magazine in one hand and the firearm in the other.

15  A.  Correct.

16  Q.  You also swabbed bullets?

17  A.  Correct.

18  Q.  And you swabbed the black plastic bag, correct?

19  A.  Yes.  The handles, the edges of the handles.

20  Q.  And moving on to fingerprints, did I get this right:  You

21  tried to develop prints on the firearm but you were unable to?

22  A.  Yes.  I did all my processing on the firearm.  However, no

23  prints were developed from those.

24  Q.  I think you testified that it's infrequently, that it's

25  less likely to recover prints from firearms.

1   A.  Yes.

2   Q.  But it can.

3   A.  Yes.

4   Q.  It's more common in your experience to recover fingerprints

5   from something like a plastic bag.

6   A.  Yes.

7   Q.  And is that because the surfaces are different?

8   A.  Yes.

9           MS. GATTO:  I have no further questions.  Thank you.

10          THE COURT:  Your brief redirect, Mr. Quigley?

11          MR. QUIGLEY:  Very brief, your Honor.

12  REDIRECT EXAMINATION

13  BY MR. QUIGLEY:

14  Q.  Ms. Mora, is it possible to touch an object and not leave

15  fingerprints?

16  A.  Yes, it is.  Fingerprints are a chance impression and there

17  are those many factors I mentioned earlier that would affect

18  whether latent prints can be recovered.  They can be left

19  behind, but whether they are recoverable depends on all those

20  factors.

21  Q.  Is it an object whether it has DNA on it?

22  A.  I am not trained in the DNA recovery -- the DNA aspect of

23  it, so I would not testify to that.

24          MR. QUIGLEY:  Nothing further, your Honor.

25          THE COURT:  Thank you.  You're excused.

1          (Witness excused)

2          THE COURT:  All right.  Ladies and gentlemen, it is

3     time for lunch.  God and the cafeteria folk willing, there will

4     be your lunch in the jury room.  We'll find out.  Let's try and

5     get back, let's see, it's now about 25 of 12.  So hopefully

6     about five minutes after 12 we'll come out and restart.  And

7     while you're back there, I'm going to talk to the parties about

8     sort of what's left in the case, what today's progress will be,

9     and what we anticipate for the remainder of the case.

10          So thank you very much.  And of course don't talk

11     about the case with each other.  I know I mentioned it enough

12     yesterday, but I feel compelled to say it again today.  So

13     thank you.

14          (The jury left the courtroom)

15          THE COURT:  Thank you.  Please be seated just for a

16     moment.  Can I have from the government who our next witness

17     is.

18          MR. QUIGLEY:  Your Honor, we intend to call

19     Ms. Brannigan from the NYPD lab, who will be our next witness.

20     I think she will be a brief witness.

21          THE COURT:  She is also a criminalist?

22          MR. QUIGLEY:  Yes, your Honor.

23          THE COURT:  Is she being offered as an expert witness

24     in this case?

25          MR. QUIGLEY:  Yes, your Honor.

DBJABAR3ps

1    THE COURT:  All right.  So you'll work it out with

2    Ms. Gatto so that we don't have the interruption we had with

3    this last witness, because I too was waiting for sort of the

4    windup question about whether she could be qualified as an

5    expert.

6        All right.  And then how many more witnesses are left?

7        MR. QUIGLEY:  Just two, your Honor.  They're both

8    experts.  Ms. Brannigan and then Mr. Ferrara, who is from the

9    OCME, are left.

10    THE COURT:  Now, you said this yesterday and I think

11    I'm starting to believe you, that we might finish with the

12    government's case today.  Is that correct?

13    MR. QUIGLEY:  I think that is possible, your Honor,

14    yes.

15    THE COURT:  All right.  We have about, maybe two and a

16    quarter hours after the lunch break.  So do you anticipate that

17    Ms. Brannigan or the remaining witnesses will go longer than

18    that?

19    MR. QUIGLEY:  I cannot, your Honor.

20    THE COURT:  All right.  And then would the defense be

21    able to begin today?

22    MS. GATTO:  Yes, your Honor.  I think that's probably

23    a chance we could finish today.  We right now anticipate two

24    short witnesses.

25    THE COURT:  All right.  Am I allowed to know who they

1    are?  You're not going to make your final decision until after

2    the government rests?

3              MS. GATTO:  We're going to call Anna Finkel, who is an

4    investigator from our office, and we're going to call Carmine

5    Alessandro.

6              THE COURT:  Mr. Alessandro?

7              MS. GATTO:  Yes.

8              THE COURT:  I didn't notice his name on your witness

9    list.  Who might he be?

10             MS. GATTO:  He's the landlord of the property.  He's

11   the owner of the property.

12             THE COURT:  And the government was given notice at

13   some point that you are going to call him as a witness?

14             MS. GATTO:  Mr. Alessandro was actually on their

15   witness list.

16             THE COURT:  All right.  And Ms. Finkel.  All right.  I

17   don't know what she'll testify to.  But I guess I get to wait

18   for the afternoon.

19             MS. GATTO:  I should say, there is a chance we'll call

20   Ms. Davis, although I think at this point we anticipate calling

21   those two witnesses.

22             THE COURT:  OK.  Thank you.

23             And have the parties received my charge, the version

24   of the charge that I have?

25             MS. GATTO:  Yes.

1      THE COURT:  OK.  Mr. Quigley, did you receive that

2  last evening as well?

3      MR. QUIGLEY:  We did, your Honor.

4      THE COURT:  All right.  And I don't, again, I

5  appreciate, Mr. Quigley, that you might know until after --

6  might not know until after the defendant's case.  Do you

7  anticipate a rebuttal case?

8      MR. QUIGLEY:  Not at this point, your Honor.

9      THE COURT:  All right.  Well, again, I'm ambitious in

10  thinking all of this can be concluded today.  That's probably

11  wishful thinking.

12      All right.  Then we should talk about a charge

13  conference.  Let's see where, at the end of the day, where we

14  are, because if we can do the charge conference, it may be

15  easier to do it tomorrow morning.  Who knows.  And I also,

16  again, this is wishful thinking on my part; it hopefully will

17  not be the longest of charge conferences because the parties

18  were almost unanimous on what they were submitting it me.  But

19  all right.  Thank you very much.

20      MR. QUIGLEY:  Your Honor, may I just make sure about

21  the afternoon?

22      THE COURT:  Yes.

23      MR. QUIGLEY:  So with Mr. Ferrara, he had prepared two

24  reports.  One report reflected analysis of physical evidence.

25  Then a second report reflected the analysis of the DNA.  The

1    first report includes certain evidence from the bank robbery.

2    That's been heavily redacted out.  But nevertheless, the

3    defense had concerns about what the jury might prefer to be

4    redacted.  So what we worked out with defense counsel, and I

5    wanted to put this on the record, is that we would give him

6    both reports to use during the testimony, but neither party

7    would offer either report into evidence.

8            THE COURT:  All right.  And Ms. Gatto, Mr. Marvinny,

9    is that in fact the agreement?

10            MR. MARVINNY:  That is our understanding.  We

11    appreciate the government coming to that agreement with us.

12    And I think Mr. Quigley said, if I missed it, Mr. Ferrara will

13    have a file up with him that he can refer to.

14            THE COURT:  Right.  But we won't be publishing

15    anything to the jury.

16            MR. MARVINNY:  That's correct.

17            THE COURT:  I understand.  All right.  Thank you for

18    working that out.

19            MR. MARVINNY:  Your Honor, we had just two --

20            THE COURT:  Oh, so close.  It's OK.

21            MR. MARVINNY:  Just one last piece with

22    Mr. Alessandro, who we think at this point will probably be our

23    first witness.  We were very much hoping to put him on today.

24    To the extent that we beg the Court's indulgence, should we be

25    running slightly behind, would we be able to put him on today?

1  I believe there is some scheduling difficulty getting him down.

2  Our understanding is that he is down here and we would love the

3  opportunity to put him on today, for expediency's sake.  So I

4  just want to flag that to the Court.  If it's 2:30, we might

5  implore your Honor to allow to us call him.  He will be an

6  exceptionally short witness.  But I wanted to raise the issue

7  with you now rather than later.

8          THE COURT:  I guess the parties can tailor their

9  directs and crosses with that in mind.  Don't be too long on

10  the cross.  Secondly, I don't mind going over a little bit, but

11  you obviously can't predict for me Mr. Quigley's

12  cross-examination.  So I appreciate it and I'm sure that the

13  jurors will appreciate it as well.  And I might be able to say

14  to them that we will go a little bit over just depending on

15  when we begin.  So I will keep in mind his schedule.

16          All right.  Thank you.

17          (Luncheon recess)

18          (Continued on next page)

19

20

21

22

23

24

25

DBJABAR3ps

1                    A F T E R N O O N   S E S S I O N

2                             2:10 p.m.

3          (Jury present)

4          THE CLERK:  Your Honor, one juror will be right out.

5          THE COURT:  OK.  And there the one juror is.  OK.

6          JUROR NO. 12:  Could you make it colder in here?

7          THE COURT:  Could I or did I?  I wish I could either.

8    I wish I had that kind of control.

9          Just one bit of housekeeping.  This is not my normal

10   courtroom and the Judge whose it is said to me that I was cruel

11   not to let you use the refrigerator.  So the minibar is in fact

12   a minibar, drink what you want, is what he said.  If his clerks

13   and interns have a little bit less, they're fine with it,

14   because he says, and I agree, that, jurors, it's too much to

15   say they're more valuable than clerks.  I like the clerks a

16   lot.  But you are equally valuable.  So just know that if

17   you're thirsty, that's yours too.

18         All right.  We will begin now.  We will continue with

19   the presentation of evidence.  The government may call its next

20   witness.

21         MR. QUIGLEY:  Your Honor, the government calls

22   Annabelle Branigan.

23         THE COURT:  Thank you.

24    ANNABELLE BRANIGAN,

25       called as a witness by the government,

1    having been duly sworn, testified as follows:

2        THE COURT:  Ms. Branigan, you may find it easier to

3    just move your chair up a little bit and speak directly into

4    microphone.

5        THE WITNESS:  Thank you.

6        THE COURT:  Government, you may begin now.

7        MR. QUIGLEY:  Yes, your Honor.  Thank you.

8    DIRECT EXAMINATION

9    BY MR. QUIGLEY:

10   Q.  Ms. Branigan, where do you work?

11   A.  I work for the New York City Police Department.

12   Q.  What do you do with the New York City Police Department?

13   A.  I'm a latent print examiner.

14   Q.  You work for the unit?

15   A.  Excuse me?

16   Q.  You work in the latent print unit?

17   A.  I work in the latent print section.

18   Q.  Where is that located?

19   A.  That's located at One Police Plaza.

20   Q.  How long have you worked in the latent print section?

21   A.  I've been in the latent print section for about 12 years.

22   Q.  How long have you been a fingerprint technician with the

23   NYPD in total?

24   A.  I've been a fingerprint technician for 28 years.

25   Q.  What did you do before you joined the latent print section?

1    A.   Prior to joining the latent print section, I worked in the

2    identification section.

3    Q.   Can you briefly describe what you did there.

4    A.   OK.   In the identification section, I was a fingerprint

5    technician, and my duties were to analyze and compare ink

6    fingerprints, and also I worked in the DOA section, and that's

7    the section where prints were sent to our office from the

8    medical examiner's office, and my duties were to compare these

9    prints of the individuals to make an identification.

10   Q.   When you received -- when you joined the latent print

11   section in 2001, what training did you receive?

12   A.   OK.   In joining the latent print section, I received

13   training in how to identify, analyze, and compare latent prints

14   that were -- that are brought to our office.

15   Q.   How long was that training?

16   A.   That initial training, in the latent print -- in my first

17   training, was approximately three months.

18   Q.   Have you received ongoing training since that time?

19   A.   Yes, I have.

20   Q.   Can you describe that briefly.

21   A.   OK.   From -- several times during the year, I have to

22   attend classes, and some of these courses are taught to us by

23   independent instructors, and there are such courses as complex

24   latent prints, the fundamentals of latent prints examination,

25   and also advance palm prints examination.   Those are some of

1   the courses I have to take.

2   Q.  Are you taking those on an ongoing basis since 2001?

3   A.  Yes.

4           MR. QUIGLEY:  Your Honor, I just want to tender

5   Ms. Branigan as an expert in latent print analysis comparisons.

6           THE COURT:  Does the defense wish to have any voir

7   dire of this witness?

8           MS. GATTO:  No.  Thank you, your Honor.

9           THE COURT:  Any objection?  OK.  Ms. Branigan, you are

10  so admitted.

11          Go ahead.

12  Q.  Ms. Branigan, could you describe how latent prints come to

13  the latent print unit, from evidence that's been collected in

14  the field.

15  A.  OK.  They come in two ways.  The prints that are lifted

16  from the crime scene are brought to our department, the latent

17  print section, by the crime scene unit detectives.  And those

18  are lifted and brought to us, physically brought to us.  And

19  then they are -- the other type of -- way that we receive

20  prints is through, if an -- if a piece of evidence is brought

21  to the police lab, there they process that evidence and, from

22  there, they make a digital photo of the prints or the images

23  that are lifted from that particular evidence.  And that is

24  sent to us by the computer.

25  Q.  So the photos are sent by computer.

DBJABAR3ps                    Branigan - direct

1    A.  Yes.

2    Q.  You don't actually get the physical evidence that was

3    initially collected.

4    A.  No.

5    Q.  Once you receive the photographs that are sent to you by

6    computer, what do you do with them?

7    A.  OK.  Once those prints are assigned to me, what I have to

8    do is analyze each image that is in the set and determine which

9    prints are of value, of no value, prior to proceeding with

10   my -- proceeding with the case.

11   Q.  And if the prints are of value, what do you do then?

12   A.  OK.  If the prints in the case, whatever prints are of

13   value, my next step is to proceed to try to make an

14   identification with the prints that I have.

15   Q.  If the prints are not of value what do you do?

16   A.  If they're not of value, then there's nothing further that

17   I could do except make a notation that they're not of value.

18   Q.  So those prints you don't compare to anyone else's.

19   A.  No.

20   Q.  Directing your attention to May of this year, Ms. Branigan,

21   did you receive images from the NYPD lab in a case involving

22   Rudolph Bartee?

23   A.  Yes.

24   Q.  Do you recall how many images you received?

25   A.  I received nine images.

1    Q.  And do you recall how those were identified?

2    A.  Excuse me?

3    Q.  Do you know how those images were identified?

4    A.  I'm not sure.  What do you mean how to identify?

5    Q.  Were they labeled in any way?

6    A.  They were labeled as -- with the initials of the person

7    that actually processed those -- the item at the lab.

8    Q.  Do you remember what those initials were?

9    A.  Yes.

10   Q.  What were they?

11   A.  They're BAM.

12   Q.  So they were, when they were each -- it was, each BAM had a

13   number?

14   A.  It's BAM1, BAM2, all the way through to 9.

15   Q.  What did you do once you received those images?

16   A.  OK.  When I received those images, what I did was, I

17   analyzed each and every one to determine which ones were of

18   value, meaning if they have enough clarity, if they have enough

19   fingerprint images, such as the ridge characteristics, if there

20   was enough information there for me to proceed in order to

21   continue to try to make an identification.

22   Q.  How many, of the nine prints you received from the

23   criminalist in Queens, how many were of value?

24   A.  At the moment I can't recall how many.  May I look at my

25   notes, please?

DBJABAR3ps                    Branigan - direct

1   Q.  Yes.  Would seeing your worksheet refresh your

2   recollection?

3            THE COURT:  He's asking you a question:  Would seeing

4   your worksheet refresh your recollection?

5            THE WITNESS:  Oh, yes, it would.

6   A.  OK.

7   Q.  Ms. Branigan, would you just take a look at it and when

8   you're finished --

9   A.  I'm done.

10  Q.  So how many prints did you --

11  A.  There were three of value.

12  Q.  And how were those prints identified?

13  A.  Um --

14  Q.  If you need to refresh your recollection, you can just look

15  at your worksheet and let me know.

16  A.  Well, I evaluated -- well, let's just say I analyzed all

17  nine prints, and out of the nine, three of them I deemed of

18  value and the other six of no value.  And what I did with the

19  ones that were of value, I noted what part of the anatomy that

20  they were.

21  Q.  OK.  But the images you received from the lab in Queens,

22  what were the labels attached to the prints that were of value?

23  Which numbers were those?

24  A.  The numbers that were attached are BAM1 is of value, BAM3,

25  of value, and BAM4, of value.

1    Q.  And do you know where, on the evidence, that those items

2    were recovered from?

3    A.  Well, the evidence, do you want me to name what type of

4    evidence it was?

5    Q.  That's fine.

6    A.  I'm not sure what you're asking.

7    Q.  Don't worry about that.

8    A.  OK.

9    Q.  And were BAM1, 3, and 4 comparisons, the prints from

10   Rudolph Bartee?

11   A.  Yes, they were.

12   Q.  And what was your conclusion with respect to those prints?

13   A.  My conclusion, the fingerprint bearing the name Rudolph

14   Bartee, it was excluded, meaning that those prints were

15   negative results to my latent prints.

16   Q.  And did you ever determine who left the prints that had

17   been labeled BAM1, 3, and 4?

18   A.  No.  To date they have not been identified to anyone.

19   Q.  So the other six prints were not of value.

20   A.  The other six are not of value.

21   Q.  And would those prints ever compared to Mr. Bartee's?

22   A.  They're of no value, so they're not compared to -- there is

23   no comparison to be made.

24   Q.  They were not compared to anyone, correct?

25   A.  The other six prints that are of no value were not compared

1   to anyone because you cannot compare no-value prints.

2          MR. QUIGLEY:  Nothing further, your Honor.

3          THE COURT:  Cross-examination.

4   CROSS EXAMINATION

5   BY MS. GATTO:

6   Q.  Good morning, Ms. Branigan.

7   A.  Good morning.

8   Q.  So the prints that you were looking at, they come from a

9   plastic bag, correct?

10  A.  Yes.

11  Q.  And you testified there were nine prints in all but only

12  three that were of value, correct?

13  A.  Yes.

14  Q.  And those three prints came from the inside of a plastic

15  bag.

16  A.  Um, I -- may I look at my note one moment?

17  Q.  Yes, please.

18  A.  OK.  Thank you.  Make sure that -- (Pause)

19          Yes.  Inside of a plastic bag.

20  Q.  You've been told, correct, that the inside of that plastic

21  bag is where the police recovered the firearm, correct?

22  A.  Um --

23          MR. QUIGLEY:  Objection.

24          THE COURT:  Yes.  Were you told anything?

25          THE WITNESS:  No.

1      THE COURT:  No.  All right.  Then that's the answer.

2  Q.  All right.  So the three prints that are inside the bag,

3  you take them, actually compare them with the fingerprints of

4  Rudolph Bartee, correct?

5  A.  Yes.

6  Q.  And you determined that Rudolph Bartee had been excluded

7  from the match.  Right?

8  A.  Yes.

9  Q.  Meaning those are not his fingerprints.

10 A.  Yes.

11 Q.  Meaning someone else touched the inside of the bag,

12 correct, and left fingerprints?

13 A.  Yes.

14 Q.  And it wasn't Mr. Bartee.

15 A.  No, it wasn't.

16      MS. GATTO:  No further questions.

17      THE COURT:  All right.  Any redirect?

18      MR. QUIGLEY:  No further redirect.

19      THE COURT:  All right.  Ms. Branigan, thank you very

20 much.  You may step down.

21      THE WITNESS:  OK.  Thank you.

22      (Witness excused)

23      THE COURT:  Mr. Quigley, do you want Ms. Mora to bring

24 her notes back to you?

25      MR. QUIGLEY:  Ms. Branigan.

1    THE COURT:  Oh, Ms. Branigan.  Sorry.  I managed to

2   call her that twice.  Sorry, Ms. Branigan.

3            MS. BRANIGAN:  That's OK.

4            MR. QUIGLEY:  Your Honor, the government calls Daniel

5   Ferrara.

6    DANIEL FERRARA,

7        called as a witness by the government,

8        having been duly sworn, testified as follows:

9            THE COURT:  Mr. Ferrara, can I ask you, please, to

10   move your chair slightly to the left so that everyone at

11   counsel table may see you.  Thank you.

12            MR. QUIGLEY:  May I proceed, your Honor?

13            THE COURT:  You may.  Thank you.

14   DIRECT EXAMINATION

15   BY MR. QUIGLEY:

16   Q.  Where do you work, Mr. Ferrara?

17   A.  I currently work at the New York City Office of the Chief

18   Medical Examiner.

19   Q.  How long have you worked there?

20   A.  A little over eight years.

21   Q.  Do you work for a particular department?

22   A.  Yes.  I work in the forensic biology department,

23   specifically in the property crimes division.

24   Q.  What's the title of your position?

25   A.  I am a criminalist level IV.

1    Q.   What do you do in that role?

2    A.   Well, as a criminalist level IV, I supervise criminalists

3    levels I through III as they examine evidence that comes in

4    from property crimes.  That includes burglaries, robberies,

5    also weapon-possession cases.  I also supervise them as they

6    perform DNA testing.  I review the results and reports that are

7    issued in DNA testing.  And I also manage my own cases where I

8    interpret the results of DNA testing, write reports, and also

9    testify in court.

10   Q.   Could you briefly describe your educational background, the

11   training that you received before assuming your current role.

12   A.   Yes.  I have a bachelor's degree in biology from the

13   University of Rochester.  And I have a master's degree in

14   biotechnology from Columbia University.  And as far as

15   training, when I started working at the medical examiner's

16   office, I want through six months of in-house training.  During

17   that time all of the techniques that we use in the laboratory

18   are demonstrated to me, and then I have to demonstrate them

19   back for the trainer.  And then ultimately I take what are

20   called competency tests, where I'm given samples, I don't know

21   what they are, I perform the DNA testing, I report the results

22   back to the supervisor, and then they assure that I'm doing

23   them correctly.  I have to pass a competency test in every area

24   of the laboratory before I can work on casework.

25             MR. QUIGLEY:  Your Honor, I offer that Mr. Ferrara is

DBJABAR3ps                    Ferrara - direct

1    an expert in DNA analysis at this time.

2              MR. MARVINNY:  No objection.

3              THE COURT:  No voir dire is required?

4              MR. MARVINNY:  No, your Honor.

5              THE COURT:  All right.  Thank you.  He is so

6    qualified.

7    Q.  Mr. Ferrara, since you joined New York OCME, have you been

8    involved in testing firearms?

9    A.  Yes, I have.

10   Q.  In your eight-plus years with OCME, approximately how many

11   gun cases do you get involved with?

12   A.  Hundreds if not thousands.

13   Q.  Mr. Ferrara, what is DNA?

14   A.  DNA is a substance that you inherit from your parents.  You

15   get half of it from your mother, half of it from your father.

16   And simply put, DNA is a blueprint for building a living thing.

17   So in the same way that you might use a blueprint to construct

18   a building, nature uses DNA to construct living things.  That's

19   everything from plants and animals up to and including human

20   beings.  As human beings we're essentially all built the same

21   way.  We all have, you know, heart, lungs, etc.  So 99 percent

22   of our DNA is exactly the same as everyone's else's.  But we're

23   also unique individuals.  And with the exception of identical

24   twins, who have the exact same DNA, there is some portion of

25   everyone's DNA, approximately 1 percent, that differs from

1   everybody else.

2   Q.  Where is DNA found?

3   A.  Well, our bodies are made up of tiny building blocks which

4   we call cells, and most of those cells have a central core,

5   which we call a nucleus, and that's where the DNA is found.

6   But more simply put, throughout our entire bodies, DNA is

7   found.

8   Q.  And in simple terms, what is DNA testing?

9   A.  So in DNA testing, we look at 15 specific locations in the

10  DNA and develop a DNA profile.  A DNA profile looks like a

11  string of numbers that represents some of those differences

12  that you find from person to person.  And you could think of

13  that string of numbers as being analogous to a bar code.

14  Q.  And are there different steps in DNA testing?

15  A.  Yes, there are.  There are four main steps to DNA testing.

16  The first step is called extraction.  And extraction is where

17  we remove the DNA from the sample.  The second step is called

18  quantitation.  In quantitation we measure how much if any DNA

19  is present in our sample.  The third step is called

20  amplification.  During amplification, we focus in on those 15

21  locations and we make millions of copies of them, essentially

22  ignoring the rest of the DNA, to bring those locations out so

23  they stand out more compared to the rest of the DNA, so that we

24  can more easily perform the fourth step, which is the

25  development of the DNA profiles.

1  Q.  You mentioned extraction or some types.  Are some

2  substances easier to get DNA out of than others?

3  A.  Well, we generally categorize DNA samples into two

4  categories.  One is what we call serological samples.  Serology

5  is the science of identifying biological substances.  So if I

6  had a T-shirt and it had a red stain on it, if I wanted to

7  determine whether it was ketchup or whether it was blood, if I

8  could perform a scientific test that proves that it's blood,

9  that's serology.  So serological samples, which include blood,

10  saliva, and semen, have a lot of DNA in those samples, because

11  they're from fluids that are from within our body.

12        The other category of DNA sample are what we call

13  touched samples.  And those are samples that are taken from

14  items that have simply been handled or touched by an

15  individual.  When you touch an item, some of the cells, the

16  little building blocks that make up your body, can be

17  transferred to the item.  And those cells can be collected and

18  we can test them as well.  And those touch samples tend to have

19  much less DNA when compared to the serological samples.

20  Q.  So is it fair to say it's harder to extract DNA from touch

21  samples than from serological samples?

22  A.  Yes.

23  Q.  And would a firearm be an example of a touch sample that

24  may have blood and saliva on it?

25  A.  Correct.  That would be a touched sample.

1    Q.  You mentioned that the last step in the DNA testing process

2    is to construct a DNA profile.  What is a DNA profile?

3    A.  So a DNA profile looks like a string of numbers.  And those

4    numbers represent each of the 15 locations.  And then we also

5    have a 16th location, which is a sex-typing location,

6    determines whether the sample came from a male or a female.  So

7    the DNA profile is just a string of numbers plus the sex-typing

8    location, that represents the differences between person to

9    person.

10   Q.  Mr. Ferrara, have you performed DNA analysis in the case

11   involving Rudolph Bartee?

12   A.  Yes.

13   Q.  Did your involvement include writing reports?

14   A.  Yes, it did.

15   Q.  Would your reports assist you in testifying today?

16   A.  They would, yes.

17         MR. QUIGLEY:  Your Honor, I'm handing up what's been

18   marked for identification only as Government's Exhibit 301 and

19   302.

20   Q.  Mr. Ferrara, in this case involving Mr. Bartee, did you

21   receive certain swabs from the NYPD lab?

22   A.  Yes, we did.

23   Q.  And were some of those swabs from a firearm and ammunition?

24   A.  They were, yes.

25   Q.  How many swabs from the firearm?

1    A.  So we received six swabs that were taken from a firearm.

2    Q.  And was one of the swabs from the trigger and trigger guard

3    of the firearm?

4    A.  Yes, it was.

5    Q.  And what did OCME determine about that swab?

6    A.  Just refreshing my memory.  So we performed testing on the

7    swab using the four steps that I just previously mentioned.

8    And on the sample of the trigger and trigger guard, we found

9    that there was insufficient DNA.  What that means is, there was

10   not enough DNA to proceed past the second step.  So the second

11   step is the quantitation where we measure how much if any DNA

12   is present in our sample.  And in order to move on to the

13   amplification, there has to be a minimum amount of DNA present.

14   And you could think of making a photocopy, which is what we're

15   sort of doing when we amplify the DNA.  You have to have an

16   original in order to make the copies.  If the original is too

17   light or it doesn't exist, you're not going to be able to make

18   the copies.  And that's what's happening here.  There is some

19   DNA present, but not enough that we can amplify those 15

20   locations.

21   Q.  So was that DNA on the trigger and trigger guard ever

22   compared against anyone else's DNA in the course of this case?

23   A.  It was not.  And we are unable to because there is not a

24   sufficient amount of DNA.

25   Q.  Did OCME also receive a swab from the textured area of the

1   handgrips?

2   A.  Yes, we did.

3   Q.  What did OCME learn about that sample?

4   A.  So when there is enough DNA present in a sample, there are

5   a variety of outcomes to the testing.  One is that we develop a

6   single-source DNA profile.  That is a profile that is from one

7   individual, one contributor.  Another possible outcome is a

8   mixture of DNA, where you have DNA from more than one

9   individual.  When you have mixtures of DNA, there are multiple

10  outcomes there as well.  One is that we would be able to

11  separate the contributors to the mixture, what we call

12  deconvolute the mixture.  We can determine from the mixture a

13  DNA profile of one of the contributors, or more of the

14  contributors.  On the other side, there are some mixture

15  samples where we cannot deconvolute them and we would not be

16  able to separate the contributors.  When that occurs, sometimes

17  they are suitable for comparison and we can compare a mixture

18  to a known individual and make some conclusion about it.  And

19  there are other times when there is simply no conclusion that

20  can be drawn -- for example, if the mixture is just too messy

21  or there are too many contributors.

22          So in the sample of textured area of handgrip, we

23  found a mixture of DNA from at least two people.  And I say "at

24  least" because, while everyone, with the exception of identical

25  twins, has different DNA, if you're closely related to someone,

1   your DNA will be more similar to theirs than a complete

2   stranger.  So it's always possible, if close relatives are

3   mixed together, we wouldn't be able to distinguish them.

4            So there were at least two people.  And we were not

5   able to deconvolute or separate out the contributors.  However,

6   it is suitable for comparison to known individuals.

7   Q.  Did OCME also receive a swab from the textured area of the

8   slide, slide, magazine, release, and safety?

9   A.  Yes, we did.

10  Q.  What did you determine about that swab?

11  A.  So, again, we did the same testing.  We also found on this

12  swab that it was a mixture of at least two people.  But this

13  time we were able to separate out what we call the major

14  contributor.  That is the person who contributed most of the

15  DNA to sample.  We also determined that the person was male.

16  And we call that person male donor A because we don't know who

17  that person is.  They are just a major contributor to the

18  mixture.

19           As far as the minor contributor, or contributors if

20  there's more than two, we found that the minor contributors

21  were not suitable for comparison.  So they're so minor there is

22  not enough DNA for the minor contributors to draw any

23  conclusion about them.

24  Q.  So were the minor contributors on the DNA on the textured

25  area of the slide ever compared to anyone else during the

1    course of this case?

2    A.  No, they were not.  And we would be unable to do so because

3    there simply isn't enough of the minor contributor for

4    comparison.

5           MR. QUIGLEY:  One second, your Honor.

6    Q.  You mentioned, I think, that you received six swabs in

7    total and you discussed three.  Where were the other swabs,

8    firearm-related swabs, found?

9    A.  So the three swabs were taken from inside the barrel, from

10   the top and bottom edges of the magazine, and from the head

11   stamps of the cartridges.

12   Q.  And were there also swabs from the handles of the plastic

13   bag?

14   A.  Yes, there was.

15   Q.  Were those, the swab from the inside of the barrel, the

16   swab of the magazine, the swab of the head stamps of the

17   cartridges, and the swab from the plastic bag, was DNA analysis

18   ever done on those?

19   A.  No.

20   Q.  Why was that?

21   A.  So in our department, our policy for firearms is that we

22   typically test three swabs regardless of how many are

23   submitted.  They tend to be from three main areas -- the

24   trigger, trigger guard, some portion of the grip of the

25   firearm, and then miscellaneous areas that are commonly

1    touched, depending on the type of firearm.  So in this case the

2    slide, the slide release, and the grooves, which are a textured

3    area of the gun which are more likely to get DNA.  So we

4    typically start with three swabs.  And if we're able to develop

5    a DNA profile, normally our policy is that we don't proceed any

6    further with testing any of the other samples.  That's what we

7    did in this case.

8    Q.  Later in this identification, did OCME receive an oral swab

9    from Mr. Bartee?

10   A.  Yes, we did.

11   Q.  What was done with that swab?

12   A.  So for that swab, we tested it in the same way that we

13   would test the evidence samples.  They go through the four

14   steps of the DNA testing.  And we were able to develop a DNA

15   profile for Mr. Bartee.

16   Q.  And what did you do once you determined that DNA profile

17   for Mr. Bartee?

18   A.  So once we determined the DNA profile, we would then

19   compare it to any samples that were suitable for comparison

20   from the evidence.  So we compared it to the male donor A, and

21   we also compared it to the other mixture where we could not

22   separate out the contributors.  And my conclusion was that

23   Mr. Bartee is excluded as being a contributor to both of those

24   samples.

25   Q.  So his DNA wasn't found -- he is not male donor A.  His DNA

1    wasn't found in the textured area of the hand grips.  Correct?

2    A.  Correct.

3    Q.  Just to be clear, male donor A's DNA was only found in the

4    textured area of the slide, slide magazine, safety.

5    A.  That is correct.  We could have compared male donor A to

6    the other mixture, but it is also a policy that we typically

7    don't do that.  We typically reserve comparisons for known

8    individuals.  So if we had received a sample that matched to

9    male donor A, therefore we would know who male donor A was at

10   that point, then we would also compare male donor A to the

11   others mixture in the case.

12   Q.  Were you able to determine the identity of male donor A?

13   A.  No, we were not.

14   Q.  Were you able to determine the identity of the contributors

15   to the mixture on the textured area of the handles?

16   A.  No, we were not.

17   Q.  What if anything can you conclude about Mr. Bartee's DNA

18   and the DNA on the trigger and trigger guard?

19   A.  I conclude that his DNA is not that of male donor A and

20   that he did not contribute to the DNA found in the other

21   mixture.

22   Q.  Just to back up --

23   A.  The textured area.

24   Q.  I think you testified earlier that the DNA on the trigger

25   and trigger guard was not suitable for comparison.

1    A.  Correct.  I'm sorry.  I misspoke.  So the male donor A from

2    the textured area of slide, slide and magazine release and

3    safety, so Mr. Bartee is not male donor A.  The minor

4    contributor of that mixture is not suitable for any comparison.

5    And the textured area of hand grips, he is excluded.  He did

6    not contribute DNA to that mixture of two people.  The trigger,

7    trigger guard was insufficient, so no comparison can be made.

8    Q.  So Mr. Bartee wasn't able to be compared to the DNA on the

9    trigger and trigger guard?

10   A.  Correct.

11   Q.  And he wasn't able to be compared to the minor contributor

12   on the DNA, on the textured area of the slide on the magazine

13   and release.

14   A.  Correct.

15   Q.  I want to shift gears for a second.  You mentioned touched

16   DNA samples.  We talked about that a little bit.  How do people

17   leave DNA on a touched sample?

18   A.  Generally speaking when you touch and handle items, cells,

19   or the little building blocks that make up your hands and the

20   rest of your body, can be transferred to the items that you

21   touch.  Your cells are constantly dying and new ones are being

22   created underneath them.  And so the old ones tend to fall off

23   or fluff off.  And so they can be transferred to items that we

24   handle.  Our sweat can help carry those cells over to the item.

25   Some of the oils in our skin can also help carry the cells from

1   our hand or other body parts to the items that we touch.

2   Q.  Are some individuals more likely than others to leave DNA

3   on objects?

4   A.  Yes.  We call those individuals shedders.  Shedders are

5   people who just typically leave more DNA behind when they touch

6   things.  There can be a variety of reasons for that.  If you

7   have particularly dry skin, if you have particularly oily skin

8   or you sweat often, factors like that can affect how much DNA a

9   particular person leaves behind when they touch an item.

10  Q.  Are certain objects more likely to retain DNA than others?

11  A.  Yes.  The properties of the item can also affect how well

12  DNA is transferred to the item.  Items that are absorptive or

13  porous, absorb liquids, will tend to hold more DNA.  Items that

14  have a rough texture, because they would rub against our skin

15  and cause more cells to come off, would tend to get more DNA

16  than smooth items.  So the item itself can play a role in how

17  much DNA is is left behind.

18  Q.  Is it possible for you to remove DNA from an object?

19  A.  Yes, it is.

20  Q.  How is that?

21  A.  You could remove DNA from an item just by physical contact

22  with an item that doesn't have DNA on it.  Or you could also

23  use cleaners or substances to try to remove DNA.  In the

24  laboratory, we keep our work areas clean and free from

25  extraneous DNA using bleach and also ethyl alcohol, which is

1   similar to rubbing alcohol.  So those are two examples of

2   substances that will damage DNA and could be used to clean an

3   item and remove DNA from it.

4   Q.  Can DNA also be affected by the way you handle an item?

5   A.  It can, depending on how rough you handle an item, how long

6   you handle an item, you know, in what way.  If you gently touch

7   the edge of it or really rub your hands across it, that can

8   affect how much DNA you leave behind.  Also, if you were

9   wearing gloves, for example, or there was some other barrier

10  between your skin and the item, that could also prevent DNA

11  from transferring.

12  Q.  Over the course of your career, have you had cases where

13  you found no DNA at all on a firearm?

14  A.  Yes, I have.

15  Q.  Are there cases where there has been no sufficient DNA

16  found on a firearm?

17  A.  Yes, we have.

18  Q.  Based on your training and experience, is it possible for

19  someone to touch an object, such as a gun, and not leave their

20  DNA on it?

21  A.  Yes.

22  Q.  Can you explain that.

23  A.  Well, the variety of factors that we've just talked about.

24  Depending on the situation, if the person touched something but

25  they're not particularly a shedder or their hands were very

1   cold or dry, they just delicately touched the item, they made

2   an attempt to clean the item off, wore gloves.  Also, the

3   storage of the item between the time when it's touched and when

4   the testing is performed can also be a factor.  If an item is

5   subjected to intense heat, that can interfere with our ability

6   to collect DNA from it.  Humidity, especially when it leads to

7   the formation of mold, can inhibit the ability of collecting

8   DNA from an item.  All of those factors could lead to someone

9   touching an item and us still not detecting DNA.

10  Q.  Based on your training and experience, is it possible for

11  someone to touch an object such as a gun and leave their DNA on

12  it but for the DNA not to have been identified during the

13  testing process?

14  A.  That's possible, yes.

15  Q.  How would that happen?

16  A.  Well, if there was DNA there but just not in a sufficient

17  amount, so I -- I couldn't give you a specific example because

18  I would have no way of knowing, but intuitively, DNA could be

19  left behind, for example, on the trigger and trigger guard.  I

20  know that there's human DNA there.  We're detecting it.  But we

21  have no way of comparing it to any known individual.  So I'll

22  never know whose DNA that was.  So that's an example in this

23  case of where DNA was left behind but the individual

24  contributor could not be identified.

25  Q.  Is it possible that the way the item was swabbed, for

1    example, could also affect whether there was DNA collected for

2    analysis?

3    A.  It can.  One of the main differences between a serological

4    sample and a touch sample is that you can see a serological

5    sample.  If there was a blood stain on an item, you know

6    exactly where to collect.  In a touched item, the DNA is not

7    visible to the naked eye.  Your cells are not visible to the

8    naked eye.  So we tend to just focus on areas where we would

9    expect someone to touch an item.  So the trigger, for example,

10   of a gun, if it was a cellphone, you might swab the individual

11   buttons, because you would expect a person to touch in that

12   area.  But since you can't see the DNA, it's somewhat of a

13   guessing game.  So it's possible that you just happened to swab

14   where there was no DNA and there is DNA elsewhere on the item.

15            MR. QUIGLEY:  One second, your Honor.

16            Nothing further, your Honor.

17            THE COURT:  All right.  Cross-examine?

18            MR. MARVINNY:  Thank you, your Honor.

19   CROSS EXAMINATION

20   BY MR. MARVINNY:

21   Q.  How are you, Mr. Ferrara?

22   A.  All right.  Thank you.  How are you?

23   Q.  Very well.

24            Mr. Quigley just asked you a series of questions about

25   how it might be possible to touch a gun and not leave your DNA.

1   A.  Correct.

2   Q.  Let's talk about the case.  You found DNA on the gun,

3   right?

4   A.  Yes, we did.

5   Q.  Fair to say actually you found a lot of DNA on that gun?

6   A.  We did.  We were able to identify a DNA profile, which we

7   called male donor A, on one sample, and we were able to detect

8   a mixture of at least two people on another sample.

9   Q.  So we'll break that down in a minute.  But for now, as you

10  testified, you found someone you called male donor A.  Yes?

11  A.  Correct.

12  Q.  And he's what you call a major contributor?

13  A.  Correct.

14  Q.  Now, male donor A's DNA was found on the textured area of

15  the slide, the slide, the magazine release, and the safety.

16  Correct?

17  A.  Correct.

18  Q.  What does it mean to be a major contributor, such as male

19  donor A?

20  A.  So a major contributor comes when you have a mixture of DNA

21  but one of the contributors contributed more or most of the DNA

22  to that mixture.  And they are oftentimes easier to deconvolute

23  because they have contributed much more of the DNA.

24  Q.  And now in addition to that donor A, you found another

25  sample DNA were suitable for comparison, correct?

1    A.   Yes.  On the textured area of hand grips, we have a mixture

2    of DNA from at least two people.  And if I had a known sample

3    from a known individual, I could compare to that mixture and

4    determine whether or not the person contributed possibly to

5    that mixture.

6    Q.   So in this case, you got DNA from Mr. Bartee.  Yes?

7    A.   We received a sample from Mr. Bartee, yes.

8    Q.   Then you compared his DNA to all of the DNA and you were

9    able to compare from the gun, correct?

10   A.   Correct.

11   Q.   And for every sample of DNA you that could compare with

12   Mr. Bartee, Mr. Bartee was excluded as a contributor to that

13   DNA, correct?

14   A.   That is correct, yes.

15   Q.   And in layman's terms, that means it wasn't Mr. Bartee's

16   DNA on the gun.

17   A.   Correct.

18   Q.   Have you become familiar with the sort of general layout of

19   the gun in the course of your work?

20   A.   I have.  In our laboratory, we typically receive the swabs

21   from the firearm.  It's just a policy decision that our lab has

22   made.  There are exceptions made to that.  Typically the police

23   department, which we've helped to train, will swab the

24   firearms.  I have been trained in the sort of structure and

25   operation of the firearm.

1   Q.  And so one of the areas of the gun in this case where you

2   found DNA was the handgrips.  Right?

3   A.  Correct.

4   Q.  That is literally it's a grip for the hand on the gun,

5   right?

6   A.  Yes.  It's where you would typically hold the gun in order

7   to fire it.

8   Q.  Right.  If you were going to fire the gun, you would have

9   to hold it by the handgrip.

10  A.  Correct.

11  Q.  You also found DNA up in the upper portion of the gun,

12  right?

13  A.  Correct, those other areas, the slide and magazine release,

14  the safety and the textured area of the slide would be on the

15  upper portion of the gun.

16  Q.  And now let's talk briefly about the magazine release.  Are

17  you aware that the magazine release is the button that one

18  would need to push to eject the magazine from the gun?

19  A.  Yes.

20  Q.  And that was one of the areas of the gun in this case where

21  you found DNA suitable for comparison, right?

22  A.  Correct.

23  Q.  Let's break it down just a little bit to be clear.  On the

24  upper part of the gun, the slide, the magazine, the magazine

25  release -- I'm sorry -- the slide, the textured area of the

1    slide, the magazine release, you found DNA of at least two

2    people, right?

3    A.   Correct.

4    Q.   You can't say it might have been three.

5    A.   It might have been three if they were close relatives,

6    like, say, a father and son or brothers.  If there were

7    brothers and sisters mixed in, it would be hard to distinguish

8    because close relatives have very similar although not

9    identical DNA profiles.

10   Q.   So is it fair to say it could be three but it's more

11   consistent with two contributors?

12   A.   That is correct, yes.

13   Q.   And one of those contributors is what you call a minor

14   contributor?

15   A.   That is correct.

16   Q.   And I think you testified that's someone who -- the DNA is

17   a very small quantity; is that right?

18   A.   Generally speaking it's less than the major contributors.

19   In this case it was so much less that we're not able to do any

20   comparison with it, though there may be situations where we can

21   make comparisons to the minor contributor.

22   Q.   But you couldn't in this case.

23   A.   But could not in this case.

24   Q.   The other source of DNA on that upper part of the gun was

25   male donor A.

1   A.  Correct.

2   Q.  And we've already talked about he's a major contributor.

3   A.  That is correct.

4   Q.  And again you determined it was in fact a man, right?

5   A.  Yes.  That's the only thing that we can determine about an

6   individual from their DNA profile, is whether it's male or

7   female.

8   Q.  And there's a lot of DNA on that portion of the gun that

9   you found.

10  A.  Yes.

11  Q.  And Mr. Bartee is not male donor A.

12  A.  Correct.

13  Q.  Now, on the handgrips, which is the lower portion of the

14  gun, you also found DNA consistent with two contributors.

15  Right?

16  A.  Correct.

17  Q.  The same thing.  It could have been three but it's more

18  likely two?

19  A.  Correct.

20  Q.  Now, you never actually compared the DNA found on the top

21  of the gun, of male donor A, to these two people found on the

22  handgrip, did you?

23  A.  Correct.  We did not.  As I said, that was more of a policy

24  decision, that we don't compare unknown individuals, because we

25  feel at that point that it's not useful information.  If we

1    have a known person that matches the male donor A, then compare

2    that individual to all samples that are suitable for comparison

3    in the case, including a mixture such as this.

4    Q.  So is it possible that male donor A's DNA was also on the

5    handgrips but you're just unaware of it now?

6    A.  That's possible, yes.

7    Q.  In any event, there were at least two people's DNA on the

8    handgrips that you were comparing to Mr. Bartee, correct?

9    A.  Correct.

10   Q.  And Mr. Bartee is neither one of those two people.  You

11   could say that, yes?

12   A.  Yes, correct.

13   Q.  I just have a couple other questions for you, Mr. Ferrara.

14   It's not possible to tell, is it, when DNA was left on the gun?

15   A.  Correct.  There is no way to tell when.  What we're

16   essentially seeing is a snapshot in time of when the sample was

17   collected.  Any DNA found could have been deposited there

18   immediately before or many years before, and there would be no

19   way for me to distinguish.

20   Q.  So there's no time stamp on DNA.

21   A.  Correct.

22   Q.  The DNA could have been left a week ago?

23   A.  Correct.

24   Q.  It could have been left a year ago?

25   A.  That is correct.

1   Q.  You just have no way of knowing.

2   A.  Yeah, correct.  There would be no way of knowing whether it

3   was recent or from a long time ago.

4   Q.  I just want to end with this question.  Mr. Quigley asked

5   you about the possibility of cleaning DNA off of an item?

6   A.  Correct.

7   Q.  And there might be some way to clean DNA off of a gun,

8   right?

9   A.  Correct.

10  Q.  You might take a rag to it and wipe it down, right?

11  A.  Correct.

12  Q.  Or you might do, you testified about some other ways you

13  might try to clean DNA.

14  A.  Correct.

15  Q.  Mr. Ferrara, is it possible, if I wanted to, to take an

16  item with my DNA on it and someone else's DNA on it and clean

17  off only my DNA?  Is that possible?

18  A.  I would say that it's possible but unlikely.  As I said

19  earlier, there's no way to see the DNA with your naked eye on

20  an item.  And if there was DNA from more than one person, there

21  would be no way to purposefully and selectively remove one

22  person's DNA and not the other.  You might by pure chance, if

23  you happened to wipe an area that has one person's DNA and

24  leave an area that has another, but that would be by chance.

25  There would be no way to intentionally do that.

1   Q.  There would be no way to intentionally clean your own DNA

2   and intentionally leave behind someone else's, right?

3   A.  Correct.

4           MR. MARVINNY:  Nothing further.

5           THE COURT:  All right.  Any redirect?

6           MR. QUIGLEY:  Briefly, your Honor.

7   REDIRECT EXAMINATION

8   BY MR. QUIGLEY:

9   Q.  Mr. Ferrara, you were asked by Mr. Marvinny earlier in the

10  examination, he asked you to determine that it wasn't

11  Mr. Bartee's DNA on the gun.  You remember that?

12  A.  Yes.

13  Q.  You said yes.  But that's not actually true, right?

14  A.  I believe you are referring to the samples where

15  comparisons couldn't be done.  So in the samples where

16  comparisons couldn't be done -- the trigger, trigger guard, as

17  well as the minor contributor to the textured area of the

18  slide, magazine release, and safety, those samples are simply

19  not suitable for comparison.  So I would not be able to

20  determine whether or not that was Mr. Bartee or anyone else's

21  DNA.

22  Q.  So that could be Mr. Bartee's DNA and you just don't know.

23  A.  It could be, yes.

24          MR. QUIGLEY:  No further questions.

25          MR. MARVINNY:  Sorry, just one question.

1    RECROSS EXAMINATION

2    BY MR. MARVINNY:

3    Q.  It could be anyone's DNA and you don't know, correct?

4    A.  Correct.

5            MR. MARVINNY:  Nothing further.

6            THE COURT:  All right.  You may step down.

7            THE WITNESS:  Thank you.

8            (Witness excused)

9            MR. QUIGLEY:  May I just collect those exhibits, your

10   Honor?

11           THE COURT:  Yes, please.  Thank you.

12           MR. QUIGLEY:  Your Honor, at this time the government

13   would like to read Government Exhibit 901, a stipulation.

14           THE COURT:  All right.  Any objection from the

15   defense?  I'm assuming not since it is a stipulation.

16           MR. MARVINNY:  That's right.

17           THE COURT:  All right.  Government Exhibit 901 is

18   received into evidence.

19           (Government's Exhibit 901 received in evidence)

20           MR. QUIGLEY:  May I publish it, your Honor?

21           THE COURT:  You may.

22           MR. QUIGLEY:  "It is hereby stipulated and agreed by

23   and between the United States of America, by Preet Bharara,

24   United States Attorney, Brendan F. Quigley and Jeffrey A.

25   Brown, Assistant United States Attorneys, and Rudolph Bartee,

1  the defendant, by and with consent of his counsel, Julia Gatto,

2  Esq. and Jonathan Marvinny, Esq. that:

3       "Prior to May 7th, 20123, the defendant Rudolph Bartee

4  was convicted in state court of an offense -- of a felony

5  punishable by imprisonment for a term exceeding one year.

6       "It is further stipulated and agreed that this

7  stipulation may be received in evidence as a government exhibit

8  at trial."

9       Your Honor, the government also offers Government

10 Exhibit 903, another stipulation.

11      MS. GATTO:  Your Honor, before we move on, I think I

12 would like request an instruction.

13      THE COURT:  Yes.  The reason for the stipulation is

14 because it is known to the defense.  But you are not to

15 consider the conviction or speculate about it for any other

16 purpose.  You are simply to know that it exists because it is

17 known to be an offense.

18      MR. QUIGLEY:  At this time the government offers

19 Exhibit 903, which is another stipulation.

20      MR. MARVINNY:  No objection.

21      THE COURT:  Government Exhibit 903 is received in

22 evidence.

23      (Government's Exhibit 903 received in evidence)

24      MR. QUIGLEY:  May I publish it, your Honor?

25      THE COURT:  You may.

DBJABAR3ps

1      MR. QUIGLEY:  "It is hereby stipulated and agreed by

2  wand between the United States of America, by Preet Bharara,

3  United States Attorney, Brendan F. Quigley and Jeffrey A.

4  Brown, Assistant United States Attorneys, and Rudolph Bartee,

5  defendant, by and with consent of his counsel, Julia Gatto,

6  Esq., and Jonathan Marvinny, Esq., that:

7      "(1) The Taurus model P.T. 58 S .380 caliber pistol

8  that is marked Government's Exhibit 203 was manufactured in

9  Brazil and imported into the United States through the state of

10  Florida;

11      "(2) The .380 caliber Wolf ammunition that is marked

12  as Government Exhibit 202 was manufactured either in Russia or

13  Germany.

14      "It is further stipulated and agreed that this

15  stipulation may be received in evidence as a government exhibit

16  at trial.

17      MR. QUIGLEY:  Your Honor, the government rests.

18      THE COURT:  All right.  May I see the parties at

19  sidebar, please.

20      JUROR NO. 8:  Your Honor, could we get --

21      MR. BROWN:  Your Honor, there is a request from the

22  jury.

23      THE COURT:  I'm sorry.  Yes.  Why not take your

24  five-minute break now.  That's fine.  Thank you.  I don't want

25  to make people uncomfortable.

DBJABAR3ps

1           (The jury left the courtroom)

2           THE COURT:  I haven't -- we'll take a five-minute

3    break.  It seems to me, I imagine there is an application

4    coming from the defense, but maybe not.

5           MS. GATTO:  There is.

6           THE COURT:  OK.  We might, I it's better to do it with

7    the jury present, even if it's at sidebar.  I don't think we

8    need to do it with them not being around.  Unless the parties

9    disagree?  You think, this being a pure legal matter, we can do

10   this without them being present?

11          MR. MARVINNY:  In fact I think we should, your Honor.

12          THE COURT:  OK.  That's fine.  Then your five-minute

13   break is that much -- do you need --

14          MS. GATTO:  I do.

15          THE COURT:  All right.  Go ahead.

16          All right.  Then you're welcome to sit down and the

17   government can get ready for its response.

18          MR. MARVINNY:  Your Honor, Mr. Bartee would like to

19   use the men's room.

20          THE COURT:  Of course.

21          And the timing suggests that we'll get both defense

22   witnesses in today, yes?

23          MR. MARVINNY:  Looks that way, your Honor.

24          THE COURT:  All right.  A Judge can hope.

25          MR. MARVINNY:  Your Honor, may I approach with some

1    case law?

2            THE COURT:  Yes.

3            MS. GATTO:  Judge, may I use your bathroom?

4            THE COURT:  Yes.

5            MS. GATTO:  Thank you.

6            (Recess)

7            THE COURT:  I'll hear --

8            MS. GATTO:  If we could wait for Mr. Bartee.

9            THE COURT:  Oh, he is in the bathroom.  I'm sorry.

10   That's right.

11           (Pause)

12           MR. MARVINNY:  May I go ahead?

13           THE COURT:  You may.  Thank you.

14           MR. MARVINNY:  Your Honor, at this time we move for a

15   judgment of acquittal pursuant to Rule 29 of the Federal Rules

16   of Criminal Procedure on the grounds there is insufficient

17   evidence to sustain a conviction on either count of the

18   indictment, on both counts of the indictment.

19           And, your Honor, the same analysis that I'm going to

20   go through now applies to both counts.  Specifically, the

21   government has failed to present sufficient evidence to sustain

22   the element of knowing possession.  The evidence that the

23   government has presented has shown this case to be what is

24   known as a joint occupancy case in the case law.  The evidence

25   is that Mr. Bartee and his common-law wife, Ms. Davis,

cohabitated in the apartment and indeed shared the one bedroom in the apartment, importantly, the bedroom room where one of the items at issue in this case, the magazine, was discovered. The mere fact that Mr. Bartee resided in the apartment and in that bedroom is insufficient without more, under the case law, to establish Mr. Bartee's constructive possession of the contraband here, your Honor, and I should say to establish his constructive possession as a practical matter.

Here both the gun and the ammunition were both concealed. They were not in plain view. And there is nothing, not a stitch of evidence, affirmatively leaking Mr. Bartee to either item. Indeed, the DNA and the fingerprint evidence, as your Honor just heard, both exclude Mr. Bartee. And the government hasn't provided any other piece of evidence providing a sufficient nexus between the gun and/or the ammunition and Mr. Bartee.

I've handed up to your Honor a series of cases that deal with this joint occupancy issue. Some of the cases are remarkably similar to this case. In fact, I don't think it's hyperbolic to say some of them are indistinguishable from this case. I've handed the Court *United States v. Mergerson*, which is a Fifth Circuit case. The cite is 4 F.3d 336, a case from 1993. And I've handed your Honor *United States v. Reese*, 775 F.2d 1066. That's a Ninth Circuit case from 1985.

In the *Mergerson*, your Honor, which is the Fifth

1    Circuit case, the defendant was living with his girlfriend in a

2    bedroom where the gun was found and there was no evidence

3    whatsoever to say that the gun was more likely his versus hers.

4    And the court found legally insufficient evidence to sustain

5    the very charges that Mr. Bartee is facing here, possession of

6    a firearm.

7         In *Reese*, which is a Ninth Circuit case, the defendant

8    shared an apartment with his wife, where the firearm was found.

9    And the analysis in the Ninth Circuit, and this is the same as

10   the 922(g) count, was exactly the same as in *Mergerson*.

11        Finally -- not finally, your Honor, additionally --

12   I've handed the Court *United States v. Bond*, 477 F.2d 1137,

13   which is a Third Circuit case from 1973.  And that case, your

14   Honor, is so similar, it really bears detailing.  In that case,

15   the contraband at issue was heroin hidden by the door frame in

16   a room, literally exactly what we have here, substituting the

17   magazine for the heroin.  And the Third Circuit wrote, "Here,

18   there is nothing except the joint occupancy of the room upon

19   which an inference of possession could be based.  A fact-finder

20   could only speculate whether both of the room's occupants or a

21   particular one of them knew of the cache, much less excised

22   control over the hidden contraband."  When I say "cache,"

23   that's c-a-c-h-e.

24        I've also handed the Court *United States v. Ford*,

25   which is a DC Circuit case, with similar analysis.  It goes on

1    and on, your Honor.

2            Now, as for the Second Circuit, I confess, I wasn't

3    able to find a Second Circuit case exactly on all fours.  But I

4    have found a Second Circuit case that I've handed to your

5    Honor, which is *United States v. Johnson*, which is 300 F.App'x

6    444.  It's a Second Circuit case from 2008.  And I handed that

7    to your Honor because that case sets a Seventh Circuit case,

8    *Castillo*, for the following proposition: "If the defendant

9    jointly occupies the premises, the government must present some

10   evidence that supports the nexus between the weapon and the

11   defendant."  And, your Honor, I wrap up with this.  In this

12   case, as I've said, there is simply no evidence, no evidence

13   connecting Mr. Bartee to the gun in any degree, in any greater

14   degree than the evidence connects Ms. Davis to the gun.  This

15   is the quintessential joint occupancy case.  Without the

16   government providing any affirmative evidence whatsoever

17   linking Mr. Bartee to the contraband, under the case law that I

18   have handed up, I quite frankly respectfully don't even think

19   it's the Court's call; the case needs to be dismissed under

20   Rule 29.

21           THE COURT:  I'm not done with you yet, though.

22   Obviously you've handed me the cases and it's better that I

23   read them before making any determinations, but I want to make

24   sure I understand that your position is that, had Mr. Bartee

25   been living alone in the residence, you would not be making

DBJABAR3ps

1    this argument.  Or it's the fact that he is living with someone

2    else and, in your view, the evidence in this case makes clear

3    that there was a gun and ammunition in a place that was shared

4    by two people, but your position is that the government has

5    said nothing to demonstrate that it is more likely he than she

6    or perhaps in any way that it is he and not she who is the

7    owner of the gun.

8              MR. MARVINNY:  That's exactly right, your Honor.  Let

9    me just say I would not be making this motion if Mr. Bartee

10   lived in that apartment alone.  Nor would I be making this

11   motion if the gun was discovered in plain view while Mr. Bartee

12   was present, because then there would be some indication that

13   Mr. Bartee knew of the existence of the gun and the ammunition.

14   So my motion is tailored very specifically to the facts we have

15   here, which are, again, completely on all fours with the case

16   law I have handed up.

17             THE COURT:  Let me hear from the government.

18             MR. QUIGLEY:  Your Honor, a couple things.  Number

19   one, just to start off, the jury instruction is very similar to

20   the jury instruction the parties proposed, the jury instruction

21   that the Court set out last night that explicitly acknowledges

22   that possession may be sole or joint.  And, here --

23             THE COURT:  But you realize, he's making a separate

24   point from that.  What he's saying is, he agrees it can be

25   joint, but you have to do something to indicate that the

1  possession was Mr. Bartee's.  That's what he's saying.

2        MR. QUIGLEY:  Your Honor, here, I think there is

3  sufficient evidence that the possession was Mr. Bartee's?  I

4  note a couple things.  Number one, to begin with, I think it

5  may not answer the question, but I believe it's certainly

6  relevant that these weapons were found in the defendant's

7  house.  They were found -- the ammunition was found in the

8  defendant's bedroom.

9        THE COURT:  But, again, sir, I'm just playing devil's

10  advocate here, these are locations where it's not suggested

11  that he's not sharing this area with his wife.  Is that

12  correct?

13        MR. QUIGLEY:  I think that's right, your Honor, yes.

14        THE COURT:  OK.  Go on with this.

15        MR. QUIGLEY:  There is sufficient fact that these were

16  concealed.  There was testimony from Agent Walsh about how long

17  the officers were knocking.  It was a very small apartment.

18  Mr. Bartee certainly had adequate time to secret those items in

19  the closet, in the bedroom, or in the sump-pump room.  The fact

20  that the light was on in the sump-pump room, I think, also

21  suggests that somebody had been in there recently.  And the

22  items, there is testimony about the condition of the items when

23  they were recovered, that they weren't dirty, they didn't have

24  cobwebs over them, they weren't dusty.  I think also allows an

25  inference that those items had been recently deposited by

DBJABAR3ps

1   Mr. Bartee before he entered the door.

2           THE COURT:  I hear what you're saying, but I think,

3   was your argument that you've just made a response to

4   Mr. Marvinny's argument to concealment, that these things

5   weren't concealed, that they were in plain view?  Again, what

6   I'm trying to understand is, what is it specifically, if

7   anything, that's been attributed, that ties the firearm and the

8   ammunition to Mr. Bartee as opposed to Ms. Davis?

9           MR. QUIGLEY:  I think one example, your Honor, would

10  be the testimony that Mr. Bartee was not dressed when he came

11  to the door.  He was wearing pants but not wearing a shirt.

12          THE COURT:  I knew what you meant.  Yes.  Go on.

13          MR. QUIGLEY:  So that suggests that he was doing

14  something else before he came -- he was not waking up, he was

15  doing something else before he came to the door.  And I think

16  there was testimony that Ms. Davis answered the door.

17          THE COURT:  Yes.  But she answered the door in sleep

18  clothes and he seemed to come up the stairs in maybe sleep

19  clothes and jeans.

20          So keep going.  Try again.

21          MR. QUIGLEY:  I think it just suggests that he was

22  doing something while he was downstairs, in the getting dressed

23  after ten minutes of police knocking, that was, by all

24  accounts, loud and should be heard.

25          THE COURT:  Anything else you want to say?

DBJABAR3ps

1        MR. QUIGLEY:  I also just note, again, I think the

2    fact, the presence of the bags demonstrates motive for

3    possession of firearms.  I think that also goes to the

4    sufficient issuance of the evidence.

5        THE COURT:  Although there has been nothing to tie him

6    as opposed to Ms. Davis to the bags either, correct?

7        MR. QUIGLEY:  That's correct, your Honor.

8        THE COURT:  Mr. Marvinny, is there something you want

9    to say in reply?

10        MR. MARVINNY:  Only this, your Honor, that the timing

11    of when the items might have been secreted in the apartment is

12    not a relevant question.  So the idea that these items --

13    Mr. Quigley thinks there's some evidence that the gun and

14    ammunition were stashed more recently.  That's not a relevant

15    part of the analysis at all.  The case law doesn't turn on the

16    length of time.

17        THE COURT:  Let me stop you for a moment, sir.  You

18    yourself conceded that if these items were in plain view, that

19    you wouldn't be making the argument you're currently making,

20    correct?

21        MR. MARVINNY:  That is correct.

22        THE COURT:  So if the evidence were to say, were to

23    demonstrate -- and I'm not saying it does -- that they were

24    only recently taken out of plain view by being secreted

25    somewhere in the house, what would that do to your cases?

1          MR. MARVINNY:  It would do absolutely nothing to my

2     cases because the virtue -- the effect of items being in plain

3     view is that there is some evidence that the defendant, at the

4     present moment when those items were discovered, was

5     necessarily aware.  And so that's the key difference.  There's

6     no evidence here showing that Mr. Bartee was aware of the items

7     at the time they were discovered.  If they're in plain view,

8     that's enough to say, well, you know, the defendant must have

9     known about them, they're wide open in the area he lives.  But

10     that's not present here.  And the government's efforts to try

11     to say, well, they must have been secreted at some point prior

12     to the search simply isn't a relevant factor in the case law.

13          In other words, the sort of, I'll call it plain view

14     exception, is an incredibly limited one.  It's when the items

15     are literally sitting out in the open at the time of the

16     search.

17          THE COURT:  And the purpose of that or the import of

18     that is that indeed there must be knowing possession because he

19     must know, and therefore the issue about joint procession is it

20     is more easily proved because it's there in front of him.

21          MR. MARVINNY:  Exactly.  And that's exactly right,

22     your Honor.  And that's why the defendant and his cohabitant

23     can be in joint possession, completely joint possession of that

24     item and there still be no doubt that there is sufficient

25     evidence that both of them were aware the items were present.

DBJABAR3ps

1     That's where the plain-view exception might come into play.

2     It's sitting on the bed when the agents came in.  Then

3     Ms. Davis and Mr. Bartee could both be charged with those items

4     and charged with joint possession.  That's not what we have

5     here.  And so the plain-view exception simply doesn't apply.

6          THE COURT:  I understand what you're saying.  And

7     Mr. Quigley, is there something you wish to say in response?

8          MR. QUIGLEY:  Your Honor, there was just one other

9     point I would like to raise.  There is evidence that Ms. Davis

10    consented to the search.  I think the only inference that can

11    be drawn from that was that she's wasn't aware the firearms

12    were in the house.

13         THE COURT:  I'm not sure that I could draw that

14    inference.  But let me just say this.  There are cases that I

15    have been given, and I ought to read them before deciding this.

16    So I'm going to reserve on the Rule 29 motion because it's

17    sufficiently important, and the cases, they may be on all fours

18    in other circuits, but we only have on all threes or all twos

19    from the Second Circuit, so I need to look into this a little

20    more carefully.

21         But I do appreciate the arguments.  So it is reserved.

22         MR. QUIGLEY:  Your Honor, just one other point.

23         THE COURT:  But I just gave you the -- go ahead.

24    Realize, I gave the decision so that we could stop the

25    argument.  But go.

1    MR. QUIGLEY:  Yes.  There is evidence that he secreted

2    it immediately prior to the search.

3    THE COURT:  I don't think that's necessarily

4    responsive to what Mr. Marvinny is saying about proof that

5    someone, that Mr. Bartee as opposed to Ms. Davis had possession

6    of it.

7    MR. QUIGLEY:  But I think the argument is, he came up

8    there second in a lesser state of dress than Ms. Davis was,

9    which suggested that he was doing something downstairs, namely,

10   secreting these items.

11   THE COURT:  And I will understand that to be your

12   argument.  OK.  Thank you.

13   May we then start with the defense case.

14   MS. GATTO:  May I just have a little more time?

15   THE COURT:  Yes.  We haven't had our five-minute

16   break.  And I will explain to the jurors we were discussing

17   legal issues.  But, yes.  Those who need a break, I'm just

18   going to walk around for a moment.

19   (Recess)

20   THE CLERK:  May I bring in the jury, your Honor?

21   THE COURT:  Yes.  Thank you.

22   (Jury present)

23   THE COURT:  Ladies and gentlemen, thank you for your

24   patience.  I do not want you to think that we do not know how

25   to figure out five minutes.  I want you to know that while you

1   were away, we had some legal discussions in the case that were

2   productive and important and needed to be done, and we wanted

3   to do those without inconveniencing you.

4           This is now the time in the case where the defense

5   may, if they wish to, present witnesses.  And just to give you

6   sort of a sense looking ahead, as a result of the work that's

7   been done today by both sides, it is, I won't say a given, but

8   it's extremely likely, almost a given, that we will finish with

9   the evidence in the case today and tomorrow we would have the

10  summations and the charge to you.  So I don't want to

11  unnecessarily get your hopes up.  And if that means you stay

12  five or ten minutes past 2:30, I think you probably would

13  welcome that trade, to be done and not have to have more of a

14  trial tomorrow.  But that's sort of where we are in the case.

15          So what I'll do is ask the defense if they have any

16  witnesses.

17          Ms. Gatto.

18          MS. GATTO:  Yes.  Thank you.  The defense calls

19  Carmine Alessandro.

20   CARMINE ALESSANDRO,

21      called as a witness by the defendant,

22      having been duly sworn, testified as follows:

23          MS. GATTO:  May I, your Honor?

24          THE COURT:  You may.  Thank you.

25  DIRECT EXAMINATION

1  BY MS. GATTO:

2  Q.  Good afternoon, Mr. Alessandro.  Where do you live?

3  A.  I live at 53 Stratton Street, Yonkers, New York.

4  Q.  What do you do for a living?

5  A.  A real estate broker.

6  Q.  As part of that -- a broker?  What did you say?

7  A.  A real estate broker.

8  Q.  Are you also in the business of renting apartments?

9  A.  Yes.

10  Q.  In connection with that business, do you have a

11  relationship to a property located at 715 Hollywood Avenue?

12  A.  Yes.  I am the owner of that property.

13  Q.  And how long have you owned the property?

14  A.  2005.

15  Q.  Can you generally explain what the property looks like.

16  A.  It's a two-family with a finished basement.

17  Q.  And what is the name of the neighborhood?

18  A.  It's in the Throgs Neck section of the Bronx.

19  Q.  Can you generally explain the neighborhood.

20  A.  A very comfortable neighborhood, a desirable neighborhood.

21  Q.  The property that you own, how many parts are in that?

22  A.  It's two apartments upstairs and a finished basement

23  apartment.

24  Q.  And the basement apartment you rent out?

25  A.  Yes.

DBJABAR3ps                Allessandro - direct

1    Q.  Mr. Alessandro, do you know who lived in the apartment, the

2    basement apartment, in May of 2013?

3    A.  May 2013, was rented out to Davis and Mister -- there

4    was -- the two people on the lease.

5    Q.  And Davis, that was a woman?

6    A.  Yes.  Marilyn Davis.

7    Q.  And the other person on the lease was -- do you know his

8    relationship to Ms. Davis?

9    A.  Yes.  They were living together.

10   Q.  And in the course of your real estate business, is it your

11   standard practice to have a lease agreement with your tenants?

12   A.  Yes.

13   Q.  And you use a standard preprinted form?

14   A.  Yes, a Bloomberg form.

15   Q.  What's the typical length of a term of lease that you enter

16   into?

17   A.  I just can't hear you.

18   Q.  I'm sorry.  What's the typical term of the lease?

19   A.  A one-year lease.

20         THE COURT:  Sir, I'm just going to ask you to wait

21   until she finishes asking her questions.  It's easier for

22   everybody to hear and understand.  Take your time.  Thank you.

23   Q.  I'm going to show you a document that's marked for

24   identification purposes as Defendant's Exhibit B.

25         MS. GATTO:  May I approach?

1          THE COURT:  You may.

2     Q.  It's a two-page document.  Take a look at that, please.  Do

3     you recognize what I've just shown you?

4     A.  Yes.

5     Q.  And is it the standard lease agreement you describe that

6     you use with people you rent to?

7     A.  Yes.

8     Q.  If you could just slip to the second page of that document.

9     Under the word "landlord," there's a signature.

10    A.  Yes.

11    Q.  Whose signature is that?

12    A.  That's mine.

13    Q.  And do you see the lease date on the front page?

14    A.  I just can't hear.

15    Q.  You do you see the date of the lease on the front page?

16    A.  OK.  The date of the lease --

17    Q.  You don't have to tell me what it is.

18    A.  Yes.  The lease date was --

19    Q.  That's OK.

20          THE COURT:  The answer is yes or no, you see it.

21          THE WITNESS:  Yes.

22    Q.  Was this document executed at or near that date?

23    A.  I can't hear.

24    Q.  You was the document executed, did you sign it --

25    A.  Yes.

1   Q.  -- at or near that date?

2   A.  Yes.

3           MS. GATTO:  Your Honor, we offer Defendant's Exhibit

4   B.

5           MR. QUIGLEY:  Your Honor, we object on hearsay

6   grounds.  I think it's a hearsay document.

7           THE COURT:  I'm sorry?

8           MR. QUIGLEY:  We object on hearsay grounds, to a

9   hearsay document.

10          THE COURT:  Sidebar, please.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At the sidebar)

2         MR. QUIGLEY:  It's a hearsay document.  Among other

3    things there's writing here which is "furniture fixtures owned

4    by landlord," an inadequate statement I think they're going to

5    be offering for the truth of the matter that the fixtures are

6    owned by the landlord.

7         THE COURT:  Let me ask you this.  It is possible that

8    if he uses this, it's to refresh his recollection that indeed

9    the furniture and fixtures were owned by the landlord.  Would

10   you have an objection to it then?

11        MR. QUIGLEY:  Just using it to refresh, no.

12        THE COURT:  You just used it to refresh the witness's

13   recollection?

14        MS. GATTO:  I do think that that provision -- and I

15   can elicit it from the witness, which is a provision of the

16   real estate document, which is a business record.  I think I

17   can establish that.  If the government wants, I can certainly

18   elicit that before so that all of the pages, there's no problem

19   with the government on the exceptions to the business record.

20        THE COURT:  Why is it not a business record?  Is it

21   only because of this statement?

22        MR. QUIGLEY:  Yes, your Honor.

23        MS. GATTO:  If it helps, I can ask two more foundation

24   questions.

25        THE COURT:  OK.

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Mr. Alessandro, looking again at Defendant's Exhibit B on

2   the last page, the second page, do you see the handwritten note

3   under the number 32?

4   A.  Yes.

5   Q.  Is that a provision of this lease agreement you had?

6   A.  We have --

7   Q.  You don't have to say what it said.

8          THE COURT:  Don't say what it is.

9   A.  It's a provision of the --

10  Q.  It is part of the agreement?

11  A.  Correct.

12  Q.  Whose handwriting is that?

13  A.  That's my handwriting.

14         MS. GATTO:  Your Honor, we now offer Defendant's

15  Exhibit B.

16         MR. QUIGLEY:  No objection, your Honor.

17         THE COURT:  It is admitted.  Defendant's Exhibit B is

18  admitted into evidence.  Thank you.

19         (Defendant's Exhibit B received in evidence)

20         MS. GATTO:  Ms. Katz, can you put it up.

21  Q.  Mr. Alessandro, looking at the document, when did Ms. Davis

22  and Mr. Bartee --

23         THE COURT:  One moment.  There it is.  OK.

24  Q.  Looking at the lease agreement, when did Mister -- well,

25  first, do you agree with me that the tenants are Ms. Davis and

1    Mr. Bartee, correct?

2    A.   Correct.

3    Q.   And looking at the document, can you tell us when the lease

4    term began for Ms. Davis and Mr. Bartee?

5    A.   October 20th, 2012.

6    Q.   And is that your understanding, that that was around the

7    time that you met?

8    A.   Yeah.  We signed the lease October 20, 2012, we signed the

9    lease.

10   Q.   OK.  You can put it aside for now.

11              Before Ms. Davis and Mr. Bartee, how many tenants have

12   you had in that basement apartment at 715 Hollywood Avenue?

13   A.   We had a grocer tenant.

14   Q.   But how many in total?

15   A.   About three.

16   Q.   And immediately before Ms. Davis and Mr. Bartee, yes or no,

17   did you have a tenant in that property?

18   A.   Yes.

19   Q.   And how long did the tenant prior to Mr. Bartee and

20   Ms. Davis live there?

21   A.   About nine months.

22   Q.   Did there come a point of time when the tenant, the one who

23   lived there before, immediately before Mr. Bartee and

24   Ms. Davis, abandoned the apartment?

25   A.   Yes.  We got a --

1    MR. QUIGLEY:  Objection.  Hearsay.

2    THE COURT:  Well, did there come a point in time --

3  you knew who was living in that apartment, correct, sir?

4    THE WITNESS:  Yes.

5    THE COURT:  Did there come a point when you realized

6  that the person who was living there was no longer living

7  there?

8    THE WITNESS:  Yes.

9    THE COURT:  Thank you.  Move on.

10  Q.  How did you learn that?

11  A.  There was a big flood where I got a call to come over to

12  the property because it, it was in disarray, and we had to go

13  there and stop the water.

14  Q.  Perfect.  And do you know when you got that call?

15  A.  It was -- it was like early in the morning, very early in

16  the morning.

17  Q.  What month of the year?

18  A.  Oh, it was like, oh, I think it was like in September.

19  Q.  September of what year?

20  A.  2012.

21  Q.  2012?

22  A.  Yes.

23  Q.  And after receiving the call, what did you do?

24  A.  I ran to the property, one of my workers.

25  Q.  Tell us exactly what you saw when you went to the property.

1    A.  It was in disarray.

2            THE COURT:  May I stop you for a moment.  When you say

3    "property," are you speaking of the building itself, the

4    basement itself, or something other than that?

5            MS. GATTO:  Thank you, Judge.  You're right.  I should

6    clarify.

7    Q.  The call about the flood, that relates to the building

8    itself or the basement?

9    A.  The basement of the property.

10   Q.  And when you went, tell us what you saw when you went to

11   the basement part after you got the call about the blood?

12   A.  Correct.

13   Q.  And tell us what you saw in the basement apartment when you

14   got there.

15   A.  The doors were wide open.  The water was gushing out.

16   So --

17           THE COURT:  From where?

18           THE WITNESS:  From the, the, the sewer loop.  It's

19   like a sump pump there.

20           THE COURT:  A sump pump.  OK.

21   Q.  And then prior to this, were they in the apartment?

22   Q.  The prior tenant's belongings, were they in the apartment?

23   A.  No, not the prior tenant.

24   Q.  No, the prior tenant --

25           (Mr. Quigley rose)

1      THE COURT:  No.  Less leading, counsel.

2  Q.  Were the prior tenant's belongings in the apartment?

3      MR. QUIGLEY:  Objection.

4      THE COURT:  Again, a little less leading.

5  Q.  And what belongings did you see there?

6  A.  Everything.  There was --

7      MR. QUIGLEY:  Your Honor, I object again.

8      THE COURT:  You object to which?

9      MR. QUIGLEY:  Foundation.  I mean --

10      THE COURT:  All right.  Sir, when you went there to

11  see the flood, what did you see in the apartment?  I know you

12  saw the water and stuff.  But what did you see in terms of

13  furniture?

14      THE WITNESS:  Everything was there.  All the furniture

15  was there.

16      THE COURT:  Well, did you look in every cupboard?  Did

17  you look in every drawer?

18      THE WITNESS:  I looked in -- all the drawers were

19  taken out of the kitchen.  Everything was in disarray.

20  Everything was on the floor.  All the knives, all the contents

21  in the cabinets was all torn out.  The bedroom was all messed

22  up.  The backdoor, the sliding doors were wide open.  There

23  was -- the beds were all turned upside down.  The room, all the

24  doors, only -- but the bedroom door was locked.  So I got

25  paranoid.  I said, I got to break this lock, maybe somebody is

DBJABAR3ps                    Allessandro - direct

1   inside the bedroom.  So I had my guy take the lock out.  Then

2   when we busted the lock.  We went inside the bedroom.

3   Everything was in disarray.  The mattresses were taken off the

4   bed.  All the belongings were on the floor.  It, it was a mess.

5           THE COURT:  All right.

6   Q.  And you mentioned furniture.  If I showed you a picture,

7   would you be able to recognize the furniture that you saw in

8   that basement apartment when you went there?

9   A.  You going to show me the picture?

10  Q.  Yes.  If I showed you a picture, would you be able to

11  recognize the furniture?

12  A.  Yeah, of course.

13          MS. GATTO:  Ms. McInerney, would you be able to put up

14  Government Exhibit 21.

15  Q.  Do you see the couch, the console, and the coffee table in

16  this picture?

17  A.  Yeah.  That would have -- that was there.

18  Q.  I'm sorry?

19  A.  That was the furniture.

20          THE COURT:  All of it, sir?

21          THE WITNESS:  Yeah, all of it.

22          MS. GATTO:  And Ms. McInerney, can you show Government

23  Exhibit 22.  This television, do you recall if the television

24  was there?

25  A.  Yeah, that was there.

1            MS. GATTO:  And Ms. McInerney, one last one,

2       Government Exhibit 58.

3       Q.   Do you see the bed and the bureau?

4       A.   That's, yeah, that was all disarrayed, yeah.

5       Q.   And was that bed and bureau there?

6       A.   Yes.

7       Q.   OK.  Thank you.

8            Mr. Alessandro, there's a back room in that basement

9       apartment that has sliding glass doors that went through the

10      backyard, correct?

11           There's a back room in that basement apartment; am

12      right?

13      A.   Correct.

14      Q.   Was there any furniture that you recall in that back room

15      when you went there in September of 2012?

16      A.   Yeah.  Everything was messy.  It was like, um --

17      Q.   Can you recall specifically if there were bunk beds there?

18      A.   If it was bunk beds.  Yeah, there was beds.

19      Q.   And you are testified earlier that after this tenant, you

20      then sublet -- rented the apartment to Mr. Bartee and

21      Ms. Davis, right?

22      A.   Correct, yes.

23      Q.   What did you do with the furniture that had been left

24      behind by the prior tenant?

25      A.   Everything was in the house.  We didn't touch anything.

1    Everything -- all the furniture that was there, stayed in the

2    house.

3    Q.  Did you rent the apartment as a furnished apartment?

4    A.  Correct, yes.  Everything was there.

5    Q.  And was that part of your lease agreement with Mr. Bartee

6    and Ms. Davis?

7              Was that part of your lease agreement with Mr. Bartee

8    and Ms. Davis?

9    A.  Correct.

10   Q.  I will just ask Ms. McInerney to show the second page of

11   Defendant's Exhibit B.

12             Can you read that written provision underneath no. 32.

13   A.  Correct.

14   Q.  Can you read it.

15   A.  Yes.  "This lease is effective when" --

16             THE COURT:  The handwritten.

17             THE WITNESS:  Oh, the handwritten OK.  "Furniture

18   fixtures own by the landlord."

19   Q.  And to be clear, the furniture fixtures owned here is what?

20   A.  All the content that was in the apartment.

21             MS. GATTO:  Thank you, your Honor.  There are no

22   further questions.

23             THE COURT:  All right.  Is there cross?

24             MR. QUIGLEY:  Yes, your Honor.

25             THE COURT:  You want to take a moment?

1          May I ask you a question, sir.  Presumably you cleaned

2     up whatever the sump pump flood was before you rented it out

3     again, correct?

4               THE WITNESS:  Of course, because --

5               THE COURT:  OK.

6               THE WITNESS:  -- it was gushing out.

7               THE COURT:  Yes.  No.  I just wanted to make sure.

8               THE WITNESS:  Sure.

9               THE COURT:  All right.  Just wanted to make sure.

10    CROSS EXAMINATION

11    BY MR. QUIGLEY:

12    Q.  So Mr. Alessandro, last year, last September, you went into

13    the basement apartment.  Right?

14    A.  Correct.

15    Q.  There's sump pump overflowing?

16              THE COURT:  You have to answer yes or no.

17    A.  Oh, yes, sir.  Yeah.

18    Q.  There's all kinds of stuff everywhere?  Dirty water?

19    A.  Yes.

20    Q.  All over the place?

21    A.  Yes.

22    Q.  Human waste, all over the place?

23    A.  I didn't see the human waste.

24    Q.  The dirty water?

25    A.  Yes.

DBJABAR3ps

Alessandro - cross

1   Q.  A lot of water damage?

2   A.  Yeah.

3   Q.  Furniture was damaged?

4   A.  Correct.

5   Q.  The furniture, you said disarray, turned over?

6   A.  Correct.

7   Q.  Drawn out of closets, out of cabinets.

8           THE COURT:  You got to answer.

9   A.  Yes.

10          MR. QUIGLEY:  Ms. McInerney, if you could put up

11  Government Exhibit 21 again.  Thank you.

12  Q.  And this is, this couch here, your testimony is that this

13  couch here was in the apartment before the sump pump overflowed

14  and all the water damage happened, right?

15  A.  This furniture was there.  Nobody -- nobody touched the

16  furniture.  The water was gushing out but nobody touched the

17  furniture.  The furniture stayed there the way it was.

18  Q.  But you said it was in disarray?

19  A.  Yeah.  The cabinets from the kitchen, the cabinets from the

20  hallway there.  There was a closet door.  All the stuff was

21  taken out.  You know, it was all on the floor.

22          (Continued on next page)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBJAABAR4          Alessandro - Cross

1    BY MR. QUIGLEY:

2    Q.   But you said furniture was in disarray.  What furniture

3    were you talking about?

4    A.   You had furniture in the bedroom that was taken out.  The

5    mattress was, you know it was like, it was like all like

6    somebody was looking for?

7         MR. QUIGLEY:  OK.  So, let's look at Government

8    Exhibit 58.

9         (Pause)

10   Q.   That's the bedroom, right?

11   A.   Correct.

12   Q.   So that's the furniture that is all in disarray?

13   A.   Correct.

14   Q.   Did you see -- when you went into the apartment did you see

15   any plastic baggies in that bed?

16   A.   Plastic bags?  They were on the floor.

17   Q.   You are familiar with what dime bags look like to package

18   drugs, right?

19   A.   Excuse me?

20   Q.   You are familiar with what dime bags looked like to package

21   drugs?

22   A.   No, I am not.

23   Q.   Okay.  Were those cabinets out of that dresser?

24   A.   Cabinets, the drawers were, the drawers.

25   Q.   Showing you what's been marked for in evidence as

1  Government Exhibit 205.  Have you ever seen any of these bags

2  before?

3  A.  No.

4  Q.  Ever seen them in the apartment?

5  A.  No.

6  Q.  No.  Never?  OK.  Not when you went there in

7  September 2012, not at any other time?

8  A.  September 12, any other time?  What do you mean?  To check

9  the property?

10  Q.  Have you ever been back to the apartment since September 12

11  to the property?

12  A.  Of course.

13  Q.  So, let's go back to Government Exhibit 58 that dresser

14  there, was that one of the pieces of furniture that was in

15  disarray?  Sorry.  The cabinets?

16  A.  You talking about the two-by-four that was in front of the

17  closet?

18  Q.  No.  The cabinets on the immediate left of the screen.

19  A.  Left side?

20  Q.  Yes.

21  A.  OK.  The cabinets.

22          THE COURT:  The dresser.

23  A.  Yeah.  Yeah.  The closet.  Yeah, that was in front of the

24  bed.

25  Q.  OK.  Was that one of the pieces of furniture that was in

1    disarray?

2    A.  I think the drawers were open.  The drawers were open.

3    Q.  What about in the living room, the TV, how was that

4    positioned?

5    A.  The TV on the wall you mean?  There was two TVs that were

6    left on the wall.  We never touched the TVs.  They were

7    existing.

8    Q.  Did that have any damage?

9    A.  The TV damage, no, there was no damage on the TV.

10   Q.  It sounds like you had an apartment that had heavy water

11   damage.  Heavy -- was in complete disarray and you rented it

12   out as is, right?

13   A.  We kept all that same furniture in there.  We left the

14   furniture in the apartment because if the prior tenant was to

15   come back I would give them the furniture cause we had no --

16   what happens was the furniture was in the apartment.  We didn't

17   touch any of the furniture.  We left everything existing.  So

18   if the tenant were to come back, it's their furniture.  So I

19   made it on the lease to show that if the tenant were to come

20   back the tenant that signed this lease wouldn't have any

21   ownership in that furniture.

22   Q.  But the place was in disarray in this case you rented it

23   out as is, right?

24   A.  We fixed -- we put the place back.  We had the sump pump.

25   We put the place back so we could rent it.

1  Q.  Now, there came a time when you spoke to an FBI agent a

2  couple of weeks ago?

3  A.  Yeah, they came to my office.

4  Q.  And you had told them that Marion Davis was the own person

5  on the lease, right?

6  A.  Marion Davis and Rudolph, right, they were on the lease.  I

7  didn't have possession of the lease when the FBI came.

8  Q.  Did you ever give it to the FBI?

9  A.  I faxed it over to them, the copy of the lease when I got

10 the lease.

11 Q.  What fax number did you use?  Do you remember?

12 A.  It was from a Staples store cause we had problems in our

13 office.  I couldn't use my fax machine.

14 Q.  You were subpoenaed to show up in court Monday by the

15 government; do you recall that?  You got a subpoena?

16 A.  Yes.

17 Q.  Hand delivered?

18 A.  What do you mean?  I didn't hand deliver.  I have the lease

19 on me.

20         THE COURT:  No.  The subpoena from the government.

21 Q.  From the U.S. Attorneys Office?

22 A.  I was subpoenaed, yes.

23 Q.  Did you show up Monday?

24 A.  I called in.

25 Q.  Did you call me?

1   A.  I called and left a message and then they said they were

2   gonna contact me back.

3   Q.  Did you ever call me back after I left you a message?

4   A.  I left a message, yeah, cause I left on my cellphone.

5   Q.  Another thing you told the FBI was that Ms. Davis -- the

6   lock -- the tenants of the apartment, Ms. Davis and Mr. Bartee

7   had changed the locks but Ms. Davis had changed the locks,

8   right?

9               MS. GATTO:  Objection, your Honor.

10              THE COURT:  I'd rather you not lead.  You can ask him

11  certain questions about what he told the FBI agents but we're

12  not -- and I presume this is because this is the direct you

13  didn't get when he didn't appear with the subpoena.

14              MR. QUIGLEY:  Correct.

15              THE COURT:  All right.

16  Q.  What, if anything, did you tell the FBI agents about

17  whether the locks had been changed after Ms. Davis moved in?

18              THE COURT:  That's total leading but --

19              MS. GATTO:  Objection.

20              THE COURT:  All right.  Do you recall having

21  discussions with the FBI regarding the locks on the basement

22  apartment?  Do you recall?

23              THE WITNESS:  The locks on the basement?

24              THE COURT:  The locks on Ms. Davis and Mr. Bartee's

25  apartment, do you recall having any discussions with the FBI

1    about those?

2              THE WITNESS:  I don't.

3              THE COURT:  There something you want to show him to

4    refresh his recollection but we're not going to lead him

5    through this.

6              MR. QUIGLEY:  Sure.  I mean this is cross though.

7              THE COURT:  I understand that but it's a little bit of

8    a hybrid, right, because if it's cross it's extending beyond

9    the direct, is it not?

10             MR. QUIGLEY:  Yes, your Honor.

11             THE COURT:  Yes.

12   Q.  I'll show you those notes.  Directing your attention to

13   there.  Does that refresh your recollection about what you told

14   the FBI?

15   A.  Well, that's the lock -- yeah, the locks that we couldn't

16   get inside the basement.  That lock for the front door, the

17   front door entrance, the locks were changed.  So I had to bust

18   the locks because Con Edison couldn't read the meters.  I did

19   tell that to the FBI.  They changed the locks on the front

20   door, the entrance door of the house, so I couldn't get into

21   the house so I had to bust the locks to get inside so Con

22   Edison could read the meters.

23   Q.  The main doors of the house?

24   A.  The main door, correct.

25             MR. BROWN:  Just one moment, judge.

```
 1              THE COURT:  Yes.

 2              MR. QUIGLEY:  Your Honor, I have nothing further for

 3    the witness.

 4              THE COURT:  All right.  Any redirect?

 5              MS. GATTO:  No.  Thank you.

 6              THE COURT:  Mr. Alessandro, you may step down.

 7              THE WITNESS:  Thank you very much.

 8              (Witness excused)

 9              THE COURT:  Ms. Gatto.

10              MS. GATTO:  Your Honor, the defense rests.

11              THE COURT:  All right.  Ladies and gentlemen, now both

12    sides have rested.  Now what does that mean?  That means we

13    have some legal things to discuss that need not occupy your

14    time.

15              Actually, is there a rebuttal case from the

16    government?

17              MR. QUIGLEY:  Your Honor, I think maybe make sense to

18    talk about this out of the presence of the jury but we may put

19    on a rebuttal case at this time.

20              THE COURT:  Ladies and gentlemen, please wait a

21    moment.  I am going to meet with counsel at sidebar.

22              (Continued on next page)

23

24

25
```

1      (Sidebar)

2           MR. QUIGLEY:  Mr. Alessandro's testimony we would like

3      to call the cousin of the prior tenant.  We had attempted to

4      contact the prior tenant himself.  He is in Yemen.  We had

5      contacted him last week.  We were not aware that Mr. Alessandro

6      was going to be called as a witness today.

7           THE COURT:  But did you not have him as your own

8      witness?

9           MR. QUIGLEY:  On one of our initial witness lists and

10     he didn't respond to our subpoena.  He says we subpoenaed him

11     and never said -- he said he didn't have a lease.  He didn't

12     have any documents.  He says he showed up here on Monday but he

13     was never anywhere to be found.  He did call me but I called

14     him back at least three or four times.  He never returned my

15     calls.

16          THE COURT:  Let me understand the nature of your

17     rebuttal case.  You wish to call the cousin of the prior tenant

18     to say what?

19          MR. QUIGLEY:  To say that he had checked up on him.

20     He had been in Yemen in the late summer with the expectation to

21     return to the apartment and his cousin -- sign asked to check

22     up on the apartment and in November within the cousin -- up on

23     the apartment he found the locks had been changed.

24          THE COURT:  All right.  How is that -- I mean your

25     point is that they opened?  Is your point that the defense

1   opened on the notion of departure under mysterious

2   circumstances?

3          MR. QUIGLEY:  Yes, your Honor.  And I think we would

4   ask him also had he ever seen his cousin with a gun which I

5   think is relevant.

6          THE COURT:  Let me hear from defense.

7          MS. GATTO:  Your Honor, one, I think I worry that most

8   of that testimony is hearsay.  I guess the testimony that he

9   came and the locks were changed, I'd ask to look at how

10  Mr. Alessandro testified whether that somehow in rebuttal to

11  that information.  But I am not quite understanding the other

12  than hearsay problem learning whether the current tenant --

13  frankly, it's helpful to us but I think you've got a major

14  hearsay problem with most of the testimony that's been

15  proffered.

16         MR. QUIGLEY:  Your Honor, we've also attempted to

17  contact and we have been literally since late last night the --

18  and the -- who is now in Yemen.

19         THE COURT:  He's in Yemen.  He is not going to be here

20  unless he is flying in tomorrow night.

21         MR. QUIGLEY:  We could consider doing video

22  conferencing.

23         THE COURT:  I'm not sure we are going to be doing

24  video.  I understand the argument but that an indication you

25  could have made earlier than right now.  Let me -- how is it

1   not hearsay?  What are you going to --

2            MR. QUIGLEY:  He'll testify about his personal

3   observations of the apartment.

4            THE COURT:  How frequently did he visit the apartment

5   in his cousin's absence?

6            MR. QUIGLEY:  My understanding -- I haven't spoken to

7   him directly -- is that he had been there several times, that

8   his cousin departure late summer and he checked up on it

9   several times between late summer and November.

10            THE COURT:  How can it be late summer and November if

11   you've moved in November?

12            MR. QUIGLEY:  Right.  The locks had been changed when

13   he went back there.

14            MS. GATTO:  That's fine.  We can stipulate that if the

15   cousin had been called.  If this person had been called he

16   would testify that he is the cousin of the prior tenant and

17   that he checked on the apartment and the locks had been

18   changed.

19            THE COURT:  Are you willing to stipulate on the

20   occasions that he checked on the apartment he saw nothing in

21   disarray?

22            MS. GATTO:  I think he is saying that when he went to

23   check on the apartment the locks had been changed.

24            THE COURT:  I think he is also saying that he checked

25   on it several times during the course of the summer, although,

1    perhaps, not on the day that Mr. Alessandro checked on it and

2    there were things in disarray.  The point is he is saying

3    there's an inference that the tenant left the place in disarray

4    and what he is saying is the cousin of the tenant who was given

5    the task of checking up on the place checked up on it and

6    didn't see things in disarray.

7         MS. GATTO:  Is that right?

8         MR. QUIGLEY:  Yes.

9         THE COURT:  I imagine you are not going to stipulate

10   to whether the guy had a gun or not.

11        MS. GATTO:  I would think that that's irrelevant but

12   we may not have to get there.

13        Well, we are not going to stipulate to that.  I don't

14   think it's admissible but maybe if you want to give the party

15   two minutes to work it out, we can.

16        THE COURT:  I'll give the parties two minutes to work

17   it out is the better course to let them go for the day.  It's

18   going to be an extremely short case in the morning.

19        MS. GATTO:  That's fine.  I assume unless you have the

20   cousin available, the cousin sounds like a very sort witness.

21        MR. QUIGLEY:  We could get him tomorrow morning.  He

22   is not here today.

23        THE COURT:  Let's let the jury go.  I'll tell them at

24   most there is an extremely short witness tomorrow morning and

25   we'll be dealing with issues trying to limit or eliminate that

DBJAABAR4                    Alessandro – Cross

1    testimony.

2                (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In Open Court)

2          THE COURT:  Ladies and gentlemen, as I mentioned at

3   the beginning of the trial, the government does have a right if

4   it wants to present a rebuttal case.  Rather than keep you here

5   while they decide whether to have a rebuttal case, I am going

6   to let you go for the day with the understanding that possibly

7   tomorrow there may be one very short witness.  But what we'll

8   deal do in the meantime is to talk and see if we can limit or,

9   perhaps, not have that witness at all.

10         So tomorrow morning we'll be either a very short

11  rebuttal case or we'll go straight into summations and the jury

12  charge.  We are letting you go for the day.  I think you are

13  lucky to have counsel on both sides who are efficient with

14  their presentation of evidence.  I thought it might take two

15  days to put this evidence in.  You see that it took one.

16         So that being said, don't talk about the case until

17  you have a reason to talk about the case.  Enjoy the rest of

18  your day and thank you for the attention you've paid and the

19  attention you will continue to pay in this case.  Thank you.

20         (Jury not present)

21         THE COURT:  All right.  Counsel, how long a charge

22  conference do we think we're going to have?  Will it be 15

23  minutes or fewer?

24         MR. QUIGLEY:  Yes.  I agree, your Honor.

25         THE COURT:  Excellent.  So then I was going to tell

1  them to come at 9:30 but I'd rather just get started.  So,

2  let's plan to meet a few minutes before they're brought in.

3  Everybody's gotten their copies of the charge.  If we meet at

4  quarter of, will that work for both sides?

5          MR. QUIGLEY:  Yes, your Honor.

6          MR. MARVINNY:  Yes, your Honor.

7          THE COURT:  OK.  Is there anything other than the

8  rebuttal thing that you will discuss when I leave the bench

9  that we need to talk about at this time?

10          MR. QUIGLEY:  No, your Honor.

11          THE COURT:  All right.

12          MS. GATTO:  I don't think so either.  If we don't

13  reach an agreement I am sure there is going to be some

14  questions about the limit and the extent of the testimony they

15  can elicit from the witness and it will probably make sense to

16  air those with the Court before we have them on the stand.

17          THE COURT:  I completely agree.  So, all right the

18  jury waits a few minutes, they will wait a few minutes.

19  Obviously, it's preferable to the extent the parties can work

20  out something but that's again me being hopeful.

21          All right.  Anything else?

22          MR. QUIGLEY:  No, your Honor.

23          THE COURT:  Thank you.  And again thank you for the

24  efficient presentation today.  I thank you for it and the jury

25  thanks you for it.

DBJAABAR4                    Alessandro - Cross

1              (Adjourned to Wednesday, November 20, 2013 at

2      8:45 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                          Page

3    COREY WALSH

4    Direct By Mr. Quigley . . . . . . . . . . .40

5    Cross By Ms. Gatto . . . . . . . . . . . . .56

6    JASON FLOYD

7    Direct By Mr. Quigley . . . . . . . . . . .76

8    Cross By Mr. Marvinny . . . . . . . . . . .85

9    Redirect By Mr. Quigley . . . . . . . . . .97

10   KEVIN COUGHLIN

11   Direct By Mr. Quigley . . . . . . . . . . .99

12   Cross By Ms. Gatto . . . . . . . . . . . . 116

13   Redirect By Mr. Quigley . . . . . . . . . 129

14   BRANDY MORA

15   Direct By Mr. Quigley . . . . . . . . . . 131

16   Cross By Ms. Gatto . . . . . . . . . . . . 144

17   Redirect By Mr. Quigley . . . . . . . . . 149

18   ANNABELLE BRANIGAN

19   Direct By Mr. Quigley . . . . . . . . . . 157

20   Cross By Ms. Gatto . . . . . . . . . . . . 164

21   DANIEL FERRARA

22   Direct By Mr. Quigley . . . . . . . . . . 166

23   Cross By Mr. Marvinny . . . . . . . . . . 182

24   Redirect By Mr. Quigley . . . . . . . . . 190

25   Recross By Mr. Marvinny . . . . . . . . . 191

```
 1   CARMINE ALESSANDRO

 2   Direct By Ms. Gatto . . . . . . . . . . . . 207

 3   Cross By Mr. Quigley . . . . . . . . . . . . 221

 4                    GOVERNMENT EXHIBITS

 5   Exhibit No.                          Received

 6   1 through 111, 114 through 151, and 905  . . .45

 7   205A   . . . . . . . . . . . . . . . . . . .50

 8   904   . . . . . . . . . . . . . . . . . . .74

 9   201, 202, 203, 204, and 902   . . . . . . . .76

10   901   . . . . . . . . . . . . . . . . . . 191

11   903   . . . . . . . . . . . . . . . . . . 192

12                    DEFENDANT EXHIBITS

13   Exhibit No.                          Received

14   A   . . . . . . . . . . . . . . . . . . . .64

15   B   . . . . . . . . . . . . . . . . . . . 213

16

17

18

19

20

21

22

23

24

25
```