UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA

v. 13 CR 351 (JSR)

JOVER NARANJO and
LUPERIO NARANJO, SR.,

Defendants.
------------------------------x

New York, N.Y.
November 20, 2013
9:10 a.m.

Before:

HON. JED S. RAKOFF,

District Judge

APPEARANCES

PREET BHARARA
United States Attorney for the
Southern District of New York
BRIAN JACOBS
BRENT WIBLE
Assistant United States Attorney

DONALDSON CHILLIEST & McDANIEL
Attorney for Defendant Jover Naranjo
XAVIER DONALDSON

LAW OFFICE OF JOHN BURKE
Attorney for Defendant Luperio Naranjo, Sr.

ALSO PRESENT: TIINA SISAS, U.S. Department of Labor
DENA MILLMAN, Spanish Interpreter
ALEX WIEDER, Spanish Interpreter
DAVID MINTZ, Spanish Interpreter
MARCIA GOTLER, Spanish Interpreter
LUKE PHILLIPS, Paralegal Specialist, AUSA

(In open court; jury present)

MICHELLE LETTIRE, resumed.

THE COURT: Good morning, ladies and gentlemen. We are actually more or less starting on time. I know it's shocking, but bear up.

Counsel, we are ready to continue.

MR. DONALDSON: Yes, sir.

CROSS-EXAMINATION

BY MR. DONALDSON:

Q. Good morning, ma'am.

A. Good morning.

Q. I am going to need you to speak up into that microphone so the last person in the back of the jury box can hear you. All right?

A. Good morning.

Q. There you go. Good morning. Good morning.

You work for Lettire, correct?

A. Yes.

Q. You said you worked there for 30 years?

A. Yes.

Q. And your educational background is what?

A. Two years of college.

Q. It would be fair to say this is a family business, correct?

A. Yes.

Q. It's owned by your two brothers?

A. Yes.
Q. What are their names?
A. Nicholas and Gerard.
Q. Which title does Nicholas have?
A. President.
Q. And Gerard is?
A. Vice-president.
Q. And it's called Lettire Construction?
A. Corp.
Q. Lettire Construction Corporation. And the company has, I guess, construction projects all over New York City. Would that be fair to say?
A. Yes.
Q. Currently five, ten projects around the city?
A. Yes.
Q. The Hobbs Ciena Project, would that be considered a multimillion dollar project?
A. Yes.
Q. If you recall, what was the contract between -- the contract amount between Lettire and Ciena?
A. Approximately 87 million.
Q. 87 million?
A. Yes.
Q. So Lettire was given 87 million to do this project on 100th Street between -- on Third Avenue; is that correct?

A. 100th and 102nd between First and Second.

Q. Does the Hobbs Ciena contract regarding the development between 100th and 102nd Streets, Lettire had approximately ten subcontractors. Would that be fair to say?

A. It was more than ten, I believe.

Q. More than ten subcontractors?

A. Yes.

Q. When we say subcontractors, we mean that Lettire subcontracted out specific work to different companies, correct?

A. Yes.

Q. So you may have a paving company or a plumbing company or demolition company or different companies to do different things for the project, correct?

A. Correct.

Q. And you had more than ten of those for that same project?

A. Yes.

Q. And Enviro was one of the subcontracts on this particular Hobbs Ciena site?

A. Yes.

Q. Would it be fair to say that the relationship between Enviro and Lettire for the Hobbs Ciena site began around August 3, 2009?

A. Yes.

Q. So their work on that project -- when I say they --

Enviro's work on that project began either on or after August 3, 2009, correct?

A. Yes.

Q. Now, in your direct you stated that your duties for Lettire were to basically oversee the whole job?

A. No, payroll.

Q. Oversee the payroll?

A. Yes.

Q. What does that mean, oversee the payroll?

A. I had to collect payroll reports from the subs, review them and submit them to HPD.

Q. So when you say you collect the payroll from the subs, you mean all the subs related to the Hobbs Ciena Project, correct?

A. Yes.

Q. And you mentioned earlier that that would be more than ten subs you collect the payrolls from, correct?

A. Yes.

Q. And that would be on a weekly basis, correct?

A. Yes.

Q. So it's fair to say on a weekly basis, you may collect, if you have ten subs, on a weekly basis, at least ten payroll records?

A. Yes.

Q. If it's more, if it's 15 subs, 15 payroll records?

A. Yes.

Q. Now, as part of your duties with the Lettire Construction Corporation, you are familiar with the Davis Bacon Act, correct?
A. Yes.
Q. And the Davis Bacon Act, based upon your familiarity, among other things, relates to wages paid to employees, correct?
A. Yes.
Q. The Davis Bacon Act also relates too, among other things, payrolls and basic records, correct?
A. Yes.
Q. You also, based upon your working at Lettire Construction for these years, you're familiar with the CWHSSA law, correct?
A. Yes.
Q. That's from you information deals with compliance with payment of overtime, correct?
A. Yes.
Q. Is that a yes?
A. Yes.
Q. You're also familiar with prevailing wage, correct?
A. Yes.
Q. You're familiar with prevailing wage because you've work on prevailing wage issues for more than a decade. Would that be fair to say?
A. Yes.
Q. More than 15 years probably, correct?

A. I'm not sure.
Q. Between ten and 15 years?
A. Yes.
Q. Now, there is a term -- a phrase called wage rates. Are you familiar with that?
A. Yes.
Q. As another word for wage rates, some people call it wage determination, correct?
A. Yes.
Q. Now, wage rates or wage determinations are -- if you don't mind, could you open the book in front of you? Sir, could you pull up page 42 on 101 in evidence, please. I'm going to ask you to look at page 42 of Government Exhibit 101 that's in evidence.

Now, I believe you identified yesterday page 42 of Government Exhibit Government Exhibit 101 as wage rate or wage determination. Is that fair to say?
A. Yes.
Q. And you're familiar with these kind of papers, right, these documents?
A. Yes.
Q. Now, you were actually involved in the negotiation of Enviro's contract with Lettire, correct?
A. No.
Q. And Enviro was a subcontractor, right?

A. Yes.
Q. And only before August 3, 2009, you didn't actually review Enviro's contract, correct?
A. No.
Q. So you do not know whether or not these wage determination rates were actually in Enviro's August 3, 2009 contract, do you?
A. No.
Q. You had a meeting with the government on September 12, 2013, correct?
A. Yes.

MR. DONALDSON: May I have one second, please, your Honor?

Q. In that meeting with the government, you were asked questions regarding Lettire and Enviro, correct?
A. Yes.
Q. And in that meeting, you talked about the wage rates, correct?
A. Yes.
Q. Did you not tell the government -- did you not tell the government on September 12, 2013 that the wage rates were attached to the contract?
A. Yes.
Q. But you didn't know that, correct? I'll ask you again.

You did not know whether or not the wage rates were attached to Enviro's contract, did you?
A. No.
Q. But on September 12, 2013 while speaking to the government, the AUSAs here, you told them that these wage rates were attached to the contract. Did you not tell them that?
A. Yes.
Q. That was not true, correct? What you told the AUSA's on September 12, 2013 was not true; isn't that correct?
A. Well, when it's prepared, they're put in the contract.
Q. Ms. Lettire, you did not see Mr. Naranjo's contract of August 3, 2009, correct?
A. Correct.
Q. You do not know whether or not those wage rates were inside that contract, did you?
A. No.
Q. So when you told the government in September 2013 that those wage rates were inside that contract, you were lying to them, were you not?
A. I wasn't lying.
Q. You were not being truthful, were you?
A. I don't know.
Q. As far as Lettire -- Lettire Construction was investigated by the federal government, correct?
A. Yes.

Q. During that investigation, you were represented by an attorney, correct?
A. Yes.
Q. Mr. Bahn or Bane what's his name?
A. Bahn.
Q. Mr. Bahn was your attorney during Lettire's -- while Lettire was being investigated, correct?
A. Yes.
Q. When did that investigation begin, if you know?
A. I'm not sure of the exact date.
Q. Approximately.
A. December.
Q. I'm sorry? December 2009, correct?
A. Yeah.
Q. As part of that investigation, isn't it true that you agreed Lettire Construction agreed with the Department of Labor that Lettire did not include or incorporate by reference the required Davis Bacon Labor Standards clauses and the CWHSSA Labor Standards clauses and its contract for work on the Hobbs Ciena Project with Enviro?
A. I don't know.

MR. DONALDSON: One second. Your Honor, may I approach the witness with 3508-2?

MR. JACOBS: Judge, I would ask counsel lay a foundation for this witness' knowledge of the terms of the

agreement he's discussing and whether she has any.

THE COURT: OK.

BY MR. DONALDSON:

Q. Ms. Lettire, you just said that you recalled that Lettire Construction was being investigated by the Department of Labor, correct?

A. Yes.

Q. And it was being investigated relating to the Hobbs Ciena Project, correct?

A. Yes.

Q. And it was being -- Lettire Construction was being investigated relating to Davis Bacon possible violations, correct?

A. Yes.

Q. Involving Lettire's subcontractors and Lettire's own employees, correct?

A. Yes.

Q. In fact, yesterday you testified that Lettire had to pay back, I believe you said, $3,000?

A. Yes.

Q. Related to this investigation, correct?

A. Yes.

Q. So you were aware that there was a settlement in this -- regarding Lettire and the Department of Labor related to an investigation, correct?

A. Yes.

MR. DONALDSON: Your Honor, may I approach the witness?

THE COURT: Well, we'll take it one question at a time, but yes, you may. I hope someone has a copy for the Court.

MR. DONALDSON: 3508-2.

THE COURT: Let me ask the witness, have you ever seen this before?

THE WITNESS: I don't remember.

THE COURT: Pardon?

THE WITNESS: I don't know.

THE COURT: You do not recognize it offhand?

THE WITNESS: Yes, I might have seen it.

THE COURT: All right. Go ahead.

Q. I'm going to ask you to look at 3508-2, pages 2 and 3, and read through that and see if that refreshes your recollection as to the question previously asked regarding what Lettire agreed with the DOL and --

MR. JACOBS: Judge, we object. There was no failure of recollection. I think the witness said she didn't know.

THE COURT: Sustained. Put another question.

BY MR. DONALDSON:

Q. Ms. Lettire, are you familiar with whether or not Lettire Construction reached a settlement agreement with the Department

of Labor related to its conduct and Enviro Demo?

THE COURT: Counsel, I think what we are going to need to do maybe to speed this along is have a side bar, so I can see where we're going and then I will make some rulings.

(Continued on next page)

(At the side bar)

THE COURT: So what's the relevance?

MR. DONALDSON: It goes to the witness' credibility. It directly relates to the prior questions I was asking regarding whether or not this wage determination was included, this wage determination which is part of the Davis Bacon Act was part of Mr. Naranjo's or Enviro's contract. She told them that it was. I believe she said in her direct testimony that it was. This clearly indicates that they --

THE COURT: And then she just said in answer to your cross-examination that that was not accurate. While she did not agree with your characterization that it was a lie in the sense of a knowing and intentional falsehood, she agreed that she had not seen the underlying contract and did not have a basis for making that statement at the time, so I don't see what this is adding.

MR. DONALDSON: I believe, your Honor, this specifically states that they agree, Lettire, she being a representative of Lettire, that Lettire specifically agreed that Lettire did not put the Davis Bacon and related items into the contract of Enviro as they were supposed to do. That this specifically states that.

MR. JACOBS: With respect to Enviro?

MR. DONALDSON: Yes.

MR. BURKE: Essentially, Judge --

THE COURT: Show me where it says that.

MR. DONALDSON: I don't have the page. Oh, page 2 and 3 Judge.

THE COURT: Where?

MR. DONALDSON: It says here page 3, number 11.

THE COURT: Respondents did not include or incorporate by reference the required labor standard clause as set forth in various provisions with the following subcontractors including -- and then there is a list including Enviro. So what does that show?

MR. DONALDSON: It says here that -- this is what I'm reading. It says, page 2, respondents stipulate to the following. Then we go to page 3, number 11, respondents did not include or incorporate by reference required DBRA labor standards clauses or the CWHSSA labor standards clauses in its contracts for work on the Hobbs Ciena project in its contracts.

MR. BURKE: In its prevailing wage.

MR. DONALDSON: So it specifically says they did not do that.

THE COURT: First of all, let me ask the government, what are those provisions -- are those the prevailing wage provisions?

MR. JACOBS: Judge, I accept their representations. I'm, frankly, not sure standing here. We had not thought this was the subject of any legitimate dispute whether any payroll

he signs within a week of the contracts reflects the rates he's saying they didn't get.

MR. DONALDSON: 29 CFR, Section 5.5(a)(1), that's why I asked that earlier. It includes wage rates. It includes records.

THE COURT: How are you going to get that before the jury?

MR. DONALDSON: I asked her whether or not she was familiar with the Davis Bacon Act; whether or not that means the Davis Bacon Act includes wage rates or whether or not Davis Bacon Act includes wage records. I asked her that earlier to set the foundation to establish this, and then this comes in because it's directly under that.

THE COURT: So what is the question now? Assuming all of that, what is the question now you propose to put to her?

MR. DONALDSON: I want to propose to put that this -- that Lettire Construction that she's a representative of, did in fact, agree that they did not do what's here, and that this is -- it's relevant, one, because it's clearly inconsistent to what she said, and I don't know that I have a limit to how many times I can show the inconsistency, but it's relevant because, one, it shows the inconsistency, and, two -- that's the main reason. It's relevant. It goes to credibility in my opinion.

MR. JACOBS: She's not the appropriate witness for this line of questioning. They would have been free to call

any number of witnesses who are familiar with the terms of the settlement who actually signed this document. She is essentially a bookkeeper for Lettire and while she --

MR. DONALDSON: Judge --

MR. JACOBS: Hang on. I'm not finished.

-- while she's familiar with the general terms of the settlement, there's no foundation for her familiarity with either the specific sections or what's reflected here that counsel intends to elicit.

MR. DONALDSON: The problem I have with that is yesterday the government rather quickly asked her about the settlement that relates directly to this settlement, it's $3,000. That is directly in this contract. It's on page -- and I read the contract again just to make sure.

THE COURT: Well --

MR. DONALDSON: She had that --

THE COURT: Excuse me.

MR. DONALDSON: I'm sorry, Judge.

THE COURT: I am going to allow some questions. We'll take it one question at a time. Either she has familiarity with this settlement or she doesn't. We don't -- none of you know the answer to that. So you can put some questions to her, and if she has familiarity with it, I will allow the answers. And if she doesn't, I won't.

MR. DONALDSON: OK.

(In open court)

BY MR. DONALDSON:

Q. Ms. Lettire, you mentioned yesterday, as well as today, that Lettire Construction settled or paid $3,000 to who?

A. The employees.

Q. And this $3,000 settlement related to the investigation of the Department of Labor to or of Lettire Construction?

A. Yes.

Q. And you're aware of that because -- are you not aware of that because it was in the settlement agreement?

A. No, the investigator sent me papers of the amounts that I had to pay the employees.

Q. Now, when asked earlier about the settlement agreement, you said you may have read it. Looking at it now, do you know if you've read that document or seen that document before?

A. I'm not sure. There was a lot of documents. I don't know.

MR. DONALDSON: Your Honor, I'll move on to something else.

THE COURT: All right.

BY MR. DONALDSON:

Q. Could you please turn to Exhibit 102 in the binder in front of you.

Ms. Lettire, do you know someone named Amanda Lettire

A. Yes.

Q. Amanda Lettire is your niece, correct?

A. Yes.
Q. And Amanda Lettire works or did work at Lettire Construction -- does she still work there?
A. Yes.
Q. How long has she been working there?
A. Five years maybe.
Q. Do you know someone named Gina?
A. Yes.
Q. Who is Gina?
A. My niece.
Q. She works there as well?
A. Yes.
Q. How long has she been working there?
A. About four years.
Q. And Gina and Amanda both work -- what do they do?
A. Amanda is assistant PM, project manager, and Gina would help me with the payroll.
Q. On direct yesterday, you identified this document as a prevailing wage signature form, correct?
A. Yes.
Q. I believe you said that's your handwriting inside the document, correct?
A. Yes.
Q. When you said that's your handwriting, you're talking about where it says classification, hourly rate, fringe rate, those

particular sections are your handwriting, correct?
A. Yes.
Q. Where it says number 3 asbestos rate and fringe, that's your handwriting as well, correct?
A. Yes.
Q. On page 16 of 101, if we can have that placed up on the screen. If you can look at page 16 of 101, you identified these signatures, correct?
A. Yes.
Q. You identified the subcontractor's signature as Jover Naranjo, correct?
A. Yes.
Q. And you said you knew that how?
A. By looking at the payroll reports.
Q. So yesterday when you said you looked at the screen or looked at the paper and said that's Jover Naranjo's signature, you knew that because you remembered his signature from looking at payroll reports?
A. Yes.
Q. The last time you looked at a payroll report with Jover Naranjo's signature was when?
A. Last week.
Q. Last week?
A. Yeah.
Q. Oh, in reviewing with the government you looked at it.

A. Yes.
Q. Is that right?
A. Yes.
Q. And you recognized the other signature to the left as whose signature?
A. My brother, Nicholas.
Q. Nicholas. OK. Can we put back up 102, please. Go back to 102, if you don't mind, in the binder in front of you.

Now, the signature you see here on 102 is whose signature?
A. Jover's.
Q. And you know that because you saw it before? You're familiar with it?
A. Yeah, well, I'm pretty sure he signed that in the office.
Q. You're pretty sure he signed that in the office?
A. When I filled out the form.
Q. Just so I'm clear, you're saying that Jover Naranjo signed Government Exhibit 102 in your office? Is that a yes?
A. Yes.
Q. Now, on top of Jover's signature, there's a name there says Lettire Construction Corporation, correct?
A. Yes.
Q. Where is the signature?
A. There isn't one.
Q. Where's the fully executed copy of this document?

A. In the office.
Q. So there is another one that has Lettire Construction Corporation's signature on it?
A. I don't know if there's a signature.
Q. I'm sorry?
A. I don't know if it's signed.
Q. So you don't know whether or not someone from Lettire actually signed this document?
A. No.
Q. Even though you're saying that he signed it in your office?
A. Yes.
Q. So when he signed this document in your office in front of you, what did you do with it?
A. I filed it.
Q. Without it being signed?
A. Yes.
Q. Haven't you signed your brother's signature before?
A. Yes.
Q. Hasn't he given you the authority to do that?
A. Yes.
Q. For like 15, 20 years?
A. Yes.
Q. So, are you saying on this particular day when he came into your office and signed this document in front of you, you didn't sign it?

A. No.
Q. And your brother didn't sign it?
A. No.
Q. Neither brother?
A. No.
Q. And you filed it away?
A. Yes.
Q. If you look to the right of those signatures, there's a word that says "date." Do you see that?
A. Yes.
Q. There's a word that says "date" that's across from the empty line for your brother's signature, correct?
A. Yes.
Q. There's no date there, correct?
A. No.
Q. And there's a word that says "date" directly across from where you're saying Jover Naranjo signed it, correct?
A. Yes.
Q. There's no date there either, right?
A. No.
Q. Can you tell the jury exactly, exactly when this was signed in your office by Jover?
A. No, I can't.
Q. It wasn't signed on August 3, 2009, correct?
A. I don't know.

Q. Isn't it true that this document was provided to Jover Naranjo sometime in December 2009?
A. I don't remember.
Q. I will give you a document -- well, will anything refresh your recollection?
A. Maybe.

MR. DONALDSON: Your Honor, can I have one second, please?

THE COURT: Yes.

BY MR. DONALDSON:
Q. Before we get to that, before we get to that, this is not a document from the Department of Labor, correct?
A. No.
Q. This is not a document from HPD, correct?
A. No.
Q. This is a document that you and Amanda made up in your office, correct?
A. Yes.
Q. In fact, you had given this document to several other subcontractors, correct?
A. Yes.
Q. And you gave it to them around December 2009, correct?
A. I don't remember.

MR. DONALDSON: Your Honor, may I approach for a quick second?

THE COURT: Yes.

MR. DONALDSON: Just so the record is clear, I'm providing the government a copy of what I want to show the witness to assist her with her recollection.

MR. JACOBS: Judge, we don't object to him showing it to the witness, but beyond that, we may object.

THE COURT: All right.

BY MR. DONALDSON:

Q. Ms. Lettire, I'm giving you a two-page document. You can't read it out loud. What I want you to do is just review it and see if that helps you to remember when the document may have been provided to Mr. Naranjo.

A. I don't remember.

Q. You don't remember?

A. I didn't do this.

Q. OK. I'll take that back.

Ms. Lettire, would it be fair to say that the document 102 in evidence was created by you and/or Amanda to assist with the investigation that was being conducted by the Department of Labor

A. I don't know.

Q. You don't know why you created it?

A. Some of the subs weren't sure of the rates because not everything is listed, like if a roofer was waterproofing, and to make sure they were using the correct rate, we just made

these up. That's as far as I know.

Q. Do you know whether or not Amanda Lettire, your niece, said anything to Jover to or -- or sent a document like this to Jover?

A. I don't know if she did, no.

Q. Now, on direct yesterday, you stated that the -- your office was on 110th Street; is that correct?

A. Yes.

Q. I believe you said that you -- Jover Naranjo walked in and mailed certified payroll records and sign-in sheets to your office, correct?

A. Yes.

Q. Now, the payroll records I believe are Government Exhibit 202 through -- I believe it's 20 -- 201 to 233.

Now, look at 201. Do you have any recollection of whether that was walked in or mailed to you?

A. No, I don't.

Q. You don't know?

A. (Indicating)

Q. Do you know which one of those were walked in and which ones were mailed in?

A. No, I don't.

Q. Do you have any idea how many were walked in and how many were mailed in?

A. No.

Q. Do you know when it was mailed in -- do you know when a certified payroll record was mailed in?

A. I don't remember, no.

Q. Do you have any envelopes stating or illustrating that Mr. Naranjo mailed one of those certified payroll records?

A. No.

Q. So when you say that Mr. Naranjo -- you know that he -- well, when you say he walked in, you remember him walking in because you saw him come into your office?

A. Yeah.

Q. And you remember him handing you documents?

A. Yeah.

Q. You remember that?

A. Yeah.

Q. How do you know he mailed it?

A. How do I know? I don't know. I don't -- he didn't -- he didn't come every week and give me payroll.

Q. Can you say while you're sitting there that Jover Naranjo definitely mailed you payroll? Ms. Lettire, can you say that Jover Naranjo definitely mailed you certified payroll records?

A. I don't have any envelopes or anything, no, I don't, so I guess --

Q. You guess what?

A. No, I guess.

Q. Let's turn to Government Exhibit 103, please. Put

Government Exhibit 103 on the screen.

MR. DONALDSON: May I have one second please, your Honor?

THE COURT: Yes.

Q. You identified this document yesterday, and I believe you said this was the amount that was paid to Enviro. Do you see that?

A. Yes.

(Continued on next page)

BY MR. DONALDSON:
Q. And you point to the number at the bottom $833,937 as the amount paid to Enviro, correct?
A. Yes.
Q. The government then referred you back to 901 and showed you -- or you indicated how much the contract was for between Lettire and Enviro. Do you recall that?
A. Yes.
Q. And that amount was 785,000, correct?
A. Yes.
Q. So then -- I'm not too good at math. It's about $45,000. It's more, $833,000 is more than the contract, is that right?
A. Yes.
Q. Now, you said on direct -- on cross, at least, that there was an investigation by the Department of Labor regarding Lettire and its relationship to subcontractors starting around December 2009, correct?
A. That was before that, I think.
Q. Before that?
A. The subs, yes.
Q. So, you have amounts paid here -- let's go November 4, 2009, 12/23, 2009, February 19, 2010, March 4, 2010, and two from March 26, 2010.
Do you see those?
A. Yes.

Q. And across from those it says "reconciled." Do you see that?
A. Yes.
Q. Tell the jury what that means.
A. That it was paid; it was cleared.
Q. That the invoices were sent to you and then you all paid them, correct?
A. Yes.
Q. So, sometime after the investigation began, Enviro was still sending you invoices for the work it was doing at the site, correct?
A. Yes.
Q. And this was while you knew that an investigation was going on, correct?
A. Yes.
Q. So, would it be fair to say that Lettire would not be paying Enviro monies after the investigation began for work that it -- let me rephrase the question.

You didn't stop paying Enviro after the investigation began, correct?
A. No.
Q. Did you hire Enviro after March 2010?
A. No, I don't think so, no.
Q. Lastly about this, when you, Lettire, received the $87-million-budget amount from Hobbs Ciena to do the work, you

budgeted a portion for demolition, correct?
A. Yeah.
Q. And Lettire is a for-profit company, correct?
A. Yes.
Q. So, the money that you budgeted for, I guess, for demolition, you took into account that Lettire wanted to make some money off that, correct? That's fair to say, right?
A. Yeah, but I don't do any of the pricing. I don't know.
Q. I'll move on.

MR. DONALDSON: I think I'm finished. Thank you very much.

THE COURT: Mr. Burke.

CROSS-EXAMINATION

BY MR. BURKE:

Q. I think you mentioned that Lettire's end of the contract got paid $87 million, right?
A. Yes.
Q. Do you know how much profit Lettire made?
A. No.
Q. And the contract was what about 81 pages?
A. I guess, yeah.
Q. And the contract is in English, right?
A. Yes.
Q. As far as you know, the contract was never translated into Spanish, right?

A. No.
Q. And I think you said one of your jobs is to check out the payroll?
A. Yes.
Q. And to make sure it complies with the Davis-Bacon Act?
A. Yes.
Q. And Lettire was the general contractor, right?
A. Yes.
Q. And under the Davis-Bacon Act the general contractor, one of the responsibilities is to see that the subcontractors comply with prevailing wage agreements, correct?
A. Yes.
Q. Because if they don't, then the general contractor is responsible to pay those wages, correct?
A. Yes.
Q. And as far as you know, Lettire has agreed to pay any back-wages that Enviro owes its workers for any violation of the prevailing wage act, right?
A. I guess yeah.
Q. And Nick Lettire is your brother, right?
A. Yes.
Q. Did you ever discuss the settlement with him?
A. No.
Q. Did you ever speak to him about business in Lettire?
A. Yeah.

Q. But as far as you remember he never -- excuse me, your Honor.

You are aware that there was a settlement, right, I think you said that before?

A. Yeah.

Q. But you never discussed this with your brother, Nick?

A. The settlement that we paid our employees? Is that what --

Q. No, the settlement I think that you had with the United States Department of Labor?

A. Yeah.

Q. You did discuss it with him?

A. Yes, a little bit, yeah.

Q. So, are you aware that Lettire agreed to pay any back-wages owed by Enviro for violating the prevailing wage laws?

A. I don't know what the exact agreement was, no.

Q. As far as you know, nobody in Lettire was arrested or accused of a crime, right?

THE COURT: Sustained. Counsel, come to side bar.

(Continued on next page)

(At the side bar)

THE COURT: Although there has been no objection to this line of questioning, I am worried that it's injecting a totally irrelevant issue into this case and has the propensity to confuse the jury.

What is the argument that you seek to advance?

MR. BURKE: That Lettire paid a fine.

THE COURT: And?

MR. BURKE: They were involved in the same behavior.

THE COURT: And?

MR. BURKE: And it had the same responsibility as Enviro.

THE COURT: Right.

MR. BURKE: They paid a fine. Nobody in Lettire was arrested or prosecuted.

THE COURT: Yes. And so what is that? An unequal protection argument? If that's your argument, of course, that's a legal argument which you would have to make as to OSHA, which it would fail remarkably, as you're well aware.

MR. BURKE: I'm sorry.

THE COURT: I think what you're trying to inject in front of the jury is an argument in which they are in no position to evaluate as to why the Department of Labor proceeded in one way with respect to some people and another way as to other people.

If we got into that, it would create a minitrial, really probably a maxitrial, and we'd be here for a few months.

MR. BURKE: How about this one, Judge: That this prevailing wage dispute is really much more in the nature of a civil dispute.

THE COURT: I know that's an argument you've been trying to make from your opening statement on. I don't see how that's proper, either.

I must admit, in fairness to defense counsel, that the government has chosen to sit like a bump on the log, or maybe the correct terminology is a potted plant, and not object, but there comes a point where the Court needs to make sure that the jury is not being asked to speculate about matters that are irrelevant to their determination, so I think you'd better move on.

MR. BURKE: Got it.

(Continued on next page)

(In open court)

MR. BURKE: One moment. I think I'm not done. I'm almost done.

THE COURT: All right.

BY MR. BURKE:

Q. Now, under the Davis-Bacon Act, Lettire, as a general contractor, has a responsibility of also notifying and explaining to the subcontractors the provisions of the prevailing wage agreement, correct?

A. Yes.

MR. BURKE: No further questions, Judge.

THE COURT: Redirect.

MR. JACOBS: Briefly, your Honor. Thank you.

REDIRECT EXAMINATION

BY MR. JACOBS:

Q. Mr. Phillips, can we put up the first page of Government Exhibit 201? And can we highlight the date where it says "for week ending" in the upper left-hand side, highlight, not zoom.

Ms. Lettire, what is this document?

A. Certified payroll report.

Q. And how close in time is the week -- how does the time period of this certified payroll relate to the August 3, 2009, contract?

A. It's dated August 9th.

Q. Is this for the first week of work on the Ciena?

A. First payroll, yes.

Q. And there's a column that begins hourly rate. Could we highlight that column.

And there are two numbers that appear, $33.15 and $49.29. How do those dollar figures relate to the prevailing wage rates that were in both Government Exhibits 101 and Exhibit 102?

A. Those are the rates.

Q. And are those the combination of the fringe and wages in those rates?

A. Yes.

Q. Let's look at the next page of this document. Whose signature is that at the bottom?

A. Jover.

Q. And on cross examination, you were asked some questions about whether you received this by mail or by hand-delivery from Mr. Naranjo.

Do you recall those questions?

A. Yes.

Q. How did you then provide this document to the New York City Department of Housing Preservation and Development?

A. I mailed it.

Q. Do you have any question whatsoever about whether you mailed it or whether you hand-delivered it?

A. No.

Q. And how did you deliver this document to the United States Department of Labor?
A. I mailed it.

MR. JACOBS: No further questions, Judge.

THE COURT: Anything else?

MR. DONALDSON: No.

MR. BURKE: Nothing, Judge.

THE COURT: Thank you very much. You may step down.

(Witness excused)

MR. JACOBS: The government calls Juan Carlos Rodriguez, but while the agent is getting him, I'd like to read a brief stipulation.

THE COURT: Yes.

MR. JACOBS: "It's stipulated and agreed that if called to testify, a Special Agent for the United States Department of Labor, Agent 1, would testify as follows: On or about June 17, 2010, Agent 1 assisted in the execution of a search warrant, the search warrant at the office of Enviro & Demo Masters, Inc. at 31-48 82nd Street, Jackson Heights, New York, the Enviro office. Government Exhibits 801 through 853 are copies of documents that Agent 1 seized from a drawer of a desk located in the basement of the Enviro office.

"Two, if called to testify, another special agent from the United States Department of Labor would testify as follows: Agent 2 assisted in the execution of a search warrant at the

Enviro office. And Government Exhibits 901 through 903 are copies of documents that Agent 2 seized from the basement of the Enviro office.

"It's stipulated and agreed that exhibits 801 through 853, 901 through 903, and this stipulation, which is marked Government Exhibit 1001, may be received in evidence as government exhibits at trial."

Your Honor, the government offers exhibit 1001, as well as exhibits 801 through 853 and 901 through 903.

THE COURT: Received.

(Government's Exhibits 801-853, 901-903, 1001 received in evidence)

MR. JACOBS: At this time, I'd like to publish briefly for the jury Government Exhibit 901 which was seized from the Enviro office. We can take that down now.

Now, we call Juan Carlos Rodriguez.

MR. DONALDSON: Before we do that, I think I left a document at the witness stand. Can I retrieve that.

THE COURT: Yes. Absolutely.

MR. DONALDSON: Sorry about that.

THE COURT: No problem.

MR. JACOBS: We're getting our interpreters from the hallway.

JUAN CARLOS RODRIGUEZ,

called as a witness by the Government,

having been duly sworn, testified through the Spanish interpreter as follows:

DIRECT EXAMINATION

BY MR. JACOBS:

Q. Good morning. Where do you work?

A. I work for UNAM.

Q. What is that?

A. The English letters stand -- UNAM stands for Laborers International of the Unions of America.

Q. It's a labor union?

A. Yes.

Q. What's your position?

A. Organizer.

Q. And what generally are your responsibilities?

A. My main responsibilities are to work with nonunion companies with the aim of organizing the workers to join the union in the future.

Q. And how long have you done that work?

A. Thirteen years.

Q. Are you familiar with a construction project that took place in 2009 at East 100th Street between First and Second Avenues?

A. Yes.

Q. Have you been to that job site?

A. Yes.

Q. When was the first day you went there?
A. The first day I went to that site was on August 12th, 2009.
Q. When was the last day?
A. Towards the end of February of 2010.
Q. Between those dates, approximately how many times did you go to the job site?
A. About 30 times.
Q. Did you go alone or with someone else?
A. I went with a coworker.
Q. Who?
A. Jerry Kraft.
Q. When you went to the job site with Mr. Kraft, where did you two locate yourselves?
A. On the sidewalk.
Q. In general, what did you and Mr. Kraft do at the job site?
A. We would give information to the workers regarding how much they should be earning from a government job. We took photos and we also filmed videos.
Q. Did you provide -- in what form did you provide information to the workers?
A. We would give it to them in writing on a flier.
Q. Were the fliers in English or Spanish?
A. Spanish.
Q. What time did you typically arrive at the job site with Mr. Kraft?

A. Always before 7:00 a.m.

Q. Did you observe workers arrive at the job site?

A. Yes.

Q. At what time approximately did you observe workers arrive?

A. Ten to 15 minutes before 7:00 a.m.

Q. What time did you typically leave the job site?

A. Between 2:00 and 3:00 p.m.

Q. Were the workers still there at that time?

A. Yes.

Q. Had any left by that point?

A. No.

Q. Did you ever come back to the job site after you had left around 3:00?

A. Yes.

Q. What time did you come back?

A. 5:30 to 6:00 in the evening.

Q. What did you observe on those occasions when you came back?

A. At that time, people would begin leaving work.

Q. How many times did you go to the job site that late?

A. Six or seven times.

Q. On a given day, how many workers in total did you typically observe enter the job site?

MR. BURKE: Objection to the form of the question.

THE COURT: Ground.

MR. BURKE: Typically.

THE COURT: Pardon.

MR. BURKE: Typically observe.

THE COURT: I think that's permissible under these circumstances. You may cross examine, of course.

Overruled.

You may answer.

THE INTERPRETER: Can that question please be repeated for the interpreter.

BY MR. JACOBS:

Q. Let me actually back up. I'll ask one question first.

Did you count workers entering the job site each morning you were there?

A. Yes.

Q. How many workers did you typically observe enter the job site?

A. Between 20 and 25 people.

Q. In the course of going to the job site, did you become familiar with an individual named Luperio Naranjo?

A. Yes.

Q. Do you see him in court here today?

A. Yes.

Q. Can you identify him by where he's sitting and a piece of clothing he's wearing?

A. Yes. He is that man that's over there with the brown sweater on.

MR. JACOBS: Could the record reflect that the witness has identified Luperio Naranjo?

THE COURT: Yes.

BY MR. JACOBS:

Q. Did you ever observe Luperio Naranjo on the job site at East 100th Street?

A. Every day.

Q. Did you ever observe Luperio Naranjo do demolition or take out debris on East 100th Street?

A. No.

Q. What did you see him doing?

A. Supposedly, he's the owner of the company.

MR. BURKE: Objection, move to strike.

THE COURT: Sustained.

BY MR. JACOBS:

Q. What did you see Mr. Luperio Naranjo doing at the job site?

A. He would come in his van and what he really did was to give gloves out to the workers, and I would see him give orders -- he would give orders to the workers.

Q. Was he ever present when you handed the workers the fliers you described?

A. Yes.

Q. How did he react?

A. He would make the workers throw the flier down to the ground.

Q. Did the worker do that?
A. Yes.
Q. Did you become familiar with an individual named Jover Naranjo?
A. Yes.
Q. Do you see him in court?
A. Yes.
Q. Can you identify who he is by where he's sitting and something he's wearing?
A. He's that man with the red and white plaid shirt on.

MR. JACOBS: Could the record reflect that the witness has identified Jover Naranjo?

MR. DONALDSON: Yes.

THE COURT: The record so reflects.

BY MR. JACOBS:
Q. Did you ever see Jover Naranjo on the job site at East 100th Street?
A. Yes.
Q. About how many times?
A. Once or twice.
Q. Did you ever see him do demolition work or take out debris on the job site?
A. No.
Q. What did you see him do at the job site?
A. I only saw him talking with Mr. Luperio Naranjo.

MR. JACOBS: May I approach.

THE COURT: Yes.

BY MR. JACOBS:

Q. I'm handing the witness materials marked for identification Government Exhibits 401 through 436.

Do you recognize those materials?

A. Yes.

Q. Did you review all those materials before testifying?

MR. BURKE: Forgive me for interrupting. Thank you. Sorry, Judge.

A. Yes.

Q. With exhibit 401, do you recognize that item?

A. Yes.

Q. What is it?

A. That's a tape recording of what we would record every day at the work site.

Q. Do the videos fairly and accurately capture what you observed at the job site?

A. Yes.

Q. And exhibit 402 through 436, what are those documents?

A. Those are photos which have been extracted from the tapes.

Q. Do the images fairly and accurately capture images that appear on the videos?

A. Yes.

Q. And do the dates fairly and accurately reflect the date

each image was recorded?
A. Yes.
Q. Do the photos in the stack show every worker you saw on the job site or just some of them?
A. It's only some of all of the workers.
MR. JACOBS: Your Honor, the government offers exhibits 401 through 436.
MR. BURKE: No objection.
MR. DONALDSON: No objection.
THE COURT: Received.
(Government's Exhibits 401-436 received in evidence)
MR. JACOBS: No further questions, Judge. Thank you.
THE COURT: Cross examination.
CROSS-EXAMINATION
BY MR. BURKE:
Q. I think you said on direct examination you work for the Labor International of Unions of America. Is that who you work for?
A. Yes.
Q. And how long have you worked for them?
A. Thirteen years.
Q. And are they -- withdrawn.
That organization, is that for all unions all over America or just certain unions?
A. No. It's for all of America and including Canada also.

Q. And this organization, they get their money from labor unions?

A. This organization receives money from the workers who are members of those unions.

Q. Because the workers pay union dues, correct?

A. Yes.

Q. And then that money goes to certain unions, correct?

A. Yes.

Q. And then those unions send money to your organization?

A. Yes.

Q. And then that organization pays you?

A. Yes.

Q. And your job is to get people to join the union, right?

A. Yes.

Q. And the more people you have in the union, the more money the union gets, right?

A. Yes.

Q. And the more money the union gets, the more power these organizations have, correct?

MR. JACOBS: Objection.

THE COURT: This is all fascinating I'm sure, but it doesn't seem to have anything to do with this case, counsel.

MR. BURKE: I understand the Court's ruling.

THE COURT: That's a step in the right direction.

BY MR. BURKE:

Q. Local 79, you're familiar with that union, right?

A. I'm a member of Local 79.

Q. And that's a pretty big union in the city, right?

A. It's very strong.

Q. Thousands of members, right?

A. Exactly.

Q. And so your job is when you see nonunion workers working, you try to get them to join the union, right?

A. Not just that.

Q. Now, turning to this case and this job in particular, what I mean is the one on 100th Street, did you complain to the Department of Labor about the job?

A. Yes.

Q. And was that in early August?

A. No.

Q. Do you know who you spoke to in the Department of Labor?

A. Yes.

Q. Who?

A. Camille Coppolla.

Q. And this is something you had done many times in the past, correct?

MR. JACOBS: Objection.

Q. What I mean when I say that is --

MR. JACOBS: Objection.

THE COURT: Sustain, but I think you can rephrase it.

BY MR. BURKE:

Q. Because as part of your duties as a union organizer, when you see nonunion workers working, very often you report it to the Department of Labor?

A. Um, yes, there are many workers who are working for nonunion companies in public jobs when they are not being paid correctly, but I need evidence to go to the Department of Labor and make a complaint.

Q. So the answer to my question is yes, this is what you do, you make reports to the Department of Labor, correct?

A. Yes.

Q. And I think you mentioned you used to go to the site with Jerry Kraft, right?

A. Yes.

Q. And who does he work for?

A. He's an organizer, he was, now he's retired and he was an organizer for Local 79.

Q. So he didn't work for the exact organization you do, but he worked for Local 79; is that fair to say?

A. Exactly.

Q. Now, you said you went to the job site about 30 times, right?

A. Yes.

Q. Could it have been as many as 40 times?

A. No.
Q. And when you went there, you would go with Jerry Kraft and other people?
A. In the beginning, Jerry Kraft and me and after three or four weeks, the picket lines at the work site began.
Q. And when you had a picket line at the work site, how many workers -- excuse me withdrawn.
How many people would be in that picket line?
A. Around ten people.
Q. And those people, were they paid by the unions, too?
A. No, they're members of the union. They go voluntarily. They are people who are not working at that time.
Q. And since the last two weeks, have you consulted with anybody from Local 79 about this case?
A. Yes.
Q. And do you know if Local 79 had people in the audience watching the trial?
A. No.
Q. How many times did you picket the job?
A. It must have been about 40 times.
Q. And when you would do that would you bring a big rat sometimes?
A. Yes.
Q. And would you blow up the rat when you got there, or did you blow it up before you brought it there? How did it work?

MR. JACOBS: Objection.

THE COURT: Sustained.

BY MR. BURKE:

Q. And would you go visit some of the workers at home?

A. No.

Q. You had meetings with the workers, though, right?

A. Yes. We had a meeting with the workers four to five months after the completion of the job.

Q. And did you have a meeting with the workers at a coffee shop?

A. Yes.

Q. And you had meetings with the workers at a restaurant?

A. Yes.

Q. On October 23, 2010, you had a meeting with the workers, right?

A. Yes. Almost a year after they had finished that job.

Q. Was that the meeting at the restaurant?

A. It might have been. I don't have my dates exact, but it might have been.

Q. And many workers were there, right?

A. Yes, around 20.

Q. And do you remember if Mr. Criollo was there?

A. Yes.

Q. Antonio Torres, was he there?

A. Yes.

Q. Mr. Lojano, was he there?
A. Yes.
Q. Pedro Pablo, was he there?
THE INTERPRETER: I'm sorry. Counsel can that name be repeated for the interpreter, please.
BY MR. BURKE:
Q. Pedro Pablo he was there right?
A. Yes.
Q. Campoverde, he was there?
A. Yes.
Q. And were you and Jerry Kraft there?
A. No. I was there. Jerry Kraft was not.
Q. And did you tell the workers that they could get more money, back-wages?
A. Yes.
Q. Did you tell them that you were going to have a civil suit against Enviro?
MR. JACOBS: Objection.
THE COURT: No, I think that I will allow a yes or no answer. You may answer that question yes or no.
THE INTERPRETER: Can you repeat the question.
THE COURT: The question was did you tell them that you were going to have a civil suit against Enviro.
THE WITNESS: No.

BY MR. BURKE:

Q. But you did tell them that they could get more money, correct?

MR. JACOBS: Objection.

THE COURT: Sustained.

BY MR. BURKE:

Q. Now, at this meeting you had a camera?

A. Yes.

Q. A video camera?

A. It wasn't mine, but there was a video camera there.

Q. And did you interview the workers?

A. No.

Q. Did anyone interview the workers?

A. Yes, other coworkers of mine spoke with the workers.

Q. Who was that?

A. Luis Montalvo.

Q. And were those interviews recorded on video tape?

A. Yes.

Q. And do you know where those video tapes are?

A. No.

Q. Now, these video tapes, they were also video and audio, correct?

A. Yes.

Q. Did you ever listen to them?

A. No. I was present there when they were being made.

Q. After these tapes were made, did you ever see them again?
A. No.
Q. And you have no idea where they are?
A. No.
Q. Now, on November 3, 2010, did you have another meeting with the workers.
A. I don't know what you're referring to, but there could have been a meeting at Local 79.

MR. BURKE: May I just approach the witness with a document?

THE COURT: Yes.

MR. BURKE: Excuse me, Judge.

BY MR. BURKE:
Q. I want you to think back. Do you remember if there was a meeting on November 3, 2010, with the workers?
A. (In English) Yes.
Q. Was that a restaurant or the union hall or where it was?
A. At the union hall.
Q. And was the Department of Labor there?

MR. JACOBS: Objection to the line of questioning.

THE COURT: Let's have a short side bar.

(Continued on next page)

(At the side bar)

THE COURT: So, what's the relevance?

MR. BURKE: The Department of Labor mentioned, in fact, if I remember correctly, that they did have meetings at the union hall and the union was there. He said he had a meeting with the workers that day. I want to see if he recalls that meeting, if he remembers the Department of Labor being there also.

THE COURT: What's the relevance of that?

MR. BURKE: The relevance of this is it goes to show this witness' bias and his interest in this case.

THE COURT: That's why I allowed the question before about the lawsuit which I thought was otherwise potentially misleading because it did perhaps go to his bias.

You've already brought out his relationship to reporting things to the Department of Labor at some length. And in connection with this particular job site, I don't see what his presence at any given meeting adds to his bias.

MR. BURKE: You mean with the Department of Labor.

THE COURT: Yes.

MR. BURKE: Okay.

THE COURT: Now, roughly how much more do you have?

MR. BURKE: I think 15 minutes, 20 minutes at most.

THE COURT: I'll give the jury their midmorning break now then.

MR. DONALDSON: Thank you.

(Continued on next page)

(In open court)

THE COURT: The objection is sustained.

Ladies and gentlemen, I think this is a good opportunity to give you your midmorning break, so we'll take a 15-minute break.

(Jury not present)

(Continued on next page)

(In open court; jury not present)

THE COURT: The witness can go back to the witness room.

(Witness temporarily excused)

THE COURT: Please be seated. Now, is this the government's last witness?

MR. JACOBS: We have one witness after this whose direct should take approximately 30 minutes.

THE COURT: We received the following note from our favorite juror number seven. It reads as follows: Dear Judge Rakoff, in explaining the schedule and process for the balance of the week, you did not say that the defense would present witnesses. Could you explain the rationale for this if it's appropriate to do so? I have not wanted to research this on my own, for obvious reasons.

I think the best way to handle this is since the case is just about finished, the government will rest, unless the defendants at that point change their mind, the defense will then rest. I will remind the jurors at that point that the defense has no obligation to present any evidence whatsoever and that the burden at all times is totally on the government to prove every charge beyond a reasonable doubt.

I think rather than having a separate colloquy with juror number seven, that's the best way to proceed.

Is there any disagreement with that?

MR. JACOBS: No, Judge. Thank you.

MR. DONALDSON: No, Judge.

MR. BURKE: That's fine, Judge. Forgive me. Then we'll just do a Rule 29 nunc pro tunc once we're done with them?

THE COURT: Exactly. We'll see you in 15 minutes.

(Recess)

(Continued on next page)

(In open court; jury present)

THE COURT: Counsel.

BY MR. BURKE:

Q. Just going back to that meeting of November 3, 2010 at the union hall, Antonio Torrez was there?

A. Yes.

Q. Mr. Campoverde was there?

A. Yes.

Q. Mr. Lojano was there?

A. Yes.

Q. Mr. Creola was there?

A. Yes.

Q. And Joaquin Pablo was there?

A. Yes.

Q. I think you also had a meeting with the workers on November 2, 2010. Is that fair to say?

A. I don't recall.

Q. If you could, sir, just examine that document in front of you. I want you to think back. On November 2, 2010, didn't you meet with some workers?

A. Yes.

Q. I think it was four -- I'm sorry?

A. Yes, looking at this now, I see that I met with some workers.

Q. I think it was four of them, correct?

A. Yes.
Q. I think Angel Lojano was one of those workers, right?
A. Yes.
Q. After these meetings that we mentioned, the ones in November of 2010, you also had many more meetings with the workers, correct?
A. I don't remember how many more there were.
Q. But there were several, correct?
A. I remember having gone to the Department of Labor with them, but the dates I don't recall.
Q. Again, sir, without being too concerned about the date, you had other meetings at the Department of Labor with the workers?
A. I always would accompany the workers when they went to the Department of Labor.
Q. Would you pick them up?
A. No. I waited for them at the place.
Q. You also met with the attorney for the Department of Labor, correct?
A. Yes.
Q. A Ms. Jennifer Huggins?
A. Exactly.
Q. And you testified at a civil proceeding, correct?
A. Yes.
Q. These gentlemen here, the folks at this front table here, you've met with them before, right?

A. Yes.
Q. How many times, do you think? Two times? Three times?
A. Four or five times.
Q. Now, it's fair to say you also called the police during your activities at 100th Street, didn't you?
A. No, I did not call them. Another co-worker called them.
Q. You were trying to get them to shut the job down, right?
A. No.
Q. But you were there when your co-worker called the police?
A. Yes, I was there. I mentioned to a co-worker what was going on, and he called the police.
Q. On August 17, 2009, you were at the job site and you saw Mr. Naranjo putting up those fliers on the wall of the job site, correct?
A. Yes.
Q. And those fliers contain the information about -- withdrawn.

Those fliers were things you were giving out, right?
A. Yes.
Q. Could the government put up 406? Pointing something out there, sir, the gentleman in the white shirt is you; is that correct?
A. Yes.
Q. And you're giving out the leaflets?
A. Yes.

Q. Do you know if there's a picket line that day?
A. No.
Q. Could I also see 420? Again, sir, that's you, right?
A. Yes.
Q. And you're giving a flier out to a worker?
A. Yes.
Q. Do you know if that was the same day as the other picture?
A. No.
Q. Thank you.

Sir, did you at sometime during your activities involving this case, did you do a dumpster dive at Gladiator's office?

THE INTERPRETER: The interpreter is going to need an explanation of dumpster dive before I can translate it.

Q. Did you inspect the garbage from Gladiator's office at some point?
A. No.
Q. Did somebody from the union do that, if you know?
A. Not as far as I know.

MR. BURKE: May I just approach the witness with a document, Judge?

THE COURT: Yes.

Q. I am just going to ask you to take a look at that document.
A. Yes.
Q. Just look at the document. After looking at the document,

do you have any memory of somebody in the union doing a dumpster dive or looking at the garbage in Gladiator?
A. It's possible because it's written down here, and it is my handwriting.
MR. JACOBS: Objection.
THE COURT: Well, I'm afraid the cat is out of the bag, so to speak, but, all right, go ahead, put another question.
Q. Again, I don't mean to press you on this too much. You've seen your notes. Do you have any recollection of you or other union members going through the garbage of Gladiator?
A. No.
Q. Your investigation on this case took place a long time ago though, right?
A. Well, we're talking about four years ago, right?
Q. Right. So some of the things you've done, you may have forgotten?
A. No, this I had not forgotten because I never did a dumpster dive.
Q. Have other union workers done dumpster dives?
A. In other places, yes.
Q. Did you do a dumpster dive -- withdrawn. But you mentioned that was in your notes, right?
MR. JACOBS: Objection.
THE COURT: Well, that was inappropriate for him to

have mentioned, and I let it stand. I'm not going to allow further questions.

MR. BURKE: I understand.

Judge, I think I am almost done. Just one moment.

Q. If you counted up all the meetings you had about this case with the workers, the Department of Labor, the U.S. Attorney, the Departmen of Labor's attorneys, would that be 40 meetings, 50 meetings, any idea?

A. No, not that many, but there were a lot.

Q. I think you mentioned that you spoke to people in Local 79 during this trial.

A. Yes.

Q. Did you speak to union bosses or workers?

A. With workers and with bosses.

Q. Did you discuss this trial?

A. On the -- specifically about this trial?

Q. Well, withdraw that question. Did you discuss this case?

A. Yes.

Q. What union bosses did you speak to?

MR. JACOBS: Objection.

THE COURT: Sustained.

MR. BURKE: Nothing further, Judge.

THE COURT: All right. Redirect?

MR. JACOBS: It's Mr. Donaldson, Judge?

THE COURT: I'm sorry, Mr. Donaldson. I didn't

realize you had cross also. Go ahead.

MR. DONALDSON: I'll be brief, your Honor.

THE COURT: Take your time.

CROSS-EXAMINATION

BY MR. DONALDSON:

Q. Good morning. I believe on cross you said that your aim is to get the workers to join the union; is that right? Or one of your aims.

A. Exactly. That's one of my aims, in order for them to have better benefits and a better lifestyle.

Q. How many workers joined the union?

THE INTERPRETER: I'm sorry, counsel?

MR. JACOBS: Objection.

THE COURT: Sustained.

Q. Can illegal immigrants join the union?

A. Yes.

Q. Now on 10/23, October 23, 2010, you said you met with several workers. Did you help any of these workers with filling out any applications?

A. Yes, of course. We are always helping them.

Q. So would you recall which application you helped them fill out on October 23, 2010?

A. Wow, there were so many of them because, unfortunately, they have a lot of difficulties writing, and so I helped them to fill out the forms.

Q. Do you recall if you helped them fill out a New York State Department of Labor reclaiming of unpaid wages form?
A. Yes.
Q. When you were speaking with these workers on these several meetings, you informed them, did you not, that if it can be shown that Enviro violated the law, they can get back wages?
A. Yes.
Q. And you told them that if they were paid in cash, that would be a violation that could help them get back wages, correct?
A. Paying cash can be one of the violations. The violations there were that they were not paying the prevailing wage, the government wage, and they were not being paid overtime.
Q. You were in contact with the Department of Labor after you spoke with the laborers, correct?
A. I always have contact with the Department of Labor.
Q. Let's try it a different way.

After you met with the laborers, you would then call the Department of Labor and tell the Department of Labor what the laborers told you, correct?

MR. JACOBS: Objection. Form.

THE COURT: Sustained as to form.

Q. You spoke with the laborers, correct?
A. No, I began speaking with the laborers six months after the job was finished.

Q. When would that be exactly?
A. They did not want to speak with me because they were afraid.
Q. I asked you when would that be exactly.
MR. JACOBS: Objection. This was covered.
MR. DONALDSON: I'll move on, Judge.
THE COURT: All right.
BY MR. DONALDSON:
Q. You said you saw Jover Naranjo at the work site one or two times?
A. Yes.
Q. When you were out there in the 30 or 40 times, were you ever out there at the same time that the Department of Labor person was there?
A. At the work site?
Q. Yes.
A. Yes.
Q. On the day that you were out there when the Department of Labor person was also out there, did you see any laborers running to hide or anything like that?
MR. JACOBS: Objection. Foundation. There's testimony on direct indicating where he was.
MR. DONALDSON: Just asking if he observed when he was out there if the Department of Labor was there.
THE COURT: I'll allow it.

THE INTERPRETER: Can I have the question repeated for the interpreter?

Q. On the day that you were out there and the Department of Labor person was out there that same day, did you see any laborers running to hide or concealing themselves at all?

A. No, I could not see them because I cannot enter the work site, but the investigators said that they spoke with more and more people --

MR. JACOBS: Objection.

THE COURT: Yes.

MR. DONALDSON: I actually have nothing further, your Honor.

THE COURT: All right. Any redirect?

MR. JACOBS: No, Judge, thank you.

THE COURT: Thank you very much. You may step down.

(Witness excused)

THE COURT: Call your next witness.

MR. WIBLE: The government calls David Rosenthal.

DAVID ROSENTHAL,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WIBLE:

Q. Good morning, Mr. Rosenthal. Do you mind just moving the microphone a little in front of you?

MR. WIBLE: May I approach, your Honor, to move the microphone?

THE COURT: Yes.

Q. Where do you work?

A. I work at New York City Department of Housing Preservation and Development.

Q. Is that agency also referred to as HPD?

A. Yes, it is.

Q. How long have you worked for HPD?

A. I've worked for 32 years.

Q. What's your current position there?

A. I just had a new position of acting co-director of the labor monitoring unit, but I've been a deputy director since 2009.

Q. What were your duties as a deputy director at the labor monitoring unit?

A. As a deputy director, I supervised the compliance officers who handled the monitoring of the prevailing wage law enforcement of HPD construction contracts.

Q. Do you require contractors to submit any documents regarding their compliance with the prevailing wage rules?

A. Yes.

Q. What kind of documents do you require them to submit?

A. Essentially, it's payrolls. That's the most important document.

Q. Is there a special term you use to describe those payrolls?
A. It's -- it's the certified payrolls.
Q. What do you do with the certified payrolls after receiving them?
A. After we -- after a compliance officer receives the payrolls, they scan the payrolls, they check it for correctness, truthfulness. We send out letters to the workers who are listed on the payrolls. We conduct site visits to the construction site to verify if these employees actually work on the -- you know, as they're noted on the payrolls.
Q. What steps do you take if, after you've done all of those things, you've determined that a contractor has not paid the prevailing wage to one or more employees?
A. OK. Well, we initiate an investigation, and that entails requesting certain documentation, canceled checks. We send out verification of letters to the -- as I stated, to the employees, and essentially background information concerning the particular payrolls.
Q. So if you have conducted an investigation like that, and you've determined that a contractor did not pay the prevailing wage to one or more employees, what steps do you take then?
A. OK. We initiate an underpayment. And underpayment means the difference of the payment that the worker received -- it could have been $10 an hour -- and difference of the prevailing wage rate, which is usually, you know, for example, as a

carpenter, they are supposed to be making $75 an hour. So it's between the $10 and the $75, we calculate the difference, and we send the bill, so to speak, to the contractor to pay.

Q. Now, are you familiar with the project called the Hobbs Ciena Project?

A. Yes.

Q. How are you familiar with that project?

A. Actually, I was the compliance officer for that particular project.

Q. What were you monitoring compliance with for that project?

A. Well, the prevailing wage laws.

Q. When approximately did you begin monitoring compliance with the prevailing wage laws for that project?

A. Just as soon as the construction began. We monitor from demolition, which was July 2009, through the final cleaning, which was sometime in 2011.

Q. Did you receive any certified payrolls for a company called Enviro & Demo Masters in connection with the Hobbs Ciena Project?

A. Yes, I did.

Q. Approximately how many certified payrolls did you receive in total for Enviro Demo?

A. In total -- 38, 39, I'm not sure of the exact number.

Q. From whom did you receive those certified payrolls?

A. I received the payrolls from Lettire Construction. They

were the general contractor of record on the site.
Q. How frequently did you receive those payrolls?
A. Well, essentially four weeks to be six weeks.
Q. How did you receive the payroll?
A. Oh, by mail, by Federal Express or --
Q. Where did you receive those payrolls?
A. Oh, we received it in the office. It was sent to 100 Gold Street.
Q. Is that here in Manhattan?
A. Yes.
Q. When you first began receiving those certified payrolls for Enviro & Demo Masters, did you receive any backup documentation with them such as sign-in sheets or copies of canceled checks?
A. We received sign-in sheets. That was really about it.
Q. Mr. Phillips, could you please pull up on the screen Government Exhibit 204 in evidence.
MR. WIBLE: May I approach, your Honor, in case it's easier for the witness to look at a hard copy?
THE COURT: Yes.
A. I need my glasses.
Q. Mr. Rosenthal, do you recognize the first document of this exhibit?
A. Yes.
Q. What is it?
A. That's the certified payroll.

Q. Is it a certified payroll for Enviro & Demo in connection with the Hobbs Ciena Project?
A. Yes.
Q. Mr. Phillips, could you please highlight the entire top row?
Mr. Rosenthal, what's listed in the top row of this document?
A. The top row is the name of the subcontractor, Enviro & Demo Masters, Incorporated.
Q. And what else?
A. Their address.
Q. Now, can we highlight the second row, please?
Mr. Rosenthal, what's shown in that row?
A. The payroll number of the -- payroll is a record of the calendar week, and they have had three weeks of work. This was the fourth week, so it's payroll number four.
Q. Continuing to move right across the page, what's in the next column?
A. And for week ending, that's the week ending of the calendar week worked at Hobbs Ciena.
Q. Continuing to move across the page, what's shown next?
A. Project and location. They were the subcontractor to the Lettire Construction performing asbestos abatement and interior demolition at the Ciena rehab of the Hobbs Ciena Project on 100th Street.

Q. I'd like to now focus your attention on the first column below that on the far left-hand side of the page. What's to the left of that?
A. That's the race and sex of the particular -- specific employee. And then next would be name, address and social security number of the employee.
Q. Mr. Phillips, could you now highlight the third column moving across the table? That column is labeled W.EX.?
A. Of withholding exemptions of a specific employee.
Q. If you look at the column to the right of that where it says work classification. What's the significance of the information put under the heading work classification?
A. That's the type of classification that's listed in the Davis Bacon schedule. That's the schedule of rates that the contractor has to adhere to. And the work classification, one worker performed asbestos abatement work; another demolition tier A, yet another demolition tier B.
Q. Let me ask you, what are a demolition tier A worker's duties?
A. Tier A demolition, they're responsible for the breaking apart of the walls, the floors. Essentially, it's really the main mechanic of the demolition.

The tier B is essentially, they just cart out the construction debris, bring it to the dumpster, and that's really all the duties that they had.

Q. How would a supervisor who didn't actually do any labor on a job site be classified according to the prevailing wage rate?
A. OK. Well, a supervisor is not really applicable to be paid prevailing wages; only if they work at least 20 percent, you know, of the time worked. So, let's say if the supervisor worked 20 percent, you know maybe three days at maybe 20 hours of -- no, say, ten hours of 40 hours, they would have to be paid prevailing wages.
Q. What if they didn't do any labor, would they be required to receive the prevailing wage?
A. No, they're not required. It's really to the discretion of the company, of course.
Q. I'd like to focus your attention now on the next column to the right where it says OT and ST. What do those abbreviations refer to?
A. That means overtime, which is time and a half or double time. And standard, which is the regular rate, regular hours.
Q. I'd like to continue moving right across the page.
Mr. Phillips, if you could highlight that next column under day and date. What's shown under that heading?
A. Well, the day and date is the specific day and the corresponding number -- the day and date.
Q. What about just under that through hours work, what's shown in those columns?
A. That's the number of the hours that the worker worked on

the particular day.
Q. Move to the next column to the right, please. Total for period, what's shown?
A. That's the total for the period of that calendar week.
Q. The total of what?
A. The total amount of hours worked.
Q. Moving to the right, the next column labeled hourly rate, what does that refer to?
A. The hourly rate refers to the specific minimum paid of the prevailing wages that the worker has to receive for the classification worked.
Q. What's the hourly rate reflected on this certified payroll for a tier A worker?
A. For a tier A worker is $49.29.
Q. For tier B?
A. Tier B is $33.15. And that represents -- there were two specific rates in the prevailing wage schedule for classification. I'm not really sure -- I'm a little sketchy right now. I don't really remember the exact rates, but, for example, $49.29, you have the base hourly rate of maybe $30 per hour, and there's a fringe benefit rate attached to it also, which is $19.29. I'm just approximating.
Q. Are you saying that the hourly rates here include both the wages and the benefits?
A. Yes. If a contractor does not have a bona fide fringe

benefit plan -- and a fringe benefit plan is essentially health, vacation, retirement and annuity -- they can combine both rates into that particular rate, and apply it cash.

Q. Moving across the page to the next column, what does gross amount earned refer to?

A. That's the calculation of the total hours worked for that calendar week and the hourly rate.

Q. Under the next column to the right, deductions, generally what does that refer to?

A. The requisite deductions, you know, like for everybody, for federal, state, city government.

Q. Tax deductions?

A. Tax deductions.

Q. What about the next column labeled total deductions, what does that refer to?

A. That's the total of all deductions, requisite deductions.

Q. In the far column on the right, net amount paid, what does that refer to?

A. That's the difference of the gross amount earned and the total deduction, so that's what they'll see in their paycheck.

Q. Mr. Phillips, can we turn to page 2 of this exhibit, please?

Mr. Rosenthal, what is this document called?

A. This is the statement of compliance.

Q. What's a statement of compliance?

A. A statement of compliance is essentially a certification of the payroll record stating that it's true and accurate, and it must be signed by the principal or payroll manager.

Q. Whose name appears on the upper left-hand corner of this statement of compliance?

A. Jover Naranjo.

Q. Mr. Phillips, can you please blow up paragraph two? Excuse me, paragraph number two, sorry.

MR. WIBLE: Your Honor, may I read the paragraph aloud?

THE COURT: Yes.

MR. WIBLE: (2) That any payrolls otherwise under this contract required to be submitted for the above period are correct and complete; that the wage rates for laborers or mechanics contained therein are not less than the applicable wage rates contained in any wage determination incorporated into the contract; that the classifications set forth therein for each laborer or mechanic conform with the work he performed.

Thank you, Mr. Phillips.

If you would now on the right-hand side of the page at the top, would you blow up paragraph beginning with B to the end of that paragraph.

Your Honor, may I read this paragraph aloud to the jury?

THE COURT: Yes.

MR. WIBLE: (B) where fringe benefits are paid in cash. Each laborer or mechanic listed in the above-referenced payroll has been paid, as indicated on the payroll, an amount not less than the sum of the applicable basic hourly wage rate plus the amount of the required fringe benefits as listed in the contract, except as noted in section 4(c) below.

Mr. Phillips, you can go back out to the full document.

Q. Mr. Rosenthal, according to this certified payroll, did Enviro & Demo offer its workers on this project a health insurance plan?

A. No.

Q. According to this certified payroll, how were Enviro employees being paid for fringe benefits?

A. In cash. Did I say before that they can combine the fringe benefit rate and the base rate?

Q. Now, looking in the lower right-hand corner of this document, whose name is typed next to the signature line?

A. Jover Naranjo.

Q. What title is listed under his name?

A. President.

MR. WIBLE: Your Honor, may I read aloud the text that appears by his signature?

THE COURT: Yes.

MR. WIBLE: The willful falsification of any of the above statements may subject the contractor or subcontractor to civil or criminal prosecution. See Section 1001 of Title 18 and section 231 or Title 31 of the United States Code.

Q. Mr. Phillips, can you just briefly flip to the next page and page 4 as well. You can take that down.

Mr. Rosenthal, I believe you mentioned earlier there's something called a verification letter. Did you send out any such letters to Enviro Demo employees in connection with the Ciena Project?

A. Yes, I did.

Q. How did you send those letters out?

A. By regular mail.

Q. Where did you send the letters from?

A. The letters from our office 100 Gold Street.

Q. Where did you get the addresses for the workers to whom those letters were sent?

A. From the payrolls or the site visits that we conducted -- site interviews, I mean.

Q. Did you ever go to the job site on East 100th Street to conduct interviews?

A. Yes.

Q. How many times did you go there?

A. I went there twice.

Q. When did you go there?

A. I went there August 2009 and March 2011.
Q. Do you remember the specific date in August 2009?
A. I believe it was August 23, 2009.
Q. Are you positive of the date?
THE COURT: Sustained.
MR. DONALDSON: Objection, Judge. Sorry.
BY MR. WIBLE:
Q. Focusing your attention on the August visit, did you go alone or with others?
A. I went with others. We usually go out as a team.
Q. What did you -- how many people did you go with, do you recall?
A. One other -- one other person.
Q. What did you and the other compliance officer do at the job site that day?
A. Well, we interviewed the workers, asked them if they received -- well, what their rate of pay was, their duties, their address, how long they've been on the job site, and it's the standard HUD 11 letter, interview -- interview record. It's developed by HUD which is the Department of Housing and Urban Development.
Q. Mr. Phillips, can we pull up --
THE COURT: Counsel come to side bar.
(Continued on next page)

(At the side bar)

THE COURT: It was represented repeatedly by the government that this witness' direct testimony would be ten minutes. It's been 20 minutes and it doesn't seem to be anywhere near conclusion. How much more do you have?

MR. JACOBS: Judge, I'm sorry. I thought I said he was 30 minutes yesterday.

THE COURT: I'm sorry. I must have misheard. That's fine then. My apologies.

MR. WIBLE: We are getting near the end.

THE COURT: Good.

(Continued on next page)

(In open court)

MR. WIBLE: May I have one moment, your Honor?

THE COURT: Yes.

BY MR. WIBLE:

Q. Mr. Phillips, would you pull up Government Exhibit 204, the first page, please?

Mr. Rosenthal, did you and the compliance officer interview any of the people listed on this certified payroll when you went to the job site in August of 2009?

A. Yes.

Q. Which of these people did you interview?

A. Well, it's been four years ago. I believe maybe Edgar Avila. I think that's all for this page.

Q. Turn to the third page, please.

A. Manuel Pereda, Milton Barahona, and I believe Pedro Orellana. I'm a little sketchy.

MR. WIBLE: Thank you. You can take that down.

Q. Did you and the compliance officer interview any additional workers that day other than the ones you just named?

A. Yes. Yes, we did.

Q. How many?

A. We interviewed three additional workers.

Q. Did those workers provide names to you?

A. Yes.

Q. Did Jover Naranjo subsequently provide you with additional

information about the names for those workers?
A. Yes.
Q. What information did he provide?
A. Their actual name -- they stated their names to us in the interview. When we prepared the underpayment stating that they were never paid for the job, they weren't on the payrolls, and we just sent him the underpayment. He sent back a letter stating we will the underpay, the fees of the people that you actually interviewed, and they were totally different names.
Q. What were the three names Jover Naranjo provided you?
A. Well, we interviewed Janet Feidal.
MR. DONALDSON: Objection, your Honor. It's non-responsive to the question.
THE COURT: Sustained.
Q. Mr. Rosenthal, I'm asking you a very specific question. What were the three names that Jover Naranjo provided you in the letter that you described?
A. Gloria Fiejo and Joaquin Pablo, and there was another Pablo, the first name I forget.
Q. Mr. Phillips, could you please pull up page 3 of Government Exhibit 204? Do any of those names appear on the certified payroll?
A. Actually, they do.
Q. Which ones?
A. I see now Joaquin Pablo, Pedro Pablo and -- let's see.

Q. Mr. Phillips, can you turn to page one, please?
A. And Gloria Fiejo.
Q. Thank you. You can take that down.

Did you see Jover Naranjo at the job site when you went there in 2009?
A. No, I did not.

(Continued on next page)

BY MR. WIBLE:

Q. What about the Luperio Naranjo Sr.?

A. Luperio, I did.

Q. What did you observe him do?

A. He was supervising the workers.

Q. Did you observe him doing any labor?

A. No, not at that point.

MR. WIBLE: May I just have one moment, your Honor.

THE COURT: Yes.

MR. WIBLE: Thank you, no further questions.

THE COURT: Cross examination.

MR. DONALDSON: Yes, your Honor.

CROSS-EXAMINATION

BY MR. DONALDSON:

Q. Good afternoon.

A. Good afternoon.

Q. I'll be brief and ask you as few questions as I can.

You mentioned that you were on the site sometime in August 2009 for the first time and that you interviewed some persons; is that correct?

A. Exactly.

Q. And then there were some names that didn't match with the payroll; is that what you said?

A. Well, workers -- and this happens often with a lot of contractors where they have workers on the job site and they

don't appear on the payrolls.

Q. It happens often?

A. Exactly. And we have to inquire why exactly inquire why they weren't on the payrolls.

Q. And when you find some type of, I guess the word would be conflict, you send some type of underpayment?

A. Exactly.

Q. And you said you observed Luperio Naranjo on the site that day?

A. Yes.

Q. And you observed him supervising?

A. He was -- in the capacity as I saw, he was supervising. He was not doing any manual work.

Q. You didn't send any underpayment for what he was doing, correct?

A. Well, he was on the payrolls as a laborer, but the thing is, I did not see him do any work, but he could have done work, let's say, before.

Q. So, you saw him there?

A. But he was in the capacity of a supervisor.

Q. So, you saw him there. You reviewed the paperwork associated with the payrolls and you did not issue an underpayment for Mr. Luperio Sr. Would that be correct?

A. No, I saw him on the payrolls; he identified himself.

Q. Now, does the subcontractors -- before we get to that.

Enviro would be considered a subcontractor, correct?
A. Subcontractor of the GC.
Q. Of the GC.
The subcontractors, do they have to submit any or sign any documents or submit documents to HPD directly?
A. Well, the payroll, payroll records.
Q. Besides the payroll do they have to send any contracts with the HPD?
A. Well, they do fill out -- they do have a subcontract with Lettire Construction, of course.
Q. But not directly with HPD, correct?
A. Not directly with HPD, no.
Q. Prior to going out to the site, to the Hobbs Ciena site, did you review any of the contracts between Enviro and Lettire?
A. Meaning?
Q. Did you review the subcontract between Enviro and Lettire prior to you visiting the site?
A. Well, that's not really needed because we know that they're doing asbestos. They have the subcontract for asbestos and demolition so we know.
Q. Did you review the contract between Lettire and Enviro prior to you going to the site?
A. No, and there was no need to.
Q. Do you know if HPD requires the subcontractors to provide any employee lists to the GC prior to executing the contract

between the GC and the subcontractor?
A. Executing the contract on -- no, but the thing is, there's a certain -- there was a new type of sign-in/sign-out at the job site, so -- and I believe there was a card record, it's card activity. So I believe they had to submit some records to Lettire.
Q. There's a new sign-in/sign-out where?
A. Oh, at the Hobbs Ciena. That was implemented by Lettire.
Q. When was that implemented?
A. During the course of the project.
Q. During the course of the project?
A. The course of the project. I'm not really sure if it began in August 2009, but it did begin maybe in the fall of 2009. I'm not really sure.
Q. Would it be fair to say that this new sign-in/sign-out procedure began sometime in December of 2009?
A. You could say that.
Q. Now, when you visited the site in August 2009, did you see or observe any of the general contractor's employees there?
A. We did.
Q. Who was that?
A. The general contractors?
Q. Yes.
A. The specific employees?
Q. You just said you observed some.

A. Yeah, we did see the specific employees of Lettire Construction, of course.
Q. At the 100th Street site in August?
A. At the 100th street site, exactly.
Q. Do you know which employees that was?
A. Not right now.
Q. Is it required that the general contractor have a project manager or someone at the site?
A. Oh, of course.
Q. Was there a project manager there at the site on the August date that you visited?
A. Yes.
Q. Do you recall that person's name being Mike Odessa or Mike?
A. I believe it was Mike, yes.
Q. You know who Mike is?
A. I know who Mike is.
Q. In August 2009, Mike was at the site?
A. Yeah, this was four years ago. And I believe he was at the site.
Q. And he's supposed to be there because he's supposed to be monitoring the site for the general contractor, correct?
A. For Lettire, the general performance of each and every subcontractor.
Q. Right. So I guess what I'm saying is, there is supposed to be a project manager or person representing the general

contractor at the site monitoring the subcontractor activities; correct?

MR. WIBLE: Objection to this line of questioning.

THE COURT: Sustained.

BY MR. DONALDSON:

Q. Now, you mentioned on -- could you put up 204, please, the first page.

In the name, address, and Social Security number column, it's required for -- well, it says name, address, and Social Security number, correct?

A. Yes.

Q. And is this a Department of Labor form. Let me rephrase the question.

Is this a Department-of-Labor-generated form?

A. Okay. It's a similar -- it's not the exact WH347, but, of course, they have the option of providing an optional payroll with the same components as WH347. But of course, the statement of compliance, which is on the reverse side, must be there, of course.

Q. Is the same.

And the WH347 has a requirement for the name, address, and Social Security number, correct?

A. In the past few years, they only had the name and last four digits of the Social Security number. This is essentially an old form, but they have the discretion, the contractor has the

discretion of providing these materials. We also have the discretion of asking for the full address of the worker, plus the full Social Security number on top of that.

So him providing this information was fine.

Q. I guess my question then is for the 347 form, I believe you said the old and new form, it still requires the name and either the Social Security number or the last four digits of the Social Security number, is that correct?

A. Yes.

Q. And the reason for that is what?

A. The reason for the identification of the worker performing work on the job site.

Q. And the reason for the Social Security number is what?

A. The reason for the Social Security number is their identification, their Social Security number identification.

MR. DONALDSON: Can I have one second, please, your Honor.

THE COURT: Yes.

MR. DONALDSON: I don't have anything further.

THE COURT: Mr. Burke.

MR. BURKE: No questions.

THE COURT: Redirect?

MR. WIBLE: No, your Honor. Thank you.

THE COURT: Thank you very much. You may step down.

(Witness excused)

MR. JACOBS: Our last piece of evidence is we have a stipulation to read. It will take three or four minutes. And with the Court's permission, we'd like to have Agent Sisas and Mr. Phillips read it in the form of question and answer that were given in a prior proceeding.

THE COURT: Wait a minute.

MR. BURKE: I'm requesting the Court's permission the same limiting instructions we've had for other statements. I think it's applicable.

THE COURT: These relate to --

MR. JACOBS: Mr. Jover Naranjo.

THE COURT: Pardon?

MR. JACOBS: These are statements Mr. Jover Naranjo gave.

THE COURT: Ladies and gentlemen, you can consider them only as to Jover Naranjo, not as to the codefendant.

MR. JACOBS: Could we also display the document at the time as it's being read.

THE COURT: Sure.

MR. JACOBS: I'm going to read the beginning language and then Agent Sisas and Mr. Phillips will begin.

Government Exhibit 1003: The parties stipulate that if called as a witness, a shorthand reporter and notary public of the State of New York would testify that the following is a true record of portions of the testimony Jover Naranjo, the

defendant, gave under oath in connection with a prior proceeding in November 2011.

Agent Sisas will read the lines marked question and Mr. Phillips will read the lines marked answer.

Please begin.

"Q. How many categories of workers did you have at the Ciena site?

"A. Three.

"Q. Name them please?

"A. Demolition laborer Tier A, demolition laborer Tier B, and asbestos worker. Or asbesto abatement worker. Something like that.

"Q. What is the difference between a Tier A and Tier B demolition worker?

"A. A is the one that breaks the walls and B is the one that takes out the garbage.

"Q. Felix was a Tier A?

"A. No, he was B.

"Q. Who gets paid more money, Tier A or Tier B?

"A. A.

"Q. How did you learn the differences between Tier A and Tier B workers?

"A. That's in the schedule. Normally they put it in the contract.

"Q. Was it in the contract that you had on the Ciena project?

"A. In the beginning no, but the following week, yes, he gave it to me.
"Q. But at the time you signed it, did you know that you had to categorize workers as Tier A or Tier B?
"A. Yes.
"Q. When did you first hear about the terms Tier A and Tier B demolition laborers?
"A. Around '89.
"Q. In '89 was that a Federal prevailing wage job?
"A. I believe so.
"Q. So you've been doing Federal prevailing wage jobs since approximately 1998?
"A. I believe so, yes.
"Q. When was Enviro & Demo Masters formed?
"A. Around 2004 or 2005 I believe.
"Q. Before there was Enviro & Demo Masters, you knew about the different categories of workers and their pay for the Federal prevailing wage jobs?
"A. Yes.
"Q. How do you know how much to pay a Tier A demolition laborer?
"A. By their schedule.
"Q. How often do those schedules change?
"A. In the state you have to pay according to how they are updated. You have to check when they change. But in Federal

prevailing wage, you don't have to change - you don't have to check when they change, it is whenever it is you sign the contract.

"Q. So when did you learn what the rate was for Tier A or Tier B workers for the Ciena Project?

"A. When they told me it was prevailing wage, I knew more or less what was going to apply because I was doing other prevailing wage.

"Q. Let's take a step back. When did you first learn that the Department of Labor had been at the Ciena site?

"A. I think the first time they were there was the first week in September.

"Q. Are there bylaws for Enviro & Demo Masters Incorporated?

"A. I believe so.

"Q. If you are the only officer, why are you not sure?

"A. I believe so, I believe it is yes because I was certified for minorities for the State and for the City and they ask for that.

"Q. Did you only create the bylaws so you can be certified for minorities?

"A. I didn't say it was for that. I said you have to have that.

"Q. Who is the secretary for Enviro & Demo Masters?

"A. I believe I am. I think I do everything.

"Q. Are you also the bookkeeper?

"A. Yes.
"Q. How often do you have elections for Enviro & Demo Masters?
"A. No, I am like Fidel, there are no elections.
"Q. Are there any shareholders for Enviro & Demo Masters?
"A. No, only myself.
"Q. How much have you earned in dividend payments as president of Enviro & Demo Masters?
"A. I do not recall. I would have to look.
"Q. Who has the authority to sign checks on behalf of Enviro & Demo Masters?
"A. Only myself.
"Q. I'm going to go over some names and I would like you to identify who these people are. Who is Marcia Gonzalez?
"A. My sister.
"Q. She's Luperio's daughter as well?
"A. Yes.
"Q. How many siblings do you have?
"A. I believe seven.
"Q. How many of them have worked for Enviro & Demo?
"A. Only my brother and my two sisters I believe.
"Q. What is the other sister's name?
"A. Jessica.
"Q. Who at Enviro was responsible for preparing the weekly payroll in the Ciena Project?
"A. Myself.

"Q. Are you the only one that has ever signed any of these certified payrolls on behalf of Enviro at the Ciena Project?
"A. Yes.
"Q. Are you able to read in English?
"A. Yes.
"Q. You did sign the certified payrolls for work done on the Enviro subcontract?
"A. Yes.
"Q. When did you first ever work on prevailing wage job sites?
"A. The first job that I got was prevailing wage.
"Q. On that job, what was your role?
"A. We were very small there and I was doing everything there.
"Q. What was the name of the company that had that first prevailing wage contract with?
"A. We did it for a school, it was for East Coast Construction in the Bronx.
"Q. What company were you working for at the time?
"A. For Triple N.
"Q. How did you learn about prevailing wages?
"A. The G.C. explained it to me more or less and there you had to turn in payroll and everything else. It was a school.
"Q. How many Federal prevailing wage jobs have you worked on since that school project in the Bronx?
"A. I don't know exactly but I think that State jobs and the City jobs do not count like the Federal ones I think. Just

Federal?

"Q. Just Federal.

"A. I would say it's a minimum 30.

"Q. How did you come up with the price, the bid amount for the Ciena Project?

"A. Like I would put a price on all the jobs. Measuring the building and calculating the square footage.

"Q. How does that translate into a dollar figure?

"A. Multiplying it.

"Q. Multiplying what by what?

"A. My price by the square footage for demolition by the square footage that had to be worked.

"Q. What is your price?

"A. Nonprevailing wage, five to six dollars square foot. Prevailing wage, eight to nine dollars a square foot. That's it.

"Q. How did you come up with the figure that for prevailing wage it should be eight to nine dollars per square foot?

"A. Because the laborer in prevailing wage is more expensive.

"Q. In the eight or nine dollars per square foot, what percentage of that is for wages paid?

"A. Calculating for another way for payroll is about 35 percent but because the payroll expenses do not end there. There are things that are paid based on payroll like Social Security, Medicaid, workers comp. insurance, so labor costs go

there. It could be up to 45 percent or more.

"Q. So 45 percent of the eight or nine dollars per square feet is attributed to payroll costs?

"A. Yes.

"Q. Now, for the Ciena project, how much did you ultimately get the contract for?

"A. Like I don't remember. I think it was 785,000 plus 70,000 for the asbestos."

MR. JACOBS: Thank you, Agent Sisas and Mr. Phillips.

The government at this time offers Government Exhibit 1003.

THE COURT: Received.

(Government's Exhibit 1003 received in evidence)

MR. JACOBS: At this time, the government rests.

THE COURT: Let me hear from counsel for the defense.

MR. DONALDSON: Regarding Jover Naranjo, we have no witnesses to call.

MR. BURKE: Luperio Naranjo rests.

THE COURT: Ladies and gentlemen, first let me advise you that the defense has no obligation to put on any case whatsoever. The firm principle for our criminal law is that the burden is always on the government to prove any criminal case beyond a reasonable doubt. So you should not infer anything whatsoever from the fact that the defense chose not to call witnesses. That is their Constitutional prerogative and

cannot be held against them in any way, shape, or form.

We have, therefore, now completed the evidence in this case, so we're going to break for today. Tomorrow at 9:00 we will hear closing arguments of counsel, followed by my instructions of law, and the case will then be yours to deliberate.

Have a very good day, and we will see you tomorrow at 9:00.

(Jury excused)

(Continued on next page)

(In open court; jury not present)

THE COURT: Next we will hear any Rule 29 motions which will be deemed to have been made both at the close of the government's case and at the close of the entire case.

Any motions from defense counsel?

MR. BURKE: On behalf of Luperio Naranjo, I'm going to ask the Court to enter a judgment of acquittal on each count in the indictment, Judge. I believe it's our position that the evidence, even taken in the best light for the government, would not be sufficient for this case to go to the jury. We're asking for a judgment of acquittal.

THE COURT: You would be negligent not to have made that motion, and I would be committing malpractice not to deny it, so the motion is denied.

MR. DONALDSON: Your Honor, I join my cocounsel. I believe a judgment of acquittal is appropriate for Mr. Jover Naranjo. I do not believe the government met its burden of proof of the elements of the six of these counts.

Specifically, I think we have to make a specific request regarding certain counts for the mail fraud count. We do not believe that the government proved the third element of the count and that is that a mailing occurred in the execution of that scheme. Based upon that and the record, we file our Rule 29 motion.

THE COURT: Thank you very much. That motion is also

denied.

Let's turn to the instructions of law, the proposed charge to the jury. Are there any objections or additions from the government on the general instructions one through eight?

MR. JACOBS: No, your Honor.

THE COURT: Any objections or additions on the general instructions from defense counsel?

MR. BURKE: Yes, and that's this, Judge, it's one of my personal sticking points, but I respectfully object to the circumstantial evidence charge.

THE COURT: The one that's been given in this court for about a hundred years.

MR. BURKE: How ever long ago. This was a defense charge which would charge - and this is before I started doing this even, that's a long time ago - they'd say, look, circumstantial evidence is okay, but you must have proof beyond a moral certainty. That's way gone by the way.

Our objection is not really to the language of the charge itself. It's all fine. It's these examples. What happens with the examples is that it tilts the power of the charge and it makes it really a government or prosecution charge.

Let me take the Court's example, for instance. And I'm paraphrasing. You know your charge backwards and forwards: Essentially, you're in a courtroom. You can't see outside.

People come in, they're dripping wet.  The umbrellas are wet.
You may be able to tell that it's raining outside.  What's our
objection?  This is a very strong example of circumstantial
evidence.

Another one which you don't seem to be giving is you
go to sleep, you wake up, there's no snow on the ground, even
though you didn't see it snow.  Out of circumstantial evidence,
that would convince you that it did snow outside.

What I'm saying is this:  The government is always or
usually the people who have the circumstantial evidence and
that's what makes the inference so strong.  And I think it's
inappropriate because of the example.  I submitted a different
type of charge to the Court, but essentially it was from Judge
Batts in a case I did a while ago.

My recollection is in that case, they give the same
example of the rain and umbrellas, but she also gives another
example of circumstantial evidence, again, I'm paraphrasing it:
You're at a train stop, it's late at night, you may think
that's because a train just hasn't come yet.  It could be
because the movies let out.  It could be because the train has
broken down.  There are different inferences to be taken from
that circumstantial evidence which are not as strong as the
example with the raincoats.

It's our position that once the Court gives that
example with the raincoats and the umbrellas, that's like

telling the jury circumstantial evidence is gold and it just tilts the charge. And that's my request and that's our position.

THE COURT: That's very interesting. My recollection is that in approximately 1970 or so, Judge Griesa experimented with trying to alter the circumstantial evidence charge and was summarily reversed by the Second Circuit; whereas, the charge that I give is one that has been heard literally in the courthouse as long as anyone can remember.

Moreover, I disagree with several of your premises. First, often it is the defense that seeks to draw inferences, sometimes extended inferences, of a circumstantial nature from the evidence. So, as a factual matter, it's not been my experience that this favors one side or the other, quite to the contrary.

I wouldn't be surprised if, in this very case, it will be the defense that will more rely on arguments from circumstantial evidence than the government. More importantly, I think that giving multiple examples is likely to inject confusion rather than to be helpful to a jury.

My main beef, if you will, with the jury instructions that are sometimes heard in this courthouse is that they are far too long, far too complicated. Relatively simple concepts become confused because the jury hears so many different formulations of the same thing that they think there must be

some esoteric aspect to it that they may have missed. The concept of inference from circumstantial evidence is something that people do every day of their lives.

To my mind, the most important part of my instruction is where I tell them after giving the example that "Using your reason and experience, you infer from established facts the existence or the nonexistence of some other fact. Please note, however, that it is not a matter of speculation or guess. It is a matter of logical inference." And that is the key.

That, to my mind, conveys to them much more simply and straightforwardly the difference between circumstantial evidence properly used and circumstantial evidence improperly used.

I'm delighted you raise this interesting question. It hasn't been raised in my court before, but I decline the invitation.

Any other objections or additions to instructions one through eight?

MR. DONALDSON: No.

MR. BURKE: No.

THE COURT: Very good.

Let's turn to the more substantive instructions. Any objection or addition from the government to instruction number nine, the mail fraud?

MR. JACOBS: Yes. Two small points on page 13 of the

draft we received.

THE COURT: Yes.

MR. JACOBS: In the first full paragraph in the second-to-last line, we would ask the Court to delete the words "federally funded."

THE COURT: They may think that that's somehow a requirement.

MR. JACOBS: Yes.

THE COURT: Yes. I will delete that.

MR. JACOBS: Then in the first sentence of the next paragraph, I believe the testimony is that the certified payrolls were Fed-Ex'd, so we would ask in addition to U.S. Mails, your Honor, add or "private or commercial interstate carrier" or something along those lines.

THE COURT: The first sentence of the final paragraph will now read "As to the third element - that in the execution of the scheme to defraud, at least one mailing was made (including in this category not only the U.S. Mails, but also private interstate carriers like Federal Express.)"

Anything else?

MR. JACOBS: Not on this instruction, Judge. Thank you.

THE COURT: Anything from defense counsel on instruction number nine?

MR. BURKE: On number nine?

THE COURT: Nine, yes.

MR. DONALDSON: No.

THE COURT: Let's turn to instruction number ten, the conspiracy to commit mail fraud.

Any additions or suggestions or objections from the government on instruction number ten?

MR. JACOBS: Yes. First in the last paragraph of page 14, this is a small point, but where it says "in or about August 2009 and continued up to," it should be "in or about February 2010."

THE COURT: Yes. Thank you.

MR. JACOBS: Also just point out that on this page where it says "Second, that the defendant you are considering knowingly and willfully joined the conspiratorial agreement," which the government agrees is appropriate here, but then on the next page, turning to 15, we would ask --

THE COURT: I don't have the indictment right in front of me. What language is in the indictment?

MR. JACOBS: The indictment charges knowingly and willfully.

THE COURT: Knowingly and willfully. And unlawfully?

MR. JACOBS: No. We stopped using the word unlawfully in indictments maybe two years ago, except where it's in the statute itself.

THE COURT: That's good.

MR. JACOBS: I have language your Honor used in a prior case charging knowingly and willfully. And we ask that the language on page 15 beginning with "If you conclude" through that paragraph down to the paragraph that begins "In this regard" be replaced with that language.

THE COURT: Was that in your requested charge?

MR. JACOBS: I believe our requested charge had knowingly and willfully, but your Honor's charge I think is superior. It's bracketed onto the next page. And that's from *U.S. v. Donald*.

THE COURT: Let me read that so defense counsel is aware of that proposed change.

"As to the second element the defendant knowingly and willfully charged in the conspiracy. To act knowingly means in this context to act consciously and deliberately rather than mistakenly or inadvertently. And to act willfully in this context means to act voluntarily, purposefully, and with knowledge of an intent to do something unlawful. Thus, the defendant enters into a conspiracy knowingly and willfully if he joins the conspiracy deliberately, purposely, and with knowledge of an intent to further one or more of the conspiracy's unlawful objectives."

So reading that, I would change it slightly. The conspiracy here is a conspiracy to commit mail fraud. And that's the only object. It should be "to act willfully in this

context means to act voluntarily, purposely, and with an intent to defraud." And I'll change the second sentence correspondingly.

With that proposed change, is there anything else from the government?

MR. JACOBS: Briefly, the word "intentionally" as it appears in two instances on page 15 and 16, and we ask it be replaced with "knowingly and willfully."

The first instance is in the second-to-last line of page 15, and the other instance is in the second-to-last paragraph of page 16.

THE COURT: No, because I have now defined willfully in terms of intent.

MR. JACOBS: That's fine, then.

THE COURT: I don't think that change needs to be made. Intentionally is a much more common word, much more familiar with the jury than willfully, so I will leave that as it is.

Anything on instruction ten from the defense?

MR. DONALDSON: No.

THE COURT: Mr. Burke.

MR. BURKE: No, your Honor.

THE COURT: Very good.

On instruction number 11, anything from the government.

MR. JACOBS: Yes. In this regard, in our request, venue is proper for this charge if either the efforts to influence testimony occurred in the district or if the official proceeding was to be conducted here.

Some portions of the evidence reflect efforts to influence testimony, particularly Jover Naranjo's conversations with employees, that may have taken place in the Enviro office in Queens, they were outside the district.

We would propose for this charge that the words "in the Southern District of New York" be struck from the second paragraph.

THE COURT: Yes.

MR. JACOBS: Then a final paragraph be added - and this was in our request - that says simply "Finally, the government must prove that it's more likely than not either that the efforts to influence testimony occurred in the Southern District of New York or that the official proceeding was to be conducted here."

THE COURT: I would give that, except for the part about "more likely than not."

Obviously, if you want that, you're entitled to it, but that means I have to tell the jury that there's a separate thing called venue, that preponderance of the evidence applies rather than reasonable doubt.

In virtually every case, venue is probably the element

that is proven most totally beyond any conceivable doubt. So I think it just confuses the jury to add that nuance, but if you insist on it, I will include it.

MR. JACOBS: We do not so insist. Thank you.

THE COURT: Let me get that language again. Hold on just a minute.

MR. JACOBS: "The government must prove either that the efforts to influence or prevent testimony occurred in the Southern District of New York or that the official proceeding was to be conducted here."

THE COURT: The official proceeding was to be conducted in that district, right?

MR. JACOBS: Correct.

THE COURT: Anything else from the government on number 11?

MR. JACOBS: No.

THE COURT: Anything from defense on number 11?

MR. DONALDSON: No.

MR. BURKE: On number 11 and number 12, I'm just asking the Court if you could insert, I guess, the language from the indictment which mentions the dates.

THE COURT: Yes. What are the dates?

MR. BURKE: From at least on or about December 3, 2009, up to and including in or about February 2010.

THE COURT: Give me the first date again.

MR. BURKE: From December 3, 2009.

THE COURT: December 3, 2009.

MR. BURKE: February 2010.

THE COURT: And February 25, 2010.

MR. BURKE: February. There's no date in February, just February 2010, whatever date they want.

THE COURT: What year are we talking about?

MR. WIBLE: The indictment gives the year February 2010.

THE COURT: I will include that where I'm saying first that the defendant you are considering, at or about sometime between on or about December 3, 2009 and on or about February 2010. Very good.

Instruction number 12, anything from the government?

MR. JACOBS: No.

THE COURT: Anything from the defense?

MR. BURKE: It will be the same issue.

THE COURT: No, it's not necessary on 12. Twelve is just saying that if they find conspiracy, the conspiracy would, obviously, relate back to Count 11, the dates we just talked about.

MR. BURKE: I'm sorry. You're saying the substantive count, you're putting the timeframe in, but not the conspiracy?

THE COURT: The reason I'm not putting in anything about the conspiracy, other than just saying this has to meet

the elements of a conspiracy to commit the crime that I've just instructed, and the crime I've just instructed has the dates.

MR. BURKE: Got it.

THE COURT: Instruction number 13, anything from the government?

MR. JACOBS: No, your Honor. Thank you.

THE COURT: This one only relates to Mr. Jover Naranjo.

MR. DONALDSON: There was a small change I considered. I spoke to the government about it, and it relates to the first sentence after the third element where it says "As to the first element, the government need prove only that a single false statement was made."

THE COURT: You need to speak a little louder.

MR. DONALDSON: I'm sorry. The first full sentence after the third described element where it starts "As to the first element."

THE COURT: Yes.

MR. DONALDSON: "The government need prove only that a single false statement was made."

My recommendation was to finish that sentence "to a government agent."

I don't know that it's absolutely necessary, but I thought it would make more sense.

THE COURT: Yes. I have no problem with that. I will

add that.

Turning to instruction number 14, anything from the government?

MR. JACOBS: Yes. In the third paragraph beginning "second," the predicate offenses for this charge are those in Counts One, Two, and Five. The charges in Count Three and Four are not predicates for aggravated identity theft.

THE COURT: Is that right? I didn't go back to look at the indictment.

How can the conspiracy not be a predicate?

MR. JACOBS: The conspiracy to commit mail fraud is a predicate, but the conspiracy to commit witness tampering under 1512(k), I don't think that statute is listed.

THE COURT: I see. We have to do that change, too. Second, if the defendant you are considering used the information to help commit the offenses -- which one are you talking about now?

MR. JACOBS: Counts One and Two.

THE COURT: Mail fraud, conspiracy to commit mail fraud. The reason I don't like it in this form is I don't like referring back to counts. So mail fraud, conspiracy to commit mail fraud.

MR. JACOBS: And false statements.

THE COURT: One or more of the mail fraud, substantive mail fraud, conspiracy, or false statement offenses discussed

above.

So, it would now read "Second, if the defendant that you are considering used the information to help commit one or more of the substantive mail fraud, mail fraud conspiracy, or false statement offenses discussed above." Then we need to change in the last full paragraph on that same page, "As to the second element, it's not necessary that you find the means of identification was used to transfer or possess in furtherance of all of the crimes of substantive mail fraud, mail fraud conspiracy, or false statements discussed above is sufficient," etc.

Anything on 14 from defense counsel?

MR. DONALDSON: No, your Honor.

MR. BURKE: No, your Honor.

THE COURT: And finally, the concluding instructions, anything from the government on 15 and 16?

MR. JACOBS: No, your Honor.

THE COURT: Defense counsel.

MR. DONALDSON: No, your Honor.

MR. BURKE: Could I just have one moment?

THE COURT: Yes.

MR. BURKE: I'm jumping back to something we have already done regarding witness credibility. We were wondering if you can give a specific charge on inconsistent statements.

THE COURT: What charge do you have in mind?

MR. BURKE: During the trial, some of the witnesses testified differently than they did on other occasions. You may take any inconsistency in their statements into account.

THE COURT: That's already in there. If you look at the credibility charge, I ask them to consider inconsistency. Let's look at that. Hang on a minute.

MR. BURKE: I think perhaps you're referring to the second paragraph which has the phrase "was the witness consistent or contradictory."

THE COURT: Yes.

MR. BURKE: I guess I'm just asking for a more extensive charge on that point.

THE COURT: In the previous sentence, "How did the way the witness testified on direct examination compare with how that witness testified in cross examination or in prior testimony?"

Do you want me to add that?

MR. DONALDSON: Yes.

MR. BURKE: Sure.

THE COURT: Then that's immediately followed by "Was the witness consistent or contradictory?"

It picks up the point that you just referred to.

Is there anything else?

MR. JACOBS: Just a small point.

THE COURT: No.

From defense counsel.

MR. DONALDSON: No, I was standing with Mr. Burke.

THE COURT: Go ahead.

MR. JACOBS: Given Mr. Burke's request for the dates we had requested a charge in our request on variance of dates and how the law requires only a substantial similarity between the dates and months alleged in the indictment.

THE COURT: Are you alleging any dates that are outside those elements because I already say at any time within those limits.

MR. JACOBS: Correct. I think as to the witness tampering, there's witness tampering that occurs, the evidence shows, between those dates alleged, but there's also efforts to hide and instruct to lie that perhaps defense could argue occurred in November rather than December or October rather than December.

To the extent they seek to make that argument, we think an instruction that the precise month is not something we need to prove. It could be useful.

I don't know whether they intend to make that argument.

THE COURT: If this comes up during summation, I will consider it. At this point, I think it would be surplusage. We do say "at or about" or "in or around" or other variations of that.

Anything else whatsoever on the charge?

MR. BURKE: Not from Mr. Naranjo.

MR. DONALDSON: No, your Honor, no.

THE COURT: Nothing.

MR. JACOBS: No.

THE COURT: Any problems with the verdict?

MR. DONALDSON: Your Honor, throughout all of my trials, I've made this one request. It's only been granted once I think in state court, and I keep asking. Hopefully, it will be granted again today.

I normally request that the verdict sheet read not guilty first and then guilty. It's my belief that because we are in an innocent-until-proven-guilty society, that not guilty should be first and guilty should be second. It hasn't happened yet, but I'm trying.

THE COURT: Aside from the fact that this is, again, an order hallowed by history, but more relevantly, it really corresponds to the way the jury has to assess this.

Not guilty comes because you have made a determination that the government has not established guilt, so you first consider the government's evidence. And if you find it has established guilt beyond a reasonable doubt, you check guilty. Otherwise, you check not guilty because of the presumption of innocence.

In addition to being the familiar way of doing it, I

think it really corresponds to the way that the jury is asked to view and deliberate about each and every charge, so I will leave it as is.

Anything else?

MR. DONALDSON: No.

MR. BURKE: No.

MR. JACOBS: No. Thank you.

THE COURT: Very good. So thank you all. We will make those changes.

I will have my law clerk email you the final version, if you want to give him your emails right after I leave in a minute. I have no problem with counsel referring to my instructions during summation. Just be sure you quote them right.

To remind everyone, the government and defense counsel each have one hour on their opening summation and the government has 20 minutes on rebuttal. Very good.

See you tomorrow.

(Adjourned to November 21, 2013 at 9:00 a.m.)

* * *

INDEX OF EXAMINATION

Examination of: Page

MICHELLE LETTIRE

Cross By Mr. Donaldson . . . . . . . . . . . . . 382

Cross By Mr. Burke . . . . . . . . . . . . . . . 411

Redirect By Mr. Jacobs . . . . . . . . . . . . . 416

JUAN CARLOS RODRIGUEZ

Direct By Mr. Jacobs . . . . . . . . . . . . . . 420

Cross By Mr. Burke . . . . . . . . . . . . . . . 427

Cross By Mr. Donaldson . . . . . . . . . . . . . 447

DAVID ROSENTHAL

Direct By Mr. Wible . . . . . . . . . . . . . . 450

Cross By Mr. Donaldson . . . . . . . . . . . . . 468

GOVERNMENT EXHIBITS

Exhibit No. Received

801-853, 901-903, 1001 . . . . . . . . . . . . 419

401-436 . . . . . . . . . . . . . . . . . . . . 427

1003 . . . . . . . . . . . . . . . . . . . . . 482