Dblgnar1

1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
    UNITED STATES OF AMERICA
3
            v.               13 CR 351 (JSR)
4
    JOVER NARANJO and
5  LUPERIO NARANJO, SR.,

6            Defendants.
    ------------------------------x
7
                           New York, N.Y.
8                          November 21, 2013
                          10:10 a.m.
9  Before:

10                HON. JED S. RAKOFF,

11                            District Judge

12                 APPEARANCES

13  PREET BHARARA
        United States Attorney for the
14        Southern District of New York
    BRIAN JACOBS
15  BRENT WIBLE
        Assistant United States Attorney
16
    DONALDSON CHILLIEST & McDANIEL
17        Attorney for Defendant Jover Naranjo
    XAVIER DONALDSON
18

19  LAW OFFICE OF JOHN BURKE
        Attorney for Defendant Luperio Naranjo, Sr.
20
    ALSO PRESENT:  TIINA SISAS, U.S. Department of Labor
21                MARIA ALVARADO, Spanish Interpreter
                DAVID MINTZ, Spanish Interpreter
22                LUKE PHILLIPS, Paralegal Specialist, AUSA

23

24

25

Dblgnar1

1          (In open court; jury present)

2          THE COURT:  Please be seated.

3          Good morning, ladies and gentlemen as always you were

4   very prompt.  I had an emergency matter that I did not expect

5   to arise.  There was nothing I could do about it, but I still

6   apologize for keeping you waiting, but we are now ready to

7   proceed.

8          Before we hear closing arguments, let me remind you

9   that nothing that counsel says is evidence.  The evidence which

10  is now fully before you consists of the testimony of the

11  witnesses, and the exhibits and there were also a few

12  stipulations.  Those are the only sources of evidence.

13         But before you begin your deliberations, it may be

14  useful for you to hear what counsel believes you should draw

15  from the evidence or from the lack of evidence, as the case may

16  be.

17         This is their opportunity to, in effect, suggest

18  arguments to you that you may find helpful or not, as the case

19  may be.

20         I remind you as I have so often that the government

21  bears the burden of proof; therefore, the government will go

22  first, then we'll hear from both defense counsel and then the

23  government will have a brief rebuttal.  So we'll begin with the

24  government.

25         MR. WIBLE:  Thank you, your Honor.  Good morning.

1          Over the past two weeks, you have heard overwhelming

2     evidence that Jover and Luperio Naranjo stole hundreds of

3     thousands of dollars by underpaying their workers.

4          The Naranjos paid their workers only a fraction of

5     what the law required and they kept the rest for themselves to

6     conceal their crime the defendants create ad web of deceit.

7     They submitted certified payroll documents that were loaded

8     with lies, they doctored checks and forged signatures on time

9     sheets to support the lies in the payrolls.  They gave workers

10    IDs with other peoples names on them and they directed workers

11    to hide from investigators and to lie to them.

12         Over the course of this trial, the government has

13    proven beyond a reasonable doubt that these defendants plotted

14    together to pay their workers far less than the prevailing wage

15    and to keep investigators from learning the truth.  You heard

16    and saw overwhelming evidence of the defendants' crimes.  You

17    heard testimony about it, you saw documents that prove it.  And

18    all that evidence has shown that Jover and Luperio Naranjo are

19    guilty as charged.

20         Now, this morning I want to do basically three things:

21    First, I want to go over what the evidence has shown.  Second,

22    I want to discuss each defendant individually.  Third, I'll

23    spend a few minutes talks about some specific elements of the

24    charges in the case.

25         Let's start by reviewing the proof.

1          Because the Ciena Project on 100th Street was funded

2     in part with federal stimulus money, the defendant's company,

3     Enviro & Demo Masters, was required to pay the workers the

4     prevailing wage.  The company's contract with the general

5     contract, Lettire Construction, made clear this was a

6     prevailing wage project, this contract that Jover Naranjo

7     signed.  You also heard Jover Naranjo's prior testimony that he

8     knew this was a prevailing wage job.  He admitted he got the

9     prevailing wage schedule at the start of the project within a

10     week of entering into the contract.

11          Jover Naranjo also signed this document which federal

12     investigators found in Enviro & Demo's offices confirming he

13     understood exactly the wages he was required to pay, including

14     both compensation and benefits, demolition workers were

15     supposed to get a total of about $49 an hour and workers who

16     carted debris out to the street were supposed to get a total of

17     about $33 an hour and they were supposed to get overtime, time

18     and-a-half if they worked more than 40 hours a week.

19          Now, Luperio Naranjo was also fully aware this was a

20     prevailing wage job.  He told Joaquin Pablo, one of the workers

21     to lie to investigators and say he was getting paid $34 an

22     hour.  Where did that number come from?  It's the prevailing

23     wage for a Tier B worker.

24          But Enviro & Demo didn't pay the prevailing wage.

25     They paid most of their workers $13 an hour.  One worker got

1  $15 an hour.  And even though the defendants' employees worked

2  a lot more than 40 hours a week, none of them got overtime.

3          Now, because this was a prevailing wage demolition

4  project, the defendants were required to complete certified

5  payrolls showing that they had paid the prevailing wage.

6          They gave those payrolls to Lettire and Lettire Fed

7  Ex'd them to the New York City agency that was overseeing the

8  project, the New York City Department of Housing Preservation

9  and Development, or HPD, as well as to the United States

10 Department of Labor.  And these certified payrolls were teeming

11 with lies.

12         First, the defendants listed lots of people on the

13 payrolls who didn't do any work on the project at all.  Second,

14 they left off the payrolls most of the people who actually did

15 do the work.  And third, they lied about the wages they paid

16 and the hours their employees worked.

17         These certified payroll documents weren't the only

18 false documents that the defendants created.  They also forged

19 signatures on time sheets and doctored canceled checks.  Why

20 did they do that?  To make the lies in the certified payrolls

21 believable.  So, let's talk about those lies and the fraudulent

22 documents that the defendants created.

23         As I said, the defendants' first category of lies was

24 listing lots of people on the payrolls who didn't actually work

25 at the job site.  So who did the defendants list on these

1    payrolls?  They put their family members and their friends.

2         Why did they do that?  Because they didn't want the

3    city and the Department of Labor to know who the real workers

4    were, but they had to list somebody; otherwise, the city would

5    wonder how the work was getting done, so they put down people

6    they trusted.

7         Let's look at this certified payroll as an example.

8    Franklin Chiriboga didn't work at the job site.  Several of the

9    workers told you that.  Who was he?  The super at Jover

10   Naranjo's building and what did the defendants do to make it

11   seem like he was working at the job site?  Several months after

12   the project had begun, a security guard started working at the

13   site and workers had to use swipe cards to get inside.

14        The defendants had one of their workers, Angel Lojano,

15   use an ID in Franklin Chiriboga's name.  Why did they do that?

16   So the swipe cards -- so the swipe card records would match up

17   with the certified payrolls, so it would look like Franklin

18   Chiriboga was working on the job site even though he really

19   wasn't.

20        The defendants also listed other people on the

21   payrolls who didn't do any work at the Ciena Project.  Gloria

22   Janet Feijo is listed as a Tier B laborer, someone who carted

23   debris out of the building into the street, but she didn't do

24   that work.  She was Jover Naranjo's wife.  Lots of workers told

25   you that.  Remember she worked in the office in Queens and gave

1    the workers their pay.  She wasn't doing labor on the job site

2    on 100th Street.

3            And Jover Naranjo, Luperio Naranjo Sr. and Luperio

4    Naranjo Jr. are all listed on certified payrolls as Tier A

5    workers, but that's not true.  The workers told you Jover

6    Naranjo only came to the site, at most, a few times.  He owned

7    Enviro & Demo.  He wasn't doing labor.

8            Let's talk about one of the days in particular that

9    Jover Naranjo is listed on the certified payroll as having done

10   labor.  This certified payroll that Jover Naranjo signed,

11   swearing it was accurate, shows he worked for seven hours on

12   Thursday, September 10.  But Jover Naranjo wasn't anywhere near

13   the job site that day.  Where was he?  At an equipment auction

14   in Mount Vernon, New York, an auction that began at 10 a.m. and

15   where he bought a $27,000 truck.  That's what he told Special

16   Agent Tara Donn who interviewed him at 3:45 that afternoon,

17   September 10, right outside of the auction house.

18           So when Jover Naranjo signed this certified payroll

19   swearing that he did seven hours of demolition work that day,

20   he lied.  He didn't do demolition work that day or any other

21   day.  And he told the very same lie on this sign-in sheet when

22   he said he worked seven hours on September 10.

23           So what about the Luperio Naranjo Sr. and Luperio

24   Naranjo Jr.?  They weren't doing demolition work on the Ciena

25   Project either.  Luperio Sr. was at that site but he over saw

1    the workers.  He wasn't actually doing the labor himself.

2    Remember Luis Bermudez from the Department of Labor told you he

3    went to the job site on September 1.  And the certified payroll

4    for that week shows that Luperio Naranjo Sr. did seven hours of

5    demolition work as a Tier A laborer, but what did Luis Bermudez

6    tell you?  Luperio Naranjo Sr. wasn't doing labor, he was

7    outside in his van, supervising the workers and Luperio Naranjo

8    Jr. didn't do any work on the job site at all.  Every single

9    worker who testified at this trial told you that.

10         So, who else is listed on the certified payrolls who

11   didn't actually work at the Ciena Project job site?  Marcia

12   Gonzalez, that's Luperio Naranjo's daughter and Jover Naranjo's

13   sister and Maria Paula Feijo, Jover Naranjo's sister-in-law.

14         The defendants listed these women on the certified

15   payrolls because there were several women who actually worked

16   at the job site, and the defendants knew if they didn't put

17   some women on the certified payrolls, investigators would catch

18   them in their lies.

19         Now, at the same time the defendants lied about who

20   was working at the job site, they left off the certified

21   payrolls most of the people who actually worked there and

22   that's their second category of lies.

23         Who did work at the job site?  You heard from six of

24   them and they told you about others, including the three women

25   workers and Pedro Pablo, Joaquin Pablo's brother.  You know

1    these people worked at the job site, not only because they told

2    you that but because Juan Carlos Rodriguez, the man from the

3    union, video recorded them at the job site.  And you saw some

4    still images from those videos, so let's look at a few of those

5    photographs.

6           Here is Antonio Torres working at the job site on

7    August 13.  He's the guy on the left in the white helmet.

8    Joaquin Pablo is shown in the middle here, also photographed at

9    the job site on August 13, but neither one of them is on the

10   certified payroll for them.  Here is the first page and here is

11   the second page.  Their names are not there.

12          On August 18, Angel Lojano, Rolando Criollo, and

13   Clever Pauta were all photographed at the job site.  The next

14   day, August 19, Richard Campoverde was photographed there.

15   None of them are on the certified payroll for that week.  You

16   can look for yourselves.  It's Government Exhibit 203.

17          And here, Ines Orbe with the black shirt and the white

18   mask and Blanca Lopez, two of the women who worked at the site,

19   neither one of them ever appeared on any certified payrolls for

20   the Ciena Project.

21          There's no legitimate question that the defendants

22   left a whole lot of their workers off the certified payrolls.

23   There were a few times when the defendants put some of the real

24   works on the payrolls.  When did they do that?  They did it

25   when government investigators had already interviewed those

1    workers at the job site and the investigators knew those

2    workers were working there.  The defendants put some their real

3    employees on the certified payrolls when they knew they didn't

4    have any other choice.

5         Now, David Rosenthal told you, the man from HPD, told

6    you he went to the job site in late August of 2009, along with

7    another compliance officer and he told you they interviewed

8    several workers that day.

9         What did the defendants do?  They listed the workers

10   that the defendants had interviewed on the certified payroll

11   for the last week of August:  Joaquin Pablo, Manuel Pereda,

12   Milton Barahona, Pedro Pablo, and Pedro Orellana.  These

13   workers were on certified payrolls for the first three weeks of

14   August and most of them never show up on a certified payroll

15   again.  But the defendants put the workers on this payroll and

16   they did it for a simple reason:  Because HPD had interviewed

17   these workers at the job site and knew they were working there.

18        You heard from one of these workers, Joaquin Pablo.

19   And he told you he worked at the job site from early August

20   through sometime in October of 2009, but this is the only

21   certified payroll his name appears on out of the roughly 33 of

22   them that are in evidence.

23        Did this certified payroll accurately reflect the

24   hours he worked that week?  Not a chance.  It shows that he

25   worked Monday through Thursday, seven hours a day, for a total

1   of 28 hours.  But Pablo actually worked Monday through Saturday

2   58 hours in total like he told you, very different from what's

3   on the certified payroll.

4           What does Enviro & Demo sign-in log show that week the

5   one Jover Naranjo delivered to Lettire along with the certified

6   payroll?  They showed Pablo worked four days that week seven

7   hours a day.  But Pablo told you that none of the signatures on

8   those sign-in sheets were his.  His signature was forged as

9   part of the fraudulent scheme.

10          Now, David Rosenthal wasn't the only government

11  investigator who went to the job site to interview the

12  defendants' employees.  Luis Bermudez from the Department of

13  Labor went there on September 1, 2009, along with other

14  investigators.  And one of the investigators interviewed

15  Richard Campoverde that day.

16          Now Campoverde hadn't appeared on any of the payrolls

17  for the Ciena Project up through August the 30, even though he

18  had been photographed there on several days.  But because the

19  Department of Labor interviewed him on September 1, 2009, the

20  defendants put him on the certified payroll for that week.

21          Why did they do that?  Because if they didn't, the

22  Department of Labor would know they had been given false

23  information but even though the defendants listed Campoverde on

24  the certified payroll, the information they put down for him

25  was false, just like for Joaquin Pablo they lied about his

1    lawyers and they forged his signature on the time sheets.

2          So even when the defendants listed their actual

3    workers on the certified payrolls, they still lied, they lied

4    about the hours they worked, they forged the employees'

5    signatures and of course, they lied about their employees'

6    wages and that brings us to the third category of lies on the

7    certified payrolls.

8          And this is really the most important category, that

9    the defendants paid their workers the prevailing wage.  Again,

10   about $49 an hour for workers who did demolition and about $33

11   an hour for the workers who carted debris out to the street.

12   Remember the defendants were supposed to pay those full amounts

13   in lieu of providing benefits, but the defendants didn't pay

14   their workers those wages.  How do you know that Enviro &

15   Demo's workers weren't paying the prevailing wage both you

16   heard from some of those workers each of whom told you how much

17   they got paid.

18          Now, it's true that each of them came in here and

19   admitted to having committed crimes, but were they reliable?

20   Were they straightforward when they answered questions.  You

21   saw their demeanors on the witness stand.  What's most

22   important here is that their testimony was consistent with each

23   other and with all the other evidence in the case.

24          Now, most of the workers told you they got $13 an

25   hour, one of them told you he got $15 an hour.  None of them

 1    told you they got the prevailing wage.  Some of the workers got

 2    paid in cash, but some got checks.  And the checks you've seen

 3    in this case that were given to the workers show you that they

 4    weren't getting the prevailing wage.  These checks are from the

 5    defendant's own bank records.

 6         For example, here's a photograph of Angel Lojano at

 7    the job site on August 18, 2009.  And just below that is the

 8    paycheck he got for the last two weeks of August.  It's

 9    obviously, not for the prevailing wage.  If you do the math,

10    you'll see $1,807.50 is a check for a little over 60 hours a

11    week at $15an hour.  What's in the memo line?  An address

12    somewhere in Brooklyn where Angel Lojano told you he wasn't

13    working.  It's another lie to cover up the fraud.

14         Let's take a look at another example.  Again this is

15    Antonio Torres in the white helmet just behind Luperio Naranjo.

16    And below that is the paycheck he got from Enviro & Demo for

17    the first two weeks of August, yet again, it's not for the

18    prevailing wage.  It's a check for just under 50 hours a week

19    at $13 an hour.  And like on the other check we just looked at,

20    the memo line lists an address where Torres wasn't working at

21    the time.

22         These checks from the defendants own bank records show

23    you that the workers got the amount they told you, 13 or $15 an

24    hour for the number of hours they told you they worked, roughly

25    50 to 60 hours a week.  But these aren't the only checks in the

1    case.

2            In addition to these checks, the defendants gave

3    altered checks to Lettire and on those falsified checks, the

4    defendants tried to make it look like their workers got the

5    prevailing wage.  For example, we discussed how Labor

6    Department investigators interviewed Richard Campoverde at the

7    job site on September 1.  And the certified payroll for that

8    week shows that he was paid $794 and 96 cents.  The defendants

9    submitted this check to Lettire, along with a certified

10   payroll.  The problem is, this isn't the real check they gave

11   Campoverde for that week because they didn't pay him the

12   prevailing wage.  This check was doctored.  It was falsified.

13           How do you know that?  This control number, this

14   number that appears on the back of the check is called a

15   control number.  And you heard a stipulation between the

16   parties that a control number is a unique number the bank

17   assigns to a single check when it's processed.  And the unique

18   control number that appears on the back of this check really

19   belongs to a different check.  It belongs to this check,

20   Government Exhibit 501, which the defendants stipulated is an

21   actual check, an actual canceled check on file with banco

22   popular.

23           You can see for yourselves, there's a redaction on the

24   back of one of these checks but the backs are identical.  This

25   check, Government Exhibit 501, is the check Campoverde actually

1    got for his work from August 31 to September 6 as the memo line

2    shows you.  How much was this check for?  $520, 40 hours of

3    work at $13 an hour.

4          So what happened here?  The defendants gave Campoverde

5    this check for $520 and when they realized he had been

6    interviewed by Labor Department investigators on September 1,

7    they decided to give a fake check to Lettire to make it look

8    like they paid him the prevailing wage.

9          So what did they do?  They took the back of the

10   processed check they had actually given him, the one for $520,

11   cut it out and paste it beneath the face of the other check

12   that matched the certified payroll, and they gave that

13   falsified check to Lettire.

14         Now, the defendants did something very similar to make

15   it seem like they had paid Joaquin Pablo the prevailing wage.

16   Pablo told you he usually got paid in cash, but he got one

17   check, this check.  It's dated September 1, 2009 and the memo

18   line says it's for the period from August 24 to August 30.

19   Remember, that's right after HPD interviewed him at the job

20   site.

21         Now, Pablo told you he got this check in December for

22   work he had done and if you look at the back of the check you

23   can see a stamp right there in the middle that shows he cashed

24   the check on December 20th, 2009.  He cashed the check in

25   December because that's when Jover Naranjo gave it to him.

1          Pablo spoke to Jover Naranjo about why he got this one

2    check when he usually got paid in cash.  And what did Jover

3    Naranjo say?  He said Enviro & Demo needed paperwork to prove

4    Pablo was working at the site the last week of August.

5          But the defendants didn't want to give Lettire a copy

6    of this check.  They knew it looked suspicious if they gave

7    Lettire a check dated September 1 that was cashed several

8    months later in December, so what did they do?  They gave this

9    check to Lettire, Government Exhibit 204, the front of the

10   check matches the check they gave Pablo.  It's the same check

11   number, the same date, the same amount, and it says the same

12   thing in the memo line, but the back you'll see is different.

13   The back of the check they gave to Lettire shows that the check

14   was processed on October 13, over two months before they gave

15   Pablo the check.

16         How did the defendants make it look like Pablo cashed

17   the check in October when they didn't even give it to him until

18   a couple of months later in December?  It was another cut and

19   paste job.  How do you know that?  Because the unique control

20   number that appears on the back of the check they gave to

21   Lettire, Government Exhibit 204, wasn't assigned to the check

22   they gave Joaquin Pablo.  It was assigned to this check,

23   Government Exhibit 514, which, again, the defendants stipulated

24   is an actual copy of a canceled check on file with Banco

25   Popular.

1    The typed information on the back of the two checks is

2  exactly the same.  The defendants took the back of this check

3  that had been issued to this other worker, Darwin Celi, exhibit

4  514, pasted it under the front of the check they issued to

5  Pablo, and pasted Pablo's signature over Celi's and then they

6  submitted that doctored check to Lettire, along with a

7  certified payroll for the last week of August.  They went to

8  all that trouble to make it look like they had paid Pablo the

9  prevailing wage when in reality they hadn't.

10    Now, these two checks to Richard Campoverde and

11  Joaquin Pablo weren't the only ones the defendants falsified.

12  You can compare for yourselves the altered checks the

13  defendants submitted to Lettire with the real checks from the

14  defendants bank records.  For example, you can compare

15  Government Exhibit 204 at page 28 which is a doctored check

16  with exhibit 514 at page four.  And you can compare Government

17  Exhibit 205 at page 14, another falsified check, with exhibit

18  514 at page five.

19    The defendants went to such great lengths to make

20  their lies seem true because they knew that the lies on the

21  certified payrolls mattered.

22    Luis Bermudez and David Rosenthal from the Labor

23  Department and DOL told you that when they find a false

24  certified payroll, they try to figure out how much a given

25  worker should have been paid and then they bill the company for

Dblgnar1                    Summation - Mr. Wible

1    the difference.  That's why the defendant's lies matter.  So

2    how much money did the defendants steal?

3          Let's take one worker as an example to give you an

4    idea of the approximate amount.  Angel Lojano told you he

5    typically worked 60 hours a week and that he got paid $15 an

6    hour.  That's about $900 a week.  So how much should he have

7    been paid for his demolition work in a typical week?  For 40

8    hours at $49 an hour and 20 hours of overtime at about $73 an

9    hour, for a total of approximately $3,400.

10         Now, Angel Lojano worked at the job site for about six

11   months or 26 weeks.  His hours may have varied a little bit

12   from one week to the next but a good estimate is that over that

13   six-month period, the defendants underpaid him by about

14   $65,000.

15         Now, Angel Lojano was just one of over 20 people who

16   worked at the job site for Enviro & Demo, at least ten of whom

17   aren't listed on any of the certified payrolls.  But what does

18   this show?  That the defendants kept hundreds of thousands of

19   dollars for themselves that they were required to pay their

20   workers.

21         Now, we have talked about the bogus documents that the

22   defendants created to make it seem like they were paying their

23   workers the prevailing wage, but that's not all the defendants

24   needed to conceal that they were paying workers far less than

25   they were required to pay.

1          You heard from multiple workers that Luperio Naranjo

2     told them to hide if government investigators showed up at the

3     site and Joaquin Pablo also told you that Luperio Naranjo

4     instructed him to lie if he got interviewed about the hours he

5     worked, about his wages, he even told Pablo to give a fake

6     name.

7          And what happened when Luperio Naranjo saw that Angel

8     Lojano spoke to a Labor Department investigator as Lojano was

9     leaving the job site one day around January 2010?  Luperio

10    Naranjo fired him for talking.  Lojano's brother, Rolando

11    Criollo, he got fired, too.  And when Angel Lojano went to

12    Enviro & Demo's office to get his final paycheck, Jover Naranjo

13    told him he should speak to the investigator again and lie.  He

14    told Lojano to change what he had told investigators and say he

15    had worked at the job site only one day cleaning out snow.

16         Luperio Rolando told Rolando Criollo that he should

17    leave New York state entirely because his brother had spoken to

18    the Labor Department.

19         What did Jover Naranjo do when he gave Joaquin Pablo

20    that back-dated check made up to look like it was for the week

21    Pablo had been interviewed at the job site?  Jover Naranjo told

22    Pablo that he was given the check to make it look -- so that he

23    would have paperwork to make it look like everything was on the

24    up-and-up.

25         The defendants wanted their workers to lie to

1    investigators, but the defendants didn't stop there, they kept

2    it up, even after the Labor Department had figured out what was

3    going on and had brought a case against the defendants.

4         They had one of the secretaries give Clever Pauta this

5    false certification to sign.  Pauta told you he got paid $13 an

6    hour and that he had spoken to Labor Department investigators,

7    but the defendants didn't want him to testify in the DOL's

8    case.  So they prepared this certification for him to sign

9    falsely asserting that he had not been underpaid.  And when he

10   refused to sign it, they fired him.

11        The defendants also wanted to hide their workers from

12   investigators so the workers would never make any statements to

13   investigators or testify in court at all.  Luis Bermudez, the

14   DOL investigator, asked Jover Naranjo for a complete list of

15   all the workers who had done work at the job site on 100th

16   Street, and this is the list Jover Naranjo gave him in early

17   December 2009.  This list contains some of the very same types

18   of lies as the certified payrolls.  Some of these people didn't

19   do any work on the job site and many of the people who actually

20   did the work don't appear on this list.

21        A few of the people on this list did work, and why are

22   those names on there?  Because these are the same people who

23   had gotten interviewed on the job site.  Jover Naranjo knew

24   government investigators already knew these workers were doing

25   work there.

1          Why did the defendants want their workers to lie?  Why

2     did the defendants want their workers to hide?  Why did they

3     want to hide their workers from investigators?  Because if the

4     workers spoke to investigators and told the truth, the

5     defendants would have to pay lots of money, money they wanted

6     to keep for themselves.

7          Now, another way that the defendants perpetrated their

8     scheme was by using other people's identities.  As we discussed

9     the defendants didn't want to put their real workers' names and

10    identification information on the certified payrolls, so what

11    did they do instead?  They listed their family members and

12    friends.  Whose names did they list?  Franklin Chiriboga,

13    Gloria Feijo, Luperio Naranjo Jr., Marcia Gonzalez, and Maria

14    Paola Feijo.  These were all real people and the defendants

15    knew it.  But the defendants didn't just put these peoples'

16    names and other information on the payrolls.

17         The defendants also had some workers use these names

18    at the job site.  They told Angel Lojano to use Franklin

19    Chiriboga's name and they gave him his ID card.  They gave

20    Clever Pauta an ID card in Luperio Naranjo Jr.'s name and they

21    told Antonio Torres to sign in at the job site using Luperio

22    Naranjo Jr.'s name.

23         So how do you know that both Jover Naranjo and Luperio

24    Naranjo were in on these crimes?  They played different but

25    complementary roles, so let's start with the fraud and false

1   statement charges.

2        How do you know that Jover Naranjo committed those

3   crimes?  Because he admitted it to Elizabeth Gingrich, the

4   forensic accountant who testified.  He told her that he left

5   about 35 percent of his workers off the certified payrolls.  He

6   told her he paid some of his workers in cash, and he admitted

7   he paid wages of 13, 15 and $22 an hour, a lot less than the

8   prevailing wage; in other words, he admitted to her exactly

9   what he had done.

10        How else do you know Jover Naranjo was responsible for

11   the fraud and the false statements on the certified payrolls?

12   Because Enviro & Demo was his company.  You heard his prior

13   testimony that he did the payroll for the company, that he was

14   the only person authorized to sign checks on the company's bank

15   account.  He knew who he was paying, he knew how much he was

16   paying them, and he knew exactly what work he was paying them

17   for.

18        Now, Jover Naranjo was also responsible for preparing

19   the certified payrolls.  He signed them as he admitted in sworn

20   testimony he gave in a prior proceeding.  He delivered those

21   certified payrolls to Lettire so they could be passed on to HPD

22   and the DOL.  And when he signed those certified payrolls, he

23   knew he hadn't done any demolition work, he knew his father

24   hadn't done any demolition work, he knew his brother hadn't

25   done any demolition work, he knew his sister, his wife, and his

1    sister-in-law hadn't done any demolition work either.  And, as

2    we just discussed, he knew there were lots of workers at the

3    job site whose names didn't appear on the certified payrolls at

4    all.

5         So what about Luperio Naranjo?  How do you know he was

6    in on the fraud?  Because what he did at the job site showed it

7    was very important to him to keep secret that Enviro & Demo

8    wasn't paying its workers the prevailing wage.  You heard from

9    multiple workers that Luperio Naranjo made them hide and told

10   them to lie.  Why did he do those things?  Because he knew

11   Enviro & Demo wasn't paying the prevailing wage and he wanted

12   to keep government investigators from finding out.

13        Luperio Naranjo directed Joaquin Pablo to tell lies

14   that demonstrated his involvement in the fraud.  He instructed

15   Pablo to lie and say he was getting $34 an hour.  Where did

16   that number come from?  Did it come out of thin air?  Of

17   course, not.

18        It's the prevailing wage for a Tier B laborer which is

19   exactly what Joaquin Pablo was.  Luperio Naranjo also had

20   workers use names he knew appeared on the certified payrolls.

21   He told Angel Lojano to use the name Franklin Chiriboga he told

22   Rolando Criollo to use the name Fabian Avila and he directed

23   both Antonio Torres and Clever Pauta to use the name Luperio

24   Naranjo Jr.  All of those names appear on the certified

25   payrolls.  Luperio Naranjo wanted the workers to tell the very

1   same lies that the defendants put on the certified payrolls and

2   that shows you he was in on the fraud.

3        In addition, how did Jover Naranjo know which workers

4   to list on the certified payrolls for the weeks that the

5   investigators went to the job site and interviewed workers?

6   Jover Naranjo wasn't at the job site those days.  Luperio

7   Naranjo told them who had been interviewed.

8        What else shows you Luperio Naranjo was in on the

9   fraud?  Let's take another look at the ID card that Angel

10  Lojano had in Franklin Chiriboga's name.  After Luperio Naranjo

11  found out that Lojano had got an ID card in his own name,

12  Luperio Naranjo made sure that the certified payrolls had

13  Lojano's name on them.

14       As of the last few days of December 2009, Lojano's

15  name replaced Chiriboga's on the certified payrolls because

16  Luperio Naranjo knew exactly how important it was for all of

17  the records to match up so they would seem legitimate in order

18  to make the scheme succeed.

19       How else do you know that Luperio Naranjo was part of

20  the fraud?  He ordered his workers to throw down those fliers

21  from the union that show the prevailing wages and after Luis

22  Bermudez from the Department of Labor showed up at the job site

23  and interviewed workers in early September, Luperio Naranjo

24  knew exactly who he was hiding his workers from.

25       Now, let's talk for a moment about the witness

1    tampering charges.  When Luperio Naranjo instructed his workers

2    to hide and to lie about their wages and hours, he wasn't

3    acting on his own.  He was carrying out the defendants' common

4    plan to pay workers less than the prevailing wage and to keep

5    investigators from learning the truth.

6            Now, because Luperio Naranjo worked on the job site

7    every day, he had a lot more interactions with the workers than

8    Jover Naranjo did, but Jover Naranjo also told some of the

9    workers to lie.  Remember after Angel Lojano had spoken to the

10   Department of Labor investigator Earl around January 2010 and

11   was fired by Luperio Naranjo, Jover Naranjo told Lojano to

12   speak to the investigator again and to lie.

13           And when Jover Naranjo knew he was in trouble with the

14   Labor Department, he had this false declaration made up for

15   Clever Pauta to try to keep Pauta from being a witness against

16   him.  Jover Naranjo told Joaquin Pablo that that one paycheck

17   Pablo got was intended to make it seem like Enviro & Demo was

18   paying the prevailing wage when it wasn't, and Jover Naranjo

19   gave Luis Bermudez this incomplete list of employees so

20   Bermudez wouldn't be able to track down the real workers so you

21   know Jover Naranjo was involved in the witness tampering, not

22   only because that was an important part of the overall scheme,

23   but also because Jover Naranjo himself told his workers to lie

24   and tried to keep the DOL from tracking them down.

25           Now, let's turn to the identity theft.  How do you

529

1   know Jover Naranjo was involved in that?

2           Because he knew he was putting names of real people

3   down on the certified payrolls, real people who didn't do any

4   work at the job site, his brother, his sister, his wife, his

5   sister-in-law, and Chiriboga.

6           What about Luperio Naranjo?  Again, he had Angel

7   Lojano use this ID card in Franklin Chiriboga's name, he gave

8   Pauta the ID card in Luperio Jr.'s name and he had Antonio

9   Torres sign in at the job site using Luperio Jr.'s name because

10  he knew these workers' real names weren't on the certified

11  payroll, but that Chiriboga's and Luperio Jr.'s names were.  He

12  had workers use real peoples' names to cover up the fraud so

13  that it would succeed.

14          Now, after closing arguments, Judge Rakoff is going to

15  instruct you in detail on the elements of each of the charges

16  in this case and whatever he says controls.  But I want to

17  briefly mention a few things about the charges.

18          First, as to the fraud counts which are Counts One and

19  Two, I expect Judge Rakoff will tell you that in order for you

20  to find the defendants guilty of mail fraud and conspiracy to

21  commit mail fraud, the government has to prove that the

22  defendants took part in a fraudulent scheme.  I've already

23  talked about the proof of the fraud and I won't go back to it

24  now.

25          Additionally, I expect Judge Rakoff will instruct you

1    that the government has to prove it was foreseeable to the

2    defendants that a mailing would happen in the course of the

3    scheme.  You've heard about lots of mailings.  Most

4    significantly you heard that Lettire used Federal Express to

5    send all these certified payrolls from Lettire's office in

6    Manhattan to HPD's Office in Manhattan.  You heard that both

7    from Michelle Lettire and from -- who sent all the Fed Ex

8    packages and from David Rosenthal at HPD who received the Fed

9    Ex packages.

10         As to the witness tampering counts, Counts Three and

11   Four, I expect Judge Rakoff will instruct you that the

12   government needs to prove the defendants sought to prevent

13   their workers from giving testimony in connection with the

14   Department of Labor investigation or to influence their

15   worker's testimony.

16         Here, the defendants knew the Labor Department

17   investigators were interviewing their workers at the job site.

18   The defendants tried to prevent their workers from testifying

19   in connection with that investigation by hiding them and to

20   influence their testimony by telling them to lie.

21         What are two clever examples?  When they fired Lojano

22   and his brother Criollo around January 2010, they told Lojano

23   to lie and they told Criollo to leave the state.  In fact, the

24   defendants' efforts to influence their workers' testimony

25   continued even after the Labor Department had brought a case

1    against them with this false certification.

2         The defendants obviously knew about the Labor

3    Department case at this point because the false certification

4    even had the Labor Department's case number in it.

5         Now, I want to say a word about conspiracy because the

6    defendants are charged with conspiracy to commit mail fraud and

7    conspiracy to commit witness tampering.  As to each of these

8    charges, I expect Judge Rakoff will instruct you that you must

9    find that two or more people agreed to commit mail fraud or

10   witness tampering and that it's the agreement that's the crime.

11   Who are the coconspirators here?  Jover and Luperio Naranjo.

12        As for Count Five, the false statement charge against

13   Jover Naranjo, I expect Judge Rakoff will instruct you that the

14   government has to prove the defendant made false statements on

15   certified payrolls and that those false statements related to a

16   matter within the jurisdiction of the Department of Labor.

17        You know those payrolls included false information for

18   the all the reasons we have already discussed and they were

19   within the Department of Labor's jurisdiction because enforcing

20   the prevailing wage law's one of the Labor Department's

21   functions.

22        Now, the certified payrolls in this case were

23   submitted both to the Labor Department and to a city agency,

24   but I expect Judge Rakoff will instruct you that a false

25   statement doesn't even have to be made directly to a federal

1      agency.  It's enough that the statement was made to a city

2      agency and that it related to the Labor Department's functions

3      and jurisdiction.

4              As to Count Six, the aggravated identity theft charge,

5      I expect Judge Rakoff will instruct you that the government

6      needs to prove that the defendants used the names of real

7      people to help commit the scheme.  I expect Judge Rakoff will

8      also instruct you that the defendants had to know they were

9      using -- they had to know that the names belonged to real

10     people.

11             Here, it's obvious the defendants knew they were using

12     real peoples' names because they used their own family members

13     and friends' names.  There's no question that the defendants

14     use of these identities helped them commit their crimes.  By

15     listing the false names on the certified payrolls the

16     defendants could leave off the names of the real workers and by

17     having those workers -- having the workers use the names of

18     these other real people on the job site, the defendants tried

19     to ensure that their workers' real identities would remain

20     secret.

21             Now, I'm going to sit down in a moment, but before I

22     do, I want to say one last thing.  Make no mistake, this is not

23     a hard case.  It's not a close case.  It's a simple case and

24     the proof here is overwhelming.

25             When you examine that proof, your common sense will

1  tell you exactly what happened here.  Jover and Luperio Naranjo

2  saw an opportunity to make a lot of money by underpaying their

3  workers, workers they thought they could control and workers

4  they thought would never come to court and testify.  They went

5  to great lengths to steal hundreds of thousands of dollars that

6  was supposed to go to those workers.

7          When you evaluate all the evidence in this case, all

8  this proof against the defendants, you will return the only

9  fair and just verdict, the only verdict that's consistent with

10  the evidence that the defendants are guilty as charged.

11          Thank you.

12          THE COURT:  Thank you very much.

13          Now we'll hear from counsel for Mr. Jover.

14          MR. DONALDSON:  If I may have a quick bathroom break.

15          THE COURT:  Sure.

16          We'll give you ladies and gentlemen a five-minute

17  break.

18          (Continued on next page)

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Please be seated.  Now we will hear from

3     Mr. Donaldson.

4          MR. DONALDSON:  Good morning.  Good morning.  I want

5     to thank you all for your attention the last two weeks.  It was

6     clear that you all were very attentive, and we all appreciate

7     that.  As the Court has indicated, my name is Xavier Donaldson.

8     I represent Jover Naranjo in this case.

9          What I want to start with is what the prosecution

10    ended with on their summation; that is, they said this is a

11    simple case.  I believe they said something to the effect; that

12    it's straightforward.  They showed you what happened.  We are

13    of the opinion that this is a what-happened case.  Normally,

14    you have a who-did-it case versus a what-happened case.  This

15    is what we like to call a what-happened case.  It is our belief

16    that the prosecution has not shown what happened.  I want to

17    say a few things, and I want you to remember these things.

18         The fact that the prosecution has brought a charge in

19    the name of the United States of America entitles the

20    government to no greater consideration than that accorded any

21    other party.  The government must prove each essential element

22    of that charge beyond a reasonable doubt.  If it fails, your

23    verdict should be not guilty on that charge.  The burden never

24    shifts.

25         Now, what's this case about?  I said it in my opening,

1    and I'll say it again.  What is this case about?  It's really

2    about a very large local union who were very upset because

3    there were no workers on this multimillion dollar work site.

4    Make no mistake about it.  This was an $87 million or more work

5    site.  And according to the union, they were upset because

6    there were no workers, in our opinion, on that site.

7         What else is this case about?  This case is about

8    incredible testimony by laborers motivated by money and

9    freedom.  And the government pretty much crystallized that a

10   second ago when they put up Angel Lojano's potential estimated

11   -- what he claims estimated cash he would have gotten, this

12   $65,000 that Lojano conservatively would have gotten.  That's

13   what this case is about.  This case is about laborers who were

14   told that they could get more money, and the government

15   crystallized that for you.  The government, according to them,

16   said Lojano conservatively was owed $$65,000.

17        What else is this case about?  And this is the part

18   that is a little shocking.  There's a little coverup going on

19   here.  Something else is going on here.  There is something

20   else going on here.  There is something under the current going

21   on here that we're going to talk about.  I'm going to bring it

22   to your attention, but there is something going on that is a

23   little bit involved in money, but it's underneath the current.

24   It's kind of sleeping.  It's dormant.  But I want to wake it

25   up.  I want to bring it to your attention.

1           How do we know that the union was mad because there

2    were no union workers on the site?  Well, Mr. Rodriguez came in

3    and testified for you.  He's a representative of the union.  He

4    is the one that filed the complaint.  He's the one that called

5    and said, listen, something's going on.  Then he came in and

6    told you, well, you know, my real aim, one of my reasons for

7    doing this, it was a good reason, an admirable reason is what

8    he told you.  It's what he wanted you all to believe because

9    that would make him seem more believable, more credible.  I

10   wanted to help the workers.  I wanted to help the little guy.

11   That's what he told you all.  That was my main reason to aid

12   the workers.  To aim to help the workers, I believe is what he

13   said.

14          Not one of these workers, not one of these workers,

15   said did they join that union; not one.  In fact, one of them

16   told you that he wasn't going to join a union because what they

17   say sometimes is not true.  Not one of these workers said that

18   that union helped them take any steps to become a United States

19   citizen; not one of them.  But his goal was to help these

20   workers.  Not one of those workers said that that union

21   representative, whose aim was to help these workers, took any

22   steps to do anything legally for these workers.  Not one worker

23   said that about this union.  Mr. Rodriguez said I came to aid

24   the workers.  Not one worker said that.  But we did find out a

25   few things, and I was asking questions for a reason.  Sometimes

1    it gets lost in translation, but I was asking questions for a

2    simple reason because I knew I had to come and talk to you all

3    again.

4              I Kept asking about that little report from October 23

5    because it was important.  Then I asked Mr. Rodriguez, well,

6    you know, was there a meeting on October 23?

7              Yes.

8              Were you there?

9              Yes.

10             Did you help out fill out applications?

11             Yeah.

12             OK.  Put a thumb tack there.

13             Workers:  What were you doing October 23?

14             I don't remember now.

15             Did you fill out any applications?

16             I don't remember now.

17             Did you meet with somebody?

18             I don't remember now.

19             Well, it's time to start remembering now because we're

20    going to start getting to what this case is really

21    about -- cash.

22             If you can put up 3507-9, Mr. Phillips, please.  Could

23    you blow that up?  This is one of those documents that was

24    filled out by one of the workers on October 23, 2010.  This is

25    ironically the same day that the officer or Mr. Rodriguez said

1   he was talking to all these workers, October 23, 2010.  That's

2   why I kept asking that question of the workers, because I knew

3   it was coming.  This is one of the documents where they added

4   on to language in this document to get more money from the

5   Department of Labor; where they put in false information to get

6   more money from the Department of Labor.

7          Some of them started saying, well, I don't remember

8   signing this.  I don't remember this.

9          Then we got Rodriguez on the stand.  What does he tell

10  you?

11         Yes, I helped them fill out applications.

12         What day?

13         October 23.

14         What day is that?

15         October 23.

16         Not one of them, not one worker, not two workers or

17  three workers.  So, yes, his aim was to help the workers out.

18  His aim was to help the workers out.  This is one of the ways

19  he did help the workers out, by helping them fill out documents

20  containing false information to get more cash from New York

21  State Department of Labor.

22         Let me repeat that.  Rodriguez was helping them fill

23  out documents fraudulently to get more cash from the Department

24  of Labor, I guess in addition to the $65,000 that they wanted.

25         There is something going on here.  It's about

1    incredible witnesses.  It's about incredible witness testimony.

2    It's about what is the bottom line, what would you do to get

3    money.  Some people say money is the root of all evil, but for

4    some strange reason, people chase it.  We teach our kids to

5    make money.

6         We got folk here, and this is not about -- I don't

7    want this to be confused with some -- I guess, some negative

8    onslaught against immigrants.  It's not that.  But we're not

9    going to avoid the reality of what's going on right now, and

10   that is very clear.  These witnesses snuck into this country.

11   They came here illegally.  One of them said he went through a

12   few mountains, went through a few countries, snuck under some

13   borders, walked about 500 miles, I imagine, dropped his visa in

14   Mexico.  Fine.  They have been here for several years

15   illegally.  Fine.  They have secured fake identifications

16   illegally.  Not fine.  They secured jobs sometimes illegally.

17   Not fine.  They were on this case and told people about their

18   fake IDs, told the government about their fake green cards,

19   told people about their fake social security cards, and they're

20   still working illegally.

21        Some of them still have their fake social security

22   cards and their fake ID cards.  Some of them are still getting

23   paid cash on construction sites right now.  Some of them have

24   never paid taxes.  Some of them claim to be paying taxes

25   without a social security number or ID number.  I have no idea

1   how that's possible.  None of them have made even the slightest

2   attempt to become a United States citizen.  All of them have

3   lied to federal officers.

4        Now, I imagine that that is all OK.  We're just

5   supposed to forget all that and whatever they say we're

6   believing them because they're on the stand, they're testifying

7   and, the government gave them an agreement.  And if they lied,

8   then something's going to happen.  Well, they already lied.

9   You don't get excused now because the government gave you a

10  letter so you say, well, I'm not going to lie now.

11       Well, that's not the way it works.  They already lied.

12  We know they are capable of lying.  We know they are capable of

13  misstating the truth.  We know they are capable of bending the

14  truth.  So that's how you should listen to their testimony,

15  with the understanding that they are capable of lying.  They

16  are capable of lying to federal officers.  They are capable of

17  sneaking around undetected.  They are capable of going to

18  Queens and Roosevelt Boulevard, which is incredible how all

19  three of them happened to go to the same Roosevelt Boulevard

20  and get the same ID.  That's incredible.  At different years,

21  mind you.  That's the most amazing part.

22       One in 2004, Roosevelt Avenue in Queens, I just walk

23  down the street.  Hey, buddy, I need some fake ID, fake social

24  security card.  Got you.

25       Another one in 2006.  Roosevelt Boulevard.  Hey,

1    buddy, fake ID, fake social security card.  I got you.

2              I guess we're just supposed to believe that.  Forget

3    the common sense.  Forget that everybody in 2004, 2000, 2006, I

4    guess the same guy is sitting there for six years in a row with

5    a sign up saying "I have fake green cards and fake social

6    security cards.  Come on down.  We can go inside."  That's just

7    how it works, I imagine, or that's what we're supposed to

8    believe.  No.  So when you are listening to their testimony,

9    I'm suggesting you listen to it with that in mind.  They are

10   capable of lying.  They have lied.  I think it's crystal clear

11   on that stand that they have been a little less than truthful.

12             With that in mind, the government wants you to believe

13   that Jover Naranjo somehow participated in these people hiding.

14   I mean, these 15, 20 workers are on a site in daylight.  Every

15   time an agent came up or Department of Labor person came up,

16   who no one knew who he looked like, they started running and

17   hiding.  What is amazing to me -- and I could have missed

18   something, but this is amazing to me -- is how ironic it is

19   that they have all these pictures of all these workers, all

20   these pictures of different workers doing different things,

21   walking with hats on, people handing out things, but on all

22   those particular things when all the cameras are out nobody is

23   hiding.  It's just mazing how that just happens to be available

24   that day when the workers are out and walking around, they got

25   cameras out and pictures taken, nobody is hiding those days.

1    They're not in the building for seven hours a day.  I guess

2    that's how it works.

3         So, according to them, we have tier A workers who do

4    the demolition inside, and tier B workers who are outside.  I

5    guess, somehow the agents came along when the tier B workers

6    who were outside were all inside too, and that's how nobody saw

7    them because they were all hiding at the same time.  That's

8    amazing.

9         What's even more amazing was that the Department of

10   Labor investigator was there a few occasions, and he couldn't

11   tell you he saw anybody hiding.  He couldn't tell you about

12   anybody hiding.  The union rep was there 30, 40 times.  One

13   time or two times when the Department of Labor person was

14   there, no evidence anybody was hiding.  An HPD person came

15   there; no evidence of hiding.  He talked to somebody, according

16   to him.  No visible violation by the same agent.  He gets

17   there.  He says, I walked around to do a visual inspection.

18        What did you see?

19        I don't know.

20        Who did you see?

21        I don't know.

22        Did you see any workers?

23        I don't recall.

24        What were you there for?

25        To do a visual inspection.

1          Of what?

2          The site.

3                          Did you see any workers?

4          I don't remember that.

5          All of a sudden he got amnesia.  There is no credible

6    evidence of hiding.  The only person that's saying somebody was

7    hiding are the workers.  There's no credible evidence of

8    anybody hiding.  In fact, it just doesn't make any sense.  But

9    let's continue.

10          I mentioned that undercurrent.  The reason why I

11   mentioned that is because as much as they gave you, as much as

12   it looked like everything started adding up, the jigsaw puzzle

13   started coming together, it started looking really good on TV,

14   something underneath doesn't make sense, and that is this:  The

15   government put in evidence, I believe it's evidence 1204, it's

16   the TCAP agreement.  You can look at it if you want to.  It

17   says on the TCAP agreement -- this is between Hobbs Ciena and

18   HPD.  It talks about prevailing wage.  This is what the

19   government put in evidence.  This is one of the first things

20   they put in evidence.  It's a nice thick contract, and they

21   referred to it, it says paragraph 9(C), prevailing wage.

22          Listen to this.  Look at it if you like.  So when they

23   did that, I said to myself, well, that's interesting.  Because

24   I know what paragraph 9(C) in this contract says and I know

25   what it doesn't say.  So it says 9(C), look at it, it says

1    prevailing wage.  It talks about how -- we'll get to it.  It

2    talks about how:  Construction of the project shall be subject

3    to the requirements of the Davis Bacon Act, the contract work

4    hours and safety hours, which is CWHSSA and the regulations,"

5    etc.  Sounds good.  Bingo.  Right?  Well, I said, all right,

6    that was put in and it was dated, I believe, June 2009.  Sounds

7    right.  Right before my client began his contract August 2009.

8    Everything sounds good.  Prevailing wage.  Great.

9              Then we look at 1202, and we turn to the fourth page

10    of 1202.  We go down to the bottom where it says "whereas"

11    section nine of the TCAP written agreement sets forth certain

12    federal requirements.  Important word next "and, whereas, DACR

13    has requested that HPD has agreed to amend" -- amend, modify,

14    alter -- "amend the TCAP written agreement to modify section

15    9(C), the prevailing wage subsection and include the applicable

16    Davis Bacon" -- wait for it -- "the applicable Davis Bacon wage

17    schedule."  That was dated -- wait for it -- March 2010.

18              Well, now that's strange.  That's pretty strange.  And

19    you say to me, Mr. Donaldson, what's that mean?  So I said,

20    well, let's go to 9(C) of that amendment or modification.

21    9(C).  Prevailing wage.  Added to 9(C) is little word in the

22    next paragraph -- schedule one.

23              OK.  Let's look at schedule one.  You flip back to the

24    back where it says schedule, wage schedule.  Flip the page,

25    what do we have?  A wage schedule with wages on it.  Now, I

1   asked myself this question:  What does this look like to me?

2   This looks shockingly like, very similar to, what's in 101 on

3   page 42.  I said to myself ding, ding, ding, why is it that

4   this modification that happened in March 2010 that adds the

5   wage schedule to the contract looks shockingly like -- take out

6   shocking -- looks exactly like that document that's in 101?

7   It's a good question.  It's a good question.  Because I don't

8   know.  Somebody wants you to believe that that wage schedule in

9   101 was either in the contract in August 2009 or maybe a week

10  after August 2009.  I don't know.  But according to these two

11  contracts, that very similar-looking wage schedule appeared

12  March 2010.  Let's keep going because it just gets more

13  interesting.

14          On December 2009, Mr. Bermudez or deputy director

15  Bermudez said he interviewed my client.  OK.  He mentioned

16  this, well, we talked and we talked about all these things, and

17  he said how many workers he had.  He said what he paid them.

18  He said all this stuff, and he also mentioned to me about the

19  prevailing wage.  So I said, Agent Bermudez, that's important

20  to you correct?

21          Yes.

22          Because you went out there to talk to him about that,

23  right?

24          Yes.

25          And that's what you were talking about, prevailing

1    wage?

2            Yes.

3            And you write down your highlights, right?

4            Yes.

5            Here's your highlights.

6            I didn't put that down in my highlights.

7            OK, fine.  We'll skip that.  Then he told you he

8    talked to my client again in April 2010.  What did he talk

9    about?

10            He talked about this, and he talked about that, and he

11    talked about wage rates in April of 2010.

12            So then I asked him, I said, well, did he talk about

13    wage rates in December of 2009 with you?

14            No.

15            But he talked about wage rates with you in April of

16    2010?

17            Yes.

18            OK, let's go back to this again.  Now it's starting to

19    make sense to me.  So then the wage rates happened to appear in

20    this document in March 2010.  My client was interviewed by

21    Bermudez in April 2010, and according to Bermudez, he mentions

22    wage rates.  OK.  Well, he didn't mention it to you in 12/2009.

23    This contract was modified in March 2010.  You interviewed him

24    again in April 2010.  And what does he mention to you in

25    April 2010?  He doesn't talk to you about December 2009, wage

1    rates.  OK.  OK.  Now I think we're -- OK.  Seems to make a

2    little sense.

3         Then Ms. Lettire gets on the stand.  Did he talk to

4    Ms. Lettire?  What did he ask her?  About wage rates.  What did

5    she say?  In court she admitted and she said told you, I did

6    not review the contract.  I was not aware of his contract.  I

7    don't know what was in his August 2009 contract.

8         But, Ms. Lettire, in September of 2013, you met with

9    the U.S. Attorney's office, right?

10        Yes.

11        And in that meeting, you told the U.S. attorney what?

12        That the wage rates were attached to the contract.

13        So, Ms. Lettire, do you know that?

14        No, I don't.

15        Did you see them?

16        No, I didn't.  Why did you tell them that?

17        I don't know.

18        Let me get this right now.  So, now something's wrong

19   now.  There's something going on here.  Somebody or something

20   is going on involving these wage rates, the prevailing wage

21   rates.  Now I'm sure someone will get up after me and go it

22   doesn't make a difference.  It clearly does because they're

23   bringing it up a lot.  And it's not making any sense at all, at

24   all.  But why do you suppose she would make that up?  Why do

25   you suppose she would say to a federal prosecutor that I saw

1    the wage rates in that document.  They were attached to that

2    document, and then come in here and tell you all, no, that's

3    not, in fact, true.  I didn't see that.  I told them something

4    that probably wasn't exactly true.  I don't want to say I lied

5    because I don't want to use the L-word on the stand, but it

6    wasn't exactly true.  I won't call it a lie.  My four-year-old

7    calls that a fib.  It wasn't exactly true.  Well, let's move

8    on.

9            Ms. Gingrich testified, and she was a very nice lady.

10   She came up here and testified very nice and everyone was like,

11   woa, she's different from all the laborers.  And she just came

12   in and testified as to what happened.  It just sounded so

13   eloquent.  Something's wrong here.  The devil is in the

14   details.  Well, let's talk about it.  There's this lawyer named

15   Mr. Bahn.  Why is that important?  Well, who cares about

16   Mr. Bahn?  He's not a lawyer in this courtroom.  Well, he is

17   now.  There's a lawyer named Mr. Bahn.  OK, work with me.  Step

18   one, lawyer named Mr. Bahn.

19           Step two, Mr. Bahn represents Lettire Construction.

20   Step two.

21           Step three, Ms. Gingrich worked for Mr. Bahn before

22   she worked for the accounting firm.  Important.  Ms. Gingrich

23   worked for Mr. Bahn before she worked for the accounting firm.

24           Step four, Lettire was being investigated by the DOL,

25   Department of Labor, related to Davis Bacon Act, prevailing

1    wage and their subcontractors.

2           Step five, Gingrich now works for an accounting firm.

3           You with me?

4           Step six, Lettire, the big construction firm who's

5    being investigated hires Gingrich's law firm to do neutral

6    review of back wages related to Lettire.  So work with me here

7    again.  Mrs. Gingrich now who is paid by Lettire conducts a

8    meeting with her boss, with Bahn, her former boss, and Jover

9    Naranjo for the purpose of deciding Lettire's involvement in

10   this DOL investigation.  And in that meeting, Jover makes these

11   incriminating statements and a very nice exonerating statement

12   of Lettire.  That is shocking, isn't it?  I mean, that's just

13   shocking.  Ms. Gingrich, that's shocking.  Your former boss,

14   the attorney, you leave and go to a separate place.  Your

15   former boss, the attorney, his client now needs help.  So he

16   then recommends you, his former employee to, do this neutral

17   investigation of his firm and then during the meeting, the only

18   people that are present are Ms. Gingrich, the supposed neutral

19   person; her boss, Mr. Bahn; the attorney for Lettire and also

20   her former boss; and Jover.  And then out of that meeting comes

21   an incriminating statement for Jover and a statement that

22   exonerates Lettire.  That is just shocking.  Who could imagine

23   that would happen?  There's an undercurrent going on here.

24          The government wants you to believe that Mr. Jover

25   Naranjo somehow profited from this hundred thousand dollars

1    contract; that he lined his pockets, I believe they said, with

2    hundreds of thousands of dollars, believe is what they said.

3    This $785,000 contract somehow that he was paid 833, according

4    to the government, he lined his pockets and got rich off this.

5    I believe the government is forgetting about Government Exhibit

6    101 where it talks about what the money is for.  They have to

7    forget about that.  It talks about what the money is for labor,

8    equipment, approval fees, wage transportation.  We talked about

9    that.  That's all in the contract.  But what's also important

10   is -- if you could put up 103, please -- this is where it

11   gets -- you have to start like the government and show pieces

12   the together so it starts making information to you.

13            According to Ms. Gingrich, there was an investigation

14   of Lettire back in December of 2009.  She met with my client in

15   November of 2009 regarding the investigation and the

16   subcontractors.  According to this document here, there was

17   payment to Jover and Enviro after November and December 2009.

18   That's what this says.

19            So, the government would have you believe then that

20   they are improperly lining their pockets with the money that

21   was received here, 12/23/2009, February 13, 2010, March 4, 2010

22   and March 26, 2010 and again March 26, 2010 you would have to

23   believe that all of that money received is improperly received

24   money, but that would have to be counted weird because Lettire

25   now, according to the government, knows that they're under

1   investigation.  They know that DOL is investigating them for

2   supposedly prevailing wage issues and Davis Bacon issues with

3   their subs.

4          So, you would have to believe then that Lettire is

5   still paying all this money to Enviro knowing that they're

6   doing something wrong.  That's what you'd have to believe

7   because otherwise that would make no sense.  Why would Lettire

8   keep paying Enviro if they know that Enviro was doing something

9   wrong?  I mean, this is a for profit company.  They are not

10  just going to give away -- what's that amount -- a hundred

11  something thousand dollars.  I mean, they're just not going to

12  do that.  What company does it?  They're trying to protect

13  themselves so why do they continue to pay Enviro money if they

14  are trying to protect themselves?  It doesn't make any sense.

15         But something else doesn't make any sense about lining

16  your pockets with money.  According to the government and their

17  $65,000 estimation of Lojano, if you multiplied it by ten

18  employees, you're at 650.  If you say 15 employees, you're at

19  900 something thousand.  The contract was for 785.  So where

20  exactly -- how much money could he possibly be making?  That

21  makes absolutely no sense.  It goes against capitalistic

22  principles.  It just makes no sense; zero sense.  There's no

23  lining of pockets.  There's no profit making.  There no

24  receiving monies and fraud going on unless, of course, we're

25  saying Lettire was in on it.  But now that would be one of

1    those undercurrents that we're talking about it.

2          We don't want to say Lettire was in on it because that

3    would be bad.  We don't want to say a big company of

4    $87 million had something to do with this because that would be

5    bad.  We don't want to say that they're responsible for any of

6    it because they put up buildings everywhere.  They're a

7    multimillion dollar company.  And this is Mr. Naranjo in the

8    real world.  We don't want to say that.

9          Could you put 102 on the screen, please?

10          I keep saying there's an undercurrent going on.  It's

11   dormant, but I need to wake it up.  I need to wake that

12   undercurrent up because something is up.  I want to turn it

13   into a tidal wave.  I don't understand 102.  It was read to

14   you.  Feel free to read it again.  This was what, again, had

15   the rates on it.

16          Ms. Lettire got up here and said on September 2013,

17   she said, yes, I told them that the rates were attached to the

18   contract.  I guess in September 2013 she remembered that.  But

19   she comes in here yesterday, or whatever it was, and all of a

20   sudden things change.  Everything changed with Ms. Lettire.

21   Things just changed because something's going on here.  You

22   know, what's particularly interesting about this $87 million

23   contract and this multimillion dollar company is that the

24   document that they're alleging is so important is signed by,

25   according to Ms. Lettire, Mr. Naranjo on the bottom.

1          Now, we're all adults.  So I had to ask the question.

2     Where's the fully executed contract?

3          I don't know.

4          When did you get this?

5          I don't know.

6          Well, if you got it August 3, 2009 when the contract

7     was signed, that would have been an easy answer, I got it

8     August 3, 2009; it was attached to the contract.

9          That didn't happen?

10         Mmm-mmm.  I don't know.

11         Why isn't your brother's signature on it?

12         I don't know.

13         Don't you have the authority to sign for your brother?

14         Yes, I do.

15         You've been doing that for 15 years?

16         Yes, I have.

17         Why didn't you sign this?

18         I don't know.

19         Why isn't it dated?

20         I don't know.

21         Where was it?  I put it in my drawer.

22         When?

23         He came in.  He signed it.  I put it in my drawer.

24         Stop for a second.  Does that make any sense to

25     anybody?  Does that make any sense to anybody?  No, it does

1    not.  She did not just come into this courtroom working for

2    this company for more than 20 years, a payroll executive for a

3    multimillion dollar company, pull out this prevailing wage

4    document in a prevailing wage case when they're being

5    investigated for prevailing wages and say "I don't know when it

6    happened."  But what's more important is the actual language of

7    it, how it reads.

8            "Lettire Construction has attached the prevailing wage

9    scale for this specific project."  Has attached?  When did that

10   happen?  "The subcontractor by signing this form agrees that

11   they have read and reviewed the prevailing scale."  This sounds

12   like somebody is trying to cover themselves.  Be honest with

13   yourself.  This sounds like someone got a form together, knew

14   that they were being investigated, knew that they messed up,

15   and they've got to cover themselves, so they put this together.

16           So I asked her, this is not a Department of Labor

17   form, is it?

18           No, it's not.

19           This is not an HPD form, is it?

20           No, it's not.

21           Who created this form?

22           She did.

23           Somebody is covering something up now.  Listen, I

24   don't like saying it, but it is what it is.  You don't have a

25   form supposedly this important that goes to the heart of the

1    case of what they're doing of their $87 million contract, every

2    other document they have is signed, fully executed and dated,

3    and this one comes out not signed, not dated, and nobody knows

4    when he got it, how he got it, where he got it or anything like

5    that.

6           Sounded simple initially.  I know it did.  The case

7    sounded simple and everybody was ready to go home.  Hold up a

8    second.

9           Let's talk about the mailing.  Once again, let's talk

10   about it.  I mean, I like putting everything out there.  There

11   is no reliable credible evidence that that man over there,

12   Jover Naranjo, did mail fraud.  I'll say it.  I'm just going to

13   say it.  You know how you know it?  They almost conceded it

14   today.  The devil is in the details because when Ms. Lettire

15   got up there the other day, she said it real quickly.  He

16   brought the certified -- no -- strike that.

17          The question was, Ms. Lettire, how did you get those

18   payroll records and sign-in sheets?

19          Answer:  Mr. Jover Naranjo walked them in and mailed

20   them in.

21          Bingo.  Mail fraud.  Got him.

22          Cross-examination is coming.  Ms. Lettire, let's talk

23   about that mailing in.

24          I don't know.

25          Did he mail it?

1      I don't know.

2      Are you sure that he mailed it?

3      No, you know what, I'm not sure.  I don't know.  I

4  don't know.  That's gone.

5      So, then on summation, which is not evidence, but you

6  can still listen, Mr. Wible didn't use the word he mailed it to

7  them any more.  His word was deliver.  His word was Mr. Jover

8  Naranjo delivered the items to Ms. Lettire.  You know why?

9  Because he's given up on Ms. Lettire and her mailing testimony.

10  He gave up on that.  Done deal.

11      Then he said focus on the Federal Express because

12  Lettire delivered it to Department of Labor.  Forget about the

13  part where he said about the mailing she messed that up.  She

14  made that up.  Forget that part.  Focus on the Federal Express

15  now.  Well, maybe.

16      Fact one:  Lettire paid Enviro.  Lettire paid Enviro.

17      Fact two:  Enviro is not in the contract for HPD.

18      Next page.

19      Aggravated identity theft.  Could you put up

20  Government Exhibit 601?  We embrace the evidence.  Angel Lojano

21  know and Franklin Chiriboga.  Why did I put this up?  Same guy,

22  different names.  The devil is in the details.

23      Mr. Lojano, the guy who possessed the fake ID's, the

24  guy who went to Queens to get a fake ID, the guy who knows how

25  to get fake IDs, testified about these pictures.  He said that

1    he was using the fake ID initially as Mr. Chiriboga.  And then

2    he decided, you know what, I don't want to use fake ID any

3    more.  I want to be my real self.  For some strange reason, he

4    has an epiphany.  You know what?  I want to go from being an

5    illegal person to being a legal person all of a sudden.  I just

6    feel my moral compass has changed.  I just want to be myself.

7         OK.  Well, let's say for some reason he's walking down

8    the street coming to work one morning, he said to himself, you

9    know what?  I don't want to be the guy I was before.  I want to

10   be myself because that's the right thing to do, just like it's

11   the right thing to do to go and try to become a U.S. citizen,

12   just like it's the right thing to do not to use fake IDs.  He

13   just decided that day it's the right thing to do to get my own

14   ID.  Well, that was the problem.  The devil is in the details.

15        He told you all "I changed it to my name."  Now, ding,

16   ding, ding, ding, ding.  Unless he's telling you all that he

17   has Gladiator stuff at his house and he can just change the ID

18   to his name and put his own face on his own name, that's a

19   problem, because that means he changed it himself.  He decided

20   to make his own ID.  That's what he said.  He decided to make

21   his own Angel Lojano Gladiator ID.  You know why he decided to

22   do that?  Because he knows how to do it.  That's how he did the

23   first one.  Because he knows how to do it.  No one told him to

24   do that.  No one game him that ID.  He knows how to do it

25   himself.  He did it because he wants to work.  He's an illegal

1   immigrant.  He needed fake ID.  He went and made one, and

2   that's what he did.  We know he knows how to do that because he

3   told you, "I did it myself.  I went and got my own ID.  I

4   changed my own name."  He didn't say anybody gave him new ID.

5   He didn't say Luperio or Jover gave him a new ID with his own

6   name on it.  No.  He said he went and did it himself.

7          So, unless he has his own Gladiator equipment-making

8   machine in his house, he clearly does because the evidence is

9   right there.  The devil is in the details.  Nobody gave him a

10  Franklin Chiriboga ID, just like no one gave him the fake ID's

11  he got in Queens, just like no one gave him the fake social

12  security numbers, just like nobody told him how to get jobs as

13  an illegal immigrant.  This is what he knows how to do.  This

14  is what he did.  And he told on himself when he said, "I went

15  and did it myself."

16         About these signatures, feel free to take them back

17  and compare them, these forgeries.  Take them back and compare

18  them.  Look at them yourself.  You're going to say to yourself,

19  well, they're forgeries because the workers told us they're

20  forgeries.  Well, the workers want cash.  The workers we know

21  are liars.  The workers we know need -- I don't know if they

22  need money.  They say they want more money.  Feel free to

23  compare the signatures yourself.

24         Tampering with a witness.  There is no credible

25  evidence that Jover corruptly persuaded anyone to hide from any

1    one or misrepresent their work schedule or pay in order to

2    influence, delay or prevent their testimony in any official

3    proceeding.  No credible evidence of that at all.  Zero.

4           Mr. Wible brought it up in summation.  He says that

5    one of the ways you can tell he tampered with a witness was

6    that Jover told Mr. Lojano to change what he told

7    investigators.  Tell them he was cleaning out snow, and that is

8    correct.  Mr. Lojano said Mr. Jover Naranjo said that.  That is

9    what Lojano said on direct.  That is exactly what he said on

10   direct.

11          But the problem is, like a lot of these witnesses,

12   when I asked the exact same question on cross, the exact same

13   question on cross, not even 15, 20 minutes later, his response

14   was "Jover told me there was nothing to be done."  That's it.

15   Feel free to go back and look at it.  It's amazing to read.

16   When they asked him the question, it fit the elements of the

17   crime.  When I asked him the question, the answer was, you

18   know, he just told me -- he asked me what happened.  I told

19   him.  He said, well, there's nothing that can be done, sorry.

20   Two entirely different answers from direct to cross.  Their

21   answer fits the elements of the crime.  Our answer don't fit

22   the elements of the crime.  The Judge is going to instruct you

23   to pay attention to how the witnesses testified during direct

24   and cross, whether their answers stay the same, whether they're

25   consistent.  I mean, it's shocking, but let's continue.

1    Clever Pauta, they put up the statement on the screen.

2    In one of them they claim there was some tampering with the

3    witness.  Mr. Pauta's document.  He said he was given this

4    document and he wouldn't sign it.  He went and spoke to a

5    friend.  They translated it for him.  He didn't sign it.

6    When he refused to do that, he said he was fired.  Why

7    do we know this didn't happen like this?  Go to the transcript.

8    because he says this happened in October 2011.  October 2011.

9    He said it two or three times, it happened October 2011.

10    According to the government, Mr. Pauta said, "After I

11    wouldn't sign it, they fired me."  October 2011?  Really.  Then

12    he goes on, the government goes on and says that -- he said

13    Jover gave it to him.  Please review the transcript as much as

14    you like.  There is nothing in there that says Jover gave this

15    man this document.  There is nothing in there that says Jover

16    spoke to him about this document.  There is nothing in there

17    that Jover fired him about this document.  There is nothing in

18    there that says Jover had anything to do with this document.

19    There is nothing in there that says Jover was even aware of

20    this document.  Nothing.

21    But what's amazing is he said he got fired after he

22    got the document and refused to sign it in October of 2011.

23    It's hard to remember falsehoods.  Truths you could remember

24    all the time because it is what it is; but when you make up

25    stuff, you can't remember what you made up three, four years

1    ago.  It's hard.

2          The last few things I want to say to you all is that

3    this idea, this concept about false statements and the

4    government's position on it, it's rather incredible,

5    remarkable, actually.  It's an exercise in intellectual

6    gymnastics, I think.  We heard the evidence.  We heard what the

7    government said.  One of the things that they're arguing, and

8    argued rather diligently, I might add, is that they know my

9    client did it -- they even put it up there -- because he told

10   you he did it.  His own words say he did it.  So they want you

11   to believe those words.

12         But, on the other hand, he is guilty of false

13   statements because he lied to people, because he lied about

14   this, because he lied about this.  So, on the one hand, they

15   want you to believe him when he tells you he's guilty.  On the

16   other hand, they want you to disregard something he said

17   because he's a liar.  It is a matter of intellectual gymnastics

18   I'd say.  It makes both sides of your brain work.  They want

19   you to believe him when it's convenient for them, but don't

20   believe him at the same time.  It's interesting.

21         It is our position that the evidence is not clear.  It

22   is our position that there is no, no way that you know what

23   happened.  It is absolutely abundantly clear to us that the

24   evidence shows that there is an undercurrent of something else

25   going on with this case that is causing a reasonable doubt.

1   There is a lot going on here that's causing reasonable doubt.

2          You have incredible witnesses testifying to you.  You

3   have inconsistent statements coming to you.  You have evidence

4   that can be interpreted six or seven different ways.  If you

5   have that, and you do, when you have that, and you do, because

6   you have that, you have a reasonable doubt.  Because you have

7   that doubt, you must say not guilty.  Thank you.

8          THE COURT:  All right.  Mr. Burke.

9          MR. BURKE:  Not guilty.  Luperio Naranjo is not

10  guilty.  He was not guilty when this trial started, and he's 's

11  not guilty today.  They have a burden of proof.  They have to

12  prove each and every element of the crimes charged beyond a

13  reasonable doubt.  They never did it.  They never got close.

14         They're right; it's not a close case.  In some ways,

15  it's ridiculous as far as Luperio Naranjo.  They've got the

16  burden of proof, and they couldn't meet it.  They couldn't meet

17  it because he didn't do the crimes.

18         He didn't commit mail fraud.  He didn't tamper with

19  witnesses.  He wasn't in a mail fraud conspiracy.  He didn't do

20  any of the crimes charged in the indictment.

21         May it please the Court, the government, the two Mr.

22  Naranjos, co-counsel, ladies and gentlemen.  Look, the contract

23  was for $147 million.  Lettire's end is 87 million.  Enviro,

24  the demolition company, ends up with 800 something because they

25  did more work than they anticipated.  Enviro did the job,

1  right?  I mean, usually when you're prosecuting a company it's

2  because they didn't do the job.  They did the job.  Enviro paid

3  the workers what they said they were going to pay them.  Right?

4  So they did the job.  They paid the workers what they said they

5  were going to pay.  Not one worker got up there and said, look,

6  they told me they're going to pay me 15 bucks and they didn't

7  pay me 15 bucks or they told me they're going to pay me $13,

8  and they didn't pay me $13.  That is not what happened.  They

9  all said they got paid what they said they're going to get

10  paid, and we're here because the government feels they should

11  have been paid more.

12          And Luperio Naranjo, the man who drives the van to the

13  job, is the one who ends up getting prosecuted.  Luperio

14  Naranjo is the father of Jover.  He's not the owner of the

15  company.  He speaks Spanish.  He's 66.  He doesn't own the

16  company.  He doesn't negotiate the contracts.  He doesn't sign

17  the contracts.  He doesn't make out the payroll.  He doesn't

18  make out the checks.  And payroll shmay-roll, he's got nothing

19  to do with that.  And you listen to the government when they

20  summed up, for the first 30 minutes of the summation I counted

21  them, they used the word "they" 186 times.  No, I didn't count

22  them.  I'm lying.  But they used the world they constantly.

23  They did this.  They did that.  Let me see.  They signed the

24  payroll.  They made out the checks.  They planned this.  They

25  wrote this down.  They wrote that down.  They is not him.  They

1   is not him.  And, again, 116 times.  The defendants did this.

2   The defendants did that.  They is not Luperio Naranjo.

3          Look, if they indict Exxon and the chairman for some

4   kind of fraud with the workers, they don't arrest and indict

5   the head of the day shift at a gas station.  And that's what's

6   happening here.  How do we get here in the first place?

7          The union starts this.  The union makes a complaint.

8   Non-union workers in Manhattan.  Calling all cars.  Come on

9   down.  We got to do something.  And sooner or later, every

10  bureaucrat in the city ends up down there.  HPD.  EPA.  The

11  Department of Labor.  They had more investigators than the

12  Warren commission doing this.

13         In part, it's based upon a company that they're saying

14  didn't pay overtime.  And he's the one, Mr. Luperio Naranjo,

15  he's the one they bring to this table today, the person they're

16  accusing of crimes.  And he's the one who's there all the time.

17  Masks, gloves.  He's a foreman.  Edgar Avila was also a

18  foreman.  All these agencies, all these investigators, I don't

19  know how many times you heard from the witness stand here where

20  they say, well, did you see him absolutely doing the demolition

21  work?  Was he digging some holes there or pushing a wheelbarrow

22  around?  And he answers, no, he's supervising.  Right?  He's

23  working.  I mean, old guys are allowed to work too.  He's

24  supervising.  But it's a big deal throughout the whole trial.

25  Right?  Every witness.  Did you see him working?  How hard was

1    he working?  He wasn't even sweating, right?  He was just there

2    supervising, or checking the guys out.

3            So what do you find out on the last day of trial?

4    This is on 457 at the top.  It sounds like it's a big deal the

5    first week or so we're here; that he is not digging a hole in

6    the ground or throwing enough garbage away.  This is

7    Mr. Rosenthal, the fellow who was just here yesterday, the last

8    witness.  The government is talking to him.

9    "Q.  How would a supervisor who didn't actually do any labor on

10   a job site be classified according to the prevailing wage rate?

11   "A.  OK.  Well, a supervisor is not really applicable to be

12   paid prevailing wages; only if they work at least 20 percent,

13   you know, of the time worked.  So, let's say if the supervisor

14   worked 20 percent, you know maybe three days at maybe 20 hours

15   of -- no, say, ten hours of 40 hours, they would have to be

16   paid prevailing wages."

17   Next question:

18   "Q.  What if they didn't do any labor, would they be required

19   to receive the prevailing wage?

20   "A.  No, they're not required."

21   Last sentence:

22   "It's really to the discretion of the company, of course."

23           It's really to the discretion of the company.  They

24   can pay him anything they want.  He is not the company.  They

25   can pay him anything they want.

1       They don't have to see him digging holes or emptying

2   garbage, and he's there all the time working.  I guess, I don't

3   know, he's not working hard enough for them, right?  That's

4   what it sounded like the whole trial.  No, he's not really

5   pulling his weight out there.  He's not the company.  If the

6   company wants to pay him a million dollars they can, but they

7   didn't.  He's not the one who made out payroll.

8       Now, it's an 81-page contract.  It's in English.  It's

9   not in Spanish.  There's a small portion of this about the

10  prevailing wage stuff and they want to blame it on him.  I

11  mean, obviously, the government's theory is this:  Look, he

12  didn't sign it and you know he wasn't there when it was

13  negotiated.  That's true.  And he didn't really meet with the

14  Department of Labor or the forensic accountant or anybody.  So

15  what's their theory?  Ahh, he's the father, he must know what's

16  going on.  Ladies and gentlemen, that's not proof beyond a

17  reasonable doubt.  That's nothing.  That's what they want you

18  to do.  That's lumping people together.

19       (Continued on next page)

20

21

22

23

24

25

1        MR. BURKE:  The workers.  We'll talk about it

2    generally.  We'll touch on it specifically.  Now, general, we

3    should let's give some up.  It's sympathetic in many ways,

4    right, the hard-working guys, it's a tough job.  They're in a

5    vulnerable position here with the government.  If they don't

6    cooperate with them, if they don't play ball with them, they're

7    accused of crimes, they can be put in jail, they can be on the

8    next plane back to South America.

9        Also, let's be honest, this is a big courthouse.  It's

10   not an old courthouse, but there's a lot of serious crimes that

11   happen here and believe it or not, there's a lot more serious

12   crimes in this courthouse.  You talk about them sneaking into

13   the country.  It's not that big a deal in the whole lexicon of

14   criminal activity.  They shouldn't do it, it's bad, but it's

15   not the end of the world.  They didn't kill anybody.  Let's

16   give them that.

17       But, let's just say this:  They're not credible,

18   they're not reliable, by their very nature, by their very

19   nature.  And certainly beyond proof beyond a reasonable doubt

20   they had fake names, they have fake IDs, they have fake green

21   cards, they have fake Social Security cards.  They're little

22   fraudsters and they lie sometimes, and maybe they tell the

23   truth sometimes, but you really can't divide it.  You really

24   can't tell one from the other.

25       Now, look, you folks in the jury, you're grownups,

1    you're mature.  The people who were on that witness stand,

2    these workers they sat down and sometimes they lied to us and

3    you heard it.  Now, can you prove it?  You heard it.  And I

4    call this my-dog-ate-my-fake-green-card defense, right?

5            They're on the witness stand.  You say, look, where is

6    that green card?  Where is that green card now?  And they go

7    oh, yeah, yeah, green card, hey, I lost that thing.  I lost

8    that green card.  Where is the Social Security card?  Oh, yeah,

9    it's coming back to me.  I lost that, too.  I lost the Social

10   Security card, too.

11           Did you look for it?  No, I didn't look for it that

12   hard, or hey, where is that visa, where is that fake visa you

13   used when you got here?  Oh, yeah, visa, I threw it away in

14   Mexico.  I think that's where it must be.  I'm sorry.  Complete

15   nonsense, complete nonsense.

16           They shouldn't be crucified, right, but you're mature

17   people.  You heard people tell stories to you.  It's just not

18   true.  It is just not true.  And once they start lying to you,

19   you see once they're willing to sit there and lie about some

20   things, you got to be very careful about believing them about

21   the other things because other things they have been rehearsed

22   on, they have been rehearsed on it ten times, 20 times, 30

23   times and the Court will tell you this and maybe the Court did

24   already, I'm not sure, they're allowed to prepare the

25   witnesses, totally proper, right?

1           You can go talk to your witnesses before they testify.

2   But there's a difference between being a prepared witness and a

3   trained seal.  So some of these things, these guys they repeat

4   over and over, over and over again, other times when you ask

5   them questions they haven't heard before they lapse into their

6   illegal alien story.

7           Now, let's talk about the hiding stuff.  Did they

8   hide?  I don't know.  Let's presume they did.  Now,

9   Mr. Bermudez from the Department of Labor testified.  Seems

10  like a nice guy.  Said he went to the job site.  He's not on

11  the border patrol, but he is an investigator.  So, maybe

12  someone thinks they're hiding.  Do you think anyone really has

13  to tell illegal aliens to hide when government investigators

14  come?

15          Do you think anyone has got to tell illegal aliens to

16  use fake ID when they have fake ID and they have done it

17  before?

18          Do you think anyone has got to tell illegal aliens who

19  had this fake identification to give fake names to agents?  Do

20  you think they have to be taught that?

21          Look, if the Department of Labor came to a place I

22  worked or maybe where you worked -- we'll pick on you,

23  instead -- maybe you don't want to talk to them and you're

24  citizens.  You think illegal aliens want to talk to these

25  people?  Look, making up stuff and lying, it's what they do.

1   It's part of who they are once they sneak in to have this

2   stuff.  It's like asking ducks why do you swim in a Lake?

3   That's what ducks do.  Why do illegal aliens lie to government

4   investigators?  That's what they do.

5            Now, let's discuss some of the workers separately.

6   And sometimes now, if I make a mistake, don't go by me, you go

7   by the transcript and there was a lot of workers -- you can get

8   them jumbled up in your head.

9            Antonio Torres was the first guy.  He admits at the

10  Department of Labor -- excuse me -- in court he said Luperio

11  Naranjo told him to hide.  He admitted that in the past at the

12  Department of Labor that he said that Edgar Avila told him to

13  hide.

14           And it seems to be a theme that runs through this:

15  Once these guys are caught lying, why did you make up that

16  name, why did you say this, why did you lie about that, it's

17  always, you know, the devil made me do it.  They made me lie.

18  Luperio made me lie.  Somebody else made me lie.  Sometimes he

19  says it's Luperio Naranjo who told him to hide; other times he

20  says Edgar Avila told him to hide.

21           What else is interesting -- maybe it's interesting --

22  it depends on what you think, the first guy, Torres, admits to

23  having a fake Social Security card and is he one of the guys

24  that lost it?  Yeah, he lost it.  He lost it a long time ago.

25  Then it turns out -- forgive me while I fumble through these

Dblgnar3                    Summation - Mr. Burke

1    documents -- then it turns out he's got a fake green card page

2    66 line 18.  Now you met with the government, correct, certain

3    times before you testified, right?

4               Answer:  Yes.

5               Did you tell them you had a fake green card?

6               Answer:  No.

7               Did they ask you if you had a fake green card?

8               Answer:  No.

9               So, he told him them had a fake security card.  He

10   didn't tell them he had a fake green card.  It's not the

11   biggest deal in the world, but now, he's got a plea agreement.

12   I don't know if you can put this stuff up can you by any

13   chance.

14               MR. WIBLE:  Objection.  I don't think there was any

15   testimony about a plea agreement.

16               MR. BURKE:  From Antonio Torres.

17               THE COURT:  I don't recall any either.  Is there

18   something in evidence?

19               MR. BURKE:  Judge, it could be my mistake.  This

20   agreement may not be in evidence.  I'll move on if that's the

21   case.

22               THE COURT:  What was the exhibit number?

23               MR. BURKE:  3502.

24               MR. WIBLE:  It's a nonprosecution agreement.  Not a

25   plea agreement.

 1        MR. BURKE:  Forgive me.  It's my mistake.  Okay.  I

 2   used the wrong words.  I said a plea agreement.  It's not a

 3   plea agreement.  It's a nonprosecution agreement.  That's me.

 4   But this is here.  Is there a chance I can see 3502-16, just

 5   the first page.  Can you blow this first paragraph up.

 6        This is the deal they made, the no-prosecution deal.

 7   And he's not going to be prosecuted for coming into the

 8   country, number one; number two, his possession of false

 9   identification documents from '09 to the present, all right.

10   It goes on, but here's one, to the extent Torres has disclosed

11   such conduct to this office as of the date of this agreement,

12   all right.

13        So he won't be prosecuted as long as he tells them

14   about his fake ID.  Is there a second page here, just the date

15   with the third page, before the trial, October.

16        So, not to be too lawyeristic about this, he admits on

17   the witness stand he didn't tell them about his green card.

18   He's got a fake green card.  So, theoretically, he could be

19   prosecuted for having a fake green card.  Are they going to do

20   it?  No.  Why?  He's on their team.

21        MR. WIBLE:  Objection, your Honor.

22        MR. BURKE:  I would -- I'll take it back.  I don't

23   know what they're going to do.  I argue this to you, I don't

24   believe they will because he's on their team.

25        Angel Lojano, the second guy who testified, now, look

1   he's back here almost in a hole when he testifies over here.

2   He's way down here.  Maybe his view of Mr. Naranjo is obscured

3   because of the screen there.  There were books there.  But they

4   ask him:  Do you see Luperio Naranjo?  He says no.

5           He doesn't see him in the courtroom.  They asked him

6   do you see Jover.  At first he says no, then he says, yes, I do

7   see Jover.

8           Look, this is not an identification case.  What I want

9   you to think about, does Angel Lojano really know what's going

10  on?

11          On page 94, he says either Jover or Luperio told him

12  to lie to investigators.  Wrong book.  It's 105, 106, this is

13  cross examination by learned cocounsel, 105:  It's fair to say

14  Mr. Naranjo, Jover Naranjo or Luperio Naranjo, did not tell you

15  to lie to those investigators, correct?

16          Answer:  Yes.

17          So when they came on that day, you lied because you

18  just wanted to lie, would that be fair to say, sir?

19          Answer:  Yes.

20          So, finally we get someone who admits they can lie on

21  their own.  What else about Mr. Torres and I'm saying, like, is

22  he credible, do we know what's happening with him.  Does he

23  know what's going on?  101, line 15:  How much did you say you

24  were paid?

25          Answer:  15 an hour.

1          Was that accurate?

2          No.

3          Then he continues.

4          How much were you paid an hour?

5          Can you repeat the question?

6          Question:  Excuse me.  I asked you how much you were

7    paid for your work at the job site?

8          Answer:  Fifteen.

9          So when you told the investigator that you were paid

10   15 an hour, was that true, was that accurate?

11         Yes.

12         So in that one page he goes from saying the $15 is not

13   accurate to saying it is accurate.  Is it the biggest deal in

14   the world?  No.  But it's something that you have to think

15   about when you say does this guy know what he's talking about?

16   Is he credible?  Is he reliable?  Is he proof beyond a

17   reasonable doubt?  He's the guy who said he still has his fake

18   ID.  They didn't even ask him for it.

19         Criollo was the next fellow who testifies.  It's

20   Lojano's brother.  He says, yeah, I talked to my brother about

21   the whole thing, what happened.  He threw his stuff away, he

22   threw his cards away, yeah, I threw it away.

23         What else is interesting?  He says his last day, they

24   call him up and tell him don't come to work again.  That's the

25   day that he didn't go to work, right.  He said it was okay, he

1   had an excuse, but do you think it's a coincidence he doesn't

2   show up for work one day, they call him up and tell him don't

3   come again?

4          They talked about money.  He said, no, it wouldn't be

5   a bad thing; the money wouldn't be a bad thing.

6          Pablo, that is, Pedro Pablo, was the next guy.  He

7   meets with the union six or seven times, four or five times

8   with the Department of Labor.

9          Can I see 406 and 420 for a second.  Now, that's 406,

10  the guy in the white shirt is the guy -- is the gentleman from

11  the union who testified.  Can I see 420.  Same fellow.  The

12  union guy identified himself.

13         Now when he testified, he said -- that's the guy from

14  the Department of Labor.  That's how close everyone was working

15  together here.  He can't tell the Department of Labor from the

16  union.  They're all meeting together.  They're all hanging out

17  together.

18         What else is significant?  Page 199.  He says these

19  words "it's not about the money," we're asking you're going to

20  get more money, he says it's not about the money, but if the

21  money comes, it's okay.

22         Now, I work for a very smart man a long time ago and

23  he told me this:  When someone says it's not about the money,

24  it's about the principle of the thing.  That's how you know

25  it's about the money.  All these guys, all these guys stand to

1   get money and that's what this is about.

2           Now, look, they may not be sophisticated in many ways.

3   They may be from outside our cultural orbit.  They're not

4   stupid.  They're intelligent.  They know what they're going

5   to -- what they have been getting paid and they know what they

6   can get.

7           Clever Pauta.  Now, going to the government's

8   summation they mentioned, they said that Luperio

9   Naranjo -- sometimes I hear these things wrong -- they said in

10  their summation Luperio Naranjo gave Pauta fake ID.

11          Page 228, line eight:  What, if anything, did you use

12  to get past the security booth.

13          Answer:  Well, I was given an ID.

14          Question:  Whose ID did you use?

15          Answer:  Luperio Jr.'s.

16          Who gave you that ID?

17          Edgar Avila?

18          Who is that?  The foreman.

19          Not Luperio.  Edgar.  Did it really happen?  The story

20  shifts.  It's not Luperio.  He's another guy.  He lost his

21  stuff.

22          Let's go to Campoverde, last but not least.  Now

23  Campoverde is the guy who goes from Ecuador to Colombia to the

24  Dominican Republic to Mexico to the United States.  I mean, you

25  can have a Masters Degree and you can't get a plane ticket now

1    to Miami, right.  He can figure this out.  He knows how to do

2    things.  And it's about money and it's about meeting with the

3    union.  He had an accident.  He got workers comp.  And can I

4    see 844 from the government's exhibit.  Those forms that we had

5    been looking at.  Look, can you blow up this thing here.

6           Campoverde.  On cross examination he says:  Yeah, I

7    signed it, that's my signature.  Through a series of questions:

8    Oh, you signed that?

9           On the document itself it says, look, you're supposed

10   to be a resident alien or U.S. citizen.  He's not.  Okay.

11   What's even better, right, he's there.  He starts saying, oh,

12   someone else filled it out.  I just signed it.

13          Then there's a break.  The next day, he's on the stand

14   the next day.  They put -- this is Mr. Jacobs on redirect --

15   they put 844 up there.  They put it on the screen.  And he says

16   to him:  Where were you working when you received this

17   document?

18          No, I didn't receive the document.

19          Have you ever seen this document before?

20          Answer:  No.

21          Can we go to page two of the exhibit.

22          Have you seen this document before?

23          No.

24          Is that your signature on the document?

25          No.

1      So, this guy goes from one day he signed it to the

2   next day he doesn't remember ever seeing this thing before in

3   his life.  Unto itself, right, let's be honest, unto itself

4   it's not the biggest deal in the world.  But this is not proof

5   beyond a reasonable doubt because this is what they're relying

6   on.  These are the witnesses the government is relying on for

7   proof beyond a reasonable doubt.  And from day-to-day they can

8   shift their testimony unless they rehearse parts of it ten, 20,

9   30 times.

10      Two guys lost their ID cards, two guys threw it away,

11   one of them still has it, and out of the six guys who

12   testified, nobody turns in their fake identification to the

13   government, none of these folks, right?

14      Alone and you can always say, well, there's a lot of

15   them, we'll stick them all together.  Maybe we can get beyond a

16   reasonable doubt that way.  We'll lump them all together.

17   Alone or together they're not credible, they're not reliable.

18      What they have in common is that they have been

19   rehearsed many times about things to say, they blame people for

20   things they have done, and the fact that if they cooperate and

21   stick with their no-prosecution agreements, they don't get

22   prosecuted, they can stay here, and they can get more money.

23      Their testimony is all of a piece.  You should not be

24   dividing their testimony, I submit to you, I argue to you into

25   like, oh, I can believe him about this, but I can't believe him

1   about that.  What I'm saying is believe whatever you want, but

2   their testimony is not proof beyond a reasonable doubt.

3           The fellow from the Department of Labor, he never sees

4   Luperio Naranjo tell anyone to hide, you know, red alert, the

5   Department of Labor is here.  He comes up in plain clothes.

6   When I say plain clothes.  He's not a cop.  He doesn't have a

7   uniform.  He dresses normally, he just walks up there.

8           He doesn't see anybody hiding like -- this is what I

9   mean, you don't really know what happened.  He never sees

10  anyone hide.  He says it's an open space.  I didn't see anybody

11  hiding.  And why is he there?  He's there because of the union

12  complaints.

13          He testified he said he's there's a civil suit pending

14  and there's been no decision yet.  He also says under the

15  Davis-Bacon Act, the general contractor, which is Lettire, is

16  responsible for any back-wages owed under the prevailing wage

17  act by the subcontractor.

18          Let's talk about the union guy.  Look, I may be

19  getting the name -- he works for the international unions of

20  the world.  I forgot.  It's an organization that's funded by

21  unions all over the country.  And then when they find people

22  doing nonunion work, that's when he swings into action.  He's a

23  union recruiter.

24          They get more members and more people in the union and

25  they can get more money.  And then they can give more money

1    back to the unions and hire more people.  And there's nothing

2    wrong with unions, right?  It's America.  You have a right to

3    have a union.

4         But this is extreme.  He's down there 30 or 40 times.

5    They're Marching around.  They're blowing up a big rodent,

6    right?  They're giving out stuff to the workers.  This is the

7    engine that starts this thing off.

8         And he's obviously talking to them about money at

9    certain points, they're talking about back-wages, what they can

10   get.  They have meetings at cafes, restaurants.  They're

11   allowed to.  That's fine.  They're all there, they're all going

12   over it, over it and what is significant, I submit to you, they

13   video tape interviews, they videotape interviews at one of the

14   first meetings, and he has no idea what I went through he has

15   no idea what I went threw so we get to hear these guys after

16   they have been prepped and gone over stuff ten, 20, 30 times,

17   right, but we don't get to hear it the first time because we

18   don't know where the tapes are.

19        And it's obvious he's working hand in glove with the

20   Department of Labor.  He brings them to the meetings, right.

21   Now he said -- excuse me -- Bermudez said look, I didn't talk

22   to the guys from the union.  They went to union hall.  They all

23   sat down together.  They're all doing this together.

24        What else did you notice, people from prominent

25   organizations testified.  Ms. Gingrich.  She's the lady from

1    Floyd Advisors.  What do they have in common?  She didn't know

2    what her firm was paid.  Mr. Pine, the first guy who testified,

3    he works for Lettire, he's the financial man.  He doesn't know

4    if Lettire made profit.  Michelle Lettire, she doesn't know if

5    they made any profit.

6           So the sophisticated people don't like to talk about

7    what profit they made.  The workers told you they told us 13

8    bucks an hour, we got paid 15 -- 13 bucks an hour.  They told

9    us 15, they got paid 15.

10          Michelle Lettire also said the company had to pay a

11   fine.  They didn't pay prevailing wages for some of their

12   workers.  They didn't have the correct kind of contract, and

13   she said the general contractor is responsible for the

14   subcontractor and the general contractor has got to pay any

15   back prevailing wages owed by the subcontract.  Okay, 412.

16          And as far as you know, Lettire has agreed to pay any

17   back-wages that Enviro owes its workers for any violation of

18   the prevailing wage act, right?

19          Answer:  I guess, yeah.

20          Now, what else that I want you to know about Michelle

21   Lettire.  Now, I think it's a big company.  They got millions

22   of contracts.  She works there for 30 years.  We asked her

23   questions about -- I'm paraphrasing now -- wasn't there a

24   settlement?  Didn't Lettire have a settlement?  What's the

25   terms of the settlement?

1      She goes, I don't know what's going on with the

2  settlement, I hardly know anything about that.  No one tells

3  me.

4      So, when it's their witness who don't know about the

5  terms of a contract for a business, it's okay.  When

6  Mr. Luperio Naranjo doesn't know about the terms of a contract

7  that's 81 pages long and in a different language, it's not

8  okay.  Then they say, oh, he must know.  He's the father.

9  That's not proof beyond a reasonable doubt.  That's conjecture.

10  It's nonsense.

11      Look, at the end of the day, there's no proof beyond a

12  reasonable doubt that he committed any of these crimes.  Now,

13  the prosecution is going to do one or two things or both to

14  Luperio Naranjo on rebuttal.  They'll say look at these

15  documents, look at all these documents.  He didn't sign the

16  contract.  He didn't make out the paperwork.  He didn't sign

17  the checks.  He didn't go meet with Lettire.  He didn't meet

18  with the Department of Labor.

19      Look, I'm sure he got checks, I'm sure he signed them,

20  cashed them, the corporation, right.  He's not the corporation.

21  They can pay them whatever they want and essentially that's

22  what the witness from HPD said, the last guy.  And the standard

23  of proof is not maybe, could have, possibly.  It's beyond a

24  reasonable doubt, okay?

25      Forget about the documents.  Let's say, okay, ladies

1   and gentlemen, on government's rebuttal, forget about the

2   documents; just go by the testimony of those workers.  You

3   heard them.  You heard for the most part rehearsed testimony,

4   some of it was ridiculous, it's not reliable, it's not

5   credible.  And remember they all have deals.  It's not a plea

6   deal, the government is right from before.  They're

7   nonprosecution agreements.

8           They're not going to be prosecuted if they come and

9   testify and meet with them if they tell the truth.  We heard

10  that a bunch of times, if they tell the truth.  Also one of the

11  witnesses admitted this:  Who determines whether or not you're

12  telling the truth?  They do, the government does.

13          And you can't just believe -- withdrawn.  You can do

14  whatever you want.  You're the jury.  You shouldn't believe

15  parts of this thing, parts of their testimony when you know

16  they're lying.

17          Statements by Jover that they're saying he made, the

18  Court has instructed you before that that's not evidence

19  against Luperio.  You don't impute knowledge to him.  And the

20  Court will define all these terms, knowingly, intentionally,

21  willfully.  He's got to know he's doing mail fraud.

22          The government might say, look, Mr. Burke will have

23  you believe all the witnesses got together and started lying.

24  And if we wanted to have them lie, we'd have them all tell the

25  same story.  Well, ladies and gentlemen, these witnesses did

1    pretty good.  We got this far.  And when you ask them questions

2    that are not in the script, that's when they come off it.

3         Now, look it's separate trials, separate evaluation of

4    the evidence, separate verdicts.  And don't forget, the

5    government witnesses, the workers, when you decide their

6    credibility, they all had these no-prosecution agreements.

7    That doesn't of itself mean they have to be lying.  What it

8    mean is the government has leverage on them and it can affect

9    the way they testify.

10        "To know that you do not know is the best; to pretend

11   to know when you do not is a disease."  Lao Tzu.

12        At the end of the day, you can only pretend that

13   there's proof beyond a reasonable doubt against Mr. Naranjo.

14   They never proved the elements of the crime against him.  He

15   started out this case innocent.  They didn't meet their burden

16   of proof.  He's innocent today.  The case will be in your hands

17   soon.  I ask you to find him not guilty of all the charges in

18   the indictment.  Thank you.

19        THE COURT:  Thank you.  Does the government want to do

20   their rebuttal now or after lunch?

21        MR. JACOBS:  If the jury is happy waiting 20 minutes,

22   we will do the rebuttal now.

23        Thank you, Judge.

24        THE COURT:  Proceed.

25        MR. JACOBS:  Ladies and gentlemen, you have just heard

1    a series of remarkable arguments from two very talented defense

2    counsel who have done their best for the last couple of hours

3    to try to distract you from the evidence in this case and say

4    look over here when what you should be looking at is right here

5    in front of you.

6          Now, just as an initial matter, just to be clear, the

7    defendant advice no burden in this case.  They don't have to do

8    anything.  They don't have to call witnesses.  They don't have

9    to put on evidence.  They don't have to make arguments.

10          Here, they did make arguments and when they do that,

11   it's appropriate and proper and you should scrutinize those

12   arguments carefully and just see if they make sense.  See if

13   they fit with the evidence you've seen and what you've heard.

14          Now, one argument you heard from both defense counsel,

15   you heard it at some length is that you shouldn't believe the

16   workers you heard testify.  This is a remarkable argument.

17   It's remarkable the way they made the argument.

18          They argue that they entered the country illegally,

19   they committed crimes, they want money, so you shouldn't

20   believe them.  Here's what's interesting about what you heard:

21   They didn't say those people weren't working at 100th Street.

22   You didn't hear either defense counsel say they were lying when

23   they told you they were working at 100th Street.  Can there

24   really be any dispute about that?  They were photographed

25   there.  They all told you they worked there.  The work somehow

1   got done.  Someone was doing it and if they were working at the

2   job site, let's just start with that, there was a fraud.

3   They're not on the certified payrolls.

4           Were they lying when they said they got $13 an hour or

5   $15 an hour instead of the prevailing wage of $49 or 33?

6   Neither defense counsel said they really did get paid $49 an

7   hour.  There's no question that that testimony that they got

8   $13 and $15 an hour was accurate.  It was corroborated by all

9   the other evidence.

10          Were they lying when they said the defendants' friends

11  and family didn't work at the job site like Gloria Feijo and

12  Marcia Gonzalez and the others, Luperio Naranjo Jr., was that

13  not credible testimony when the workers said those people

14  didn't actually work at the job site even though their names

15  are throughout the certified payrolls?  Nobody ever saw them at

16  the job site.

17          And again, if that's -- you credit that testimony,

18  there's a fraud here because the certified payrolls say that

19  those people worked at that job site.  And I think the

20  inability to really explain what of this -- the main parts of

21  the testimony, the inability of defense counsel to say which of

22  those main parts should not be credited really exposes what's

23  going on here because in large part the testimony of the

24  workers was consistent, they corroborated each other, and it

25  was consistent with all the other evidence you saw and heard in

1   this case.

2           Now, the testimony -- the argument that workers you

3   shouldn't believe them it's remarkable for another reason which

4   is that their incentive is to tell the truth.  They all have

5   these nonprosecution agreements with the government that

6   provide they won't be criminally prosecuted for certain crimes,

7   but in order to get that protection, in order to keep it, they

8   have to tell the truth on the witness stand.  That's their

9   incentive here because if they are not truthful, that

10  protection goes out the window.

11          Now, it's worth pointing out the protection is

12  actually more limited than Mr. Burke said.  He said that they

13  get to stay in this country and that's just not true.  Nothing

14  in those agreements says that the separate agency that handles

15  immigration won't deport them.  That's not a part of the

16  agreements.  The only protection the agreements provide is

17  against being criminally prosecuted for certain specific crimes

18  listed in the agreements.  You'll be free to look at them

19  yourselves in the jury room.  They're government exhibits 3500

20  in different numbers.

21          And in order to keep that limited protection, they

22  have to tell the truth.  Now, did they do that?  You saw their

23  demeanors on the witness stand.  You saw how they answered

24  questions.  You saw how they acknowledged when they had been

25  inaccurate in some respect.  You saw how they made efforts to

1   give answers to the questions that were being posed to them,

2   sometimes repeatedly.  You saw how their testimony, the

3   testimony of each worker was in large part consistent with the

4   testimony of the other workers.

5          Another reason and the last reason, this argument

6   about not believing the workers is remarkable is because the

7   basis for the argument the fact that the workers were here

8   illegally and committed crimes really demonstrates exactly why

9   these defendants chose these workers as part of the scheme,

10  because part of the scheme was to hire workers who they thought

11  wouldn't talk to law enforcement.

12         The reason the defendants say not to trust these

13  workers is the reason they hired them because they thought they

14  could rely on these particular workers to keep the scheme a

15  secret.

16         Now, another theme, and I just want to address a few

17  of the themes defense counsel raised in their arguments I can't

18  address all of them and it's the evidence that controls, but

19  another argument they both made is that this case has something

20  to do with the labor union.

21         This argument is a complete distraction.  The case is

22  not about a union.  What did you hear about the labor union?

23  You heard the two guys periodically went to the job site on

24  East 100th Street, handed out fliers that listed the prevailing

25  wage information, talked to workers when they could, shot

1    video, told the Department of Labor what was going on.  That's

2    it.  There's no evidence that the union did anything illegal or

3    improper or was somehow part of the prevailing wage scheme.

4         The idea that this case has something to do with the

5    union, that there's some undercurrent, as Mr. Donaldson kept

6    saying, is a pure distraction.  It's like the giant inflatable

7    rat that you heard defense counsel mention a few times in cross

8    examination.  It is simply a distraction, trying to get you to

9    look here, instead of at the evidence.

10        And one other -- before I move on to the next thing,

11   there's one other thing worth pointing out about the nature of

12   some of the testimony defense counsel challenged that the

13   workers gave.  They challenge a few of the smaller things they

14   testified about, not the amount they made or whether they

15   worked on the job site, but some other things.

16        They say Angel Lojano was lying about Luperio Naranjo

17   giving him the Franklin Chiriboga ID card, and you can tell

18   that because when he ultimately got an ID card in his own name,

19   the one that says Angel Lojano, he made that; or they say

20   they're lying about hiding because no one ever saw them hiding

21   even though how are investigators supposed to see them if they

22   were hiding?  It's not clear.

23        They say the signatures aren't forgeries even though

24   the workers who said the signatures were forged in large part

25   hadn't seen those sign-in sheets before.  That was their

1   testimony.  They knew it was a forgery because they had never

2   seen that document.  They never signed in to work.

3            As you are evaluating all this testimony, one thing to

4   keep in mind is that memory about big things that happened four

5   years ago can be clear even if the smaller details are less

6   clear.

7            Everyone walks by the big statue coming into the

8   courthouse.  But can you say she is standing on the left foot

9   or the right foot?  The big statue of justice, is she standing

10  on the left foot or right foot, even though you've seen it

11  every day.  That's a small detail.  It's the kind of thing you

12  don't remember, but that doesn't mean you don't see the statue.

13           Mr. Donaldson spent a good portion of his summation

14  talking about something that his client's own words prove is

15  not true.  He spent a good portion of his summation trying to

16  suggest to you that the wage determination, the information

17  about what the prevailing wages are, that Jover Naranjo didn't

18  know that information, that he wasn't given it at the start of

19  the project.

20           But what did Jover Naranjo's own words say about this?

21  Government Exhibit 1003, Jover Naranjo's prior testimony under

22  oath.

23  "Q.  How did you learn the differences between Tier A and Tier

24  B workers.

25  "A.  That's in the schedule.  Normally they put it in the

1    contract.

2    "Q.  Was it in the contract that you had on the Ciena Project?

3    "A.  In the beginning no, but the following week, yes, he gave

4    it to me.

5    "Q.  But at the time you signed it, did you know that you had

6    to categorize workers as Tier A or Tier B?

7    "A.  Yes."

8         And why?  Because he had been doing prevailing wage

9    work for 20 years, more than that.  So of course he knew the

10   wage schedule.  He said that in Government Exhibit 1003, when

11   they told me it was prevailing wage, I knew more or less was

12   what was going to apply because I was doing other prevailing

13   wage.

14        The idea that Mr. Jover Naranjo didn't know the

15   prevailing wage rate is simply preposterous.  And not only

16   that, it's listed in the very first certified payroll that

17   Jover Naranjos from the first week of work.  The prevailing

18   rates are right there in a column that documents Jover Naranjo

19   signed it and says it's accurate.

20        Mr. Donaldson spent a good portion of his time working

21   about how maybe there is something else going on, maybe there's

22   something going on with the wage rates.  There is nothing going

23   on.  Jover Naranjo knew exactly what those rates were from the

24   very start.

25        Mr. Donaldson also said that there's no mailing here

1  and that the government is trying to switch something on you,

2  switch its theory in some way with respect to the mailing.  Not

3  true.  The beginning of this trial, I said they're charged with

4  mail fraud because the certified payrolls that are part of the

5  scheme were mailed from Lettire, the general contractor, to the

6  city agency that reviews them.  And that's exactly what the

7  evidence showed.

8        What did you hear?  You heard that David Rosenthal

9  from HPD testified that he received the certified payrolls from

10  Lettire, the general contractor.  And he was even more specific

11  than that; he said it was by Fed Ex.  And then Michelle

12  Lettire, the bookkeeper, testified she mailed the certified

13  payrolls.  How?  By Fed Ex.  To whom?  David Rosenthal.  Their

14  testimony matched up precisely.  You heard from the person who

15  sent and received the mailings and it was unchallenged.

16        You heard from Mr. Burke at some length that Luperio

17  Naranjo, he's not the owner here, he didn't sign the contract,

18  he didn't sign the payrolls, and so you should find him not

19  guilty.  Let's just look at this argument for a few minutes.

20        First I expect Judge Rakoff will instruct you that

21  even a single act is sufficient to bring a defendant into a

22  conspiracy, a single act.  Conspirators don't have to play

23  equal roles.  They don't have to play the same roles.  One act

24  can be enough.

25        And here you have numerous acts from Luperio Naranjo

1    that make him part of this scheme.  As Mr. Wible explained

2    Luperio Naranjo told Joaquin Pablo to tell investigators that

3    he makes $34 an hour.  Where did that number come from?  It's

4    the prevailing wage for work Pablo was doing.  That's one act.

5    He tells Criollo and Lojano to use the names Fabian Avila and

6    Franklin Chiriboga, two names that appear right next to each

7    other on a lot of the certified payrolls.

8          He tells Antonio Torres to use the name Luperio

9    Naranjo Jr., another name that appears on the certified

10   payrolls.  Each time a worker is interviewed on site, somehow

11   that worker appears on the certified payrolls for that week.

12   Why?  Because Luperio Naranjo makes sure that that information

13   is passed on to Jover Naranjo.

14         And of course, Luperio Naranjo knew that the

15   Department of Labor was investigating here.  He spoke with Luis

16   Bermudez on September 1 near the beginning of the project and

17   Bermudez told him Bermudez was with the Department of Labor.

18   Luperio Naranjo also spoke with the union representative.  And

19   when he saw the union representative handing out those sheets

20   with the prevailing wage on them, he told the workers to throw

21   them to the ground.  He knew exactly what was going on here.

22         And just one other point here, Mr. Burke spent some

23   time arguing that that Luperio Naranjo, he wasn't doing any

24   demolition and we were, the government was lingering on that in

25   some form of prejudice based on Luperio Naranjo's age.  That is

1    simply false.

2            The reason it matters that Luperio Naranjo wasn't

3    doing demolition is because the certified payrolls say that he

4    was.  They say he was doing demolition, and they say that

5    because people need to be listed on the certified payrolls or

6    otherwise, the government would wonder how the work is getting

7    done.  They weren't listing the real workers, so they had to

8    list people.  And one person they listed was Luperio Naranjo

9    saying he's doing demolition.  It matters that he wasn't doing

10   demolition because that's what the certified payrolls say he

11   was doing and it was a lie.

12           You heard Mr.  -- I just have two left.  You heard

13   Mr. Donaldson say that Jover Naranjo wasn't involved in any

14   sort of witness tampering.  What are some examples?  I'll just

15   give a couple.  Jover Naranjo told Angel Lojano to lie to the

16   Department of Labor and say he was only at the job site once

17   shoveling snow.

18           And Mr. Donaldson says, well, on cross examination

19   Lojano testified that Jover said there's nothing to be done.

20   But nothing that was said on cross examination by Angel Lojano

21   rebutted that he also told -- that he was also told by Jover

22   Naranjo to lie, and the lie he told to tell is perfectly

23   consistent with what's going on.

24           He's told to say I was shoveling snow and, in fact, it

25   is the winter when he's being told this.  It's not January.

1    And he's told to say he's only at the job site once because, of

2    course, he had been seen there by the very investigators who he

3    spoke with that Jover Naranjo was so concerned with.

4            Jover Naranjo also gave that document with the list of

5    addresses for the workers to Luis Bermudez in deliberate effort

6    to prevent the witnesses from being found, to prevent them from

7    ever testifying at any proceeding.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      MR. JACOBS:  Criollo was fired and the Luperio Naranjo

2  tells him to leave the state.  Pablo is given a fake check and

3  Jover Naranjo says this is to make it look like you were being

4  paid the prevailing wage or he says it's to make it look like

5  you were working for the company back in August on the job

6  site; I need paperwork to prove it.  Pauto is given that phony

7  declaration to sign, and he refuses to sign it and say that he

8  withdraws his name as an underpaid worker.  Of all of these are

9  examples of witness tampering.

10     Like I said, I don't have time here to address each of

11 the arguments you heard from defense counsel.  So with the

12 arguments I haven't addressed, simply look at the evidence.

13 The evidence answers all of those arguments.  But I do want to

14 say one last thing before I sit down.

15     The general idea from each of defense counsel is that

16 you should look at each little piece of evidence:  Look at it

17 in isolation; pick it apart.  But as you're evaluating the

18 evidence, look at what the evidence shows as a whole.  What

19 does the big picture here show.  It shows workers got paid $13

20 or $15 an hour on that job site.  They weren't paid the

21 prevailing wage.  To hide this, the certified payrolls were

22 loaded with lies.  The certified payrolls were Fed Exed from

23 the general contractor to the City.  Jover Naranjo admitted

24 what he did to Elizabeth Gingrich.  Jover Naranjo gave that

25 fake list of employees to Luis Bermudez.  Jover Naranjo gave

1    doctored checks to Lettire.  When Lojano didn't play along,

2    they fired him.  Jover Naranjo told him to lie.  When Criollo,

3    who happened to be Lojano's brother, they fired him too, and

4    Luperio said, "You should leave New York State."

5         This evidence, and all the other evidence you've seen

6    and heard, firmly establishes the defendant's guilt.  I want to

7    close by asking you to do the same three things I asked you to

8    do at the beginning of this trial:  Follow the law, apply the

9    evidence, use your common sense, and return a verdict of guilty

10   on all counts.

11            MR. JACOBS:  Thank you.

12            THE COURT:  Thank you very much.

13            Ladies and gentlemen, we are going to let you go have

14   your lunch now.  It's been preordered so you will have lunch in

15   the jury room.  I want to make sure that you understand you

16   should not begin your deliberations yet.  Do not discuss the

17   case among yourselves in any way, shape or form because there

18   is one thing still to come, which is my instructions of law.

19   Until you hear them, you must not deliberate on the case.  You

20   must not discuss anything you heard this morning.  You must not

21   discuss the evidence of the case.

22            So have a terrific lunch.  We will see you at 2:00.  I

23   will give you my instructions on the law, and then you will

24   start your deliberations.

25            (Jury excused)

dblgnar1

1          THE COURT:  Those were four very fine summations.  I

2     congratulate counsel on a job well done.  We will see you at

3     2:00.

4                         (Luncheon recess)

5                         AFTERNOON SESSION

6                              2:00 p.m.

7          (In open court; jury present)

8          THE COURT:  I'm giving my courtroom deputy copies of

9     the charge to distribute to the jury and also to the court

10    reporter and to counsel, and we will, in addition, mark one

11    copy as Court Exhibit 2 to be docketed.

12         Bring in the jury.

13         (Jury present)

14         THE COURT:  Ladies and gentlemen, you have now a copy

15    of my instructions.  We will read them together now and then

16    you will have them with you to take with you into the jury room

17    when you begin your deliberations.  If you look at the table of

18    contents, you will see that the instructions are divided into

19    three parts:

20         First, are the general instructions.  These

21    instructions apply not only to this case but to all cases.

22    Then there are the instructions that apply to more specific

23    charges of this case.  And then there are some concluding

24    instructions about how you fill out your verdict form and

25    things like that.

1          So let's begin with instruction number one.

2          We are now approaching the most important part of this

3    case, your deliberations.  You have heard all the evidence in

4    the case, as well as the final arguments of the lawyers for the

5    parties.  Before you retire to deliberate, it is my duty to

6    instruct you as to the law that will govern your deliberations.

7    As I told you at the start of this case, and as you agreed, it

8    is your duty to accept my instructions of law and apply them to

9    the facts as you determine them.

10         Regardless of any opinion you may have as to what the

11   law may be or ought to be, it is your sworn duty to follow the

12   law as I give it to you.  Also, if any attorney or other person

13   has stated a legal principle different from any that I state to

14   you in my instructions, it is my instructions that you must

15   follow.

16         Because my instructions cover many points, I have

17   provided each of you with a copy them, not only so that you can

18   follow them as I read them to you now, but also so that you can

19   have them with you for reference throughout your deliberations.

20   In listening to them now and reviewing them later, you should

21   not single out any particular instruction as alone stating the

22   law, but you should instead consider my instructions as a

23   whole.

24         Your duty is to decide the factual issues in the case

25   and arrive, if you can, at a verdict.  You, the members of the

1  jury, are the sole and exclusive judges of the facts.  You pass

2  upon the weight of the evidence; you determine the credibility

3  of the witnesses; you resolve such conflicts as there may be in

4  the testimony; and you draw whatever reasonable inferences you

5  decide to draw from the facts as you determine them.

6       In determining the facts, you must rely upon your own

7  recollection of the evidence.  To aid your recollection, we

8  will send you all of the exhibits at the start of your

9  deliberations, and if you need to review particular items of

10 testimony, we can arrange to provide them to you in transcript

11 or read-back form.

12      Please remember that none of what the lawyers have

13 said in their opening statements, in their closing arguments,

14 in their objections or in their questions is evidence.  Nor is

15 anything I may have said evidence.  The evidence before you

16 consists of just three things:  The testimony given by

17 witnesses that was received in evidence, the exhibits that were

18 received in evidence, and any stipulations of the parties that

19 were received in evidence.

20      Testimony consists of the answers that were given by

21 the witnesses to the questions that were permitted.  Please

22 remember that questions, although they may provide the context

23 for answers, are not themselves evidence; only answers are

24 evidence, and you should therefore disregard any question to

25 which I sustained an objection.  Also, you may not consider any

1    answer that I directed you to disregard or that I directed be

2    stricken from the record.  Likewise, you may not consider

3    anything you heard about the contents of any exhibit that was

4    not received in evidence.

5         Furthermore, you should be careful not to speculate

6    about matters not in evidence.  For example, there is no legal

7    requirement that the government prove its case through a

8    particular witness or by use of a particular law enforcement

9    technique.  Nor should you speculate about why one or another

10   person whose name may have figured in the evidence is not part

11   of this trial or what his or her situation may be.  Your focus

12   should be entirely on assessing the evidence that was presented

13   here for your consideration.

14        It is the duty of the attorney for each side of a case

15   to object when the other side offers testimony or other

16   evidence that the attorney believes is not properly admissible.

17   Counsel also have the right and duty to ask the Court to make

18   rulings of law and to request conferences at the side bar out

19   of the hearing of the jury.  All such questions of law must be

20   decided by me.  You should not show any prejudice against any

21   attorney or party because the attorney objected to the

22   admissibility of evidence or asked for a conference out of the

23   hearing of the jury or asked me for a ruling on the law.

24        I also ask you to draw no inference from my rulings or

25   from the fact that upon occasion I may have asked questions of

certain witnesses.  My rulings were no more than application of the law and my questions were intended only for clarification or to expedite matters.  You are to expressly understand that I have no opinion as to the verdict you should render in this case.

You are to perform your duty of finding the facts without bias or prejudice as to any party.  You are to perform your final duty in an attitude of complete fairness and impartiality.  You are not to be swayed by rhetoric or emotional appeals.

The fact that the prosecution is brought in the name of the United States of America entitles the government to no greater consideration than that accorded any other party.  By the same token, it is entitled to no less consideration.  All parties, whether the government or individuals, stand as equals at the bar of justice.

Please also be aware that the question of possible punishment is the province of the judge, not the jury, and therefore it should not in any way enter into or influence your deliberations.  Your duty is to weigh the evidence and not be affected by extraneous considerations.

It must be clear to you that if you were to let bias or prejudice or fear or sympathy or any other irrelevant consideration interfere with your thinking, there would be a risk that you would not arrive at a true and just verdict.  So

1   do not be guided by anything except clear thinking and calm

2   analysis of the evidence.

3          The two defendants here, Jover Naranjo and Luperio

4   Naranjo, Sr., are charged with several federal crimes about

5   which I will instruct you shortly.  Please bear in mind,

6   however, that the charges or counts, as they are called, are

7   not themselves evidence of anything.

8          The defendants have pleaded not guilty, and you must

9   consider the evidence against each of them individually.  To

10  prevail against a given defendant on a given charge, the

11  government must prove each essential element of that charge

12  beyond a reasonable doubt as to that defendant.  If the

13  government succeeds in meeting this burden, your verdict should

14  be guilty on that charge.  If it fails, your verdict should be

15  not guilty on that charge.  The burden never shifts to any

16  defendant for the simple reason that the law presumes a

17  defendant to be innocent and never imposes upon a defendant in

18  a criminal case the burden of or duty of calling any witness or

19  producing any evidence.

20         Since in order to convict a given defendant of a given

21  charge, the government is to prove that charge against that

22  defendant beyond a reasonable doubt.  The question then is what

23  is a reasonable doubt?  The words almost define themselves.  It

24  is a doubt based upon reason.  It is a doubt that a reasonable

25  person has after carefully weighing all the evidence.  It is a

1    doubt that would cause a reasonable person to hesitate to act

2    in a matter of importance in his or her personal life.  Proof

3    beyond a reasonable doubt must be, therefore, be proof of a

4    convincing character that a reasonable person would not

5    hesitate to rely upon in making an important decision.

6          A reasonable doubt is not caprice or whim.  It is not

7    speculation or suspicion.  It is not an excuse to avoid the

8    performance of an unpleasant duty.  The law does not require

9    that the government prove guilt beyond all possible or

10   imaginable doubt.  Proof beyond a reasonable doubt is

11   sufficient to convict.

12         If, after fair and impartial consideration of the

13   evidence, you have a reasonable doubt as to defendant's guilt

14   with respect to a particular charge against him, you must find

15   the defendant not guilty of that charge.  On the other hand,

16   if, after fair and impartial consideration of all the evidence,

17   you are satisfied beyond a reasonable doubt of a defendant's

18   guilt with respect to a particular charge against him, you

19   should not hesitate to find that defendant guilty of that

20   charge.

21         In deciding whether the government has met its burden

22   of proof, you may consider both direct evidence and

23   circumstantial evidence.

24         Direct evidence is evidence that proves a disputed

25   fact directly.  For example, where a witness testifies to what

1    he or she saw, heard or observed, that is called direct

2    evidence.

3            Circumstantial evidence is evidence that tends to

4    prove a disputed fact by proof other facts.  To give a simple

5    example, suppose that when you came into the courthouse today,

6    the sun was shining and it was a nice day, but the courtroom

7    blinds were drawn, and you could not look outside.  Then later,

8    as you were sitting here, someone walked in with a dripping wet

9    umbrella, and, soon after, somebody else walked in with a

10   dripping wet raincoat.  Now, on our assumed facts, you cannot

11   look outside the courtroom, and you cannot see whether it is

12   raining.  So you have no direct evidence of that fact.  But, on

13   the combination of the facts about the umbrella and the

14   raincoat, it would be reasonable for you to infer that it had

15   begun raining.

16           That is all there is to circumstantial evidence.

17   Using your reason and experience, you infer from established

18   facts the existence or the non-existence of some other fact.

19   Please note, however, that it is not a matter of speculation or

20   guess -- it is a matter of logical inference.

21           The law makes no distinction between direct and

22   circumstantial evidence.  Circumstantial evidence is of no more

23   or less value than direct evidence, and you may consider either

24   or both and may give them such weight as you conclude is

25   warranted.

1        It must be clear to you by now that counsel for the

2    government and counsel for the defendants are asking you to

3    draw very different conclusions about various factual issues in

4    the case.  Deciding these issues will involve making judgments

5    about the testimony of the witnesses you have listened to and

6    observed.  In making these judgments, you should carefully

7    scrutinize all the testimony of each witness, the circumstances

8    under which each witness testified, and any other matter in

9    evidence that may help you decide the truth and the importance

10   of each witness's testimony.

11       Your decision of whether to believe a witness may

12   depend on how that witness impressed you.  How did the witness

13   appear?  Was the witness candid, frank and forthright, or did

14   the witness seem to be evasive or suspect in some way?  How did

15   the way the witness testified on direct examination compare

16   with how the witness testified on cross-examination or in prior

17   testimony?  Was the witness consistent or contradictory?  Did

18   the witness appear to know what he or she was talking about?

19   Did the witness strike you as someone who was trying to report

20   his or her knowledge accurately?  These are examples of the

21   kinds of commonsense questions you should ask yourselves in

22   deciding whether a witness is, or is not, truthful.

23       How much you choose to believe a witness may also be

24   influenced by the witness's bias.  Does the witness have a

25   relationship with the government or a defendant that may affect

 1   how he or she testified?  Does the witness have some incentive,

 2   loyalty or motive that might cause him or her to shade the

 3   truth?  Does the witness have some bias, prejudice or hostility

 4   that may cause the witness to give you something other than a

 5   completely accurate account of the facts he or she testified

 6   to?

 7        In this regard, you have heard testimony from

 8   cooperating witnesses who testified that they have entered into

 9   agreements to cooperate with the government.  The law permits

10   the use of testimony from cooperating witnesses; indeed, such

11   testimony, if found truthful by you, may be sufficient in

12   itself to warrant conviction if it convinces you of a given

13   defendant's guilt beyond a reasonable doubt.  However, the law

14   requires that the testimony and motives of a cooperating

15   witness be scrutinized with particular care and caution.  After

16   carefully scrutinizing the testimony of a cooperating witness

17   and taking account of its special features, you may give it as

18   little or as much weight as you deem appropriate.

19        As to all witnesses, you should consider whether a

20   witness had an opportunity to observe the facts he or she

21   testified about.  Also, as to all witnesses, you should

22   consider whether the witness's recollection of the facts stands

23   up in light of the other evidence in the case.

24        In other words, for all witnesses, what you must try

25   to do in deciding credibility is to size up a person just as

1    you would in any important matter where you are trying to

2    decide if a person is truthful, straightforward and accurate in

3    his or her recollection.

4            The defendants did not testify in this case.  Under

5    our Constitution, a defendant has no obligation to testify or

6    to present any evidence, because it is the government's burden

7    to prove a defendant guilty beyond a reasonable doubt.  A

8    defendant is never required to prove that he or she is

9    innocent.

10           Therefore, you must not attach any significance to the

11   fact that the defendants did not testify.  No adverse inference

12   against the defendants may be drawn by you because they did not

13   take the witness stand, and you may not consider it against the

14   defendants in any way in your deliberations in the jury room.

15           With these preliminary instructions in mind, let us

16   now turn to the specific charges against the defendants Jover

17   Naranjo and Luperio Naranjo, Sr.  Count One charges the

18   defendants with conspiracy to commit mail fraud, but we will

19   first discuss Count Two which charges the defendants with the

20   substantive crime of mail fraud.

21           In order to convict a given defendant of mail fraud,

22   the government must prove beyond a reasonable doubt each of

23   three elements as to that defendant:

24           First, that the defendant devised a fraudulent scheme;

25           Second, that that defendant did so knowingly and

1    willfully and with a specific intent to defraud; and,

2              Third, that at least one mailing occurred in the

3    execution of that scheme.

4              As to the first element, a scheme to defraud is a plan

5    or design to obtain money or property by means of one or more

6    false or misleading statements of a material fact.  A statement

7    is false if it is an outright lie.  A statement is misleading

8    if it is true as far as it goes but creates a false impression

9    by omitting material information necessary to correct the false

10   impression.  A statement is material if it relates to a fact

11   that a reasonably prudent person would consider important in

12   making a decision to transfer money or property.

13             Here, specifically, the government alleges, and the

14   defendants deny, that defendants devised a scheme to obtain

15   payment under a federally funded demolition contract without

16   paying workers the required prevailing wage.  In this regard,

17   federal law requires that the workers employed on construction

18   projects, funded, at least in part, with federal money, must be

19   paid no less than the prevailing wage for similar workers in

20   the area, an amount determined by the U.S. Secretary of Labor.

21   Further, this law requires that contractors and subcontractors

22   on such projects submit weekly payroll statements with respect

23   to the wages and benefits paid to each employee.

24             As to the second element -- that the defendant you are

25   considering participated in the scheme knowingly and with a

1    specific intent to defraud -- to act knowingly means to act

2    consciously and deliberately rather than mistakenly or

3    inadvertently; but in this context, it also means that the

4    defendant had knowledge that he was participating in a

5    fraudulent scheme.  It is not enough that the defendant you are

6    considering may have participated in a fraudulent scheme

7    carelessly, negligently or otherwise unknowingly.  He must do

8    so knowingly.  Similarly, to act willfully, and with a specific

9    intent to defraud, requires that the given defendant you are

10   considering purposely intended to obtain payment under a

11   demolition contract without paying workers the required

12   prevailing wage.

13          As to the third element -- that in the execution of

14   the scheme to defraud at least one mailing was made (including

15   in this category not only U.S. mails but also private

16   interstate carriers like Federal Express) -- it is not

17   necessary that the use of the mails itself contained a

18   fraudulent representation; rather, it is sufficient if it was

19   used to further or assist in carrying out the scheme to defraud

20   in any respect.  Also, to cause the use of the mails, it is not

21   necessary for a given defendant to be directly or personally

22   involved in sending the mail, so long as the mailing was

23   reasonably foreseeable in the execution of the scheme to

24   defraud.  The mailing must, however, either come from or go to

25   somewhere in the Southern District of the New York.  In this

1  regard, I instruct you that Manhattan and the Bronx are within

2  the Southern District of New York.

3          In addition to the substantive mail fraud count, Count

4  Two, both defendants are also charged with conspiracy to commit

5  mail fraud, Count One.  In order for the defendants you are

6  considering to be guilty of conspiracy, the government must

7  prove beyond a reasonable doubt each of the following two

8  elements:

9          First, that such a conspiracy existed; and,

10          Second, that the defendant you are considering

11  knowingly and willfully joined the conspiratorial agreement and

12  thereby became a member of the conspiracy.

13          Starting with the first element, what is a conspiracy?

14  A conspiracy is an agreement, or an understanding, of two or

15  more persons to accomplish by concerted action one or more

16  unlawful purposes.  In this count, the unlawful purpose alleged

17  to be the object of the conspiracy is the mail fraud scheme

18  previously discussed.  The conspiracy alleged here is therefore

19  an agreement to commit the scheme to defraud as previously

20  described.  Also, please bear in mind that conspiracy is an

21  entirely distinct and separate offense from the actual mail

22  fraud.  The actual commission of the object of the conspiracy

23  is not an essential element of the crime of conspiracy.

24  Rather, the government is required to prove beyond a reasonable

25  doubt only two or more persons, in some way or manner,

1  explicitly or implicitly, came to an understanding to

2  accomplish the unlawful objective of mail fraud.

3          Further, while it is charged that the alleged

4  conspiracy to commit mail fraud began in or around August 2009

5  and continued up to in or around February 2010, it is not

6  essential that the government prove that the conspiracy started

7  and ended on those specific dates or that it existed throughout

8  that period.  Rather, it is sufficient to satisfy the first

9  element that you find that in fact a conspiracy was formed and

10 that it existed for any time within the charged period.

11         If you conclude that the government has proved beyond

12 a reasonable doubt that the charged conspiracy existed, you

13 must then consider the second essential element, which is that

14 the defendant you are considering intentionally joined and

15 participated in the conspiracy.  To prove this element, the

16 government must prove beyond a reasonable doubt that a given

17 defendant entered into the conspiracy to commit mail fraud and

18 did so knowingly and willfully.

19         To act knowingly means in this context to act

20 consciously and deliberately rather than mistakenly or

21 inadvertently; and to act willfully in this context means to

22 act voluntarily, purposely and with an intent to defraud.

23 Thus, a defendant enters into a conspiracy knowingly and

24 willfully if he joins the conspiracy deliberately, purposefully

25 and with an intent to defraud.

1          If you find beyond a reasonable doubt that the

2     defendant you are considering joined in the charged conspiracy

3     and did so knowingly and willfully, then the second element is

4     satisfied.

5          In this regard, it is not necessary that the defendant

6     be fully informed of all the details of the conspiracy in order

7     to justify an inference of participation on his part.  Nor does

8     the defendant need to know the full extent of the conspiracy or

9     all its participants.  It is not necessary that defendant

10    receive any monetary benefit from participating in the

11    conspiracy.  All that is necessary is proof beyond a reasonable

12    doubt that a defendant knowingly and willfully joined in the

13    conspiracy for purpose of furthering its unlawful purpose.

14         The defendant also need not have joined the conspiracy

15    at the outset.  The defendant may have joined it at any time in

16    its progress, and he will still be held responsible for what

17    was done before he joined, as well as what was done during his

18    participation in the conspiracy.  The law does not require that

19    each conspirator have an equal role in the conspiracy.  Even a

20    single act may be sufficient to draw a defendant within the

21    ambit of the conspiracy if it meets the essential requirements

22    I have described.

23         However, I want to caution you that the mere

24    association by one person with another person does not make

25    that first person a member of the conspiracy even when coupled

1    with knowledge that the second person is taking part in a

2    conspiracy.  Mere presence at the scene of a crime, even

3    coupled with the knowledge that a crime is taking place, is not

4    sufficient to support a conviction.  In other words, knowledge

5    without participation is not sufficient.  What is necessary is

6    that the defendant you are considering participated in the

7    conspiracy with knowledge of its unlawful purpose and with

8    intent to aid in the accomplishment of its unlawful purpose.

9           In short, in order to satisfy the second essential

10   element of the conspiracy charge, you must find beyond a

11   reasonable doubt that the defendant you are considering, with

12   an understanding of the unlawful character of the charged

13   conspiracy, knowingly and willfully joined and participated in

14   the conspiracy for the purpose of furthering its unlawful

15   object.

16          Finally, in addition to these two elements, you must

17   also find at least one act in furtherance of the conspiracy

18   occurred in the Southern District of New York.

19          Count Three charges both defendants with conspiracy to

20   commit witness tampering, and Count Four charges both

21   defendants with substantive witness tampering.  We will

22   consider the substantive offense first.

23          Count Four charges that the defendants instructed

24   Enviro & Demo Masters' employees to misrepresent their work

25   schedules, pay rates and/or identities to the U.S. Department

1  of Labor or to hide from the labor department's investigators,

2  after the defendants were aware that Enviro & Demo Masters was

3  under investigation for violating the prevailing wage laws.  In

4  order to sustain its burden of proof with respect to this

5  charge, the government must prove each of the following two

6  elements beyond a reasonable doubt:

7          First, that the defendant you are considering at

8  sometime between around December 2009 and around February 2010,

9  corruptly persuaded at least one employee to hide from the

10  labor department's investigators or to misrepresent the

11  employee's work schedule, pay rate and/or identity; and

12          Second, that the defendant did so knowingly and with

13  an intent to influence, delay or prevent the testimony of such

14  employee in an official proceeding.

15          As to the first element, corruptly persuaded means

16  persuading for an unlawful purpose.

17          As to the second element, an official proceeding

18  includes a labor department investigation.

19          In addition, the government must prove either that the

20  efforts to influence or prevent testimony occurred in the

21  Southern District of New York or that the official proceeding

22  was to be conducted in this district.

23          In addition to the witness tampering count, Count

24  Four, both defendants are also charged with a conspiracy to

25  commit witness tampering, Count Three.  In order for a given

1   defendant to be guilty of a conspiracy to commit witness

2   tampering, the government must prove beyond a reasonable doubt

3   the same elements of a conspiracy discussed above in

4   instruction number 10 concerning conspiracy to commit mail

5   fraud, except that here the object of the conspiracy must be

6   the witness tampering described in instruction number 11.

7          One defendant, Jover Naranjo, is also charged in Count

8   Five with making false statements to government agents.

9   Specifically, this count charges that between August 2009 and

10  February 2010, Jover Naranjo submitted false certified payroll

11  reports that misrepresented the identities of certain employees

12  working on the Ciena Project, the hours employees worked, and

13  the wages employees were paid.  In order to sustain its burden

14  of proof with respect to this charge, the government must prove

15  each of the following three elements beyond a reasonable doubt:

16         First, that at some point between August 2009 and

17  around February 2010, Jover Naranjo knowingly made a false

18  statement to a government agent in the Southern District of New

19  York;

20         Second, that Jover Naranjo knew that the statement was

21  false; and

22         Third, that the statement was material and related to

23  a matter within the jurisdiction of a department or agency of

24  the United States -- here, the Department of Labor.

25         As to the first element, the government need prove

1    only that a single false statement was made to a government

2    agent.  If such a false statement was made, and if it was made

3    in the Southern District of New York, that would satisfy the

4    first element.

5         As to the second element, the government must prove

6    that Jover Naranjo knew that the statement was false at the

7    time he made the statement.

8         As to the third element a statement is material if it

9    could have influenced a government agency's decision or

10   activities.  In this regard, it is not necessary that the

11   Department of Labor actually relied on the statement; rather,

12   it is sufficient if it reasonably could have relied on the

13   statement.  Moreover, a statement relates to a matter within

14   the Department of Labor's jurisdiction if it concerns an

15   authorized function of the department.  The statement need not

16   be made directly to the Department of Labor in order to relate

17   to a matter within its jurisdiction; it is sufficient that the

18   statement concerns an authorized function of the Department of

19   Labor.  Here, the Department of Labor is an agency of the

20   United States and its authorized functions include the

21   enforcement of federal laws concerning the payment of

22   prevailing wages.

23        Finally, both defendants are charged in Count Six with

24   aggravated identity theft.  Specifically, the government

25   alleges that each defendant used the personal identification

1    information of another person in order to commit one or more of

2    the crimes we have discussed.  To convict the defendant you are

3    considering on this charge, the government must prove beyond a

4    reasonable doubt each of the following three elements:

5           First, that the defendant you are considering

6    possessed the personal identification information of another

7    person, such as the person's name, Social Security number, date

8    of birth, driver's license, alien registration number,

9    government passport number, employer or taxpayer identification

10   number;

11          Second, that the defendant you are considering used

12   the information to help commit one or more of the substantive

13   mail fraud, mail fraud conspiracy or false statement offenses

14   discussed above; and

15          Third, that the defendant you are considering did so

16   knowingly and intentionally and without lawful authority.

17          As to the first element, the government must prove

18   both that a means of identification was that of an actual

19   person and that the defendant you are considering knew that the

20   means of identification was that of an actual person.

21          As to the second element, it is not necessary that you

22   find the means of identification was used, transferred or

23   possessed in furtherance of all the crimes of substantive mail

24   fraud, mail fraud conspiracy and false statements.  It is

25   sufficient if you find beyond a reasonable doubt that the

1    defendant you are considering used, transferred or possessed

2    the means of identification in connection with any one of those

3    three crimes.

4         Finally, as to the third element, a defendant acts

5    without lawful authority either when he uses a means of

6    identification without the consent or knowledge of the person

7    or when he uses the identification in furtherance of a crime

8    even with the person's consent.

9         You will shortly retire to the jury room to begin your

10   deliberations.  As soon as you get to the jury room, please

11   select one of your number as the foreperson to preside over

12   your deliberations and to serve as your spokesperson if you

13   need to communicate with the Court.

14        You will be bringing with you in the jury room a copy

15   of my instructions of law and a verdict form on which to record

16   your verdict.

17        Let me pause there for a minute, ladies and gentlemen,

18   and show you the verdict form.  It is a simple two-page

19   document, and for each count as to each defendant, you will

20   check the box guilty or not guilty.  So, there are altogether

21   six charges against Jover Naranjo and five against Luperio

22   Naranjo, so there will be eleven questions in all that you will

23   have to determine guilty or not guilty.

24        When you reach your verdict, your foreperson will sign

25   the verdict, date it, fold it and seal it in this envelope

1  cleverly marked "verdict" and that will be brought out here to

2  me and I will not open it until you are all back here in the

3  courtroom, and then it will be opened and read to you, and you

4  will be asked to individually affirm that that is your verdict.

5  The reason we go through all of those particulars is to be

6  absolutely sure that we have your verdict as you have reached

7  it.

8         So, let's go back to the instructions.

9         If you want any of the testimony provided, that can

10  also be done.  I'm sorry, I forgot to mention, in addition, we

11  will send into the jury room all the exhibits that were

12  admitted into evidence.  If you want any of the testimony

13  provided, that can also be done either in transcript or

14  read-back form, but please remember that it is not always easy

15  to locate what you might want, so be as specific as you

16  possibly can be in requesting portions of the testimony.

17         Any of your requests -- in fact, any communication

18  with the Court -- should be made to me in writing, signed by

19  your foreperson, and given to the marshal who will be available

20  outside the jury room throughout your deliberations.  After

21  consulting with counsel, I will respond to any question or

22  requests you have as promptly as possible, either in writing or

23  by having you return to the courtroom so that I can speak with

24  you in person.

25         You should not, however, tell me or anyone else how

1    the jury stands on any issue until you have reached your

2    verdict and recorded it on your verdict form.  As I have

3    already explained, the government to prevail on a given charge

4    against a given defendant must prove each essential element of

5    that charge as to that defendant beyond a reasonable doubt.  If

6    the government carries this burden, you should find the

7    defendant guilty of that charge.  Otherwise, you must find the

8    defendant not guilty of that charge.

9        Each of you must decide the case for yourself, after

10   consideration with your fellow jurors, of the evidence in the

11   case, and your verdict must be unanimous.  In deliberating,

12   bear in mind that while each juror is entitled to his or her

13   opinion, each should exchange views with his or her fellow

14   jurors.  That is the very purpose of jury deliberation -- to

15   discuss and consider the evidence, to listen to the arguments

16   of fellow jurors, to present your individual views, to consult

17   with one another, and to reach a verdict based solely and

18   wholly on the evidence.

19       If, after carefully considering all of the evidence

20   and the arguments of your fellow jurors, you entertain a

21   conscientious view that differs from the others, you are not to

22   yield your view simply because you are outnumbered.  However,

23   you should not hesitate to change your opinion which, after

24   discussion with your fellow jurors, now appears to you

25   erroneous.  In short, your verdict must reflect your individual

1    views, and must also be unanimous.

2            This completes my instructions of law.

3            All previous objections to the Court's charge are

4    deemed to have been remade at this time and to have been

5    denied.

6            Is there any other reason why counsel needs to

7    approach the side bar?

8            MR. JACOBS:  No, your Honor.

9            MR. DONALDSON:  No, your Honor.

10           MR. BURKE:  No, Judge.

11           THE COURT:  So, ladies and gentlemen, after you start

12   your deliberations, you will continue to go as long as you

13   need.  You can take as little or as long as you need to reach a

14   verdict, but if at 5:00 you haven't reached a verdict, you

15   should simply leave the jury room and go home, and come back at

16   9:00 a.m. tomorrow.  Whoever is your foreperson will be in

17   charge of making sure that you don't start your deliberations

18   again until all 12 of you are back in the jury room.

19           I say all 12, because at this point the one part of

20   this process I don't like is we have to excuse our alternate

21   juror.  However, you're not off the hook yet because if any

22   juror were, God forbid, to take sick, we would have to call you

23   back and start deliberations all again with you as one of the

24   regular jurors.  So, as a result of that, please do not discuss

25   the case even now, even after you are excused, with anyone.  My

1  courtroom deputy will contact you when the jury has reached a

2  verdict and the case is over, and then, of course, you are

3  free, but until then you are still on call.  With that, thank

4  you so much for your service, and if you would go back into the

5  jury room and get your belongings and leave before the rest of

6  the jury reenters, that would be appreciated.

7          (Alternate juror excused)

8          THE COURT:  I am handing the verdict form to my

9  courtroom deputy to give to the jury.  I will ask counsel to

10  get the exhibits ready to go in promptly after the jury is

11  excused.

12          So we will swear in the marshal.

13          (Marshal sworn)

14          THE DEPUTY CLERK:  Jurors, please follow the marshal.

15          (At 2:52 p.m. the jury retired to deliberate)

16          (Jury not present)

17          THE COURT:  Please be seated.

18          So, as soon as possible, the government should gather

19  the exhibits, show them to defense counsel to make sure

20  everything is correct, and then give them to my courtroom

21  deputy who will give them to the jury.  That needs to be done

22  extremely promptly.

23          As soon as that is over --

24          MR. JACOBS:  They're ready, Judge.

25          THE COURT:  Very good.  That qualifies as extremely

1    promptly.  In fact, even before I talk about anything else,

2    let's have my courtroom deputy take them back.

3            MR. JACOBS:  Judge, I will just say we offered defense

4    counsel the opportunity to look at them this morning.  I'm not

5    sure if they have, but if they would like to, they may before

6    they go back.

7            MR. BURKE:  We trust them, Judge.

8            MR. DONALDSON:  I have, yes, I think they're good.

9    They're trustworthy guys.

10           THE COURT:  Very good.

11           MR. JACOBS:  I also think I removed the exhibit list

12   that had been sitting on the top.  Let me just confirm I've

13   removed it.

14           THE COURT:  I have a bench trial that is under way

15   that is going to resume in approximately five minutes.  So you

16   will need to vacate those tables.  You can leave your stuff

17   there, but during the time the jury is deliberating, I want at

18   least one lawyer for each party to always be on this floor.

19   You don't have to be in the courtroom.  You can be out in the

20   hallway.  You cannot be on any other floor.  You cannot be

21   anywhere else but on this floor, and that's so that when the

22   jury sends in a note, we can immediately address the note and

23   not go looking for you.

24           If at 5:00 the jury has not reached a verdict, you

25   are, of course, free to leave, and we will see you again at

1    9:00 tomorrow morning.

2            Anything that counsel needs to raise with the Court?

3    Very good.  I will see you then.

4            (Recess pending verdict)

5            (In open court; jury not present)

6            (At 4:12 p.m. a note was received from the jury)

7            THE COURT:  We've received a note.  I'm going to mark

8    this jury note number 9, because although it's the first note

9    since the deliberations began, we have various notes from the

10   jurors.

11           It reads as follows:  As it relates to mail fraud, can

12   you explain the definition of "devised a fraudulent scheme"

13   perhaps through an explanation.

14           Being by nature a pedant, I can't help but note the

15   tautology between "can you explain" and "perhaps through an

16   explanation."

17           In any event, nevertheless, we want to help the jury.

18           So here is my proposed response, and then I will hear

19   from counsel.

20           To the jury:  Thank you for the note.  To "devise" a

21   fraudulent scheme means either to originate such a scheme or to

22   knowingly participate in such a scheme.

23           I think that's all that is necessary, but let's hear

24   from counsel.  I'll read it one more time.

25           To the jury:  Thank you for your note.  To devise a

1  fraudulent scheme means either to originate such a scheme or to

2  knowingly participate in such a scheme.

3          Any objections from the government?

4          MR. JACOBS:  No, your Honor.

5          THE COURT:  Any objections from defense counsel?

6          MR. DONALDSON:  Your Honor, my only issue with that is

7  that when you talk about the word devise, I could see where the

8  originate comes from, but when you say participate --

9          THE COURT:  Yes.  So, there's a history here which

10  goes back to 1872, so I perhaps have a little bit more

11  familiarity with it than you.

12          So the mail fraud statute was enacted in 1872, and

13  they used the term devise in the 19th century sense, but that

14  would be closer to originate than to participate.  But

15  subsequently through many decisions of both the Supreme Court

16  and lesser courts, it was brought in so that it became clear so

17  that anyone who joined a scheme in a sense, being similar to a

18  conspiracy, would be said to have helped devise it.  It's also

19  roughly comparable to an aider-and-abettor-type situation.  And

20  these cases mostly came up in the situation where someone who

21  was not themselves intent on fraud put together something that

22  acted as if it were a fraud, so-called constructive fraud, and

23  then someone else seeing the potential there joined.  And the

24  defense was raised, well, someone else devised the scheme, and

25  the answer was, no, that's not really the limit on the word

1   devise.  It is a given if you knowingly participate in the

2   scheme knowing it's a fraudulent scheme, then you can be said

3   to have helped devise it.

4         So that is sort of how the case law played out.  This

5   was mostly, as undoubtedly you know, between 1872 and 1909, and

6   it's briefly referred to in the obscure *Duquesne Law Review*

7   article Mail Fraud Statute (Part I) by some guy named Rakoff.

8         So, anyway, now that I really played pedant for a day,

9   that is how participation comes to be part of it.

10        So, any objection from defense counsel?

11        MR. DONALDSON:  With that, no.

12        MR. BURKE:  No.

13        THE COURT:  OK.  Very good.  So I will have my

14  courtroom deputy make a copy of this and docket it as Court

15  Exhibit 3 and have the original sent in to the jury just as

16  soon as she is done with it.

17        Thank you very much.

18        (Recess pending verdict)

19        (In open court; jury not present)

20        (At 5:11 p.m. a note was received from the jury)

21        THE COURT:  The defendants are not here.  Counsel were

22  about to leave, but we received from the jury as they were

23  leaving, a note dated -- I'm sorry, a note we've labeled jury

24  note 10.

25        "In the morning we would like the following

transcripts:  Antonio Torres, Angel Lejano, Pedro Pablo, Fausto
Criollo, Joaquin Pablo, Richard Campoverde, and Kleve Pauto."

I guess it should be Clever Pauta, but they forgot the
R.  I admire their decision in eliminating at least one or two
witnesses.

So, anyway, here is what you guys have to do before
tomorrow morning:  Obtain -- or you may already have it -- a
copy of the transcript.  You don't have to excise objections.
You have to excise any side bars.  They may already be excised.
If not, work with the court reporters to get a copy that
doesn't have the side bars.  I don't care about anything else.
Then we need to make 12 copies of each of these.  I will give
that privilege to the government.

So all that we need from defense counsel is to stick
around long enough so you can see the one copy of each of
these, and the government will need to take the steps
necessary.  Then before 9:00 tomorrow, just bring the entire
package -- you may need that cart again -- to my courtroom
deputy who will have them waiting for the jurors when they
arrive.  All right?

MR. DONALDSON:  Judge, in any instances where there is
an objection is sustained, move to strike.

THE COURT:  The jury has already heard from my
instructions that they are to disregard on that.  It's no
different seeing it in print than hearing it live.  They know

DblQnar4                    Deliberations

1    they are to disregard it.  To take that out will add many

2    hours, because it not only requires either you have to do it

3    through a black pencil or you have to wait until our court

4    reporters, who are busy doing other things, are available to do

5    it.

6         If, however, you want to do it, I don't want to

7    deprive you of that opportunity, but I'm not going to ask the

8    government to do that.  And I'm not going to ask Mr. Donaldson

9    to do that unless he wants to, but, Mr. Burke, if you want to

10   go through each and every one of those transcripts and

11   white-out or black-out any situation where there's objection

12   sustained or -- the number of cases involving an actual strike

13   was about two in the entire thing.

14        MR. DONALDSON:  To be quite frank, Judge, there is

15   really only one situation that I'm concerned about, and that's

16   on my brilliant cross-examination.

17        THE COURT:  That doesn't limit the field, does it?

18        MR. DONALDSON:  It sure does, where I bring out -- I'm

19   asking someone about their fake identity, and it's kind of a

20   run-on answer, and he says, "Oh I got that" -- I'm paraphrasing

21   now -- "I got that from Luperio Naranjo, Jr." or something to

22   that effect, and I object.

23        THE COURT:  That's fair enough.  If you want to find

24   that and white it out, and I will even ask the government to

25   help you white it out, but you have to find it.  Maybe you can

DblQnar4                    Deliberations

1    work with the court reporters downstairs.

2            MR. DONALDSON:  I have transcripts.  I think I can

3    probably find it in five minutes.

4            THE COURT:  That's fine.  I have no objection if

5    that's the only one you care about, it can be whited out.

6            MR. JACOBS:  Judge, could we also send the jury a note

7    indicating that Pedro Pablo was not a witness at the trial.

8    They've asked for seven individuals.  Six of them were

9    witnesses at trial.  Nobody named Pedro Pablo testified.  It's

10   Joaquin Pablo's brother.  There was some testimony was about

11   him, but he was not a witness.

12           THE COURT:  OK.  I will deal with that tomorrow

13   morning, but you will submit all the others, and then I'll send

14   in a note after running it by all of you at 9:00 a.m. that says

15   "Pedro Pablo was referred to in testimony, but he was not

16   himself a witness, so there is no transcript of his testimony."

17           I'm happy to do that.  I just don't want to take the

18   time now.  I just have ten minutes more before we move on to

19   another matter.  Thanks so much.

20                (Adjourned to November 22, 2013, at 9:00 a.m.)

21

22

23

24

25